**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MANZANITA BAND OF THE KUMEYAAY NATION, <br> 6 Old Mine Road <br> Boulevard, CA 91905, | Case No. _____ |
| CAMPO KUMEYAAY NATION, <br> 36190 Church Road, Suite 1 <br> Campo, CA 91906, | |
| EWIIAAPAAYP BAND OF KUMEYAAY INDIANS, <br> 4054 Willows Road <br> Alpine, CA 91901 | |
| IIPAY NATION OF SANTA YSABEL, <br> P.O. Box 130 <br> Schoolhouse Canyon Road <br> Santa Ysabel, CA 92070 | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| SYCUAN BAND OF THE KUMEYAAY NATION, <br> 1 Kwaaypaay Court <br> El Cajon, CA 92019 | |
| on behalf themselves <br> and on behalf of their members as *parens patriae,* | |
| JOHN ELLIOTT <br> P.O. Box 1122 <br> 19 Blackwood Road <br> Boulevard, CA 91905, and | |
| KUMEYAAY HERITAGE PRESERVATION COUNCIL, <br> 5663 Balboa Avenue, Suite 610 <br> San Diego, CA 92111 | |
| Plaintiffs, | |
| v. | |
| CHAD WOLF, in his official capacity as Under Secretary of Homeland Security for Strategy, Policy, and Plans, | |

MS 0445
2707 Martin Luther King Jr. Avenue SE
Washington, DC 20528-0525,

THE DEPARTMENT OF HOMELAND
SECURITY,
MS 0525
2707 Martin Luther King Jr. Avenue SE
Washington, DC 20528-0525,

MARK MORGAN, in his official capacity as
Senior Official Performing the Duties of the
Commissioner of United States Customs and
Border Protection,
1300 Pennsylvania Ave NW
Washington, DC 20229,

UNITED STATES CUSTOMS AND BORDER
PROTECTION,
1300 Pennsylvania Avenue NW
Washington, DC 20229,

TODD SEMONITE, in his official capacity as
Commanding General of the United States Army
Corps of Engineers,
441 G Street NW
Washington, DC 20314-1000, and

THE UNITED STATES ARMY CORPS OF
ENGINEERS,
441 G Street NW
Washington, DC 20314-1000

     Defendants.

## I.      NATURE OF THE ACTION

1.      The Kumeyaay people have, historically and to the present day, lived in what is

now California and Mexico, on both sides of the border imposed on the land by the United States

and Mexico in the mid-19th century.   Today, the Kumeyaay Nation is comprised of thirteen

federally-recognized Indian tribes occupying reservations in southern California, whose members

reside in both the United States and Mexico, and regularly travel back and forth for cultural, and

religious purposes, as the Kumeyaay people have historically done.  The Kumeyaay people, including members of the Plaintiff Tribes and individual Plaintiff, continue to practice their religion and maintain their culture as part of their daily life throughout their territory, including the border region on both sides, where sacred sites, trails, plants and medicines, and the landscape itself have sustained their people for hundreds of years.  The Plaintiff Kumeyaay Tribes are today all located in San Diego County, California.  They seek a declaratory judgment and injunctive relief to protect the Kumeyaay people's ability to practice their religious beliefs and cultural traditions at and across the border region, as they have done for hundreds of years, by preventing Defendants from constructing a trench, a 30-foot-high fence that extends from that trench, and its related infrastructure at the border, and within the region of the border relied on by the Kumeyaay people, until the Defendant Department of Homeland Security and its officials comply with federal law.  Specifically, the Religious Freedom Restoration Act ("RFRA") and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended ("IIRIRA"), require Defendants to consult with the Kumeyaay Tribes on how to avoid the unnecessary destruction and desecration of Kumeyaay religious and cultural sites, human remains, sacred and funerary objects, and the historical record of their culture that marks the landscape, before constructing, during construction, and while maintaining the border fence, and further require Defendants to implement the results of that consultation to protect the religious and cultural rights of the Kumeyaay people for that same period.

2. This action is made necessary by the failure of the Defendants, in designing and constructing a fence and related infrastructure at the U.S.-Mexico border, to consult with the Kumeyaay Tribes about how to avoid or minimize the destruction and desecration of locations and disruption of practices that are central to Kumeyaay religious life and practice.  The Defendants,

each of whom has failed to consult with the Kumeyaay Tribes, are: the Under Secretary of Homeland Security for Strategy, Policy, and Plans Chad Wolf, who is purporting to exercise the duties of the Acting Secretary of Homeland Security ("Defendant Wolf") but who has no legal authority to do so; the Department of Homeland Security ("DHS"); the Senior Official Performing the Duties of the Commissioner of United States Customs and Border Protection, Mark Morgan ("Commissioner"); the United States Customs and Border Protection ("CBP"); Commanding General of the United States Army Corps of Engineers Lieutenant General Todd Semonite ("Commanding General"); and the United States Army Corps of Engineers ("Corps") (collectively, "Defendants").

3.      Defendants' actions violate their obligations under IIRIRA and RFRA, the Kumeyaay people's rights under IIRIRA and RFRA, and the rights of the Kumeyaay people to the free exercise of religion under the First Amendment to the United States Constitution.  Defendants are therefore acting *ultra vires*, and Plaintiffs are entitled to declaratory and injunctive relief against them, that will protect the religious and cultural rights of the Plaintiff Kumeyaay Tribes and their members' rights to religious exercise, all of which are protected by federal law.

4.      In addition, because the Defendant Wolf has no legal authority to exercise the duties of the Secretary of Homeland Security, he cannot lawfully waive the application of other federal laws to the border fence project in eastern San Diego County and the border fence project in western Imperial County, and therefore the Defendants are acting arbitrarily, capriciously, contrary to law, and without observance of procedures required by law by failing to comply with the National Environmental Policy Act, the National Historic Preservation Act, the Endangered Species Act, the Native American Graves Protection and Repatriation Act, and the American

Indian Religious Freedom Act, and their actions must be reversed under the Administrative Procedure Act.

5.     Furthermore, the Defendant Wolf's purported waiver of the application of various federal laws to the border fence project in eastern San Diego County and the border fence project in western Imperial County violates the Free Exercise Clause of the First Amendment because by purporting to waive the application of the American Indian Religious Freedom Act and the Native American Graves Protection and Repatriation Act, the Defendant Wolf  has "impose[d] special disabilities on the basis of religious views or religious status," *Emp't Div. v. Smith,* 494 U.S. 872, 877 (1990) (citations omitted), with respect to Native American religions, but no other.  The Defendant Wolf is therefore acting arbitrarily, capriciously, contrary to law, and without observance of procedures required by law, and he induced Defendants DHS, CBP, Commissioner Morgan, the Corps, and Commanding General Semonite to rely on the purported waiver and themselves violate the law.

## II.     PARTIES

6.     The Plaintiff Manzanita Band of the Kumeyaay Nation ("Manzanita") is a federally-recognized Indian tribe, *see* Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 85 Fed. Reg. 5462, 5464 (Jan. 30, 2020) (listed as "Manzanita Band of Diegueno Mission Indians of the Manzanita Reservation, California"), with a governing body duly recognized by the Department of the Interior, and is a member of the Kumeyaay Nation.  The Manzanita Reservation is 4,752 acres, located just north of Live Oak Springs, California and the Campo Reservation, approximately ten miles north of the U.S.-Mexico border.  Most members of the Manzanita Band live on the Reservation and in and around the Kumeyaay Nation's aboriginal territory.

7.      The Plaintiff Campo Kumeyaay Nation ("Campo") is a federally-recognized Indian tribe, *see id.* at 5463 (listed as "Campo Band of Diegueno Mission Indians of the Campo Indian Reservation, California"), with a governing body duly recognized by the Department of the Interior, and is a member of the Kumeyaay Nation.  The Campo Reservation is 16,512 acres located around Live Oak Springs, Clover Flat, and Tierra del Sol, California.  The southern boundary of the Campo Reservation is located approximately 0.4 miles north of the U.S.-Mexico border.  Members of the Campo Kumeyaay Nation live on the Reservation, and in and around the Kumeyaay Nation's aboriginal territory.

8.      The Plaintiff Ewiiaapaayp Band of Kumeyaay Indians ("Ewiiaapaayp") is a federally-recognized Indian tribe, *see id.*, with a governing body duly recognized by the Department of the Interior, and is a member of the Kumeyaay Nation.  The main Ewiiaapaayp Reservation is approximately 4,102 acres, located southeast of Mount Laguna, California, approximately thirty miles north of the U.S.-Mexico border.  Most members of the Ewiiaapaayp Band live off-reservation in and around the Kumeyaay Nation's aboriginal territory.

9.      The Plaintiff Iipay Nation of Santa Ysabel ("Iipay") is a federally-recognized Indian tribe, *see id.*, with a governing body duly recognized by the Department of the Interior, and is a member of the Kumeyaay Nation.  The Santa Ysabel Reservation is approximately 15,526 acres, located near Santa Ysabel and Julian, California, approximately thirty-five miles north of the U.S.-Mexico border.  Most members of the Iipay Nation live on the reservation and in and around the Kumeyaay Nation's aboriginal territory.

10.     The Plaintiff Sycuan Band of the Kumeyaay Nation ("Sycuan") is a federally-recognized Indian tribe, *see id.*, with a governing body duly recognized by the Department of the Interior, and is a member of the Kumeyaay Nation.  The Sycuan Reservation is made up of

approximately 1,982 acres of land near Harbison Canyon and Crest, California, approximately twenty miles from the U.S.-Mexico border.  Most members of the Sycuan Band live in and around the Kumeyaay Nation's aboriginal territory.

11.     Plaintiffs Manzanita, Campo, Ewiiaapaayp, Iipay, and Sycuan (hereinafter "Plaintiff Kumeyaay Tribes") bring claims as *parens patriae* on behalf of their members, who are Kumeyaay Indians who practice traditional Kumeyaay culture and religion and who use areas near the projects for ceremonial purposes.

12.     John Elliott is a member of Manzanita, and a member of the Manzanita Executive Committee.  Mr. Elliott practices traditional Kumeyaay culture and religion and uses areas near the projects for ceremonial purposes, including traditional religious ceremonies and gathering plants and other materials used in ceremonies.  He has knowledge of sacred and cultural sites near the project sites, and the importance of the area to traditional Kumeyaay culture and religion.

13.     The Plaintiff Kumeyaay Heritage Preservation Council ("KHPC"), is an organization that represents nine federally-recognized tribes of the Kumeyaay Nation.  It is charged with protecting Kumeyaay religious and ceremonial life, the natural and cultural resources on which that life depends, and the culture of the Kumeyaay Tribes within their aboriginal territory.

14.     The Defendant Chad Wolf is the Under Secretary of Homeland Security for Strategy, Policy, and Plans.  The Defendant Wolf is unlawfully exercising the powers of the Acting Secretary of the Department of Homeland Security, which gives him de facto operational control over all activities of that Department.  The Defendant Wolf is sued in his official capacity as Under Secretary.

15.     The Defendant Department of Homeland Security is a Department of the United States Government tasked, *inter alia*, with overseeing the operations of the CBP and ensuring the

security of the United States' international borders, including overseeing construction of the border fence under IIRIRA.

16.     The Defendant Mark Morgan is the Senior Official Performing the Duties of the Commissioner of CBP.  As such, he has operational control over all activities of that agency.  He is sued in his official capacity.

17.     The Defendant United States Customs and Border Protection is an agency of the United States Government within DHS that is responsible for enforcing federal law regarding immigration on the United States' international border, including overseeing construction of the wall being constructed along the U.S.-Mexico border under IIRIRA.

18.     The Defendant Lieutenant General Todd Semonite is Chief of Engineers of the United States Army and the Commanding General of the Corps, with operational control over all activities of that agency, and is sued in his official capacity.

19.     The Defendant United States Army Corps of Engineers is an agency of the United States Government within the Department of Defense and Department of the Army that is responsible for constructing public works projects under the jurisdiction of the United States Government, including barriers being constructed along the U.S.-Mexico border under IIRIRA.

### III.     JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1362, because it is brought by federally-recognized Indian Tribes, and it seeks to protect and enforce rights held by those Tribes and their members under the First Amendment, IIRIRA, Pub. L. No. 104-208, div. C, tit. I, § 102(b)(1)(C)(i), 110 Stat. 3009, 3009–554 (codified as amended at 8 U.S.C. § 1103 note), RFRA, 42 U.S.C. § 20000bb-1(a), the American Indian Religious Freedom Act ("AIRFA"), 42 U.S.C. § 1996, and the Native American Graves Protection and Repatriation Act ("NAGPRA"), 25 U.S.C. §§ 3001-3013.

21.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because this action is brought against officers of the United States and agencies thereof acting in their official capacities, and defendants DHS, CBP, and Corps reside in this district.

## IV.     FACTUAL ALLEGATIONS

**A.     Background on the Kumeyaay Nation and Its Cultural and Religious Patrimony.**

22.     The Kumeyaay are the aboriginal people of the geographic area between the Pacific Ocean to the Colorado River and the San Luis Rey River south to Baja California and the Sea of Cortez.  For generations, the Kumeyaay have lived, worshipped, died, and been buried or cremated throughout this region on both sides of the present-day border.  Figure 1 below shows the Kumeyaay clans (Miskwis, Kwitark, Paipa, Hitlmawa, Kwainyi'l, Saiku'r, Oswai and Hilmiarp) that are known to have occupied the region where the border fence is proposed to be built.



Figure 1: Shimulls (Clans) of Southern Imperial and San Diego County (*Source:* Richard L. Carrico, *Clans & Shimulls/Sibs Of Western San Diego County* (2017)[1]).

23.     The region depicted in Figure 1 is home to significant Kumeyaay spiritual and cultural sites reflecting Plaintiffs' and Plaintiffs' members' deep and abiding ties to the area. During Spanish colonization, and after Mexico and then the United States gained control of what is now California and Mexico, the Kumeyaay Nation was subject to extreme discrimination and oppression and was forced to surrender direct control of much of their lands and settle on reservations in southern California.  However, members of the Kumeyaay Nation have never ceased practicing their religion and culture, and traveling for those purposes, on and off their reservations at historic, cultural, and religious sites in the United States and Mexico.

---

[1] *Available at* https://scahome.org/wp-content/uploads/2017/12/02-Carrico-Richard.pdf.

24.     Tecate, for example, is a Kumeyaay settlement, whose name means "knife or cut," which straddled what is now the U.S.-Mexico border.

25.     The Kumeyaay Boundary Mountain (Awi'hopil) is located in close proximity to, and in clear view of, the area where Defendants are constructing the border fence.  The mountain's southern flanks are within 650 to 780 feet of the border.  The peak of Boundary Mountain was a resting place for Kumeyaay and other native runners as they traveled from the mountains to the desert and also through the adjacent Jewell Valley and south into what is now Mexico.  The peak is also known to the Kumeyaay as Lookout Point because of the sweeping view of Kumeyaay territory offered from its summit.  Boundary Mountain is a sacred place to the Kumeyaay people.

26.     The Kumeyaay people's use and occupancy of this area is confirmed by an archaeological site, P-37-004466, comprised of a 40 to 50 meter area, which is located just 5 to 10 yards north of the border fence and southwest of Boundary Mountain.

27.     Jacumba Valley (Jacume/Hametaay) is a village site extending from its center near the Jacumba Hot Springs several miles in all directions, including south into what is now Mexico. Jacumba Valley is highly significant in Kumeyaay culture and religious practice, historically and to the present day.  Jacumba Valley extending from the north and across the international border is known in the Kumeyaay language as "Hametaay," meaning "pumpkin" or "pumpkin shaped," in reference to its landform. Jacumba itself probably means "bubbling" or "roiling water," in refence to the well-known hot springs there, which are associated with well-known archaeological sites that document the Kumeyaay people's use and occupancy of the Jacumba Valley.

28.     Jacumba Valley is the central location of a Kumeyaay origin story.  In that story, two brothers, Tuchaipai and Yokomatis, emerged from the ground at the base of a hill among the springs.  Kumeyaay traditionally believe that a hill at Jacumba is the house built by the two

brothers; to the south is a hot spring which represents the portal or the door to the house. Kumeyaay traditionally used water from the spring for bathing and its restorative powers. From the hill one can see Mokopá, an important landmark mountain several miles to the south in Mexico.

29.     Jacumba Valley, in San Diego County, contains the Jacumba Valley Archaeological District ("District"), which the Bureau of Land Management has determined is eligible for listing on the National Register of Historic Places ("NHRP"). The District covers a 4,222-acre area generally encompassing the northern half of the Jacumba Valley and provides evidence of the long occupation by the Kumeyaay of the area surrounding Jacumba, including the project site.   The District comprises 144 prehistoric archaeological sites, which include village sites, sacred and ceremonial sites, lithic scatters, earth ovens, and a 10,000-year-old stone hearth. The District includes other culturally significant sites such as plant gathering locales and trails. Portions of the District have been identified as ethnographically significant by Kumeyaay elders and non-tribal ethnographers. The District would be immediately adjacent to the border fence near Jacumba.

30.     The Jacumba Valley area, including the District, continues to be important for Kumeyaay religious and cultural practices. Kumeyaay collect juniper, white sage, greasewood, and jojoba in the area for use in ceremonies. An iron oxide scum that appears in some of the pooled ground water in the area is boiled to produce a brilliant red to orange pigment that is used for rock art and face painting, which are traditional elements of Kumeyaay religion and culture. Just south of Jacumba in Mexico is a ceremonial solstice site used by Kumeyaay people, named Rumerosa, which further evidences the importance of the area between Rumerosa and Jacumba where the project site is located.

31.     The Yuha Basin, in Imperial County, contains the Yuha Discontiguous Archaeological District, which was listed on the NRHP in 1981.  In 1977, the Imperial Valley College Museum surveyed the Yuha District, which produced the greatest concentration of pre-contact archaeological resources in southern California to that date.  These resources are a record of the prehistorical existence and lifeways of the Kumeyaay people, and the Yuha Basin and Discontiguous Archaeological District are connected by historic trails to other parts of the Kumeyaay homeland.

32.     Tecate Peak (Kuchamaa or 'Amatnuk'), is a mountain that straddles the U.S.-Mexico border, but rises and falls mostly within the United States.  Kuchamaa was placed on the NRHP in 1992.  The summit of Kuchamaa is one of the most important ceremonial locations and sacred sites in traditional Kumeyaay territory.  Religious leaders held ceremonies and dances at a secret place high on the mountain.  Kumeyaay healers traveled to the mountain to sing special healing songs, and initiation ceremonies were held there.  Leaders from other parts of the region, including as far as Baja California, traveled to the mountain for important ceremonial dances. Kumeyaay continue to visit Kuchamaa to this day to conduct ceremonies and religious practices on which their culture depends.  The role of Kuchamaa in the religion of the Kumeyaay people is analogous to the role of a cathedral or other house of worship that has endured for hundreds of years in Christian religion.  The Kumeyaay have strongly resisted attempts to develop portions of Kuchamaa, including plans to build electrical transmission lines across it and a park on top of it. Kumeyaay resistance led to these proposals being dropped.

33.     For generations, the Kumeyaay people have relied on an extensive system of trails to link their coastal villages with those of the eastern mountains and the desert.  Trail and travel corridors in proximity to the border, some of which cross the border, include the Jewell Valley

trail system, which is just north and east of Boundary Mountain. These trails link Jacumba to the In-ko-pah Gorges to the east and several villages to the north within what are now the Manzanita, Campo, and La Posta Indian Reservations. The trail complex also goes east to the Yuha Basin. Many of the recorded trails are associated with travel, trade, and procurement of resources. Other trails have a spiritual and sacred nature. Kumeyaay holy men and healers (kwesiyaay) used special trails to access meditation sites such as Kuchamaa, to travel to sacred springs, and to perform rituals that historically included painting images on rock faces.

34.     The extensive use by the Kumeyaay of the area, and its religious and cultural significance, is further demonstrated by the presence of human remains in the area where the border fence is proposed to be built. Probable human remains were found at the project site near Tierra del Sol by a forensic anthropologist from the San Diego County Medical Examiner's Office, who traveled to the proposed border fence site and concluded that faunal remains found during construction are likely human. Human remains were also found at site P-37-004281 (which is just north of the project site and southwest of Boundary Mountain) during construction of another segment of the border fence in west San Diego. Those remains were discovered at an extensive site that was previously undocumented. These human remains were not and are not treated by Defendants as subject to the requirements of NAGPRA.

35.     The treatment of human remains is especially important in Kumeyaay traditional religious belief. In Kumeyaay religion, a person's soul cannot rest in the afterlife if the parts of that person's body are separated from each other after death. The destruction or disturbance of human remains at Kumeyaay burial sites is therefore sacrilege and extremely distressing.

36.     Defendant CBP provides Kumeyaay people in Mexico special rights to cross the border in order to participate in Kumeyaay cultural and social activities upon presentation of a

letter of invitation from a Kumeyaay tribal government in the United States.  This recognition confirms the importance of the border region to all of the Kumeyaay people.

37.    Big horn sheep have special cultural significance to the Kumeyaay people.  The population of Peninsular big horn sheep in southeastern California are protected by the federal Endangered Species Act as an endangered species.  Big horn sheep live in small, fragmented communities that travel long distances across mountain terrains separated by broad valleys to seek sources of water, mate, and give birth.  Numerous communities of big horn sheep live on either side of the international border and travel back and forth, including populations in California that travel into Mexico for sources of water and to give birth.  As shown in Figure 2 below, construction of a new border fence in Imperial County between existing fence sections would disrupt a critical migration path for big horn sheep and cause irreparable harm to the health of the species.



Figure 2: *Peninsular Bighorn Sheep Range* (Source: Robert L. Peters et al., Defenders of Wildlife, *In the Shadow of the Wall: Part II Borderlands Conservation Hotspots on the Line*  10 (2018)[2]).

38.     The continuation of the religion and culture of the Kumeyaay people depends on their access to, and the availability of, the sacred sites, mountains, trails, landscape, and cultural and natural resources described in ¶¶ 22-37, *supra*.

---

[2]   *Available at*  https://defenders.org/sites/default/files/migration/docs/defenders-borderreport-partii.pdf.

**B.     The Border Fence**

38.     The CBP, under DHS's supervision, and the Corps are constructing new border

barrier projects in eastern San Diego County and western Imperial County, under authority given

to the Secretary of Homeland Security by Congress under IIRIRA.  These border barriers take the

form of a large metal fence approximately 30 feet in height.

39.     Section 102 of IIRIRA, as amended since it was passed in 1996, provides that:

> The Secretary of Homeland Security shall take such actions as may be necessary to
> install additional physical barriers and roads (including the removal of obstacles to
> detection of illegal entrants) in the vicinity of the United States border to deter
> illegal crossings in areas of high illegal entry into the United States.

*Id.* § 102(a) (codified at 8 U.S.C. § 1103 note).  IIRIRA further provides that, to carry out that

responsibility,

> the Secretary of Homeland Security shall construct reinforced fencing along not
> less than 700 miles of the southwest border where fencing would be most practical
> and effective and provide for the installation of additional physical barriers, roads,
> lighting, cameras, and sensors to gain operational control of the southwest border.

*Id.* § 102(b)(1)(A).

40.     Additionally, IIRIRA provides the Secretary of Homeland Security ("Secretary")

with limited authority to waive laws when necessary to expedite construction of "physical barriers

and roads" along the U.S.-Mexico border:

> Notwithstanding any other provision of law, the Secretary of Homeland Security
> shall have the authority to waive all legal requirements such Secretary, in such
> Secretary's sole discretion, determines necessary to ensure expeditious
> construction of the barriers and roads under this section.  Any such decision by the
> Secretary shall be effective upon being published in the Federal Register.

*Id.* § 102(c)(1).  IIRIRA does not explicitly refer to RFRA, nor does the Secretary have authority

to waive RFRA.

41.     In addition, the Free Exercise Clause of the First Amendment prohibits the

Secretary from "impos[ing] special disabilities on the basis of religious views or religious status,"

*Smith*, 494 U.S. at 877, and the protections of the First Amendment apply to Native American religions, as Congress made clear in enacting AIRFA.

42.     Section 102 of IIRIRA also requires that the Secretary "shall consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, *Indian tribes*, and property owners in the United States to minimize the impact on the environment, *culture*, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed." *Id.* § 102(b)(1)(C)(i) (emphasis added).  This provision is not waivable, has not been waived, and is still in effect and applicable to the exercise of authority under IIRIRA.

43.     IIRIRA's consultation provision must be read in harmony with its waiver provision. IIRIRA requires consultation with Indian tribes prior to the Secretary's exercise of his waiver authority to determine whether "minimiz[ing] the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed," *id.* § 102(b)(1)(C)(i), would affect the "expeditious construction of the barriers and roads under [Section 102]," *id.* § 102(c)(1), and if so, whether that effect can be avoided or mitigated, and the means by which that can be done.  That interpretation gives effect to both provisions.  It is also clear that IIRIRA does not authorize the Secretary to seek to minimize impacts by waiving laws that protect "the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed" without prior effective consultation concerning, *inter alia*, the impacts of such a waiver.  A waiver has no effect on impacts that § 102(c)(1)(C)(i) protects.

44.     IIRIRA does not waive any laws of its own force.  It permits the Secretary of Homeland Security – and only the Secretary – to waive legal requirements that the Secretary

"determines necessary to ensure expeditious construction of the barriers and roads under [Section 102]." *Id.* § 102(c)(1).  Such a waiver, if lawfully issued by the Secretary and consistent with IIRIRA, is only effective when published in the Federal Register.  *Id.*  Additionally, IIRIRA does not purport to preclude judicial review of its terms to determine their legality.  IIRIRA only limits judicial review of a decision by the Secretary of Homeland Security to waive "legal requirements" under Section 102(c)(1).  *See id.* § 102(c)(2)(A) (limiting jurisdiction over "all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to [Section 102(c)(1)]" to claims "alleging a violation of the Constitution"); *id.* § 102(c)(2)(B) (limiting time for filing claim "brought pursuant to [Section 102(c)(2)(A)]"); *id.* § 102(c)(2)(C) (limiting appellate jurisdiction over review of district court decision issued under Section 102(c)(2)).  If the Secretary has not waived legal requirements under Section 102(c)(1), then actions taken to comply with Section 102(b) are subject to judicial challenge under the provisions of federal law that apply to any other agency action.

45.     IIRIRA's consultation provision also requires consultation with Indian tribes prior to the construction of the border fence in order to "minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed."  *Id.* § 102(b)(1)(C)(i).  IIRIRA does not authorize the Secretary to begin construction without such consultation, and thus without being informed of the impacts of construction on "the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed."  *Id.*

46.     Donald J. Trump is currently President of the United States.  When he announced his campaign for President in June 2015, President Trump promised that:

I would do various things very quickly.

. . .

I would build a great wall, and nobody builds walls better than me, believe me, and I'll build them very inexpensively, I will build a great, great wall on our southern border.  And I will have Mexico pay for that wall.

*Full Text: Donald Trump Announces a Presidential Bid*, Wash. Post, June 16, 2015,

https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-

announces-a-presidential-bid.

47.     Later, speaking as a candidate during his campaign for President, President

Trump promised that:

I will build the greatest wall that you've ever seen. And I would never do this myself. But I hope it will be so – actually, it will even look great. I already know what it should look like.

. . .

I'm a great builder. What do I best in life, I build. Your infrastructure is crumbling. Isn't it nice to have a builder? A real builder. So you take precast plank. It comes 30 feet long, 40 feet long, 50 feet long. You see the highways where they can span 50, 60 feet, even longer than that, right? And do you a beautiful nice precast plank with beautiful everything. Just perfect. I want it to be so beautiful because maybe someday they'll call it The Trump Wall. Maybe. So I have to make sure it's beautiful, right? I'll be very proud of that wall. If they call at this The Trump Wall, it has to be beautiful. And you put that plank up and you dig your footings. And you put that plank up – there's no ladder going over that. If they ever go up there, they're in trouble, because [t]here's no way to get down. Maybe a rope.

Ian Schwartz, *Trump on Border: Maybe They'll Call It "The Trump Wall"*, RealClearPolitics,

Aug. 19, 2015, https://www.realclearpolitics.com/video/2015/08/19/trump_on_border_maybe_

theyll_call_it_the_trump_wall.html.

48.     On January 20, 2017, President Trump was inaugurated.  In his Inauguration

Address, President Trump stated: "We must protect our borders from the ravages of other countries

making our products, stealing our companies, and destroying our jobs. Protection will lead to great

prosperity and strength. . . . America will start winning again, winning like never before. . . . We

will bring back our borders." *The Inaugural Address*, White House, Jan. 20, 2017, https://www.whitehouse.gov/briefings-statements/the-inaugural-address/.

49.     On January 25, 2017, President Trump issued Executive Order 13,767, regarding the construction of the promised border wall. *See* Border Security and Immigration Enforcement Improvements, 82 Fed. Reg. 8793 (Jan. 25, 2017).  Relying on IIRIRA and other federal laws, Executive Order 13,767 stated "It is the policy of the executive branch to: (a) secure the southern border of the United States through the immediate construction of a physical wall on the southern border, monitored and supported by adequate personnel so as to prevent illegal immigration, drug and human trafficking, and acts of terrorism . . . ." *Id.* at 8793, § 2(a).  The Order clarified that "'Southern border' shall mean the contiguous land border between the United States and Mexico, including all points of entry," *id.* at 8794, § 3(b), and that "'[w]all' shall mean a contiguous, physical wall or other similarly secure, contiguous, and impassable physical barrier," *id.* § 3(e). The proposed border fence is such a "wall" as defined by Executive Order 13,767.

50.     Pursuant to IIRIRA and Executive Order 13,767, CBP began preparing to construct border barrier projects in eastern San Diego County and western Imperial County, California, in the Kumeyaay aboriginal territory.

51.     On March 16, 2020, CBP announced that it would be "constructing new border barrier projects in eastern San Diego County, California, within the U.S. Border Patrol San Diego Sector." *San Diego County Border Barrier Projects*, CBP, Mar. 16, 2020 (last modified Aug. 18, 2020),      https://www.cbp.gov/document/environmental-assessments/san-diego-county-border-barrier-projects ("San Diego Announcement"). On the same day, CBP announced that it would be "constructing new border barrier project [sic] in Imperial County, California, within the U.S. Border Patrol El Centro Sector." *Imperial County Border Barrier Project*, CBP, Mar. 16, 2020

(last modified Aug. 18, 2020), https://www.cbp.gov/document/environmental-assessments/imperial-county-border-barrier-project ("Imperial Announcement"). As CBP described in its announcements and later public documents requesting public comment on the projects, these projects would include the following: in San Diego County, constructing approximately 5 miles of totally new "steel bollard fencing" and replacing approximately 14 miles of existing barriers that no longer meet "operational needs," San Diego Announcement; and in Imperial County, "approximately 11 miles of new steel bollard fencing," Imperial Announcement. These new "border barriers" would be "new steel bollard fencing," made up of "30-foot steel bollards that are approximately 6" x 6" in diameter." San Diego Announcement; Imperial Announcement. Additionally, CBP announced that construction would include "the installation of a linear ground detection system, road construction or refurbishment, and the installation of lighting, which will be supported by grid power and include embedded cameras." *Id.* As shown in Figures 3 and 4 below, the proposed areas for construction of this border fence are near Kumeyaay tribal reservations and cut through the aboriginal territory of the Kumeyaay Nation.



Figure 3: *San Diego County Border Barrier Map* (Source: Open Letter from Paul Enriquez, Acquisition, Real Est. and Env't Dir., CBP (Apr. 1, 2020)[3]).

---

[3]     *Available     at*     https://www.cbp.gov/sites/default/files/assets/documents/2020-Apr/ FY20%20San%20Diego%20County%20Border%20Barrier%20Projects%20Request%20for%20 Input%20Extension_ENGLISH.pdf.



Figure 4: *Imperial County Border Barrier Map* (Source: Open Letter from Paul Enriquez, Acquisition, Real Est. and Env't Dir., CBP (Apr. 1, 2020)[4]).

52.     Simultaneously with CBP's first announcements of the proposed border fence construction in San Diego and Imperial Counties, the Defendant Wolf issued notices in the Federal Register, purporting to waive the application of certain laws to construction of the new border fence in San Diego and Imperial Counties pursuant to IIRIRA.  *See, e.g.*, Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 85 Fed. Reg. 14,958 (Mar. 16, 2020).  In the San Diego County notice, the Defendant

---

[4]     *Available     at     https://www.cbp.gov/sites/default/files/assets/documents/2020-Aug/FY20%20Imperial%20County%20Border%20Barrier%20Project%20Request%20for%20Input%20Extension_ENGLISH.pdf.

Wolf purported to waive applicability of the following laws, "including all federal, state, or other laws, regulations, and legal requirements of, deriving from, or related to the subject of, the following statutes, as amended":

> The National Environmental Policy Act (Pub. L. 91-190, 83 Stat. 852 (Jan. 1, 1970) (42 U.S.C. 4321 et seq.)); the Endangered Species Act (Pub. L. 93-205, 87 Stat. 884 (Dec. 28, 1973) (16 U.S.C. 1531 et seq.)); the Federal Water Pollution Control Act (commonly referred to as the Clean Water Act (33 U.S.C. 1251 et seq.)); the National Historic Preservation Act (Pub. L. 89-665, 80 Stat. 915 (Oct. 15, 1966), as amended, repealed, or replaced by Pub. L. 113-287 (Dec. 19, 2014) (formerly codified at 16 U.S.C. 470 et seq., now codified at 54 U.S.C. 100101 note and 54 U.S.C. 300101 et seq.)); the Migratory Bird Treaty Act (16 U.S.C. 703 et seq.); the Migratory Bird Conservation Act (16 U.S.C. 715 et seq.); the Clean Air Act (42 U.S.C. 7401 et seq.); the Archeological Resources Protection Act (Pub. L. 96-95 (16 U.S.C. 470aa et seq.)); the Paleontological Resources Preservation Act (16 U.S.C. 470aaa et seq.); the Federal Cave Resources Protection Act of 1988 (16 U.S.C. 4301 et seq.); the National Trails System Act (16 U.S.C. 1241 et seq.); the Safe Drinking Water Act (42 U.S.C. 300f et seq.); the Noise Control Act (42 U.S.C. 4901 et seq.); the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (42 U.S.C. 6901 et seq.); the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. 9601 et seq.); the Archaeological and Historic Preservation Act (Pub. L. 86-523, as amended, repealed, or replaced by Pub. L. 113-287 (Dec. 19, 2014) (formerly codified at 16 U.S.C. 469 et seq., now codified at 54 U.S.C. 312502 et seq.)); the Antiquities Act (formerly codified at 16 U.S.C. 431 et seq., now codified at 54 U.S.C. 320301 et seq.); the Historic Sites, Buildings, and Antiquities Act (formerly codified at 16 U.S.C. 461 et seq., now codified at 54 U.S.C. 3201-320303 & 320101-320106); the Farmland Protection Policy Act (7 U.S.C. 4201 et seq.); the Wilderness Act (Pub. L. 88-577 (16 U.S.C. 1131 et seq.)); the Federal Land Policy and Management Act (Pub L. 94-579 (43 U.S.C. 1701 et seq.)); National Fish and Wildlife Act of 1956 (Pub. L. 84-1024 (16 U.S.C. 742a, et seq.)); the Fish and Wildlife Coordination Act (Pub. L. 73-121 (16 U.S.C. 661 et seq.)); the Wild Horse and Burro Act (16 U.S.C. 1331 et seq.); the Administrative Procedure Act (5 U.S.C. 551 et seq.); the Eagle Protection Act (16 U.S.C. 668 et seq.); sections 102(29) and 103 of Title I of the California Desert Protection Act (Pub. L. 103-433); the Native American Graves Protection and Repatriation Act (25 U.S.C. 3001 et seq.); and the American Indian Religious Freedom Act (42 U.S.C. 1996).

*Id.* at 14,959-60. The Defendant Wolf did not have authority to issue a waiver under IIRIRA because he was not lawfully the Secretary of Homeland Security or lawfully exercising the powers and duties of that office. The Defendant Wolf did not purport to waive the requirements of RFRA,

nor could he have done so even if he was lawfully the Secretary of Homeland Security or lawfully exercising the powers and duties of that office, as IIRIRA does not give the Secretary of Homeland Security authority to waive the requirements of RFRA.

53.     By purporting to waive the Native American Graves Protection and Repatriation Act and the American Indian Religious Freedom Act, the Defendant Wolf "impose[d] special disabilities on the basis of religious views or religious status" of Native Americans in violation of the Free Exercise Clause of the First Amendment.  *See Smith*, 494 U.S. at 877 (citations omitted).

54.     Also on March 16, 2020, the Defendant Wolf issued another notice in the Federal Register, purporting to waive the application of certain laws to construction of the new border fence pursuant to IIRIRA in western Imperial County.  *See* Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 85 Fed. Reg. 14,960 (Mar. 16, 2020).  In that notice, the Defendant Wolf purported to waive applicability of the following laws, "including all federal, state, or other laws, regulations, and legal requirements of, deriving from, or related to the subject of, the following statutes, as amended":

> The National Environmental Policy Act (Pub. L. 91-190, 83 Stat. 852 (Jan. 1, 1970) (42 U.S.C. 4321 et seq.)); the Endangered Species Act (Pub. L. 93-205, 87 Stat. 884 (Dec. 28, 1973) (16 U.S.C. 1531 et seq.)); the Federal Water Pollution Control Act (commonly referred to as the Clean Water Act (33 U.S.C. 1251 et seq.)); the National Historic Preservation Act (Pub. L. 89-665, 80 Stat. 915 (Oct. 15, 1966), as amended, repealed, or replaced by Pub. L. 113-287 (Dec. 19, 2014) (formerly codified at 16 U.S.C. 470 et seq., now codified at 54 U.S.C. 100101 note and 54 U.S.C. 300101 et seq.)); the Migratory Bird Treaty Act (16 U.S.C. 703 et seq.); the Migratory Bird Conservation Act (16 U.S.C. 715 et seq.); the Clean Air Act (42 U.S.C. 7401 et seq.); the Archeological Resources Protection Act (Pub. L. 96-95, 93 Stat. 721 (Oct. 31, 1979) (16 U.S.C. 470aa et seq.)); the Paleontological Resources Preservation Act (16 U.S.C. 470aaa et seq.); the Federal Cave Resources Protection Act of 1988 (16 U.S.C. 4301 et seq.); the Safe Drinking Water Act (42 U.S.C. 300f et seq.); the Noise Control Act (42 U.S.C. 4901 et seq.); the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (42 U.S.C. 6901 et seq.); the Comprehensive Environmental Response,

Compensation, and Liability Act (42 U.S.C. 9601 et seq.); the Archaeological and
Historic Preservation Act (Pub. L. 86-523, 74 Stat. 220 (June 27, 1960)   as
amended, repealed, or replaced by Pub. L. 113-287, 128 Stat. 3094 (Dec. 19, 2014)
(formerly codified at 16 U.S.C. 469 et seq., now codified at 54 U.S.C. 312502 et
seq.)); the Antiquities Act (formerly codified at 16 U.S.C. 431 et seq., now codified
at 54 U.S.C. 320301 et seq.); the Historic Sites, Buildings, and Antiquities Act
(formerly codified at 16 U.S.C. 461 et seq., now codified at 54 U.S.C. 3201-320303
& 320101-320106); the Farmland Protection Policy Act (7 U.S.C. 4201 et seq.);
the Federal Land Policy and Management Act (Pub L. 94-579, 90 Stat. 2743 (Oct.
21, 1976) (43 U.S.C. 1701 et seq.)); National Fish and Wildlife Act of 1956 (Pub.
L. 84-1024, 70 Stat. 1119 (Aug. 8, 1956) (16 U.S.C. 742a, et seq.)); the Fish and
Wildlife Coordination Act (Pub. L. 73-121, 48 Stat. 401 (March 10, 1934) (16
U.S.C. 661 et seq.)); the National Trails System Act (16 U.S.C. 1241 et seq.); the
Administrative Procedure Act (5 U.S.C. 551 et seq.); the Wild Horse and Burro Act
(16 U.S.C. 1331 et seq.); the Eagle Protection Act (16 U.S.C. 668 et seq.); the
Native American Graves Protection and Repatriation Act (25 U.S.C. 3001 et seq.);
the American Indian Religious Freedom Act (42 U.S.C. 1996); the Wilderness Act
(Pub. L. 88-577, 78 Stat. 890 (Sept. 3, 1964) (16 U.S.C. 1131 et seq.)); and sections
102(29) and 103 of Title I of the California Desert Protection Act (Pub. L. 103-433,
108 Stat. 4471 (Oct. 31, 1994)).

*Id.* at 14,961.  The Defendant Wolf did not have authority to issue a waiver under IIRIRA because

he was not lawfully the Secretary of Homeland Security or lawfully exercising the powers and

duties of that office.  The Defendant Wolf did not purport to waive the requirements of RFRA, nor

could he have done so even if he was lawfully the Secretary of Homeland Security or lawfully

exercising the powers and duties of that office, as IIRIRA does not give the Secretary of Homeland

Security authority to waive the requirements of RFRA.[5]

55.     By purporting to waive the Native American Graves Protection and Repatriation

Act and the American Indian Religious Freedom Act, the Defendant Wolf "impose[d] special

disabilities on the basis of religious views or religious status" of Native Americans in violation of

the Free Exercise Clause of the First Amendment.  *See Smith*, 494 U.S. at 877 (citations omitted).

---

[5] Later, the Defendant Wolf also purported to waive requirements for federal contracting and
acquisitions for the Projects in both counties that are not at issue here.  *See* Determination Pursuant
to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as
Amended, 85 Fed. Reg. 28,658 (May 13, 2020).

56.     The Defendant Wolf took the actions described in ¶¶52-55, *supra*, without first consulting with Indian tribes, as required by Section 102 of IIRIRA, to "minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed," *id.* § 102(b)(1)(C)(i), and without first determining whether minimizing any such impacts would affect the "expeditious construction of the barriers and roads under [Section 102]," *id.* § 102(c)(1), and if so, whether that effect could be avoided or mitigated, and the means by which that can be done.

57.     RFRA "applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993." 42 U.S.C. § 2000bb-3(a).  Moreover, any "Federal statutory law adopted after November 16, 1993, is subject to [RFRA] unless such law explicitly excludes such application by reference to [RFRA]." *Id.* § 2000bb-3(b).

58.     Substantively, RFRA provides that:

**(a) In general**

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).

**(b) Exception**

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

*Id.* § 2000bb-1.  "Exercise of religion" includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.* § 2000bb-2(4) (incorporating by reference 42 U.S.C. § 2000cc-5(7)(A)).

### C. The Invalidity of the Appointment of the Defendant Wolf.

59.     The Senate of the United States has not confirmed the President's nomination of a Secretary of Homeland Security since it confirmed Kirstjen Nielsen on December 5, 2017. Secretary Nielsen resigned effective April 7, 2019, as a result of political and policy disagreements with President Trump and his advisors, including implementation of border security measures.

60.     The Secretary of Homeland Security is the head of an Executive Department and therefore subject to the Appointments Clause of the United States Constitution.  *See Fin. Oversight & Mgmt. Bd. v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1657 (2020).  The Appointments Clause provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law."  U.S. Const. art. II, § 2, cl. 2.

61.     When the office of Secretary of Homeland Security becomes vacant, but the Senate has not yet confirmed an appointee to fill the vacancy, the vacancy is filled under the terms of the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. §§ 3345-3349d, and the Homeland Security Act, 6 U.S.C. §§ 101-674.

62.     Congress enacted the FRVA as an exercise of its power, consistent with the Appointments Clause, to provide how offices subject to Presidential appointment and Senate confirmation might be filled by "Acting" officials when those offices become vacant.  The FVRA provides that

> [i]f an officer of an Executive agency (including the Executive Office of the President, and other than the Government Accountability Office) whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate, dies, resigns, or is otherwise unable to perform the functions and duties of the office—

> (1) the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity subject to the time limitations of section 3346 . . . .

5 U.S.C. § 3345(a).  The FVRA also provides that the President may designate other officials or officers to serve as an acting officer, subject to certain conditions not relevant here.  *Id.* § 3345(a)(2)-(3).  This statutory scheme is the "exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office," *id.* § 3347(a), *unless* "a statutory provision expressly . . . authorizes . . . the head of an Executive department, to designate an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity . . . ."  *Id.* § 3347(a)(1)(A).

63.     Before December 23, 2016, this provision of the FVRA was the sole authority that governed succession to the office of the Secretary of Homeland Security.  On December 9, 2016, the President exercised his Section 3345(a)(2)-(3) authority to designate an order of succession for the office of Secretary of Homeland Security in cases where the Secretary dies, resigns, or is otherwise unable to exercise the duties of the office.  *See* Executive Order 13,753, Amending the Order of Succession in the Department of Homeland Security, 81 Fed. Reg. 90,667 (Dec. 9, 2016).

64.     Executive Order 13,753 provides that, when there is a vacancy in the position of Secretary of Homeland Security, the following line of succession applies to determine who may serve as Acting Secretary:

(i)      Deputy Secretary of Homeland Security;
(ii)     Under Secretary for Management;
(iii)    Administrator for the Federal Emergency Management Agency [("FEMA")];
(iv)     Under Secretary for National Protection and Programs;
(v)      Under Secretary for Science and Technology;
(vi)     Under Secretary for Intelligence and Analysis;
(vii)    Commissioner of [CBP] . . . .

*Id.* at 90,667, § 1.  On December 15, 2016, former Secretary of Homeland Security Jeh Johnson issued a memorandum providing that the order of succession to the office of Secretary would be governed by Executive Order 13,753.  Since the issuance of Executive Order 13,753, federal law redesignated the position of the Under Secretary for National Protection and Programs as the Director of the Cybersecurity and Infrastructure Security Agency ("CISA").  *See* Cybersecurity and Infrastructure Security Agency Act of 2018, Pub. L. No. 115-278, § 2(a), 132 Stat. 4168, 4169 (codified at 6 U.S.C. § 652(a), (b)).

65.     On December 23, 2016, the Homeland Security Act was amended to allow the Secretary of the Department of Homeland Security to set a department-specific order of succession for vacancies in the position of Secretary of Homeland Security.  *See* National Defense Authorization Act for Fiscal Year 2017 ("2017 NDAA"), Pub. L. No. 114-328, tit. XIX, § 1903(a)(2), 130 Stat. 2000, 2672 (2016) (codified at 6 U.S.C. § 113(g)).  Specifically, the amended Homeland Security Act provides that "the Under Secretary for Management shall serve as the Acting Secretary if by reason of absence, disability, or vacancy in office, neither the Secretary nor Deputy Secretary is available to exercise the duties of the Office of the Secretary."  6 U.S.C. § 113(g)(1).  Further, "the Secretary may designate such other officers of the Department in further order of succession to serve as Acting Secretary."  *Id.* § 113(g)(2).  Section 113(g) provides that its order of succession provisions are "[n]otwithstanding chapter 33 of Title 5 . . . ." *Id.* § 113(g)(1), (2).  Chapter 33 of title 5 contains the FVRA and its general order of succession provisions.  5 U.S.C. § 3345.

66.     The Homeland Security Act does not purport to create an exception to any provision of the FVRA, nor does it retroactively invalidate any order of succession to the office of Secretary

of Homeland Security set under FVRA that existed at the time the Homeland Security Act was enacted.

67.    The Secretary of Homeland Security has, pursuant to the Secretary's authority under the Homeland Security Act, periodically amended former Secretary Johnson's memorandum to refine the order of succession.

68.    The FVRA provides that "[a]n action taken by any person who is not acting under section 3345, 3346, or 3347 . . . in the performance of any function or duty of a vacant office to which this section and sections 3346 [and] 3347 . . . apply shall have no force or effect."  *Id.* § 3348(d)(1).  Further, FVRA provides that "[a]n action that has no force or effect under [§ 3348(d)(1)] may not be ratified."  *Id.* § 3348(d)(2).  An "action" for purposes of Section 3348 is "any agency action as defined under [5 U.S.C. §] 551(13)," *id.* § 3348(a)(1), i.e., "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," *id.* § 551(13).  A "function or duty" means "any function or duty of the applicable office that" is established by statute or regulation and that is required by statute or regulation to be performed by the applicable officer, and only that officer.  *Id.* § 3348(a)(2).

69.    A person serving as Acting Secretary of Homeland Security pursuant to a secretarial delegation made under 6 U.S.C. § 113(g) is also serving pursuant to 5 U.S.C. § 3347, which expressly contemplates that executive officials may set orders of succession pursuant to other federal laws.

70.    As reported by Reuters, on January 6, 2019, President Trump explained to reporters that he preferred to rely on acting Cabinet officers, rather than seeking Senate appointment consistent with the process envisioned by the Constitution:

U.S. President Donald Trump said on Sunday he was in no hurry to find permanent replacements for one-quarter of his Cabinet currently serving in an acting capacity because it gives him "more flexibility."

"I am in no hurry," Trump told reporters as he departed for Camp David, the U.S. presidential retreat, for meetings on the partial government shutdown . . . .

"I like acting. It gives me more flexibility. Do you understand that? I like acting. So we have a few that are acting. We have a great, great Cabinet," Trump said. He did not elaborate on why they give him more flexibility.

Amanda Becker, *Trump Says Acting Cabinet Members Give Him 'More Flexibility'*, Reuters (Jan. 6, 2019 11:51 AM), https://www.reuters.com/article/us-usa-trump-cabinet/trump-says-acting-cabinet-members-give-him-more-flexibility-idUSKCN1P00IG.

71.    Again, in an interview on February 3, 2019, President Trump stated his preference to rely on acting officials, rather than seeking Senate appointment for cabinet officials:

MARGARET BRENNAN: . . .  you have an acting [Attorney General] until you get [then-nominee William] Barr confirmed--

PRESIDENT DONALD TRUMP: Yes.

MARGARET BRENNAN: An acting defense secretary. An acting chief of staff. An acting interior secretary.

PRESIDENT DONALD TRUMP. It's OK. It's easier to make moves when they're acting.

MARGARET BRENNAN: So you are going to shake up--

PRESIDENT DONALD TRUMP: Some, and some not.

MARGARET BRENNAN: --positions.

PRESIDENT DONALD TRUMP: Some are doing a fantastic job. Really- I like acting because I can move so quickly. It gives me more flexibility. But- but actually, some of the names you mentioned, they're doing a fantastic job.

*Transcript: President Trump on "Face the Nation," February 3, 2019*, CBS News (Feb. 3, 2019 7:31 AM), https://www.cbsnews.com/news/transcript-president-trump-on-face-the-nation-february-3-2019/.

72.     On April 7, 2019, Secretary Nielsen announced in a letter to the President that she was resigning as Secretary of Homeland Security, "effective April 7." *See* Letter from Kirstjen M. Nielsen, Sec'y of Homeland Sec., to Donald J. Trump, President of U.S. (Apr. 7, 2019), https://www.dhs.gov/sites/default/files/publications/19_0407_s1_nielsen-resignation-letter.pdf. At the time former Secretary Nielsen resigned on April 7, the position of Deputy Secretary was vacant.  However, the Senate-confirmed Under Secretary for Management—second in line after the Deputy Secretary—was in office.  Therefore, the Under Secretary became Acting Secretary on April 7 under the then-existing order of succession.

73.     Later the same day, President Trump publicly announced that Kevin McAleenan, then the Commissioner of CBP, would replace former Secretary Nielsen as Acting Secretary of Homeland Security, stating "I have confidence that Kevin will do a great job!" @realDonaldTrump,        Twitter        (Apr.        7,        2019        6:02        PM), https://twitter.com/realDonaldTrump/status/1115011885303312386.   This posting on social media was of no legal effect.

74.     At approximately 10:36 PM on April 7, despite having already resigned that day, former Secretary Nielsen announced that she had "agreed to stay on as Secretary through Wednesday, April 10th . . . ."   @SecNielsen, Twitter (Apr. 7, 2019 10:36 PM), https://twitter.com/SecNielsen/status/1115080823068332032.  This posting on social media was of no legal effect.

75.     On April 9, 2019, following President Trump's public statement and her own attempted retraction of her resignation, former Secretary Nielsen signed a memorandum which she and others purported would designate the Commissioner of CBP as her successor.   Former Secretary Nielsen was not legally serving as Secretary of Homeland Security at that time, and so the memorandum, to the extent it could have ever had any legal effect, was not the result of a decision or action by the Secretary of Homeland Security and was void, *ultra vires*, and without any legal force or effect.

76.     The next day, April 10, 2019, former Secretary Nielsen purported to exercise the Secretary's authority under 6 U.S.C. § 113(g)(2) to revise the line of succession to the office of Secretary, which was an action taken in the performance of a function or duty that the Homeland Security Act designates be performed only by the Secretary.   Ex. 1, *DHS Orders of Succession and Delegations of Authorities for Named Positions*, DHS Delegation No. 00106, Revision No. 08.5 (Apr. 10, 2019) ("Purported April 10 Delegation").[6]   The purported revision amended the existing memorandum issued by former Secretary Johnson.

77.     In Section II.A of the Purported April 10 Delegation, former Secretary Nielsen provided that, in the case of the Secretary's death, resignation, or inability to perform the functions of the office, the succession to the Secretary's office would be governed by Executive Order 13,753.   That is, the Purported April 10 Delegation left the existing order of succession in place in the case of the Secretary's death, resignation, or inability to perform the functions of the office. So, former Secretary Nielsen was not legally serving as Secretary of Homeland Security on April 10, and the Purported April 10 Delegation was not made by a decision or action by the Secretary

---

[6] The Purported April 10 Delegation contained annexes not relevant to the claims in this case, which are not included in Exhibit 1.

of Homeland Security and is void, *ultra vires*, without any legal force or effect, and cannot be ratified. *See* 5 U.S.C. § 3348(d)(1)-(2). However, the order of succession the Purported April 10 Delegation outlined for the Secretary's resignation, death, or inability to perform the functions of the office <u>was</u> in effect, albeit under Executive Order 13,753 and prior revised delegations that incorporated it by reference.

78. The same day she issued the Purported April 10 Delegation, former Secretary Nielsen purported to resign again. The position of Deputy Secretary remained vacant. At the same time former Secretary Nielsen purported to resign, the Senate-confirmed Under Secretary for Management resigned, leaving vacant that position and the position of Acting Secretary. Additionally, the position of Administrator for FEMA – next in line under Executive Order 13,753 after the Under Secretary for Management – was also vacant. However, at that time, the position of Director of CISA – that is, the former "Under Secretary for National Protection and Programs" named as fourth in the line of succession in Executive Order 13,753 – was occupied by an official who had been confirmed to that position by the Senate.

79. Under Executive Order 13,753 and the Purported April 10 Delegation, the Director of CISA was <u>fourth</u> in the line of succession, and the Commissioner of CBP was <u>seventh</u> in the order of succession. Therefore, the Director of CISA should have become Acting Secretary instead of the Commissioner of CBP. However, DHS instead determined the Commissioner of CBP should serve as Acting Secretary.

80. At that time, the Commissioner of CBP was Kevin McAleenan. McAleenan purported to be Acting Secretary starting on April 10, 2019 while continuing to hold the position of Commissioner of CBP.

81.     President Trump never nominated McAleenan to serve as Secretary of Homeland Security, and the Senate never confirmed him to that position.  As such, McAleenan only exercised the authority of the Acting Secretary to the extent permitted by the FVRA, the Homeland Security Act, and Executive Order 13,753.  Because none of these authorities allowed him to become Acting Secretary in the event of former Secretary Nielsen's resignation, McAleenan's actions taken to exercise the functions or duties of the Secretary were not taken as the result of a decision or action by the Secretary of Homeland Security and are void, *ultra vires*, of no force or effect, and cannot be ratified.  *See* 5 U.S.C. § 3348(d)(1)-(2); *Lucia v. SEC*, 138 S. Ct. 2044, 2055 (2018); *NLRB v. Noel Canning*, 573 U.S. 513 (2014); *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952).

82.     On November 1, 2019, the Associated Press reported that President Trump made the following comment to reporters:

> President Donald Trump said Chad Wolf, a longtime Homeland Security official, would be the new acting head of the department, the fifth person in the job for this administration.

> But Trump's casual announcement, made Friday in response to a reporter's question outside the White House, temporarily created more uncertainty about who was in charge of the sprawling agency.

> Weeks of speculation focused on who would be named the next leader, and Kevin McAleenan, the current acting secretary, had agreed to stay on temporarily. The department initially would not confirm Wolf was next in line, saying only that McAleenan was acting secretary.

> When a reporter asked Trump directly whether Wolf was to be the next DHS secretary, the president responded, "He's acting, and we'll see what happens."

Jill Colvin & Colleen Long, *Correction: Homeland Security Secretary Story*, Associated Press (updated Nov. 3, 2019), https://apnews.com/3d88f6f2ced042b6a1033f6f4f77a8f2.  The statement by the President was of no legal effect, either to determine who was serving as Acting Secretary on November 1 or who would serve in that position in the future.

83.     On November 8, 2019, McAleenan purported to revise the Purported April 10 Delegation.  Ex. 2, *Amendment to the Order of Succession for the Secretary of Homeland Security* (Nov. 8, 2019) ("Purported Revised Delegation").  That was an action taken in the performance of a function or duty that the Homeland Security Act designates be performed only by the Secretary. The Purported Revised Delegation purported to change the order of succession to the position of Secretary of Homeland Security in the event of the Secretary's death, resignation, or inability to perform the functions of the office, as follows:

1) Deputy Secretary of Homeland Security
2) Under Secretary for Management
3) Commissioner of CBP
4) Under Secretary for Strategy, Policy, and Plans

Because McAleenan was not legally holding the office of Acting Secretary under the order of succession imposed by the Homeland Security Act and Executive Order 13,753, the Purported Revised Delegation was void, *ultra vires*, of no force and effect, and cannot be ratified.  *See* 5 U.S.C. § 3348(d)(1)-(2).

84.     At the time McAleenan issued the Purported Revised Delegation, there was no Senate-confirmed Under Secretary for Strategy, Policy, and Plans.  The Defendant Wolf was at that point the Assistant Secretary of Homeland Security for Strategy, Plans, Analysis, and Risk, and was serving as Acting Under Secretary of Homeland Security for Strategy, Policy, and Plans.

85.     On November 13, 2019, McAleenan resigned his position as Commissioner of CBP.  When he resigned, the positions of Secretary, Deputy Secretary, Under Secretary for Management, Commissioner of CBP, and Administrator of FEMA were all vacant.  However, the position of Director of CISA – that is, the former "Under Secretary for National Protection and Programs" named as fourth in the line of succession in Executive Order 13,753 – was still filled by a Senate-confirmed official.

86.     On the day that McAleenan resigned, the Defendant Wolf ascended to the position of Under Secretary of Homeland Security for Strategy, Policy, and Plans pursuant to Senate confirmation of his appointment to that position.  The position of Under Secretary for Strategy, Policy, and Plans was created by legislation after Executive Order 13,753 was issued.  *See* 2017 NDAA, tit. XIX, § 1902(a) (codified at 6 U.S.C. § 349).  The order of succession provided by Executive Order 13,753 does not designate the Under Secretary for Strategy, Policy, and Plans as an officer who can serve as Acting Secretary.

87.     Relying on the invalid Purported Revised Delegation, DHS determined on November 13, 2019 that the Defendant Wolf would become Acting Secretary.  The Defendant Wolf has purported to continue to exercise the authority of that office ever since.  The Defendant Wolf has never been confirmed by the Senate to hold the office of Secretary of Homeland Security.

88.     Because the Defendant Wolf has not legally held the office of Acting Secretary under the order of succession imposed by the clear and mandatory language of the FVRA and Homeland Security Act and under Executive Order 13,753, any action he has taken in the performance of a function or duty as purported Acting Secretary was not the result of an action or decision of the Secretary and is void, *ultra vires*, of no force and effect, and cannot be ratified.  *See* 5 U.S.C. § 3348(d)(1)-(2).  That includes the purported waivers under IIRIRA that Defendant Wolf issued on March 16, 2020, which purported to waive the National Environmental Policy Act ("NEPA"), the National Historic Preservation Act ("NHPA"), the Endangered Species Act ("ESA"), the Administrative Procedure Act ("APA"), NAGPRA, and AIRFA, among others, *see* ¶¶ 52, 54, *supra*, since those actions are taken in the performance of a function or duty that IIRIRA designates be performed only by the Secretary of Homeland Security.  Those purported waivers were not issued as a result of an action or decision made by the Secretary of Homeland Security

under IIRIRA § 102(c)(1), and are void, *ultra vires*, of no force and effect, and cannot be ratified, *see* 5 U.S.C. § 3348(d)(1)-(2).

89.     On August 14, 2020, the Government Accountability Office ("GAO") issued a report in which it determined that McAleenan and the Defendant Wolf did not have authority to act as Secretary of Homeland Security under the FVRA, the Homeland Security Act, the Purported April 10 Delegation, and Executive Order 13,753.  *See* U.S. Gov't Accountability Office, *Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security* (Aug. 14, 2020), https://www.gao.gov/assets/710/708830.pdf.

90.     In response to that report, Defendant DHS, through its "Senior Official Performing the Duties of the General Counsel," sent a letter to the GAO's General Counsel, demanding that the GAO retract its report. *See* Letter from Chad Mizelle, Senior Official Performing Duties of Gen. Counsel, DHS, to Thomas Armstrong, Gen. Counsel, GAO (Aug. 17, 2020), https://www.dhs.gov/sites/default/files/publications/20_0817_ogc_gao-as1-succession-response.pdf.  As shown by the text of the letter, the Defendant DHS's position is that McAleenan and the Defendant Wolf validly ascended to the position of Acting Secretary pursuant to delegations issued under the Homeland Security Act.  That position is without legal merit, for the reasons set forth in ¶¶ 60-88, *supra*, and as determined by the United States District Court for the District of Maryland in its recent decision in *Casa de Maryland, Inc. v. Wolf*, No. 8:20-cv-02118-PX, 2020 WL 5500165 (D. Md. Sept. 11, 2020).

**D.      Threats to the Plaintiffs' Religious and Cultural Resources and Practices Posed by Border Fence Construction**

91.     Construction of the new border fence segments involves substantial ground-disturbing activities, including trenching for placement of the wall, road construction for

temporary and permanent access roads, and clearing land for ancillary facilities.  Such activities, if undertaken in, on, or around Kumeyaay cultural and religious sites on and around the U.S.-Mexico border, including those described in ¶¶ 24-33, *supra*, would severely damage or destroy those sites by physical destruction or damage, or by desecration, or by physical destruction or damage of the natural setting in which such sites are found, or by physical destruction or damage to natural resources on which the sacred nature of such sites depends.  In addition, the cumulative effect of the activities undertaken to construct the new border fence compounds their impact on the religion and culture of the Kumeyaay people, including Plaintiff Elliott.

92.     Kumeyaay tribal members have also been prevented from monitoring ground disturbing activity in order to identify possible cremation sites and engage in appropriate religious practices required upon the discovery of such cremation cites..

93.     Despite this risk and disruption to Kumeyaay religion and culture, and the consultation and mitigation obligations imposed by IIRIRA, the Secretary of Homeland Security did not adequately consult with Kumeyaay Tribes about how to avoid cultural or religious sites or mitigate harm to those sites prior to beginning construction, nor has the Secretary of Homeland Security done so since beginning construction.

94.     DHS first announced plans to construct new border barriers in eastern San Diego County and western Imperial County in 2018.  When those plans were announced, Plaintiff Manzanita insisted by written letter that it should be consulted before construction could begin.  But the Plaintiff Kumeyaay Tribes were never consulted during the development of the projects or development of any waiver of legal requirements that applied to those projects.

95.     CBP first sent letters requesting comment to the Plaintiff Kumeyaay Tribes and other stakeholders on March 16, 2020 – the day that the Defendant Wolf purported to waive

application of legal requirements to the projects in eastern San Diego County and western Imperial County.

96.     On May 7, 2020, CBP held a "tribal coordinating briefing" with Plaintiff Campo in which it provided information about what CBP planned to do but did not engage in meaningful consultation about the effects that construction might have.  CBP held another briefing on May 8, 2020 that was not attended by any tribes, and so no consultation occurred at that briefing, either.

97.     On June 16, 2020, after construction had begun, CBP conducted another coordination briefing that was attended by Plaintiffs Campo and Manzanita, and one other Kumeyaay tribe.  CBP provided information to the Plaintiffs about what it was planning to do but did not engage in meaningful consultation about what effects construction might have.  The Plaintiffs emphasized that CBP did not have sufficient information about the effects of construction and that tribal monitoring was required.  CBP also said it was "developing" a plan for communicating with Tribes, but the plan was not finalized.  Construction continued despite the Plaintiffs' concerns and the lack of a tribal communication plan.

98.     On July 7, 2020, CBP conducted a conference call that was attended by Plaintiff Manzanita and another Kumeyaay tribe.  Plaintiff Manzanita raised the fact that suspected human remains had been found during construction, but that construction was ongoing, and tribal monitoring was not sufficient.  Plaintiff Manzanita and the other tribe on the call also requested a site visit to an area where CBP planned to engage in blasting as part of construction.

99.     The site visit that was requested on July 7, 2020, occurred on July 9, 2020, and included representatives of Plaintiff Manzanita and another Kumeyaay tribe.  During the visit, tribal representatives found what appeared to be human remains near the project area.  This indicates that human remains are likely to be located in and around the project area.  However,

CBP downplayed the discovery because it occurred outside of the precise project footprint and refused to stop construction or alter construction plans. CBP took no other action in response to this discovery, and more specifically took no action in anticipation of the discovery of human remains in the precise project footprint.

100.    On July 31, 2020, tribal representatives, accompanied by a forensic anthropologist, visited the site where human bone had been found on July 1, 2020. Near the site, the forensic anthropologist identified what he determined was likely cremated human remains. Again, CBP dismissed this discovery because it was not within the precise project footprint. CBP took no other action in response to this discovery, and more specifically took no action in anticipation of the discovery of human remains in the precise project footprint.

101.    In these and other ways, CBP repeatedly refused to acknowledge tribal requests that, based on repeated discoveries of human remains and other artifacts around the project area, there should be additional surveying and cultural monitoring to prevent or minimize impacts to human remains and Kumeyaay culture and religion. Construction never stopped during this period to allow for consultation on the discoveries or how to accommodate tribal concerns.

102.    On August 3, 2020 Plaintiffs Manzanita, Campo, Ewiiaapaayp, and KHPC, along with other Kumeyaay tribes, sent the Defendants Wolf, Commissioner Morgan, and Commanding General Semonite a letter dated July 31, 2020, in which they demanded that Defendants: stop all ground disturbing activities in San Diego County until all impacts on Kumeyaay religious beliefs, practices, and cultural resources had been fully evaluated and provide adequate access to the Project sites by tribal monitors. The Tribes also demanded Defendants consult with the Tribes by providing information about the Project plans and schedule, a completed Environmental Stewardship Plan ("ESP") as required by federal law, and cultural resource studies completed since

2010, by receiving and accepting comments from Kumeyaay representatives on the requested documents, and meeting with Kumeyaay representatives to discuss these matters.  They also demanded Defendants take concrete actions to avoid and mitigate impacts to cultural and religious resources.  The Tribes proposed a specific timeline for completing the consultation and limiting the delay of the projects. Letter from Angela Elliott Santos, Chairwoman, Manzanita Band of Kumeyaay Nation et al., to Chad F. Wolf, Acting Sec'y, DHS et al. (July 31, 2020).  The aforementioned Plaintiffs' attempts to initiate consultation did not, however, result in meaningful consultation on the effects of the projects on Kumeyaay culture and religion.

103.    On August 6, 2020, Plaintiff Manzanita called the CBP official that had been acting as the CBP contact with Tribes on border fence matters, requesting consultation and a temporary stop to border fence construction, including a videoconference between tribal leaders and federal government officials to discuss the tribes' position on border fence construction.  Plaintiff Manzanita also asked for a response to the July 31, 2020 letter.  *See* Letter from Angela Elliott Santos, Chairwoman, Manzanita Band of Kumeyaay Nation, to Paul Enriquez, Acquisitions, Real Estate & Envtl. Dir., Border Wall Project Mgmt. Off., CBP (Aug. 10, 2020).

104.    On August 17, 2020, CBP informed Plaintiff Manzanita by letter that a "response to your letter is being finalized, and I anticipate that you will receive it soon."  Letter from Paul Enriquez, Dir., Acquisition, Real Estate & Envtl., Infrastructure Portfolio, Program Mgmt. Office Directorate, CBP, to Angela Elliott Santos, Chairwoman, Manzanita Band of Kumeyaay Nation (Aug. 17, 2020).

105.    On August 17, 2020, Plaintiff Manzanita sent a letter to Defendants Wolf, Commissioner Morgan, and Commanding General Semonite, requesting a response to the Plaintiffs' July 31, 2020 letter.  *See* Letter from Angela Elliott Santos, Chairwoman, Manzanita

44

Band of Kumeyaay Nation, to Chad F. Wolf, Acting Sec'y, DHS et al. (Aug. 17, 2020).  On August 21, 2020, Plaintiff Manzanita sent a substantially similar letter to Defendants Wolf, Commissioner Morgan, and Commanding General Semonite, repeating the request and noting the urgency of the matter.  *See* Letter from Angela Elliott Santos, Chairwoman, Manzanita Band of Kumeyaay Nation, to Chad F. Wolf, Acting Sec'y, DHS et al. (Aug. 21, 2020).

106.    The evening of August 24, 2020, Plaintiff Manzanita received by email a letter from CBP dated August 20, 2020, in which CBP purported to respond to the Plaintiff Kumeyaay Tribes' letter of July 31, 2020.  *See* Letter from Aaron M. Heitke, Chief Patrol Agent, CBP, San Diego Sector, to Angela Elliott Santos, Chairwoman, Manzanita Band of Kumeyaay Nation (Aug. 20, 2020).  The letter, which was not from Defendants Wolf, Commissioner Morgan, or Commanding General Semonite, stated that the project in San Diego County was being carried out under an IIRIRA waiver but CBP "is committed to responsible environmental stewardship."  *Id.* at 1.  However, the letter noted that an ESP had not been completed and refused to stop construction activities.  The letter made only vague promises to continue "to engage in ongoing dialogue with tribal leadership and members to address concerns to the greatest extent possible."  *Id.* at 3.  CBP also said it had hosted conference calls with representatives of the Kumeyaay Nation in May and June of the year and hosted with the Corps a site visit of the Project on July 9, 2020.  *See* ¶¶ 96-99, *supra*.

107.    CBP hosted a call with the Tribes on August 28, 2020, in which it discussed some of their cultural surveying efforts in San Diego.  However, CBP continued construction on the border wall during this time, and at the call made clear that there were insufficient monitors available to oversee all construction activities.

108.   CBP has held periodic calls with tribal representatives since August 28.  However, CBP has not sought the Tribes' views on mitigating or avoiding impacts on Kumeyaay cultural resources, nor has it altered its construction plans in response to tribal comments on such matters. Furthermore, construction is ongoing with insufficient monitoring and funding for monitoring. Participation in the consultation by the Kumeyaay Tribes is therefore contingent on their accepting the destruction of the Plaintiffs' religious and cultural patrimony as a result of the uninterrupted continuation of construction.

109.   The Plaintiffs' access to the site is necessary to advise Defendants of possible damage to sites or of the import of sites, artifacts, or remains that earthmoving uncovers.  The access that CBP has allowed the Plaintiffs for those purposes has been severely and unnecessarily limited and is inadequate.  Among other failings in providing effective access, CBP has agreed to fund only a small number of tribal monitors who will be present to oversee construction.  In a letter dated July 26, 2020 CBP committed to funding tribal monitors for only approximately forty-five total days of 10 person-hours each.  Since then, CBP has represented to tribal monitors that they do not have funding to pay for monitoring in Imperial County unless the agency reduces monitoring in San Diego County, and that CBP only has funding for monitoring through October 3, 2020.

110.   CBP's environmental resources contractor, Cogstone, initially only retained one tribal monitor per day to monitor construction activities, which is inadequate for the purpose of monitoring impacts on Tribal religious and cultural rights and resources.  Later, Cogstone increased the number of tribal monitors to three, but that number is also inadequate.  For example, other recent major earth disturbing infrastructure projects in San Diego County in Kumeyaay aboriginal territory have employed ten to twenty tribal monitors.

111.    Plaintiffs have not been advised about the scope and location of all ground disturbing activity related to border fence construction.  Additionally, Plaintiffs have not been given the opportunity to review soils at all work areas, which must be done ahead of, during, and after all ground disturbances to determine if cultural resources will be, are, or have been affected and, if so, how such affects can be minimized.  Nor have Defendants developed basic protocols with the Plaintiffs for appropriate mitigation of impacts to Kumeyaay cultural and religious resources.

112.    Defendants have also failed to provide Plaintiffs with an adequate opportunity to remove, safeguard, and repatriate all cultural articles in accordance with Kumeyaay religious practices.

113.    This lack of consultation on impacts and their mitigation violates IIRIRA and RFRA, and the Defendants' actions to implement IIRIRA without complying with its consultation requirements and RFRA are *ultra vires*.

114.    Despite the lack of a full evaluation of the effect of border fence construction on Kumeyaay religious and cultural resources, and the lack of consultation with Kumeyaay people on how to avoid or minimize such impacts, construction is ongoing.  Thus, if the Secretary affords Plaintiffs the opportunity to engage in consultation without halting construction, that opportunity will be wholly ineffective and inadequate because the Kumeyaay people's religious and cultural patrimony will be destroyed, with respect to certain items irreparably, by the ongoing construction activities at the same time they are consulting, and because they will be unable to access sites that construction has made physically inaccessible.  This process makes a mockery of IIRIRA's consultation requirement, and unlawfully conditions the right of consultation on continuation of construction and therefore on the denial and forfeiture of Kumeyaay rights to practice Kumeyaay

religion in the Project areas, to protect religious and cultural resources in the Project areas, to gather plants in the Project areas for religious and ceremonial purposes, and to access sacred sites in the Project areas.  That is intolerable and places a substantial burden on Kumeyaay religious practice in violation of RFRA.  Thus, the Defendants' actions in implementing border fence construction under IIRIRA are *ultra vire*s.

**E.  Defendants Have Not Complied with Their Responsibility to Evaluate the Effects of Border Fence Construction Under NEPA, the NHPA, the ESA, NAGPRA, and AIRFA.**

115.    In his March 16, 2020 waivers, the Defendant Wolf purported to waive the application of NEPA, the NHPA, the ESA, NAGPRA, and AIRFA to the construction of the border fence in eastern San Diego County and western Imperial County.  Because his waivers were ineffective, void, and *ultra vires*, these statutes still apply.

116.    NEPA is implemented by regulations promulgated by the Council on Environmental Quality.  *See* 40 C.F.R. pts. 1500-1508.  The regulations in place when this Project was initiated, and that therefore apply to it under NEPA, provide that NEPA governs proposed "major federal actions" such as a federal construction project.  *See* 40 C.F.R. §§ 1508.18, 1508.18(b)(4) ("major federal actions" to which NEPA applies include major actions "which are potentially subject to [f]ederal control," such as "[a]pproval of specific projects, such as construction or management activities located in a defined geographic area").  The construction of the border fence in eastern San Diego County is a "major federal action."  The construction of the border fence in western Imperial County is a "major federal action."

117.    Before approving such actions, federal officials must take a "hard look" at the proposed environmental impacts of the proposed action and proposed alternatives to the proposed action and provide a full and fair discussion of significant environmental impacts of the project.

42 U.S.C. § 4332(C)(i)-(iii); 40 C.F.R. §§ 1502.1, 1508.8, 1508.11.  Additionally, when a proposed federal action would have a primary impact on the natural environment, then the agency may consider secondary socio-economic effects from the project.  *See Coal. of Concerned Citizens v. FTA*, 843 F.3d 886, 905 (10th Cir. 2016) (citing *Cure Land, LLC v. U.S. Dep't of Agric.*, 833 F.3d 1223, 1235 n.10 (10th Cir. 2016)); *see also Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 761 (2004).

118.    When a project could affect Indian tribes, a "hard look" includes reviewing a project in light of principles of environmental justice, under which an agency should address the "disproportionately high and adverse human health or environmental effects" its actions have "on minority populations and low-income populations," including Indian tribes.  Exec. Order No. 12,898, § 1-101, 59 Fed. Reg. 7629 (Feb. 16, 1994).  Environmental justice recognizes that human activities often have disproportionately negative effects on the resources, health, and welfare of historically disadvantaged populations.  *Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004); *see Latin Ams. for Soc. & Econ. Dev. v. Adm'r of FHA*, 756 F.3d 447, 465 (6th Cir. 2014); *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 232 (5th Cir. 2006)). Under principles of environmental justice, mitigation measures "should reflect the needs and preferences of . . . Indian tribes to the extent practicable."  Council on Envtl. Quality, Exec. Office of President, *Environmental Justice: Guidance Under the National Environmental Policy Act* 16 (1997).[7]

119.    To comply with NEPA and evaluate potential impacts, a responsible agency "shall integrate the NEPA process with other planning at the earliest possible time . . . ."  40 C.F.R. § 1501.2.    The agency first prepares an environmental assessment of the proposed project,

---

[7] https://www.epa.gov/sites/production/files/2015-02/documents/ej_guidance_nepa_ceq1297.pdf.

determining whether there will be no significant impacts from the project, or whether further environmental study is required in an environmental impact statement. *Id.* § 1501.3 (incorporating *id.* § 1508.9).

120.    If the agency determines that it is proper to prepare an environmental impact statement, the agency must engage in a scoping process to determine the environmental impacts to be reviewed, *id.* §§ 1501.4(d), 1501.7, in which it must invite the participation of any affected Indian tribe, *id.* § 1501.7(a)(1).  It must then prepare an environmental impact statement, *id.* pt. 1502, which should, *inter alia*, describe the purpose and need of the proposed action and alternatives, *id.* § 1502.13, "[r]igorously explore and objectively evaluate all reasonable alternatives" to the proposed project, *id.* § 1502.14(a), "[i]nclude the alternative of no action," *id.* § 1502.14(d), "[i]nclude appropriate mitigation measures not already included in the proposed action or alternatives," *id.* § 1502.14(f), and "describe the environment of the area(s) to be affected," *id.* § 1502.15.  It must then describe, *inter alia*, the environmental consequences of the project, including direct and indirect effects, *id.* § 1502.16(a)-(b) (incorporating *id.* § 1508.8), the environmental effects of alternatives, *id.* § 1502.16(d), and "historic and cultural resources," *id.* § 1502.16(g).

121.    Defendants have not complied with any of these requirements of NEPA in their planning or construction of the border fence in eastern San Diego County and western Imperial County.

122.    The NHPA protects "historic properties," which means "any prehistoric or historic district, site, building, structure, or object included on, or eligible for inclusion on, the National Register [of Historic Places], including artifacts, records, and material remains relating to the district, site, building, structure, or object."  54 U.S.C. § 300308.  The National Register of Historic

Places is a registry of "districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, engineering, and culture" maintained by the Secretary of the Interior. *Id.* § 302101 (incorporated by reference by *id.* § 300311). A historic site is eligible for listing on the Register when it

> possess[es] integrity of location, design, setting, materials, workmanship, feeling, and association and
>
> (a) that are associated with events that have made a significant contribution to the broad patterns of our history; or
>
> (b) that are associated with the lives of persons significant in our past; or
>
> (c) that embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or
>
> (d) that have yielded, or may be likely to yield, information important in prehistory or history.

36 C.F.R. § 60.4.

123.    The NHPA requires that the head of each federal agency "assume responsibility for the preservation of historic property that is owned or controlled by the agency," 54 U.S.C. § 306101(a)(1), and ensure "the preservation of property not under the jurisdiction or control of the agency but potentially affected by agency actions is given full consideration in planning," *id.* § 306102(b)(3). Additionally,

> [t]he head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, shall take into account the effect of the undertaking on any historic property. The head of the Federal agency shall afford the [Advisory] Council [on Historic Preservation ("ACHP")] a reasonable opportunity to comment with regard to the undertaking.

54 U.S.C. § 306108; *see* 36 C.F.R. § 800.1(a).  This process of taking such effects into account is known as the "Section 106 Process."

124.    An "undertaking" for NHPA purposes is "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency."  36 C.F.R. § 800.16(y).  Construction of the border fence in eastern San Diego County is a federal undertaking.  Construction of the border fence in western Imperial County is a federal undertaking.

125.    Agencies "<u>must complete the section 106 process 'prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license,</u>'" *id.* § 800.1(c) (citing 54 U.S.C. § 306108) (emphasis added), and must ensure "that the section 106 process is initiated early in the undertaking's planning, so that a broad range of alternatives may be considered during the planning process for the undertaking," *id.*

126.    Additionally, under NHPA, the agency must "consult with any Indian tribe . . . that attaches religious and cultural significance to historic properties that may be affected by an undertaking."  *Id.* § 800.2(c)(2)(ii); *see id.* § 800.6(a).

127.    The agency must determine whether or not historic properties would be affected by a federal undertaking and support that determination with "sufficient documentation to enable any reviewing parties to understand its basis."  *Id.* § 800.11(a).  If an agency determines historic properties will not be affected, the documentation the agency must provide includes:

> (1) A description of the undertaking, specifying the Federal involvement, and its area of potential effects, including photographs, maps, drawings, as necessary;

> (2) A description of the steps taken to identify historic properties . . . ; and

> (3) The basis for determining that no historic properties are present or affected.

*Id.* § 800.11(d).  If the agency determines historic properties will be affected, the documentation the agency must provide includes:

(1) A description of the undertaking, specifying the Federal involvement, and its area of potential effects, including photographs, maps, and drawings, as necessary;

(2) A description of the steps taken to identify historic properties;

(3) A description of the affected historic properties, including information on the characteristics that qualify them for the National Register;

(4) A description of the undertaking's effects on historic properties;

(5) An explanation of why the criteria of adverse effect were found applicable or inapplicable, including any conditions or future actions to avoid, minimize or mitigate adverse effects; and

(6) Copies or summaries of any views provided by consulting parties and the public.

*Id.* § 800.11(e).

128.    The agency must then consult with tribal and state historic preservation officers, as well as other consulting parties that the agency may have invited to participate, and develop a memorandum of agreement with those parties to describe how adverse effects to historic properties will be resolved, *id.* § 800.6(b), and that will "govern the undertaking and all of its parts," *id.* § 800.6(c).

129.    When the potential effects on historic properties cannot be fully determined prior to the approval of a federal undertaking, the agency may negotiate a programmatic agreement to "govern the implementation of a particular program or the resolution of adverse effects from certain complex project situations or multiple undertakings." *Id.* § 800.14(b), (b)(1)(ii).  As with memorandums of agreement, programmatic agreements must be agreed to by the agency, appropriate state and tribal historic preservation officers.  *Id.* § 800.14(b)(2)(iii).  Development of the programmatic agreement must include consultation with affected Indian tribes, *id.* § 800.14(f), and the responsible agency must provide summaries of the affected tribes' views to the ACHP, *id.* § 800.14(f)(2).

130.    Defendants have not complied with any of these requirements of the NHPA in their planning and actions to construct the border fence in eastern San Diego County and western Imperial County.

131.    The ESA prohibits anyone under the jurisdiction of the United States from taking an "endangered species" of fish or wildlife within the United States, or violating any regulation pertaining to an endangered or species listed as "threatened."  16 U.S.C. § 1538(a)(1)(B), (G).

132.    "Endangered species" are "any species which is in danger of extinction throughout all or a significant portion of its range . . . ."  16 U.S.C. § 1532(6).  A "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  *Id.* § 1532(20).  The Secretary of the Interior determines whether species are endangered or threatened, *see id.* § 1533(a)(1); 50 C.F.R. § 424.11, and maintains a list of those species, 50 C.F.R. § 17.11(h).  The ESA also protects species that are proposed in the Federal Register to be listed as either threatened or endangered, *see id.* § 402.02.

133.    To "take" an endangered species means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).

134.    The ESA and its implementing regulations also protect "critical habitats," which are specific areas within the geographical area occupied by a listed species that are essential for the conservation of the species or that may require special management considerations or protection, or other specific areas essential for the conservation of the species.  16 U.S.C. § 1532(5)(A).  *See* USFWS Threatened & Endangered Species Active Critical Habitat Report, U.S. Fish & Wildlife Serv., https://ecos.fws.gov/ecp/report/table/critical-habitat.html (last visited Sept.

19, 2020).  The ESA also protects areas that are proposed in the Federal Register to be critical habitats.  *See* 50 C.F.R. § 402.02.

135.    Federal agencies must engage in consultation with the U.S. Fish and Wildlife Service ("FWS") to determine how to "reduce the likelihood of conflicts between listed species or critical habitat and proposed actions," 50 C.F.R. § 402.11(a), where "actions" includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States," *id.* § 402.02.  The construction of the border fence in eastern San Diego County and western Imperial County is an "action."

136.    The federal agency responsible for the action must develop a biological assessment to evaluate the potential effects of the action on listed and proposed species and designated and proposed critical habitat, and determine whether such species or habitat are likely to be adversely affected by the action.  *Id.* § 402.12(a).  A biological assessment must be completed before "any contract for construction is entered into and before construction is begun."  *Id.* § 402.12(b)(2). This requires obtaining a statement from the Director of the FWS of any listed or proposed species or designated or proposed critical habitat.  *Id.* § 402.12(c)-(d).  If a listed species or critical habitat may be present, the agency must complete a biological assessment.  *Id.* § 402.12(d)(2).

137.    After the biological assessment is completed, the agency must submit it to the Director of the FWS, *id.* § 402.12(j), and if the Director concurs in the biological assessment, then the agency must determine whether to consult with the FWS on how to avoid, minimize, or offset the effects of the action, *id.* §§ 402.12(k), 402.14(a)-(g), and then develop with FWS a biological opinion on whether the proposed action will jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat, *id.* §§ 402.14(h), 402.02. The agency then must evaluate the biological opinion to determine "whether and in what manner

to proceed with the action" in light of its obligations under the ESA to prevent the extinction of species or destruction of critical habitat without an exemption from the Secretary of the Interior. *See* 50 C.F.R. § 402.15; 16 U.S.C. § 1536(a).

138.    Defendants have not complied with any of the requirements of the ESA in their planning and construction of the border fence in eastern San Diego County or in their planning and construction of the border fence in western Imperial County.

139.    NAGPRA, 25 U.S.C. §§ 3001-3013, governs the federal government's treatment and possession of Native American cultural items, which include human remains, funerary objects used as part of a death rite or ceremony, sacred objects used in the practice of traditional Native American religion, and "cultural patrimony," which are objects "having ongoing historical, traditional, or cultural importance central to the Native American group or culture itself, rather than property owned by an individual Native American, and which, therefore, cannot be alienated, appropriated, or conveyed by any individual . . . ." 25 U.S.C. § 3001(3).

140.    NAGPRA provides that, if any person knows or has reason to know they have discovered Native American cultural items on Federal lands after November 16, 1990, then they must notify the head of the department or agency having management authority over the lands, must cease the activity that resulted in the discovery of the cultural items in the area of the discovery, and must make a reasonable effort to protect the items before resuming the activity.  *Id.* § 3002(d)(1). Any activity may not resume until 30 days after the head of the agency or department certifies that notice has been received.  *Id.*  If the cultural items uncovered are human remains or funerary objects associated with human remains, then those cultural items belong to the lineal descendants of the dead person. *Id.* § 3002(a)(1).  If the cultural items are funerary objects that are

not associated with human remains, sacred objects, or cultural patrimony, then they belong to the Indian tribe with the closest cultural affiliation with the items.  *Id.* § 3002(a)(2)(B).

141.    NAGPRA applies to the project sites of the border barrier construction, and Defendants have not complied with the requirements of NAGPRA in the construction of the border fence.

142.    AIRFA provides that:

On and after August 11, 1978, it shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites.

42 U.S.C. § 1996.

143.    Defendants have not complied with the policy articulated in AIRFA in the construction of the border fence.

144.    AIRFA and NAGPRA specifically protect the free exercise of religion and the religious practices and beliefs of Indians and Indian tribes under the Free Exercise Clause of the First Amendment, which provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . . "  U.S. Const. amend. I.

145.    Defendant Wolf did not purport to waive any other statutes protecting the religious beliefs and practices of any other Americans in his purported March 16, 2020 waivers.  Defendant Wolf's actions singled out Indian religion for discriminatory treatment and that discrimination is not the most narrowly tailored way to achieve a compelling governmental purpose.  Defendant Wolf's actions therefore violate the Free Exercise Clause of the First Amendment.

## COUNT I

**The Defendants' Construction of Border Fence Projects Before the Secretary of Homeland Security has Consulted with the Plaintiff Kumeyaay Tribes on Tribal Religious and Cultural Practice Is Arbitrary and Capricious, Contrary to Law, and Not in Accordance with Procedure Required by Law, 5 U.S.C. § 706.**

146.     The Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

147.     The Secretary of Homeland Security has never properly waived the application of the APA to the actions of DHS and CBP in carrying out Section 102(b) of IIRIRA by constructing the border wall in eastern San Diego County or in western Imperial County.

148.     The Defendants' actions to approve construction of the border wall constitute final agency actions under 5 U.S.C. § 704.

149.     In IIRIRA, Congress required in clear and mandatory language that, when constructing border security measures authorized by its provisions, the Secretary of Homeland Security "shall consult with . . . Indian tribes . . . to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which [the measures] will be constructed." *Id.* § 102(b)(1)(C)(i) (codified at 8 U.S.C. § 1103 note).

150.     Plaintiffs include Kumeyaay Indian tribes, an individual Kumeyaay Indian, and KHPC, which represents Indian tribes, many of whom reside near or are located near the sites at which the border fence projects in eastern San Diego County and Imperial County under IIRIRA are being, or will be, constructed, and their environment, culture, and quality of life will be seriously damaged to the extent that construction of the border fence harms or destroys cultural and religious sites of significance to the Kumeyaay Nation, including historical villages, trails, culturally significant geographical features, locations connected to the Kumeyaay origin story, places where Kumeyaay gather for cultural and religious purposes today, and the resting sites of

the remains of Kumeyaay people.  Absent effective consultation under IIRIRA and compliance

with RFRA, Defendants' construction of the border fence will cause such damage, harms, and

destruction.

151.    The Plaintiffs hold a cause of action against the Secretary under the APA, 5 U.S.C.

§ 702.

152.    The Secretary of Homeland Security has never fulfilled the statutory obligation

under IIRIRA to consult with Plaintiffs to minimize the impacts of border fence construction in

eastern San Diego County and western Imperial County on the Plaintiffs' members' environment,

culture, commerce, and quality of life.

153.    The Defendants' actions to construct the border fence in eastern San Diego County

and western Imperial County before the Secretary of Homeland Security has complied with the

consultation requirement is arbitrary, capricious, not in accordance with law, and without

observance of procedure required by law.  5 U.S.C. § 706(2)(A), (D).

### COUNT II

**Defendants' Construction of the Border Fence Imposes a Substantial Burden on the Kumeyaay People's Religious Freedom in Violation of RFRA, 42 U.S.C. § 2000bb-1(a) to (b).**

154.    The Plaintiffs reallege and incorporate by reference the preceding paragraphs as if

fully set forth herein.

155.    No federal official or agency may take action exceeding the scope of their statutory

authority.

156.    In RFRA, Congress commanded in clear and mandatory language that the

"Government shall not substantially burden a person's exercise of religion even if the burden

results from a rule of general applicability," unless the Government demonstrates that the burden

"is in furtherance of a compelling governmental interest" and "is the least restrictive means of

furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(a) to (b).  Congress also commanded that these provisions would apply to "all Federal law, and the implementation of that law," regardless of when the law was passed, and that no law would exempt RFRA's application unless it expressly refers to RFRA.  *Id.* § 2000bb-3(a) to (b).  These provisions protect "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  *Id.* § 2000bb-2(4) (incorporating by reference 42 U.S.C. § 2000cc-5(7)(A)).

157.    The Kumeyaay people, including Plaintiff Elliott, practice their religion by traveling to religiously – and culturally – significant sites near the area of proposed new border fence construction.  These include former settlement sites, areas where tribal members gather plants and minerals for ceremonies and practices, geographic features connected to the Kumeyaay origin story, and burial sites.

158.    During construction of the border fence, Kumeyaay people, including Plaintiff Elliott, will be unable to visit certain of those sites, and will be unable to prevent damage or irreparable harm to those sites from construction activities, as Defendants will block Kumeyaay people's access to them.  This will prevent Kumeyaay people from engaging in religious practices and rites that are important, and in some cases central, to their traditional religion.

159.    Construction has begun and is continuing despite the fact that consultation has never been adequate.  Defendants have not consulted with the Plaintiffs or undertaken efforts to ensure avoidance or mitigation of impacts on tribal religious practices.  These impacts, and the failure to consult regarding them or adequately mitigate them, put substantial burdens on Kumeyaay religious practice.

160.    The Defendants have never demonstrated that imposing these substantial burdens is justified by a compelling governmental interest, or that the imposition of these burdens by

currently-planned border fence construction, without sufficient consultation or mitigation, is the most restrictive means of meeting a government interest.

161.    Defendants' actions violate RFRA, 42 U.S.C. § 2000bb-1(a).

## COUNT III

**By Approving and Engaging in the Projects without Complying with NEPA, the NHPA, the ESA, and NAGPRA, the Defendants Wolf, DHS, Morgan, CBP, Semonite, and Corps Have Acted Arbitrarily and Capriciously, Contrary to Law, and Without Procedure Required by Law, 5 U.S.C. § 706.**

162.    The Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

163.    The official actions of a purported federal official who was not legally appointed to his or her position are void ab initio and *ultra vires*.

164.    The process by which an official may succeed to the office of Secretary of Homeland Security and serve as Acting Secretary is defined in clear and mandatory terms by the FRVA and the Homeland Security Act.

165.    The Homeland Security Act, by clear and mandatory language, provides that only the Secretary of Homeland Security may designate the order of succession to serve as Acting Secretary, beyond the Deputy Secretary and Under Secretary for Management.

166.    The FVRA, by clear and mandatory language, provides that the actions of any Acting official who is not acting in compliance with 5 U.S.C. § 3347 shall have no force or effect, 5 U.S.C. § 3348(d)(1), and may not be ratified, *id.* § 3348(d)(2).

167.    The Homeland Security Act provides that the Secretary may designate the succession to the office of Secretary.  At the time the last Senate-confirmed Secretary of Homeland Security resigned, the line of succession was set by Executive Order 13,753.

168.    On April 10, 2019 former Secretary Nielsen purported to exercise the Secretary's authority under the Homeland Security Act by issuing the Purported April 10 Delegation, which provided that in the event of the Secretary's death, resignation, or inability to perform the function of the office, the succession to the office of Secretary would follow the order of succession defined in Executive Order 13,753.

169.    On April 10, 2019, DHS relied on the Purported April 10 Delegation and improperly elevated McAleenan to serve as Acting Secretary, even though he was not the next official in line for that position under the Homeland Security Act and Executive Order 13,753. Therefore, all subsequent official acts McAleenan took as purported Acting Secretary are contrary to the plain and mandatory language of the Homeland Security Act and FVRA, and therefore were not the result of a decision or action by the Secretary of Homeland Security, and are invalid, *ultra vires*, without legal force or effect, and cannot be ratified.

170.    McAleenan purported to change the order of succession to the office of Secretary of Homeland Security by issuing the Purported Revised Delegation, even though he had not been properly elevated to the position of Acting Secretary and exercised the authority of that office in violation of the Homeland Security Act, the FVRA, and Executive Order 13,753.

171.    Because of the circumstances described in ¶¶ 60-88, *supra*, the Purported Revised Delegation was contrary to the plain and mandatory terms of the Homeland Security Act and FVRA, and therefore was not issued as a result of a decision or action by the Secretary of Homeland Security and is invalid, *ultra vires*, of no legal force and effect, and cannot be ratified. The Purported Revised Delegation could not determine succession to the role of Acting Secretary, which continues to be controlled by Executive Order 13,753.  Executive Order 13,753 required that, after April 10, 2019, the Director of CISA become the Acting Secretary.

172.     Instead of following Executive Order 13,753, DHS followed the Purported Revised Delegation and installed the Defendant Wolf as Acting Secretary.  The Defendant Wolf was not, and has never been, Director of CISA.  He has not been confirmed by the Senate to any office other than Under Secretary for Strategy, Policy, and Plans by the Senate.  Therefore, the Defendant Wolf is not the Acting Secretary.

173.     IIRIRA provides that only the Secretary of Homeland Security may waive the application of legal requirements to the construction of barriers and roads authorized by IIRIRA. *Id.* § 102(c)(1).

174.     The Defendant Wolf issued the March 16, 2020 purported waivers for the border fence project in eastern San Diego County and western Imperial County.  Because he was not, and could not have been, serving as Acting Secretary of Homeland Security, those purported waivers were not made as a result of an action or decision by the Secretary of Homeland Security, and are *ultra vires*, void, without force or effect, and because they were issued contrary to the terms of the Homeland Security Act and the FVRA, they cannot be ratified.

175.     The Secretary of Homeland Security never properly waived the application of the APA to the actions of DHS and CBP in carrying out Section 102(b) of IIRIRA by constructing the border wall in eastern San Diego County and western Imperial County.

176.     The Secretary of Homeland Security never properly waived the application of the NEPA, the NHPA, NAGPRA or the ESA to the actions of DHS and CBP in carrying out Section 102(b) of IIRIRA by constructing the border wall in eastern San Diego County and western Imperial County.

177.     The provisions of all statutes the Defendant Wolf purported to waive in the March 16, 2020 waivers still apply to the border fence project in eastern San Diego County and to the

border fence project in western Imperial County to the extent provided by their own terms.  NEPA, the NHPA, the ESA, and NAGPRA apply to the border fence projects in eastern San Diego County and western Imperial County because those projects are a "major federal project" under NEPA, a federal "undertaking" under the NHPA, and "an action" under the ESA, and are taking place on "federal lands" under NAGPRA.

178.    The Defendants' actions to approve construction of the border wall constitute final agency actions under 5 U.S.C. § 704.

179.    Defendants have not complied with their obligations under NEPA, the NHPA, the ESA, and NAGPRA.  These obligations are non-discretionary and imposed by federal law and regulations.

180.    The Defendants' failure to comply with these authorities without a valid IIRIRA waiver is arbitrary, capricious, not in accordance with law, and without observance of procedure required by law.  5 U.S.C. § 706(2)(A), (D).

## COUNT IV

**The Defendant Wolf's Purported Waiver of AIRFA and NAGPRA Violates the Free Exercise Clause of the First Amendment and is Therefore Arbitrary and Capricious and Otherwise Not in Accordance with Law, 5 U.S.C. § 706(2)(A).**

181.    No federal official or agency may "impose special disabilities on the basis of religious views or religious status," *Smith*, 494 U.S. at 877 (citations omitted).

182.    AIRFA and NAGPRA specifically protect the free exercise of religion and the religious practices and beliefs of Indians and Indian tribes under the Free Exercise Clause of the First Amendment, which provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I.

183.     The Defendant Wolf purported to waive AIRFA and NAGPRA but did not purport to waive any other statutes protecting the religious beliefs and practices of any other Americans in his purported March 16, 2020 waivers.  The Defendant Wolf's actions singled out Indian religion for discriminatory treatment and that discrimination is not the most narrowly tailored way to achieve a compelling governmental purpose.

184.     The Defendant Wolf's actions therefore violate the Free Exercise Clause of the First Amendment, and his purported waiver was arbitrary, capricious, and otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for the following relief:

1.     A declaration that:

(a)     The Defendants have and are violating IIRIRA in the construction of the border fence in eastern San Diego County and western Imperial County, because the Secretary of Homeland Security has failed to consult with the Plaintiffs prior to the exercise of the Secretary's waiver authority about how to identify, and mitigate damage to, the Kumeyaay environment, culture, and quality of life, and by failing to do so prior to beginning construction;

(b)     The Defendant Wolf's purported exercises of the Secretary of Homeland Security's waiver authority under IIRIRA are invalid, and the purported waivers for eastern San Diego County and western Imperial County are null and void and cannot be ratified;

(c)     The Defendant Wolf's purported exercise of the Secretary of Homeland Security's waiver authority under IIRIRA, specifically the waiver of AIRFA and NAGPRA imposes special disabilities on Native American religious beliefs and practices in violation of the Free Exercise Clause of the First Amendment;

(d)     Defendants have and are violating RFRA in the construction of the border fence in eastern San Diego County and western Imperial County by imposing a substantial burdens on Kumeyaay religious practice without demonstrating that the burden is justified by a compelling governmental interest and that the government is pursuing the least restrictive means of furthering that interest; and

(e)     Defendants have and are violating NEPA, the NHPA, NAGPRA, and the ESA in the construction of the border fence in eastern San Diego County and western Imperial County by engaging in a major federal project without complying with the requirements of NEPA, the NHPA, NAGPRA, and the ESA.

2.      An injunction that bars Defendants from engaging in border fence construction in San Diego County and Imperial County, in the area indicated in Figures 3 and 4, *supra*, until:

(a)     The Secretary of Homeland Security has consulted with the Plaintiffs, and through consultation Defendants have developed a mutually-agreeable approach to: identifying, and mitigating damage to, the Kumeyaay environment, culture, and quality of life; and preventing substantial burdens on Kumeyaay religious practice without a written demonstration by Defendants that the substantial burden is justified by a compelling governmental interest and that the government is pursuing the least restrictive means of furthering that interest;

(b)     Defendants have complied with their obligations to engage in environmental review under NEPA;

(c)     Defendants have complied with their obligations under the NHPA by consulting with the Plaintiffs and other affected Indian tribes to identify historic properties in the area of potential effects of the border fence projects in eastern San Diego County and western Imperial County and develop plans to avoid, mitigate, and treat adverse effects to those properties;

(d)     Defendants have complied with their obligations under the ESA to develop a biological assessment on the border fence projects in eastern San Diego County and western Imperial County and, if necessary, consult with the Director of FWS to develop a biological opinion on the project and determine whether and how to proceed with the project consistent with the ESA; and

(e)     Defendants have complied with their obligations under NAGPRA by ensuring that the procedures of NAGPRA will be followed after any discovery of cultural items protected by NAGPRA during construction.

3.     An award of attorneys' fees and costs under 28 U.S.C. § 2412, 54 U.S.C. § 307105, and any and all other applicable authorities

4.     Such further relief as the Court deems appropriate.

DATED this 23nd day of September, 2020.          */s/ Colin Cloud Hampson*

_____
Frank S. Holleman, Bar # 1011376
Sonosky, Chambers, Sachse, Endreson &
  Perry, LLP
1425 K Street, NW, Suite 600
Washington DC 20005
Phone no.: 202-682-0240
Fax no.: 202-682-0249
E-mail:  fholleman@sonosky.com

Colin Cloud Hampson, Bar # 448481
Sonosky, Chambers, Sachse, Endreson &
  Perry, LLP
145 Willow Road, Suite 200
Bonita, CA 91902
Phone no.: 619-267-1306
Fax no.: 619-267-1388
E-mail:  champson@sonoskysd.com

*Counsel for Plaintiffs*

67

Mark Radoff (application for admission *pro hac vice* forthcoming)
Sycuan Tribal Government Legal Department
2 Kwaaypaay Ct.
El Cajon, CA 92019
Phone no.: 619-445-4564
Fax no.: 619-445-0238
E-mail:  mradoff@sycuan-nsn.gov

*Counsel for Plaintiff Sycuan Band of the Kumeyaay Nation*