**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MANZANITA BAND OF THE KUMEYAAY NATION, *et al.*, | **Case No. 1:20-cv-02712-RC** |
| Plaintiffs, | |
| v. | |
| CHAD WOLF, in his official capacity as Under Secretary of Homeland Security for Strategy, Policy, and Plans, *et al.*, | |
| Defendants. | |

**MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

Pursuant to Fed. R. Civ. P. 65 and Local Rule 65.1, Plaintiffs move for a Temporary Restraining Order and Preliminary Injunction to immediately require the Defendants to halt the ongoing construction of border fence segments in eastern San Diego County and Imperial County, California, and any and all activities by Defendants related to construction.  Defendants are constructing the border fence without the tribal consultation required by law, and in violation of numerous federal statutes, which irreparably harms Plaintiffs by, *inter alia*, destroying, disturbing, and desecrating lands, sacred sites, human remains, and natural resources of religious and cultural importance to the Kumeyaay Nation, and by preventing the Kumeyaay people from exercising their religion on those lands and at their sacred sites, and from protecting human remains discovered during construction through religious ceremonies.  The legal and factual grounds on which a Temporary Restraining Order and Preliminary Injunction are sought is set forth in the accompanying Memorandum of Points and Authorities.

Defendants' construction activities are causing ongoing irreparable harm to the Plaintiffs, and the Plaintiffs therefore request expedited consideration of this motion pursuant to Local Rule 65.1, specifically, a hearing within ten days.

Respectfully submitted,

DATED this 25th day of September, 2020.

/s/ Colin Cloud Hampson

_____
Frank S. Holleman, Bar # 1011376
Sonosky, Chambers, Sachse, Endreson &
 Perry, LLP
1425 K Street, NW, Suite 600
Washington DC 20005
Phone no.: 202-682-0240
Fax no.: 202-682-0249
E-mail:  fholleman@sonosky.com

Colin Cloud Hampson, Bar # 448481
Sonosky, Chambers, Sachse, Endreson &
 Perry, LLP
145 Willow Road, Suite 200
Bonita, CA 91902
Phone no.: 619-267-1306
Fax no.: 619-267-1388
E-mail:  champson@sonoskysd.com

Whitney A. Leonard (application for
 admission pro hac vice forthcoming)
Sonosky, Chambers, Sachse, Miller &
 Monkman, LLP
725 East Fireweed Lane, Suite 420
Anchorage, AK 99503
Phone no.: 907-258-6377
Fax no.: 907-272-8332
E-mail:      whitney@sonosky.net

Counsel for Plaintiffs

Mark Radoff (application for admission pro
 hac vice forthcoming)
Sycuan   Tribal   Government   Legal
 Department
2 Kwaaypaay Ct.

El Cajon, CA 92019
Phone no.: 619-445-4564
Fax no.: 619-445-0238
E-mail:  mradoff@sycuan-nsn.gov

*Counsel for Plaintiff Sycuan Band of the
Kumeyaay Nation*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 25, 2020, I electronically filed the above and foregoing document with the Clerk of Court via the ECF System for filing.

*/s/ Colin Cloud Hampson*

Colin C. Hampson

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MANZANITA BAND OF THE KUMEYAAY
NATION, *et al.*,

      Plaintiffs,

v.

CHAD WOLF, in his official capacity as Under
Secretary of Homeland Security for Strategy,
Policy, and Plans, *et al.*,

      Defendants.

**Case No. 1:20-cv-02712-RC**

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................... 1

FACTUAL BACKGROUND ............................................................................... 4

LEGAL STANDARD ......................................................................................... 10

ARGUMENT ....................................................................................................... 12

I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR
      CLAIMS ...................................................................................................... 12

      A.    Defendants Did Not Comply with the Requirement of IIRIRA that
            Consultation Must Take Place Before Construction Authorized by
            IIRIRA May Begin. ............................................................................ 13

      B.    Defendants' Demand that Plaintiffs Engage in Consultation
            Without Stopping Construction Violates RFRA. ................................. 18

      C.    Defendants Have Violated NEPA, the NHPA, NAGPRA, and the
            ESA. .................................................................................................... 23

            1.    Defendants Have Not Complied with their Obligations
                  under NEPA, the NHPA, NAGPRA, and the ESA ................................. 23

            2.    Defendants' Obligations under NEPA, the NHPA,
                  NAGPRA, and the ESA Were Never Waived Under
                  IIRIRA. ............................................................................................. 27

      D.    The Defendant Wolf's Issuance of the Illegal Waivers Violates the
            Kumeyaay People's First Amendment Right to Free Exercise of
            Their Religion. ................................................................................... 34

      E.    The Jurisdictional Provisions of IIRIRA Do Not Bar Plaintiffs'
            Claims. ............................................................................................... 35

II.    PLAINTIFFS WILL BE IRREPARABLY HARMED IF CONSTRUCTION
      OF THE BORDER BARRIER IS NOT HALTED .................................... 38

III.   THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH
      IN FAVOR OF AN INJUNCTION. ........................................................... 42

CONCLUSION ................................................................................................... 45

# TABLE OF AUTHORITIES

## CASES

*A.B.-B. v. Morgan*, No. 20-CV-846 (RJL), 2020 WL 5107548 (D.D.C. Aug. 31, 2020) ...................................................................................................................11

*Adoptive Couple v. Baby Girl*, 570 U.S. 637 (2013) ....................................................14

*Alabama v. Bozeman*, 533 U.S. 146 (2001)..................................................................13

*Alcor Life Extension Found. v. Richardson*, 785 N.W.2d 717 (Iowa 2010) .................39

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982) ............2

*Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531 (1987)..............................40

*Anderson v. Yungkau*, 329 U.S. 482 (1947)..................................................................13

*Bonnichsen v. United States*, 367 F.3d 864 (9th Cir. 2004)..........................................25

\* *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).......................................18

*Carr v. United States*, 560 U.S. 438 (2010) ................................................................15

\* *Casa de Md., Inc. v. Wolf*, No. 8:20-cv-02118-PX, 2020 WL 5500165 (D. Md. Sept. 11, 2020) ...........................................................................................................32, 33

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006).......11

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ............................................................21

*Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678 (D.C. Cir. 2004) .......24

*Confederated Tribes of Chehalis Reservation v. Mnuchin*, No. 20-CV-01002 (APM), 2020 WL 1984297 (D.D.C. Apr. 27, 2020)....................................................11

*Currier v. Woodlawn Cemetery*, 90 N.E.2d 18 (N.Y. 1949) ........................................39

*Davis v. District of Columbia*, 158 F.3d 1342 (D.C. Cir. 1998)...................................42

*Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288 (D.C. Cir. 2009)................11, 12

*Delorme v. United States*, 354 F.3d 810 (8th Cir. 2004) .............................................19

*District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1 (D.D.C. 2020) ..........11

*Edmond v. United States*, 520 U.S. 651 (1997) ...........................................................28

*Elrod v. Burns*, 427 U.S. 347 (1976) ...........................................................................42

*Emp't Div. v. Smith*, 494 U.S. 872 (1990) ................................................................3, 34

*Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93 (D.D.C. 2003) .....................10, 11

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) .............................14

*Fin. Oversight & Mgmt. Bd. v. Aurelius Inv., LLC*, 140 S. Ct. 1649 (2020) ................28

*Fowler v. Rhode Island*, 345 U.S. 67 (1953) ...............................................................34

*Gartrell v. Ashcroft*, 191 F. Supp. 2d 23 (D.D.C. 2002)..............................................19

*Gillette v. United States*, 401 U.S. 437 (1971)..............................................................34

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006)
.........................................................................................................................................22

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) ...............................................42, 43

*Ill. Nat'l Guard v. Fed. Lab. Rels. Auth.*, 854 F.2d 1396 (D.C. Cir. 1988) ...................14

*In re Border Infrastructure Env't Litig.*, 284 F. Supp. 3d 1092 (S.D. Cal. 2018) ..................13, 15

*In re Border Infrastructure Env't Litig.*, 915 F.3d 1213 (9th Cir. 2019).......................36

*Kaemmerling v. Lappin*, 553 F.3d 669 (D.C. Cir. 2008) ...............................................19

*Kickapoo Tribe of Okla. v. Lujan*, 728 F. Supp. 791 (D.D.C. 1990)..............................19

* *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1 (D.D.C. 2020)......................................28, 33

*La Posta Band of Diegueño Mission Indians of La Posta Reservation v. Trump*, No.
3:20-cv-01552 (S.D. Cal. Sept. 9, 2020)....................................................15, 19, 20

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ...........11, 12, 40, 43

*League of Women Voters of U.S. v. Newby*, 963 F.3d 130 (D.C. Cir. 2020) ................11

*Little v. Shell Exploration & Production Co.*, 690 F.3d 282 (5th Cir. 2012) ...............25

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ....................................................16, 42

*McDaniel v. Paty*, 435 U.S. 618 (1978)........................................................................34

*Mockaitis v. Harcleroad*, 104 F.3d 1522 (9th Cir. 1997) ............................................21

*Moe v. Confederated Salish & Kootenai Tribes of Flathead* Reservation, 425 U.S.
463 (1976) .................................................................................................................19

*Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012) ..................................................25

*N.J. Air Nat'l Guard v. Fed. Lab. Rels. Auth.*, 677 F.2d 276 (3d Cir. 1982)................14

*Nat'l Coal. to Save Our Mall v. Norton*, 269 F.3d 1092 (D.C. Cir. 2001) ...................14

*Nat'l Lab. Rels. Bd. v. SW Gen., Inc.*, 137 S. Ct. 929 (2017) .......................................28

*Nat'l Wildlife Fed. v. Burford*, 835 F.2d 305 (D.C. Cir. 1987) ....................................40

*Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058 (9th Cir. 2008) .........................21

*Nelson v. Miller*, 570 F.3d 868 (7th Cir. 2009).............................................................20

*Nken v. Holder*, 556 U.S. 418 (2009) ...........................................................11, 42, 43

* *Noel Canning v. Nat'l Lab. Rels. Bd.*, 705 F.3d 490 (D.C. Cir. 2013) ....................31, 32

*O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973 (10th
Cir. 2004) ..................................................................................................................42

*Priests for Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229 (D.C. Cir.
2014) .........................................................................................................................20

*Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500 (D.C. Cir. 2016)........................12, 43

*Quapaw Tribe of Okla. v. Blue Tee Corp.*, 653 F. Supp. 2d 1166 (N.D. Okla. 2009) ................................................................................................................19

*Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior*, 755 F. Supp. 2d 1104 (S.D. Cal. 2010) ........................................................40, 42

*Robinson v. Wadford*, 731 S.E.2d 539 (N.C. Ct. App. 2012) ...........................39

*Save Strawberry Canyon v. Dep't of Energy*, 613 F. Supp. 2d 1177 (N.D. Cal. 2009) ................................................................................................................42

*Shell Oil Co. v. Iowa Dep't of Revenue*, 488 U.S. 19 (1988) .........................14

*Sherbert v. Verner*, 374 U.S. 398 (1963) .......................................................19

*Singh v. Carter*, 168 F. Supp. 3d 216 (D.D.C. 2016) .....................................20

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101 (D.D.C. 2017) ..................................................................................................14

\* *SW Gen., Inc. v. Nat'l Lab. Rels. Bd.*, 796 F.3d 67 (D.C. Cir. 2015) ............33

*Thomas v. Review Bd.*, 450 U.S. 707 (1981) .................................................21

*Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106 (D.D.C. 2012)........................42

*United States v. Hoffman*, 436 F. Supp. 3d 1272, 1285 (D. Ariz. 2020) ......21

*United States v. Katz*, 271 U.S. 354 (1926) ............................................15, 16

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C. Cir. 1977) ...........................................................................................................11

*Washington v. Reno*, 35 F.3d 1093 (6th Cir. 1994) .......................................43

\* *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ................11, 12, 38

*Yankton Sioux Tribe v. U.S. Army Corps of Eng'rs*, 209 F. Supp. 2d 1008 (D.S.D. 2002) ..............................................................................................................40

*Yellowbear v. Lampert*, 741 F.3d 48 (10th Cir. 2014) ..................................21

*Zubik v. Burwell*, 136 S. Ct. 1557 (2016) .....................................................20

## FEDERAL LAW AND RULES

1 U.S.C. § 1 ....................................................................................................24

5 U.S.C. § 702 ................................................................................................37

Homeland Security Act, 6 U.S.C. §§ 101-674

    6 U.S.C. § 113 .........................................................................................28, 30

    6 U.S.C. § 113(g)(1) .....................................................................................30

\*    6 U.S.C. § 113(g)(2) ........................................................................30, 31, 32

    16 U.S.C. § 1533 .........................................................................................26

Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb to 2000bb-4

\*    42 U.S.C. § 2000bb-1(a) ...............................................................................18, 22

\*    42 U.S.C. § 2000bb-1(b) ...................................................................................18

42 U.S.C. § 2000bb-1(c) ...................................................................................19

42 U.S.C. § 2000bb-2(4) ...................................................................................18

42 U.S.C. § 2000bb-3(a) ...................................................................................18

42 U.S.C. § 2000bb-3(b) ...................................................................................19

42 U.S.C. § 2000cc-5(7)(A) ...................................................................................18

42 U.S.C. § 4332(C)(i)-(iii) ...................................................................................23

54 U.S.C. § 306108 ...............................................................................................24

42 U.S.C. § 1996 ...................................................................................................35

Cybersecurity and Infrastructure Security Agency Act of 2018, Pub. L. No. 115-278,
§ 2(a), 132 Stat. 4168, 4169 (codified at 6 U.S.C. § 652(a), (b)) ...........................29

Federal Vacancies Reform Act, 5 U.S.C. §§ 3345-3349d

5 U.S.C. § 3345(a) ...............................................................................................28

5 U.S.C. § 3345(a)(2) .....................................................................................14, 28

5 U.S.C. § 3345(a)(3) .....................................................................................14, 28

5 U.S.C. § 3347(a) ...............................................................................................28

5 U.S.C. § 3347(a)(1)(A) ......................................................................................29

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No.
104-208, div. C, tit. I, § 102, 110 Stat. 3009 (codified as amended at 8 U.S.C. §
1103 note)

§ 102(b)(1)(A) ...........................................................................13, 17, 18, 36

\*    § 102(b)(1)(C)(i) .................................................................13, 15, 17, 36, 39

§ 102(b)(1)(C)(ii)(I) ......................................................................................38

§ 102(c)(1) ............................................................................................. passim

§ 102(c)(2)(A) .............................................................................35, 36, 37

§ 102(c)(2)(B) .................................................................................36, 37

National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328,
130 Stat. 2000 (2016)

tit. XIX

§ 1902(a) ...........................................................................................33

§ 1903(a)(2) .....................................................................................29

Native American Graves Protection and Repatriation Act, 25 U.S.C. §§ 3001-3013

25 U.S.C. § 3001(9) ................................................................................35

25 U.S.C. § 3001(3) ................................................................................25

25 U.S.C. § 3002(a)(1) ............................................................................26

25 U.S.C. § 3002(a)(2)(B) .......................................................................26

25 U.S.C. § 3002(d)(1) ............................................................................25

U.S. Const. art. II, § 2, cl. 2 ...................................................................28

## FEDERAL REGULATIONS, GUIDANCE, AND EXECUTIVE ORDERS

36 C.F.R. § 800.1(a) ...............................................................................24

36 C.F.R. § 800.1(c) ...............................................................................25

36 C.F.R. § 800.2(c)(2)(ii) ......................................................................25

36 C.F.R. § 800.2(c)(2)(ii)(A) .................................................................39

36 C.F.R. § 800.6 ...................................................................................25

36 C.F.R. § 800.11(a) .............................................................................25

36 C.F.R. § 800.11(d) .............................................................................25

36 C.F.R. § 800.11(e) .............................................................................25

36 C.F.R. § 800.16(*l*) .............................................................................24

36 C.F.R. § 800.16(y) .............................................................................24

40 C.F.R. § 1501.2 .................................................................................24

40 C.F.R. § 1501.3 .................................................................................24

40 C.F.R. pt. 1502 .................................................................................24

40 C.F.R. § 1502.1 .................................................................................23

40 C.F.R. § 1508.8 .................................................................................23

40 C.F.R. § 1508.11 ...............................................................................23

50 C.F.R. § 402.02 .............................................................................26, 27

50 C.F.R. § 402.11(a) .............................................................................26

50 C.F.R. § 402.12(a) .............................................................................26

50 C.F.R. § 402.12(b)(2) .........................................................................26

50 C.F.R. § 402.12(d)(2) .........................................................................27

50 C.F.R. § 402.12(j) ..............................................................................27

50 C.F.R. § 402.14(h) .............................................................................27

Council on Env't Quality, Exec. Office of President, *Environmental Justice:
Guidance Under the National Environmental Policy Act* (1997) ...........................24

Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 85 Fed. Reg. 14,958 (Mar. 16, 2020) ....................................................................................................................27

Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 85 Fed. Reg. 14,960 (Mar. 16, 2020) ....................................................................................................................27

Endangered and Threatened Wildlife and Plants, 74 Fed. Reg. 17,288 (Apr. 14, 2009) ...........................................................................................................................9

Executive Order 13,753, Amending the Order of Succession in the Department of Homeland Security, 81 Fed. Reg. 90,667 (Dec. 9, 2016) ......................................29, 31, 32, 33

Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020) ....................................23, 24

## OTHER SOURCES AND AUTHORITIES

Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225 (2000) ...............................................................14

*Imperial County Border Barrier Project*, CBP, Mar. 16, 2020 (last modified Aug. 18, 2020), https://www.cbp.gov/document/environmental-assessments/imperial-county-border-barrier-project ...........................................38

Letter from Kirstjen M. Nielsen, Sec'y of Homeland Sec., to Donald J. Trump, President of U.S. (Apr. 7, 2019) ..........................................................................30

*New Oxford American Dictionary* (3d ed. 2010)......................................................................15

@realDonaldTrump, Twitter (Apr. 7, 2019 6:02 PM), https://twitter.com/realDonaldTrump/status/1115011885303312386................................................30

@SecNielsen, Twitter (Apr. 7, 2019 10:36 PM), https://twitter.com/SecNielsen/status/1115080823068332032 ........................................................................30, 31

Richard Carrico, *Strangers in a Stolen Land* (2008) (Amazon Kindle ed.) ..................................5

Robert L. Peters et al., Defs. of Wildlife, *In the Shadow of the Wall: Part II* (2018) .......................................................................................................................9, 27

*San Diego County Border Barrier Projects*, CBP, Mar. 16, 2020 (last modified Aug. 18, 2020), https://www.cbp.gov/document/environmental-assessments/san-diego-county-border-barrier-projects............................................38

## INTRODUCTION

The Plaintiffs in this action seek a declaratory judgment and injunctive relief to protect the Kumeyaay people's ability to practice their religious beliefs and cultural traditions at and across the border region, as they have done for hundreds of years, by preventing Defendants from constructing a trench, a thirty-foot high fence that extends from that trench, and its related infrastructure at the border until the Defendant Department of Homeland Security ("DHS") and its officials comply with federal law.  They are not currently doing so, relying in part on invalid waivers of federal law that were issued by Defendant Chad Wolf, the Under Secretary of Homeland Security for Strategy, Policy, and Plans ("Defendant Wolf"), whom the Defendant DHS illegally began treating as Acting Secretary in November 2019.  Defendants must be made to comply with federal law immediately, as their illegal acts are causing Plaintiffs irreparable harm and immediate injury, contrary to the public interest and the rule of law.

Plaintiffs Manzanita Band of the Kumeyaay Nation, Campo Kumeyaay Nation, Ewiiaapaayp Band of Kumeyaay Indians, Iipay Nation of Santa Ysabel, and Sycuan Band of the Kumeyaay Nation are federally recognized Indian tribes of Kumeyaay people, whose modern-day reservations are located in San Diego County, California (collectively, "Plaintiff Kumeyaay Tribes").  Plaintiff John Elliott is a member of the Manzanita Band of the Kumeyaay Nation and serves on its Executive Committee.  For many years, Mr. Elliott and his family have engaged in traditional cultural and religious practices in the historical Kumeyaay territory, including at sacred and cultural sites around the projects.  Plaintiff Kumeyaay Heritage Preservation Council ("KHPC"), is an organization that represents nine federally recognized tribes of the Kumeyaay Nation.  The Kumeyaay people have lived for centuries in what is now California and Mexico, on both sides of the border imposed on the land by the United States and Mexico in the mid-19th century.  The Kumeyaay people—Plaintiffs and Plaintiffs' members—continue to practice their

religion and maintain their culture as part of their daily life throughout their territory, including the region on both sides of the U.S.-Mexico border, where sacred sites, trails, plants and medicines, and the landscape itself have sustained their people for hundreds of years.  The Plaintiff Kumeyaay Tribes bring their claims on their own behalf, and as *parens patriae* on behalf of their members, whose well-being is threatened by the destruction of cultural and religious resources that the Plaintiff Kumeyaay Tribes would, if they had direct legislative jurisdiction, address through their own sovereign lawmaking powers.  *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982).

On March 16, 2020, Defendant Customs and Border Protection ("CBP") announced that it would be constructing new border barriers across territory in both San Diego County and Imperial County, California, which are Kumeyaay aboriginal lands.  *See* Compl. ¶ 51 at 23-24, figs. 3 & 4, ECF No. 1.  The Defendant Wolf, unlawfully claiming to be the Acting Secretary of Homeland Security, purported to waive application of numerous federal laws to each of the new border barrier[1] projects under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA").  The Defendant Wolf lacked authority to issue these waivers because IIRIRA grants this authority *only* to the Secretary of Homeland Security, and the Defendant Wolf's treatment as Acting Secretary by DHS is invalid under the Federal Vacancies Reform Act ("FVRA") and the Homeland Security Act.  The Defendant Wolf was therefore acting *ultra vires* in issuing the purported waivers, and accordingly, each of the purportedly waived federal laws continues to apply to the new border barrier projects.  In addition, even a properly appointed Secretary of Homeland Security does not have authority to waive the application of the Religious Freedom Restoration Act ("RFRA") or the tribal consultation requirements of IIRIRA itself, which continue to apply to

---

[1] The border barriers are also referred to herein as a "border fence" and a "border wall."

the border barrier projects, notwithstanding any actions of the Defendant Wolf.  Furthermore, even if the waiver of the Native American Graves Protection and Repatriation Act ("NAGPRA") and the American Indian Religious Freedom Act ("AIRFA") had been issued with proper authority, such a waiver violates the Free Exercise Clause of the First Amendment by imposing "special disabilities on the basis of religious views or religious status," *Emp't Div. v. Smith*, 494 U.S. 872, 877 (1990) (citations omitted), on Native Americans and their religion and on no other people or religion.

Under the Defendant Wolf's invalid waivers, Defendants CBP—under the direction of its Senior Official Performing the Duties of the Commissioner Mark A. Morgan ("Commissioner Morgan")—and the Army Corps of Engineers ("Corps")—under the direction of its Commanding General, Lieutenant General Todd Semonite ("Commanding General Semonite")—began construction of the new border fence projects in the spring and summer of 2020, without consultation with the Plaintiff Kumeyaay Tribes and without complying with the procedures required by numerous federal statutes, including RFRA, IIRIRA, NAGPRA, the National Environmental Policy Act ("NEPA"), the National Historic Preservation Act ("NHPA"), and the Endangered Species Act ("ESA"), among others.  Despite multiple requests by Plaintiff Kumeyaay Tribes that the Defendants halt this illegal construction until adequate consultation and review procedures have been followed, Defendants have continued their construction activities unabated. Among other things, these activities include earth-moving operations that are being conducted without allowing for adequate tribal monitoring.  Monitoring is necessary to identify and protect from destruction any historical and sacred objects or human remains uncovered in the construction process, and to allow Kumeyaay people to engage in the sacramental rites that under Kumeyaay

religious beliefs and practices are necessary to restore peace to the soul of the deceased after human remains are disturbed or separated.

The resulting injury to Kumeyaay religion and culture caused by disturbing sacred ground and the remains of Kumeyaay ancestors is irreparable. The Defendants' illegal construction activities therefore irreparably harm the Plaintiffs each and every day that they are allowed to continue without adequate tribal consultation and review of cultural, historical, and environmental impacts that is required by law and necessary to minimize, mitigate, or avoid those harms. The Plaintiffs seek immediate injunctive relief halting construction of the border barrier segments in San Diego and Imperial Counties until the Defendants adequately consult with the Plaintiff Kumeyaay Tribes and otherwise comply with all applicable federal laws.

## FACTUAL BACKGROUND

The Kumeyaay are the aboriginal people of the geographic area bounded by the Pacific Ocean on the west, the Colorado River to the east, the San Luis Rey River to the north, and Baja California and the Sea of Cortez to the south. The Kumeyaay have lived, worshipped, died, and been buried or cremated throughout this region for hundreds of years, on both sides of the U.S.-Mexico border imposed in the mid-nineteenth century. For generations, the Kumeyaay people have relied on an extensive system of trails to link their coastal villages with those of the eastern mountains and the desert. Carrico Decl. ¶ 18.

Today, the Kumeyaay Nation is comprised of thirteen federally-recognized Indian tribes—including the Plaintiff Kumeyaay Tribes—which occupy reservations and rancherias in southern California, in San Diego and Imperial counties. Kumeyaay people reside in both the United States and Mexico, and as they have done for generations, they regularly travel back and forth for cultural and religious purposes, using the same trails they have relied on for those purposes for generations, as well as modern means of transportation. Defendant CBP provides Kumeyaay people in Mexico

special rights to cross the border in order to participate in Kumeyaay cultural and social activities upon presentation of a letter of invitation from a Kumeyaay tribal government in the United States. Elliott Decl. ¶ 19.  This confirms the importance of the border region to all of the Kumeyaay people.

Despite extreme discrimination and oppression since the beginning of colonization, members of the Kumeyaay Nation have never ceased practicing their religion and culture at historic, cultural, and religious sites on and off their reservations in the United States and Mexico, to which they continue to travel.  The challenge of that commitment is demonstrated by the history of the Kumeyaay, who have survived the attempted destruction of Kumeyaay religion and culture. *See* Richard Carrico, *Strangers in a Stolen Land* (2008) (Amazon Kindle ed., locations 318-348, 1486-1563, 1714, 2299-2304).

Throughout that history and across their aboriginal territory, the Kumeyaay peoples' treatment of human remains has been culturally important.  In Kumeyaay traditional religious beliefs, a person's soul cannot rest in the afterlife if the remains are disturbed, or if parts of the body of the deceased are separated after death.  Santos Decl. ¶ 16; Elliott Decl. ¶ 15.  If human remains are disinterred, or the body is separated, the Kumeyaay people must engage in religious ceremonies to restore peace to the souls of the dead.   Elliott Decl. ¶ 15.

The areas where the new sections of border fence are now being constructed contain numerous sites of longstanding, documented, and continuing cultural and religious importance to the Kumeyaay people.

Tecate Peak, (Kuchamaa or 'Amatnuk), is a mountain near the mid-point of San Diego county that straddles the U.S.-Mexico border, but rises and falls mostly within the United States. Kuchamaa was placed on the National Register of Historic Places ("NRHP") in 1992.  In

prehistoric times, Kumeyaay settled just east of Kuchamaa in the village of Tecate, which also straddles the U.S.-Mexico border.  Carrico Decl. ¶ 24.  The summit of Kuchamaa is one of the most important ceremonial locations and sacred sites in traditional Kumeyaay territory.  Elliott Decl. ¶ 8; *see also* Carrico Decl. ¶ 18.  Religious leaders held ceremonies and dances at a secret place high on the mountain.  Elliott Decl. ¶ 8.  Kumeyaay healers traveled to the mountain to sing special healing songs, and initiation ceremonies were held there.  *Id.*  Kumeyaay continue to visit Kuchamaa to this day to conduct ceremonies and religious practices on which their culture continues to depend.  Elliott Decl. ¶ 8.  The role of Kuchamaa in the religion of the Kumeyaay people is analogous to the role of a cathedral or other house of worship that has endured for hundreds of years in Christian religion.  For that reason, the Kumeyaay have strongly resisted attempts to develop portions of Kuchamaa, including plans to build electrical transmission lines across it and to build a park on top of it.  Kumeyaay resistance led to these proposals being dropped.

East of Tecate Peak, the Kumeyaay Boundary Mountain (Awi'hopil) is located just north of the border in east San Diego county.  Awi'hopil is a sacred place to the Kumeyaay.  Elliott Decl. ¶¶ 4, 6.  It is located less than a thousand feet from where Defendants are constructing the border fence.  Carrico Decl. ¶ 14.  Access to Awi'hopil is provided by the Jewell Valley trail system, which begins north and east of Boundary Mountain.  Awi'hopil's peak was a midpoint resting place for Kumeyaay and other native runners as they traveled from the mountains to the north, through the Jewell Valley, south into what is now Mexico.  *Id.*  The peak is also known to the Kumeyaay as Lookout Point because of the stunning panorama of Kumeyaay territory offered from its summit.  *Id.*  The Kumeyaay people's use and occupancy of this area is confirmed by an archaeological site, P-37-004466, comprised of a 40 to 50 meter area, which is located just 5 to 10 yards north of the border fence and southwest of Boundary Mountain.  *Id.*

Jacumba Valley (Jacume/Hametaay) is a village site east of Awi'hopil, in the southeast corner of San Diego county.  It extends from a center near the Jacumba Hot Springs several miles in all directions, including south into Mexico.  Jacumba Valley is highly significant in Kumeyaay culture and religious practice, historically and to the present day.  Carrico Decl. ¶¶ 15-17; Elliott Decl. ¶¶ 4, 5, 10.  In the Kumeyaay language, Jacumba Valley is known as "Hametaay," meaning "pumpkin" or "pumpkin shaped" in reference to its landform.  Carrico Decl. ¶ 15.  Jacumba itself probably means "bubbling" or "roiling water" in refence to the hot springs there, which are associated with well-known archaeological sites that document the Kumeyaay people's use and occupancy of the Jacumba Valley.  *Id.*

Jacumba Valley is also the central location of a Kumeyaay origin story, in which two brothers who were creators, Tuchaipai and Yokomatis, emerged from the ground at the base of a hill among the Jacumba springs.  *Id.* ¶ 16.  Kumeyaay have traditionally believed that a hill at Jacumba is the house built by the two brothers, and that the hot spring just south of the hill is the portal to the house.  *Id.*  Kumeyaay traditionally used water from the Jacumba springs for bathing and its restorative powers.  *Id.*  From the hill one can see Mokopá, an important landmark mountain several miles to the south in Mexico.  *Id.*

The historical and cultural importance of Jacumba Valley is confirmed by the inclusion of the Jacumba Valley Archaeological District ("District") on the NRHP.  Haws Decl. ¶ 23.  The District covers a 4,222-acre area generally encompassing the northern half of the Jacumba Valley and evidences the Kumeyaay's long occupation of the area surrounding Jacumba, including the project site.  *Id.*  The District comprises 144 prehistoric archaeological sites, which include village sites, sacred and ceremonial sites, lithic scatters, earth ovens, and a 10,000-year-old stone hearth. *Id.*  The District also includes other culturally significant sites, such as plant-gathering locales and

trails.  *Id.*   Portions of the District have been identified as ethnographically significant by Kumeyaay elders and non-tribal ethnographers.  *Id.*  The District is immediately adjacent to the border fence near Jacumba.  *Id.*

The Jacumba Valley area, including the District, continues to be important for Kumeyaay religious and cultural practices, including gathering.  Elliott Decl. ¶¶ 10-11.  Kumeyaay rock art and face painting, traditional elements of Kumeyaay religion and culture, rely on an iron oxide scum that appears in some of the pooled ground water in the area, which is boiled to produce a brilliant red to orange pigment.  Carrico Decl. ¶ 17.  Kumeyaay also collect juniper, white sage, greasewood, and jojoba in the area for ceremonial use.  *Id.*; *see also* Elliott Decl. ¶¶ 10-11.  And just south of Jacumba in Mexico is a ceremonial solstice site named Rumorosa, which is used by Kumeyaay people, Elliott Decl. ¶¶ 4, 8, and evidences the importance of the area between Rumorosa and Jacumba where the project site is located.

East of the Jacumba Valley, in Imperial County, the Yuha Basin includes the Yuha Discontiguous Archaeological District, which was listed on the NRHP in 1981.  In 1977, a survey performed by the Imperial Valley College Museum produced the greatest concentration of pre-contact archaeological resources in southern California to that date.  These resources record the prehistorical existence and lifeways of the Kumeyaay people.  The Yuha Basin and Discontiguous Archaeological District are connected by historic trails to other parts of the Kumeyaay homeland. Haws Decl. ¶ 24.

For generations, the Kumeyaay trail system has linked their villages in the west with those to the east, and to the sacred sites across their territory.  Carrico Decl. ¶ 18.  For example, these trails link Jacumba to several villages to the north, within what are now the Manzanita, Campo and La Posta Indian Reservations.  *Id.*  The trail complex also goes west to the Yuha Basin.  Many

of the recorded trails are associated with travel, trade, and procurement of resources.  Other trails have a spiritual and sacred nature.  For example, Kumeyaay holy men and healers (kwesiyaay) used special trails to access meditation sites such as Kuchamaa, to travel to sacred springs, and to perform rituals that historically included painting images on rock faces.  *Id.*

The wild populations of big horn sheep that inhabit the border region have special cultural significance to the Kumeyaay people.  Elliott Decl. ¶ 17.  Big horn sheep live in small, fragmented communities that travel long distances across mountain terrains separated by broad valleys to seek sources of water, to mate, and to give birth.  *See* Robert L. Peters et al., Defs. of Wildlife, *In the Shadow of the Wall: Part II Borderlands Conservation Hotspots on the Line* 9-10 (2018) ("Defenders of Wildlife").[2] Numerous communities of big horn sheep live on either side of the international border and travel back and forth, including populations in California that travel into Mexico for sources of water and to give birth.  *Id.*  The population of Peninsular big horn sheep in southeastern California are protected by the federal Endangered Species Act as an endangered species.  *See* Endangered and Threatened Wildlife and Plants, 74 Fed. Reg. 17,288 (Apr. 14, 2009). Construction of a new border fence in Imperial County between existing fence sections would disrupt a critical migration path for big horn sheep, which would irreparably harm the health of the species.  *See* Defenders of Wildlife at 9-10.

The continuation of the religion and culture of the Kumeyaay people depends on their access to, and the availability of, the sacred sites, mountains, trails, landscape, and cultural and natural resources in the region described above.  Construction of the new border fence threatens to terminate their ability to do so in critical respects as the new sections of border fence that are now being constructed directly affects these sites, and construction is proceedings without the

---

[2] https://defenders.org/sites/default/files/migration/docs/defenders-borderreport-partii.pdf.

consultation with the Kumeyaay Tribes that the law requires, which would afford the Defendants and the Kumeyaay people an opportunity to identify the potential impacts, and plan to avoid or mitigate those impacts in the construction of the border wall.

This is demonstrated, without more, by the identification and mistreatment of human remains in the area where the border fence is proposed to be built.  Probable human remains were found at the project site near Tierra del Sol, the human nature of which was confirmed by a forensic anthropologist from the San Diego County Medical Examiner's Office, who traveled to the proposed border fence site and found that faunal remains found during construction are likely human.  Carrico Decl. ¶ 30; Haws Decl. ¶ 18.  Human remains were also found at site SDI-4281, which is just north of the Project site and southwest of Boundary Mountain, during construction of another segment of the border fence in west San Diego.  Carrico Decl. ¶ 26.  Those remains were discovered at an extensive archaeological site that was previously undocumented.  These human remains were not and are not treated by Defendants as subject to the requirements of NAGPRA.

The Kumeyaay people's historic and continuing use and occupancy of the border region, the identification of human remains within the Project site, and the inability of the Kumeyaay to monitor earthmoving activities at the site, makes the further discovery of Kumeyaay burial sites, and the destruction or disturbance of human remains at those burial sites inevitable.  Particularly distressing for the Kumeyaay Plaintiffs is that in these circumstances, they are unable to engage in the ceremonies necessary to rest the souls of the deceased in peace, *see* Elliott Decl. ¶ 15; Santos Decl. ¶ 16, which causes irreparable harm.

## LEGAL STANDARD

When courts review a request for preliminary injunctive relief, "[t]he same standards apply for both temporary restraining orders and preliminary injunctions."  *Experience Works, Inc. v.*

*Chao*, 267 F. Supp. 2d 93, 96 (D.D.C. 2003) (citing *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)).  To obtain either form of injunctive relief, a plaintiff must show: (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Under the first factor, "[p]laintiffs need only establish a likelihood of success on the merits of one claim to obtain the injunctive relief that they seek." *A.B.-B. v. Morgan*, No. 20-CV-846 (RJL), 2020 WL 5107548, at *6 (D.D.C. Aug. 31, 2020) (citing *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 21 (D.D.C. 2020)); *see also League of Women Voters of U.S. v. Newby* (*League of Women Voters II*), 963 F.3d 130, 134 (D.C. Cir. 2020) (describing court's prior grant of injunction based on "finding that plaintiffs . . . were likely to succeed on the merits of at least one claim").  Harm is irreparable under the second factor if it is "so 'imminent that there is a clear and present need for equitable relief'" and it is "beyond remediation." *League of Women Voters of U.S. v. Newby* (*League of Women Voters I*), 838 F.3d 1, 8 (D.C. Cir. 2016) (alteration omitted) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).  And "[w]here, as here, the federal government is the opposing party, the balance of equities and public interest factors merge." *Confederated Tribes of Chehalis Reservation v. Mnuchin*, No. 20-CV-01002 (APM), 2020 WL 1984297, at *6 (D.D.C. Apr. 27, 2020) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

"In this jurisdiction, courts evaluate the four preliminary injunction factors on a 'sliding scale'—if a 'movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor.'" *Id.* (quoting *Davis v. Pension*

11

*Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009)).  While some courts have noted that the Supreme Court's decision in *Winter* "raised doubts over whether the 'sliding scale' framework continues to apply," *id.*, "[i]n the absence of a D.C. Circuit decision overruling it, the sliding scale framework remains binding precedent that this court must follow," *id.* at *7.  Thus, a court in this Circuit evaluates whether the "four factors, taken together, warrant relief."  *League of Women Voters I*, 838 F.3d at 6 (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016); and citing *Winter*, 555 U.S. at 20-22).  Here, that standard is plainly met by the "unusually strong showing" that Plaintiffs will succeed on the merits of their claims, and because of the irreparable damage that Defendants' actions pose to Plaintiffs' religious and cultural and rights and patrimony, which is fundamental to their identity and existence, and protected by the very federal laws that Defendants are violating.

## ARGUMENT

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

Plaintiffs are likely to succeed on the merits of their claims because Defendants have utterly failed to comply with their obligations under IIRIRA, other federal statutes that govern federal construction projects like the border fence projects, and the Constitution of the United States.  With respect to their obligations under federal statutes other than IIRIRA, Defendants have purported to carry out the border barrier projects under waivers issued under IIRIRA.  However, the waivers on which they have relied were issued by an Under Secretary of Homeland Security, not someone lawfully holding the position of Secretary of Homeland Security, and the waivers are therefore invalid and do not authorize Defendants' actions.  While Defendants may argue that this Court lacks jurisdiction over Plaintiff's claims under a jurisdictional provision found in IIRIRA, that provision does not apply here for the same reason: it governs only challenges to waivers issued by

the Secretary of Homeland Security, who in fact has never issued a waiver for these projects, and not the purported issuance of a waiver by someone who is not the Secretary.

> ### A.   Defendants Must Comply with the Consultation Requirement of IIRIRA Before Construction Authorized by IIRIRA May Begin.

Defendants are carrying out the projects in eastern San Diego County and Imperial County under Section 102 of IIRIRA, Pub. L. No. 104-208, div. C, tit. I, § 102, 110 Stat. 3009, 3009-554 (codified as amended at 8 U.S.C. § 1103 note), which gives the Secretary of Homeland Security authority to "construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective and provide for the installation of additional physical barriers, roads, lighting, cameras, and sensors to gain operational control of the southwest border." IIRIRA § 102(b)(1)(A).

Section 102(b)(1)(C)(i) of IIRIRA requires that, in order to carry out the responsibilities imposed by "this section"—i.e., Section 102 of IIRIRA—the Secretary "shall consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed." IIRIRA § 102(b)(1)(C)(i). The Secretary is under a mandatory duty to consult with Indian tribes and others. *Alabama v. Bozeman*, 533 U.S. 146, 153 (2001) ("The word 'shall' is ordinarily the 'language of command.'" (quoting *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947))); *In re Border Infrastructure Env't Litig.*, 284 F. Supp. 3d 1092, 1123 (S.D. Cal. 2018) (reviewing consultation provision and finding "[t]his provision is mandatory"). That consultation must take place before construction of the border fence authorized by IIRIRA begins, as indicated by the requirement that consultation must regard "sites at which such fencing "*is to be constructed*." IIRIRA § 102(b)(1)(C)(i) (emphasis added).

And because the consultation requirement governs how the Secretary carries out all of Section 102, the Secretary must also consult with Indian tribes under Section 102(b) before waiving the requirements of other laws under Section 102(c)(1).  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 155-56 (D.D.C. 2017) (scope of consultation obligations is determined by the legal authorities establishing those obligations); *see Adoptive Couple v. Baby Girl*, 570 U.S. 637, 652 (2013) (provisions occurring in adjacent subsections of a statute "should be read in harmony"); *Shell Oil Co. v. Iowa Dep't of Revenue*, 488 U.S. 19, 25 (1988) (words must be read with "reference to the statutory context"); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("words of a statute must be read in their context and with a view to their place in the overall statutory scheme").[3]  Pre-waiver consultation allows the Secretary to obtain the information needed to develop standards on how to protect "the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed" before deciding whether to waive federal laws that protect those interests, which may provide the best or only means of affording that protection. In short, IIRIRA does not authorize the Secretary to waive laws without prior effective consultation

---

[3] That the waiver provision applies "[n]otwithstanding any other provision of law" does not change this conclusion.  *See* IIRIRA § 102(c)(1).  The phrase "notwithstanding any other provision of law" as it is used in IIRIRA plainly is intended to instruct reviewing courts on how to harmonize a waiver issued under IIRIRA with the provisions of the pre-existing statutes that the Secretary might have waived, not to create exceptions to the requirements of other provisions of IIRIRA. *See Nat'l Coal. to Save Our Mall v. Norton*, 269 F.3d 1092, 1095 (D.C. Cir. 2001) (citing Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225, 237-42 (2000)); *Ill. Nat'l Guard v. Fed. Lab. Rels. Auth.*, 854 F.2d 1396, 1403 (D.C. Cir. 1988) (quoting *N.J. Air Nat'l Guard v. Fed. Lab. Rels. Auth.*, 677 F.2d 276, 283 (3d Cir. 1982)).  When Congress indicates that a "notwithstanding" clause specifically affects other provisions of the same law, it knows how to do so.  *See* 5 U.S.C. § 3345(a)(2)-(3) (providing provisions of paragraphs (2) and (3) of subsection (a) apply "notwithstanding paragraph (1)" of subsection (a)).

concerning, *inter alia*, the impacts of such a waiver, and how best to mitigate those impacts if a waiver is granted.

The Southern District of California noted that this is the "logical" interpretation of the statute but nevertheless decided that IIRIRA does not require the Secretary to complete the consultation process before issuing waivers or even before beginning construction. *In re Border Infrastructure Env't Litig.*, 284 F. Supp. 3d at 1125-26; *see also La Posta Band of Diegueño Mission Indians of La Posta Reservation v. Trump*, No. 3:20-cv-01552, slip op. at 22-25 (S.D. Cal. Sept. 9, 2020) (finding requirement was not sufficiently clearly mandatory to meet requirements for establishing an *ultra vires* common law cause of action), *appeal filed*, No. 20-55941 (9th Cir. filed Sept. 8, 2020).   But that conclusion cannot be reconciled with the text of IIRIRA.   Section 102(b)(1)(C)(i) of IIRIRA refers to the construction of the border fence subject to consultation using the infinitive tense "to be," indicating that construction "is due to happen." *See New Oxford American Dictionary* 142 (3d ed. 2010).   That differs from the present-tense use of "shall consult" earlier in the same subparagraph to describe the Secretary's mandatory obligation to consult.   In short, consultation comes before construction.   When Congress varies verb tenses to set the different requirements of a statute, courts presume that the varying tenses communicate different meanings. *Carr v. United States*, 560 U.S. 438, 449-50 (2010).   In this case, the use of the present tense "shall consult" imposes a prospective obligation on the Secretary of Homeland Security to consult, *see id.* at 449, and Congress's switch to the infinitive "to be" to describe construction indicates that construction is "due to happen" after consultation—meaning that construction cannot be authorized until the Secretary consults, consistent with the purposes of the consultation requirement to "minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents" located near construction, *see United States v. Katz*, 271 U.S.

15

354, 357 (1926) (laws are to be given sensible construction in light of the general legislative purpose of the act); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 585 (1992) (Stevens, J., concurring in the judgment) (when Congress mandates inter-agency consultation, "we must presume that such consultation will have a serious purpose that is likely to produce tangible results").

In their unbridled haste to construct these projects, the Defendants acted before the consultation requirement had been met.  When DHS first announced its plans to construct in 2018, Plaintiff Manzanita insisted that it must be consulted before construction could begin.  Santos Decl. ¶ 5; Haws Decl. ¶¶ 6-7.  But no discussion with Plaintiff Kumeyaay Tribes regarding these projects took place until *after* DHS announced on March 16, 2020, that it was constructing new portions of a border fence in eastern San Diego and Imperial Counties and the Defendant Wolf purported to waive the requirements of numerous federal laws for those projects.  *See* Haws Decl. ¶¶ 10-11.  And construction commenced before DHS or the Secretary of Homeland Security engaged in consultation to evaluate the impacts of construction on Kumeyaay religious beliefs, develop a monitoring plan by which Kumeyaay members could observe impacts to cultural and religious sites and artifacts and burial sites or human remains, or develop accommodations for Kumeyaay religious practice and ceremonies.  *See* Haws Decl. ¶¶ 12, 19, 21, 25b-c, e-k.  What interaction that did occur has not been sufficient to gather such information from Kumeyaay tribes.  *See id*; Santos Decl. ¶ 13.  Therefore, construction began without the information required to determine how to minimize the effects of construction on communities near the border.  Even after construction began, tribal representatives repeatedly raised concerns that human remains had been found near the project site, that therefore it was critically important that proper surveying and monitoring take place, and that more monitoring was needed to protect cultural resources.  Haws Decl. ¶¶ 12, 17-18; Santos Decl. ¶¶ 14-15.  Defendant CBP did not halt construction to consult

16

and develop new monitoring or construction protocols, choosing instead to downplay tribal concerns and to assert that they would continue to share information about what CBP had *already* decided to do.  *See* Haws Decl. ¶ 14.

In light of these shortcomings in consultation, the Plaintiff Kumeyaay Tribes again asked for consultation on August 3, 2020.  Santos Decl. ¶ 6; Ex. 2 to Santos Decl., Letter from Angela Elliott Santos, Chairwoman, Manzanita Band of Kumeyaay Nation et al., to Chad F. Wolf, Acting Sec'y, Dep't of Homeland Sec. et al. at 11 (July 31, 2020) ("July 31 Letter").  DHS's resulting consultation efforts were again inadequate, and DHS still failed to halt construction during consultation.  Santos Decl. ¶¶ 8-19; Ex. 8 to Santos Decl., Letter from Aaron M. Heitke, Chief Patrol Agent, U.S. Border Patrol, San Diego Sector to Angela Elliott Santos, Chairwoman, Manzanita Band of Kumeyaay Nation, at 2 (August 20, 2020) ("we cannot halt construction activities").  Since then, construction has continued, and consultation has been minimal and halting.  Haws Decl. ¶¶ 21, 25b-c, e-k.  As a result, the monitoring plans for the projects are plainly inadequate, and nowhere near the scope and sufficiency of those provided in other recent projects, such as the Tule Wind project in Kumeyaay aboriginal territory.  July 31 Letter at 11.  CBP has also informed the Kumeyaay Tribal Plaintiffs that it does not have access to enough funding to have tribal monitors at both the eastern San Diego and Imperial County projects, and it originally had no plans to provide monitors at the Imperial County project, Haws Decl. ¶ 25k, where indeed construction has taken place without tribal monitoring, Santos Decl. ¶ 14.

Defendants acted arbitrarily, capriciously, and otherwise not in accordance with law when they engaged in construction authorized under IIRIRA § 102(b)(1)(A) before consultation to determine how to minimize the effects of construction was complete, as required by § 102(b)(1)(C)(i).  Their belated consultation efforts have not been sufficient to give Defendants

the information required to determine how to minimize the negative effects of border fence construction. Because Defendants have and are plainly violating their statutory obligations, the Plaintiffs are likely to succeed on the merits of their claim that Defendants have arbitrarily and capriciously and not in accordance with law engaged in construction under IIRIRA § 102(b)(1)(A)

**B.      Defendants' Demand that Plaintiffs Engage in Consultation Without Stopping Construction Violates RFRA.**

Defendants have also demanded that the Plaintiff Kumeyaay Nations engage in "communication" and "coordination" *while construction is ongoing*—effectively requiring the Plaintiff Kumeyaay Tribes to accept severe ongoing restrictions on their ability to engage in Kumeyaay religion in exchange for the benefit of consultation, purportedly to determine how to minimize effects which have already occurred and are continuing. This self-defeating plan violates Defendants' obligations under RFRA.

RFRA was "designed to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706 (2014). It provides that "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," but provides an exception under which the federal government *can* burden the exercise of religion but only if the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a) to (b). This protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.* § 2000bb-2(4) (incorporating by reference 42 U.S.C. § 2000cc-5(7)(A)). RFRA "applies to all Federal law, and the implementation of that law, whether statutory or otherwise." *Id.* § 2000bb-3(a).[4]  And it gives any person—including natural

---

[4] The Secretary of Homeland Security has never purported to waive the applicability of RFRA to the Projects—but could not in any event, because RFRA provides that "Federal statutory law

persons like Mr. Elliott and the Plaintiff Kumeyaay Tribes' members, as well as nonprofit associations like KHPC, *see Hobby Lobby*, 573 U.S. at 707-08—who suffers a violation of RFRA an independent cause of action against the federal government. 42 U.S.C. § 2000bb-1(c). The Plaintiff Kumeyaay Tribes can, therefore, prosecute a *parens patriae* action against the Government on behalf of their members to vindicate their sovereign or quasi-sovereign interests in protecting tribal culture and religion. *See Kickapoo Tribe of Okla. v. Lujan*, 728 F. Supp. 791, 793 (D.D.C. 1990) (noting that a tribe may bring a case *parens patriae* when the tribe is "acting on behalf of all of its members"); *Quapaw Tribe of Okla. v. Blue Tee Corp.*, 653 F. Supp. 2d 1166, 1179-80 (N.D. Okla. 2009) (citing *Moe v. Confederated Salish & Kootenai Tribes of Flathead* Reservation, 425 U.S. 463 (1976); *Delorme v. United States*, 354 F.3d 810 (8th Cir. 2004)).

The government imposes a "substantial burden" on religious exercise in violation of RFRA when it forces a person to "choose between following the precepts of [one's] religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of [one's] religion in order to accept [benefits], on the other hand . . . ." *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008) (quoting *Sherbert v. Verner*, 374 U.S. 398, 404 (1963)). Plaintiffs face that choice here. Areas of unique religious significance to the Kumeyaay are being harmed or degraded by the ongoing construction in ways that damage their integrity and undermine the Kumeyaay people's ability to practice their religion. Elliott Decl. ¶¶ 10-12, 15. And when Kumeyaay individuals have asked to engage in religious practices at or near the project site, they have had to engage in in-person negotiation with CBP and Corps officials to determine how they might do so. *Id.* ¶ 16; *La Posta*

---

adopted after November 16, 1993, is subject to this chapter unless such law explicitly excludes such application by reference to [RFRA]." *Id.* § 2000bb-3(b). Although IIRIRA gives the Secretary of Homeland Security the authority to waive other laws, it does not expressly mention RFRA, and so the Secretary's waiver power does not extend to RFRA. *See Hobby Lobby*, 573 U.S. at 719 n.30; *Gartrell v. Ashcroft*, 191 F. Supp. 2d 23, 36-37 (D.D.C. 2002).

*Band*, slip op. at 4 (discussing Parada declaration).  And, because there are an insufficient number of monitors, including a sometimes total lack at the Imperial County project, *see* Haws Decl. ¶¶ 17-18, 25g-h, k; Santos Decl. ¶ 14, monitoring is inadequate for Kumeyaay people to determine when and where they should engage in necessary religious ceremonies required after human remains are disinterred or separated.  These actions have made it "effectively impracticable" for Kumeyaay to engage in religious exercise in the manner mandated by their faith.  *See Singh v. Carter*, 168 F. Supp. 3d 216, 228 (D.D.C. 2016) (quoting *Nelson v. Miller*, 570 F.3d 868, 878-79 (7th Cir. 2009)).

At the same time, the Plaintiffs must accept these burdens as the price of engaging in consultation to attempt to minimize future, perhaps even more severe burdens on religion.  *See* Santos Decl. ¶ 17.  That means they must tolerate the destruction of religious sites and the elimination of access to areas where they engage in religious exercise, and thereby violate their religion, as a necessary and unavoidable condition of the consultation offered to them by the Government.  The alternative is to refuse to engage in consultation, adhere to the tenets of their religion, but lose any opportunity to minimize the federal government's continuing harm to their religious practice.

This is more than the "minimal burden" imposed by engaging in minor bureaucratic compliance which the D.C. Circuit has in other circumstances found is not foreclosed under RFRA. *See Priests for Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229, 237 (D.C. Cir. 2014), *vacated and remanded sub nom. Zubik v. Burwell*, 136 S. Ct. 1557 (2016).  Rather, it requires that the Kumeyaay people forfeit their right to practice religion at many different locations of spiritual significance and accept damage, destruction, and desecration to their religious sites, all imposed in many different ways by Defendants' ongoing activities, in order to hopefully limit in some small way how religious practice will be negatively impacted in the future.  And the threat that the

Kumeyaay who try to engage in ceremonies at disinterments at the project site may be barred from the project site or punished for going there without permission, undermines the Kumeyaay people's ability to engage in necessary elements of their religion throughout the project area, which also imposes a substantial burden on their religion.  *See Mockaitis v. Harcleroad*, 104 F.3d 1522, 1531 (9th Cir. 1997);[5] *United States v. Hoffman*, 436 F. Supp. 3d 1272, 1285 (D. Ariz. 2020) ("The prosecution of Defendants" for entering federal lands without a permit to leave water and supplies for migrants traveling through the desert "prevents them 'from participating in an activity motivated by sincerely held religious beliefs'" and "substantially burdens" their religious exercise) (quoting *Yellowbear v. Lampert*, 741 F.3d 48, 55 (10th Cir. 2014) (Gorsuch, J.)).

In substantial effect, then, Defendants' approach to consultation has pressured Kumeyaay people, including Plaintiffs and their members, into accepting the elimination of part of their religious practice and giving it up forever, in exchange for consulting about how to save some other part of it.  RFRA forbids this.  *See Thomas v. Review Bd.*, 450 U.S. 707, 717 (1981) (pressuring a person to give up religious exercise in exchange for a benefit results in "indirect" compulsion that "is nonetheless substantial" and burdens free exercise of religion).  Moreover, the construction of the border fence and the barriers that Defendants have put in the way of Kumeyaay re-interment ceremonies is classic government coercion that prevents Kumeyaay from engaging

---

[5] The Ninth Circuit distinguished *Mockaitis* in a 2-1 decision in *Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058, 1073 n.15 (9th Cir. 2008), because *Mockaitis* applied RFRA to a local government, which was barred by the Supreme Court's decision in *City of Boerne v. Flores*, 521 U.S. 507, 532 (1997), and because it found the *Mockaitis* discussion of substantial burden was not clearly defined.  As the dissent in *Navajo Nation* noted, however, "the federalism holding of *City of Boerne* . . . was entirely unrelated" to the Ninth Circuit's substantial burden analysis, and the majority in *Navajo Nation* failed to provide "any explanation of why the result reached in *Mockaitis* is incorrect."  535 F.3d at 1092-93 (Fletcher, J., dissenting).  Indeed, no such explanation could be forthcoming, as *Mockaitis* correctly concluded that government conduct that coerces a religious adherent into not undertaking religious ceremonies required by his or her faith imposes a substantial burden on that person.

in religious ceremonies.  That IIRIRA, and any other authorities under which Defendants may bar access to the project site, are laws of general applicability that were not specifically intended to interfere with Kumeyaay religious practice is of no import, since RFRA forbids laws of general applicability from having such impacts.  *See Hobby Lobby*, 573 U.S. at 694 (quoting 42 U.S.C. § 2000bb-1(a)).

Nor does the burden imposed by Defendants' actions satisfy the compelling interest test that RFRA requires the government to satisfy in order to impose such a substantial burden.  RFRA "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened."  *Id.* at 726 (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-31 (2006)).  "This requires us to 'loo[k] beyond broadly formulated interests' and to 'scrutiniz[e] the asserted harm . . .'" of accommodating religious exercise.  *Id.* at 726 (alterations in original) (quoting *O Centro*, 546 U.S. at 431).  At both the preliminary injunction and merits stages, the Government carries the burden of proof to demonstrate that the burden on religious exercise is the least restrictive alternative of achieving a compelling government interest.  *O Centro*, 546 U.S. at 429.

The Defendants have not articulated a compelling interest that would justify the burden on Kumeyaay religious practice.  Presumably, their interest, like President Trump's, is in constructing a barrier, in an attempt to prevent illegal entry into the United States from Mexico.  *See* Compl. ¶¶ 46-47.  But even if that were a compelling interest, the Government's chosen approach is not the most narrowly tailored way to achieve that interest while avoiding impacts on Kumeyaay religion. The Government could have, from the start, engaged in the consultation that the Plaintiff Manzanita requested two years ago and, again on August 3, through the consultation process, then

developed a plan to minimize the impacts of border fence construction on Kumeyaay religion. After completing consultation, the Government could have planned a border wall route or construction methods, schedules, and protocols that would accommodate Kumeyaay religious practice and ceremonies and protect the integrity of sacred sites. This would have allowed for the border fence and infrastructure to be constructed, and the goals of the border fence achieved, without imposing a burden on Kumeyaay religious exercise by coercing the Kumeyaay not to engage in religious ceremonies or by requiring the trade-off, *after* construction began, of religious exercise for consultation. Because this alternative was and is available and Defendants did not take it, their actions violated and continue to violate RFRA.

### C.   Defendants Have Violated NEPA, the NHPA, NAGPRA, and the ESA.

#### 1.   Defendants Have Not Complied with their Obligations under NEPA, the NHPA, NAGPRA, and the ESA.

The construction of the border fence in eastern San Diego County and western Imperial County involves the expenditure of federal funds as part of a project undertaken by federal agencies on federal lands. Therefore, the projects trigger a number of federal laws that require agencies to "stop, look, and listen" before undertaking such efforts.

For instance, under the National Environmental Policy Act, before a federal agency can approve a major federal project like construction activities in a defined geographic area, it must take a "hard look" at the possible environmental impacts of the proposal, proposed alternatives to the proposal, and provide a full and fair discussion of the project's significant environmental impacts. 42 U.S.C. § 4332(C)(i)-(iii); 40 C.F.R. §§ 1502.1, 1508.8, 1508.11.[6] This process begins

---

[6] On September 14, 2020, new regulations governing the NEPA process went into effect. *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304, 43,304 (July 16, 2020) (providing effective date of new rules). However, these new rules are not retroactive to activities begun before September 14, 2020, unless

with a written environmental assessment prepared by the agency, and, if the agency determines that further environmental study is required, a written environmental impact statement, 40 C.F.R. §§ 1501.2, 1501.3, which must include content required by the federal regulations, *id.* pt. 1502. Such study must be done in accordance with principles of environmental justice, *see Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004), under which federal agencies must specifically consider Indian tribes' uses of resources for unique cultural purposes, and the affected tribes' preferred mitigation strategies, Council on Env't Quality, Exec. Office of President, *Environmental Justice: Guidance Under the National Environmental Policy Act* 16 (1997).[7]  Despite the effects the projects will impose on Kumeyaay religious and ceremonial practices, values and resources, such as native plants, access to sacred sites, and the viewscape, Elliot Decl. ¶¶ 9-18, none of this has been done.

Under the National Historic Preservation Act, a federal agency must "take into account the effect of [a federal] undertaking on any historic property," 54 U.S.C. § 306108; *see* 36 C.F.R. § 800.1(a), where a "historic property" is a property listed on the NRHP or eligible for listing, *see* 36 C.F.R. § 800.16(*l*).  A federal undertaking is a "project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency," *id.* § 800.16(y), which includes the projects at issue here.  Agencies must consider the potential effects of the undertaking on historic properties before the expenditure of federal funds on the project is approved, *id.* § 800.1(c), and make a written determination of whether there will be potential effects with

the agency specifically applies them.  *Id.* at 43,372.  DHS, CBP, and the Corps have not applied the new NEPA regulations here, so the NEPA regulations cited in the body of this brief are the regulations that were in place on March 16, 2020, when DHS announced the projects, and during the period when construction began.  But, even if the new NEPA regulations did apply, Defendants have not complied with the new regulations, either.

[7] https://www.epa.gov/sites/production/files/2015-02/documents/ej_guidance_nepa_ceq1297.pdf.

supporting documentation, *id.* § 800.11(a), (d), (e).  That must be done in consultation with Indian tribes that attach cultural and religious significance to historic properties that may be affected.  *Id.* §§ 800.2(c)(2)(ii), 800.6.   Numerous historic properties that have cultural and religious significance to the Kumeyaay, including NRHP-listed sites, will or may be affected by the projects. *See* Elliott Decl. ¶¶ 4-8; Haws Decl. ¶¶ 21-24; Carrico Decl. ¶¶ 13-25; Santos Decl. ¶ 14.  But Defendants have not engaged in the NHPA process or begun the process.

NAGPRA, 25 U.S.C. §§ 3001-3013, governs the federal government's treatment and possession of Native American cultural items, which include human remains, funerary objects used as part of a death rite or ceremony, sacred objects used in the practice of traditional Native American religion, and "cultural patrimony," which are objects "having ongoing historical, traditional, or cultural importance central to the Native American group or culture itself, rather than property owned by an individual Native American, and which, therefore, cannot be alienated, appropriated, or conveyed by any individual . . . ."  *Id.* § 3001(3).

NAGPRA provides that, if any person—which includes employees or contractors of federal agencies, *see* 1 U.S.C. § 1 (defining "person"); *see also Little v. Shell Expl. & Prod. Co.*, 690 F.3d 282, 286 (5th Cir. 2012) (citing *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 454-55 (2012) (discussing expansive meaning of "person" in common use and under the Dictionary Act)—knows or has reason to know they have discovered Native American cultural items on Federal lands after November 16, 1990, then they must: notify the head of the department or agency having management authority over the lands; cease the activity that resulted in the discovery of the cultural items in the area of the discovery; and make a reasonable effort to protect the items before resuming the activity.  25 U.S.C. § 3002(d)(1).  Any such activity may not resume until thirty days after the head of the agency or department certifies that notice has been received.

*Id.* If the cultural items uncovered are human remains or funerary objects associated with human remains, then those cultural items belong to the lineal descendants of the dead person. *Id.* § 3002(a)(1). If the cultural items are funerary objects that are not associated with human remains, sacred objects, or cultural patrimony, then they belong to the Indian tribe with the closest cultural affiliation with the items. *Id.* § 3002(a)(2)(B).

NAGPRA applies to the project sites of the border barrier construction, which are located in areas that certainly contain Kumeyaay cremation sites. Santos Decl. ¶¶ 15-16; Carrico Decl. ¶¶ 28-30. However, Defendants have not attempted to comply with NAGPRA to the construction of the border fence.

Under the Endangered Species Act, *see* 16 U.S.C. § 1533, federal agencies must engage in consultation with the U.S. Fish and Wildlife Service ("FWS") to determine how to "reduce the likelihood of conflicts between listed species or critical habitat and proposed actions," 50 C.F.R. § 402.11(a), where "actions" includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States," *id.* § 402.02. The construction of the border fence in eastern San Diego County and western Imperial County constitutes such "actions."

The federal agency responsible for the action must develop a biological assessment to "evaluate the potential effects of the action on listed and proposed species and designated and proposed critical habitat, and determine whether any such species or habitat are likely to be adversely affected by the action." *Id.* § 402.12(a). A biological assessment must be completed before "any contract for construction is entered into and before construction is begun." *Id.* § 402.12(b)(2). If a listed species or critical habitat may be present, the agency must complete a biological assessment, *id.* § 402.12(d)(2), which the agency must submit to the Director of the

FWS for the Director's review and concurrence, *id.* § 402.12(j).  The agency must then develop a biological opinion with FWS on whether the proposed action will jeopardize the continued existence of a species protected by the ESA, or result in the destruction or adverse modification of a habitat that is essential for the conservation of a species protected by the ESA.  *Id.* §§ 402.02, 402.14(h).  The Defendants have not undertaken any of these mandatory requirements, despite the fact that the border fence will slice through the range of the endangered Peninsular Bighorn Sheep.  *See* Elliott Decl. ¶ 17; Defenders of Wildlife at 10; Compl. ¶ 37, at 16.

      **2.**     **Defendants' Obligations under NEPA, the NHPA, NAGPRA, and the ESA Were Never Waived Under IIRIRA.**

No doubt Defendants will take the position that NEPA, the NHPA, NAGPRA, and the ESA do not apply to the projects, because the Defendant Wolf purported to waive them under IIRIRA by publishing waiver notices in the Federal Register on March 16, 2020.[8]  But IIRIRA § 102(c)(1) only allows the *Secretary of Homeland Security* to waive federal laws.  The Defendant Wolf has never legally held the position of Secretary of Homeland Security—his highest position in the Department has only ever been the *Under Secretary of Homeland Security for Plans, Policy, and Strategy*.  Therefore, any waivers he purported to issue are void *ab initio*, were not issued by the Secretary of Homeland Security, and do not exempt the projects from the applicability of any other federal laws.

The Defendant Wolf has never been confirmed to the position of Secretary of Homeland Security by the Senate and could only exercise the authority of that office pursuant to laws that Congress has passed under its Appointments Clause power, governing how a vacancy in the office

---

[8] *See* Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 85 Fed. Reg. 14,958 (Mar. 16, 2020); Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 85 Fed. Reg. 14,960 (Mar. 16, 2020).

of the Secretary is filled by an Acting Secretary.  *See Fin. Oversight & Mgmt. Bd. v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1657 (2020).  The Appointments Clause, U.S. Const. art. II, § 2, cl. 2, requires the President to obtain the advice and consent of the Senate before appointing any principal officer of the United States—such as the head of a department, like the Secretary of Homeland Security—which is "among the significant structural safeguards of the constitutional scheme," *Edmond v. United States*, 520 U.S. 651, 659 (1997).  Congress has exercised this authority, "since the early days of the Republic, [to] authorize[] 'the President to direct certain officials to temporarily carry out the duties of a vacant [Senate-confirmed] office in an acting capacity, without Senate confirmation." *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 7 (D.D.C. 2020) (quoting *Nat'l Lab. Rels. Bd. v. SW Gen., Inc.*, 137 S. Ct. 929, 934 (2017)).

The laws authorizing such temporary designations that are relevant here, are the FVRA, 5 U.S.C. §§ 3345-3349d, *see SW Gen.*, 137 S. Ct. at 934, and Section 103 of the Homeland Security Act, as amended, 6 U.S.C. § 113.  The FVRA provides that

> [i]f an officer of an Executive agency . . . whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate, dies, resigns, or is otherwise unable to perform the functions and duties of the office—
>
> > (1) the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity subject to the time limitations of section 3346 . . . .

5 U.S.C. § 3345(a).  The FVRA also provides that the President may designate other officials or officers to serve as an acting officer, subject to conditions not relevant here.  *Id.* § 3345(a)(2)-(3). This statutory scheme is the "exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office," *id.* § 3347(a), *unless* "a statutory provision expressly . . . authorizes . . . the head of an Executive department, to designate an officer or

employee to perform the functions and duties of a specified office temporarily in an acting capacity . . . ." *Id.* § 3347(a)(1)(A).

Before December 23, 2016, the FVRA was the sole authority that governed succession to the office of the Secretary of Homeland Security.  On December 9, 2016, the President exercised his Section 3345(a)(2)-(3) authority to designate an order of succession for the office of Secretary of Homeland Security.  *See* Executive Order 13,753, Amending the Order of Succession in the Department of Homeland Security, 81 Fed. Reg. 90,667 (Dec. 9, 2016).  Executive Order 13,753 provides that, when there is a vacancy in the position of Secretary of Homeland Security, the following line of succession applies to determine who may serve as Acting Secretary:

(i)     Deputy Secretary of Homeland Security;
(ii)    Under Secretary for Management;
(iii)   Administrator for the Federal Emergency Management Agency [("FEMA")];
(iv)    Under Secretary for National Protection and Programs;
(v)     Under Secretary for Science and Technology;
(vi)    Under Secretary for Intelligence and Analysis;
(vii)   Commissioner of [CBP] . . . .

*Id.* at 90,667, § 1.[9]  On December 15, 2016, former Secretary of Homeland Security Jeh Johnson issued Delegation 00106, reiterating that the order of succession to the office of Secretary would be governed by Executive Order 13,753.

On December 23, 2016, Section 103 of the Homeland Security Act was amended to allow the Secretary of Homeland Security to set a department-specific order of succession for vacancies in the position of Secretary of Homeland Security.  *See* National Defense Authorization Act for Fiscal Year 2017 ("2017 NDAA"), Pub. L. No. 114-328, tit. XIX, § 1903(a)(2), 130 Stat. 2000,

---

[9] Since the issuance of Executive Order 13,753, Congress redesignated the Under Secretary for National Protection and Programs as the Director of the Cybersecurity and Infrastructure Security Agency ("CISA").  *See* Cybersecurity and Infrastructure Security Agency Act of 2018, Pub. L. No. 115-278, § 2(a), 132 Stat. 4168, 4169 (codified at 6 U.S.C. § 652(a), (b)).

2672 (2016) (codified at 6 U.S.C. § 113(g)).  Specifically, the amended Homeland Security Act provides that "the Under Secretary for Management shall serve as the Acting Secretary if by reason of absence, disability, or vacancy in office, neither the Secretary nor Deputy Secretary is available to exercise the duties of the Office of the Secretary," 6 U.S.C. § 113(g)(1), and "[n]otwithstanding chapter 33 of Title 5, the Secretary may designate such other officers of the Department in further order of succession to serve as Acting Secretary," *id.* § 113(g)(2).  Since this amendment to the Homeland Security Act, DHS has relied on the Homeland Security Act's procedures to define the order of succession to the office of Secretary of Homeland Security.  This has occurred through the amendment or revision of Delegation 00106 by the Secretary of Homeland Security.

On April 7, 2019, Secretary Nielsen announced in a letter to the President that she was resigning as Secretary of Homeland Security, "effective April 7."  *See* Letter from Kirstjen M. Nielsen, Sec'y of Homeland Sec., to Donald J. Trump, President of U.S. (Apr. 7, 2019), https://www.dhs.gov/sites/default/files/publications/19_0407_s1_nielsen-resignation-letter.pdf. At the time former Secretary Nielsen resigned on April 7, the position of Deputy Secretary was vacant.  However, the Senate-confirmed Under Secretary for Management—second in line after the Deputy Secretary—was in office.  Therefore, the Under Secretary became Acting Secretary on April 7 under the then-existing order of succession.

After Secretary Nielsen's resignation, President Trump stated his intention that Kevin McAleenan, then the Commissioner of CBP, should become Acting Secretary of Homeland Security.  @realDonaldTrump, Twitter (Apr. 7, 2019 6:02 PM), https://twitter.com/ realDonaldTrump/status/1115011885303312386.  At approximately 10:36 PM on April 7, despite having already resigned, former Secretary Nielsen announced that she had "agreed to stay on as Secretary through Wednesday, April 10th . . . ."  @SecNielsen, Twitter (Apr. 7, 2019 10:36 PM),

https://twitter.com/SecNielsen/status/1115080823068332032.   To the extent that a posting on social media could possibly have any legal effect under the Homeland Security Act, neither did, as Secretary Nielsen had already resigned when they were made.

On April 10, 2019, former Secretary Nielsen purported to exercise the Secretary's authority under 6 U.S.C. § 113(g)(2) to revise the line of succession to the office of Secretary, which was an action taken in the performance of a function or duty that the Homeland Security Act designates be performed only by the Secretary.   *See* Holleman Aff., Ex. 1, *DHS Orders of Succession and Delegations of Authorities for Named Positions*, DHS Delegation No. 00106, Revision No. 08.5 (Apr. 10, 2019) ("Purported April 10 Delegation").[10]   The purported revision amended the existing memorandum issued by former Secretary Johnson.   Section II.A of the Purported April 10 Delegation provided that, in the case of the Secretary's death, resignation, or inability to perform the functions of the office, the succession to the Secretary's office would be governed by Executive Order 13,753.   However, because former Secretary Nielsen was not the Secretary, she could not exercise the Secretary's authority to amend the delegation and her purported revision was of no legal effect.   *See Noel Canning v. Nat'l Lab. Rels. Bd.*, 705 F.3d 490, 493, 507 (D.C. Cir. 2013) (as a majority of a panel of a board were not validly appointed under the Constitution, the panel necessarily lacked a quorum and an order it issued was void *ab initio*), *aff'd* 573 U.S. 513 (2014).

The same day she issued the Purported April 10 Delegation, former Secretary Nielsen purported to resign again.   The position of Deputy Secretary remained vacant.   At the same time former Secretary Nielsen purported to resign, the Senate-confirmed Under Secretary for Management resigned.   Additionally, the position of Administrator for FEMA, next in line under

---

[10] The Purported April 10 Delegation contained annexes not relevant to the claims in this case, which are not included in Exhibit 1 to the Holleman Authenticating Affidavit.

Executive Order 13,753 after the Under Secretary for Management, was also vacant.  However, at

that time, the position of Director of CISA—that is, the former "Under Secretary for National

Protection and Programs" named as *fourth* in the line of succession in Executive Order 13,753—

was occupied by a Senate-confirmed appointee.  However, DHS instead elevated Kevin

McAleenan—the Commissioner of CBP who was *seventh* in the line of succession.  The elevation

of McAleenan was in violation of the order of succession set by Executive Order 13,753 and the

Purported April 10 Delegation, and therefore McAleenan lacked the authority to take any actions

of the Acting Secretary.  *See Noel Canning*, 705 F.3d at 493; *Casa de Md., Inc. v. Wolf*, No. 8:20-

cv-02118-PX, 2020 WL 5500165, at *22-23 (D. Md. Sept. 11, 2020) (finding plaintiffs were likely

to succeed on the merits of their claim that McAleenan's elevation as Acting Secretary was invalid,

and therefore he could not amend Delegation 00106).

On November 8, 2019, McAleenan purported to revise the Purported April 10 Delegation.

*See* Holleman Aff., Ex. 2, *Amendment to the Order of Succession for the Secretary of Homeland

Security* (Nov. 8, 2019) ("Purported Revised Delegation").  That was an action taken in the

performance of a function or duty that the Homeland Security Act designates be performed *only*

by the Secretary.  6 U.S.C. § 113(g)(2).  The Purported Revised Delegation purported to change

the order of succession to the position of Secretary of Homeland Security in the event of the

Secretary's death, resignation, or inability to perform the functions of the office, as follows:

1) Deputy Secretary of Homeland Security
2) Under Secretary for Management
3) Commissioner of CBP
4) Under Secretary for Strategy, Policy, and Plans

Because McAleenan was not legally holding the office of Acting Secretary under the order of

succession imposed by the Homeland Security Act and Executive Order 13,753, he had no

authority to issue the Purported Revised Delegation, and so it is void and the existing order of succession remained in effect.  *See Casa de Md.*, 2020 WL 5500165, at *23.

On the same day that McAleenan resigned, the Defendant Wolf had become Under Secretary of Homeland Security for Strategy, Policy, and Plans.  The order of succession provided by Executive Order 13,753 does not designate the Under Secretary for Strategy, Policy, and Plans as an officer who can serve as Acting Secretary.[11]  Nevertheless, relying on the invalid Purported Revised Delegation, DHS determined that the Defendant Wolf would become Acting Secretary.  The Defendant Wolf began claiming the right to exercise the authority of the Acting Secretary on November 13, 2019 and has purported to continue to exercise the authority of that office ever since.  The Defendant Wolf has never been confirmed by the Senate to hold the office of Secretary of Homeland Security.  *See Casa de Md.*, 2020 WL 5500165, at *14.

Because the Defendant Wolf does not hold and has not legally held the office of Acting Secretary, any action he has taken in the performance of a function or duty of the Secretary of Homeland Security was not the result of an action or decision of the Secretary and is void.  *See SW Gen., Inc. v. Nat'l Lab. Rels. Bd.*, 796 F.3d 67, 78 (D.C. Cir. 2015), *aff'd*, 137 S. Ct. 929 (2017); *Cuccinelli*, 442 F. Supp. 3d at 30, 34.  Because IIRIRA provides that only the Secretary of Homeland Security may waive laws under Section 102(c)(1), and the discretion to decide whether to waive laws is vested solely with the Secretary, the Defendant Wolf could not exercise the Secretary's waiver authority.  That renders void *ab initio* the Defendant Wolf's purported March 16, 2020 waivers of NEPA, the NHPA, the ESA, and NAGPRA.  *See SW Gen.*, 796 F.3d at 78

---

[11] The position of Under Secretary for Strategy, Policy, and Plans was created by legislation after Executive Order 13,753 was issued.  *See* 2017 NDAA, tit. XIX, § 1902(a) (codified at 6 U.S.C. § 349).

(describing that when action taken in violation of FVRA it is void *ab initio*).  Those actions were taken by an official who was serving only as an Under Secretary, not the Secretary.

For these reasons, the Plaintiffs are likely to succeed on the merits of their claim that Defendants DHS, Commissioner Morgan, CBP, Commanding General Semonite, and the Corps all acted arbitrarily and capriciously and otherwise not in accordance with law when they approved and undertook the projects without complying with NEPA, the NHPA, the ESA, and NAGPRA, and Defendants are likely to succeed on the merits of their claim.

**D.      The Defendant Wolf's Issuance of the Illegal Waivers Violates the Kumeyaay People's First Amendment Right to Free Exercise of Their Religion.**

The Defendant Wolf's purported waivers also violate the First Amendment's guarantee that the Kumeyaay people may freely exercise their religion.  The First Amendment protects religious exercise by providing that the federal government may not "impose special disabilities on the basis of religious views or religious status . . . ."  *Smith*, 494 U.S. at 877 (citing *McDaniel v. Paty*, 435 U.S. 618 (1978); *Fowler v. Rhode Island*, 345 U.S. 67, 69 (1953)).  What this means in practice is that the government cannot impose policies or laws that have the effect of giving special status or disfavor to the practice of some religions compared to others, *see Fowler*, 345 U.S. at 69-70 (ordinance prohibiting people from addressing religious meetings in public parks was unconstitutional where enforcement of ordinance would permit Christian congregations to hold Mass or services in a park but ban a Jehovah's Witness from giving a sermon to congregants), or of distinguishing between different "sectarian affiliation[s] or theological position[s]," *Gillette v. United States*, 401 U.S. 437, 450-51 (1971).  Here, the Defendant Wolf made such an invalid distinction based on religious affiliation or theology when he purported to issue waivers that discriminated between Indian religions and other religions, by only waiving laws that protect Indian religions, and not any other laws having to do with religious exercise.

Those laws were NAGPRA and the American Indian Religious Freedom Act ("AIRFA"). NAGPRA, as discussed above, specifically protects human remains and cultural patrimony used in religious ceremonies related to death—but only for remains and cultural patrimony "of, or relating to, a tribe, people, or culture that is indigenous to the United States." 25 U.S.C. § 3001(9); *see Bonnichsen v. United States*, 367 F.3d 864, 875 (9th Cir. 2004). And as its name indicates, AIRFA is strictly limited to Native American religion:

> On and after August 11, 1978, it shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites.

42 U.S.C. § 1996. These statutes recognize the Government's obligation to provide protection for Indian religious exercise and in the case of NAGPRA, provide discrete mechanisms for doing so. In his purported March 16, 2020 waivers, the Defendant Wolf waived both statutes. That decision violated the First Amendment, because those were the *only* laws protecting religious exercise that the Defendant Wolf purported to waive. The Defendant Wolf's waivers singled out protections for Indian religion and tried to strip them away. This is a paradigmatic example of government conduct that violates the First Amendment, because it "impose[s] special disabilities on the basis of religious views" by eliminating legal protections for Indian religion, but not for other religions.

### E.    The Jurisdictional Provisions of IIRIRA Do Not Bar Plaintiffs' Claims.

Defendants may argue that Plaintiffs will not succeed on the merits because the jurisdictional provisions of IIRIRA prevents the Court from hearing their claims. *See* IIRIRA § 102(c)(2)(A)-(B). However, those provisions do not apply here.

IIRIRA § 102(c)(2)(A) provides that

> The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, *by the*

> *Secretary of Homeland Security pursuant to [IIRIRA § 102(c)(1)].*  A cause of action or claim may only be brought alleging a violation of the Constitution of the United States.  The court shall not have jurisdiction to hear any claim not specified in this subparagraph.

(Emphasis added).  IIRIRA § 102(c)(2)(B) goes on to provide that a constitutional claim brought under § 102(c)(2)(A) "shall be filed not later than 60 days after the date of the action or decision made by the Secretary of Homeland Security" and that such a claim "shall be barred unless it is filed within the time specified."

By their own terms, these jurisdictional provisions only apply to claims or causes of action brought to challenge a decision by the Secretary of Homeland Security under § 102(c)(1) *to waive legal requirements that apply to construction of barriers and infrastructure authorized by IIRIRA*. Therefore, they do not apply to claims brought to challenge other elements of border wall construction that do not "arise from" a decision by the Secretary of Homeland Security to issue a waiver.  *See In re Border Infrastructure Env't Litig.*, 915 F.3d 1213, 1221-22 (9th Cir. 2019). Plaintiffs' claims that Defendants DHS, Commissioner Morgan, CBP, Commanding General Semonite, and the Corps acted arbitrarily and capriciously in beginning construction on the projects before the Secretary of Homeland Security had consulted with the Plaintiff Kumeyaay Tribes, and that Defendants' consultation and construction efforts violate RFRA, arise from IIRIRA § 102(b)(1)(C)(i), not § 102(c)(1).[12]  Nor does IIRIRA § 102(c)(2)(A) apply to Plaintiffs' claims that Defendants failed to comply with NEPA, the NHPA, NAGPRA, and the ESA.  Those claims arise from Defendants' construction of the border fence under § 102(a) and § 102(b)(1)(A), not any purported exercise of the Secretary's § 102(c)(1) waiver authority.

---

[12] In any event, RFRA cannot be the subject of an IIRIRA § 102(c)(1) waiver, as discussed *supra* at 19 n.4, and so necessarily no RFRA claim could "arise from" such a waiver.

36

More fundamentally, § 102(c)(2)(A) does not apply because Defendant Wolf is not the Secretary of Homeland Security.  *See supra* at 28-35.  So even if Defendants' reliance on the Defendant Wolf's purported March 16, 2020 waivers could be said to cause Plaintiffs' claim to "arise from" a purported § 102(c)(1) waiver, § 102(c)(2)(A) still would not apply.  Section 102(c)(2)(A) only applies to a cause or claim "arising from" an "action undertaken" or "decision made" by "*the Secretary of Homeland Security pursuant to [IIRIRA § 102(c)(1)]*."  (Emphasis added).  And § 102(c)(1), in turn, provides that "the Secretary of Homeland Security shall have the authority to waive" legal requirements that "such Secretary, in such Secretary's sole legal discretion, determines necessary to expedite construction of the barriers and roads under [§ 102]." The Defendant Wolf is an Under Secretary.  He is not the Secretary, has never acted as the Secretary, and has never made a decision as the Secretary.  His purported March 16, 2020 waiver decisions were not made by the Secretary pursuant to § 102(c)(1)—they were made, *ultra vires*, by the Under Secretary for Strategy, Policy, and Plans.  To the extent Plaintiffs' claims "arise from" an action or decision by the Defendant Wolf, they arise from actions undertaken or decisions made by the Under Secretary for Strategy, Policy, and Plans.  For that reason, the § 102(c)(2)(A) jurisdictional provision, which is limited to challenges to waivers by the Secretary, does not apply.

For the same reason, the sixty-day statute of limitations on constitutional claims found in § 102(c)(2)(B) does not apply to Plaintiffs' First Amendment claims.  Section 102(c)(2)(B) only imposes the sixty-day limitation on claims brought under § 102(c)(2)(A).  The Plaintiffs do not challenge an action by the Secretary of Homeland Security, and so their First Amendment claim is not brought under § 102(c)(2)(A) and the sixty-day statute of limitations is inapplicable here.

As the jurisdictional provisions of IIRIRA do not apply, the Plaintiffs may bring a right of action under the Administrative Procedure Act ("APA").  *See* 5 U.S.C. § 702.  Absent an effective

waiver, that right is not affected by IIRIRA, *see* IIRIRA § 102(b)(1)(C)(ii)(I).  Although the Defendant Wolf purported to waive the application of the APA to the projects in his March 16, 2020 waivers, those waivers were void *ab initio* and of no force or effect for the reasons discussed 28-35, *supra*.  So, the Court can hear the merits of Plaintiffs' claims—and Plaintiffs are likely to succeed on those merits, as discussed above.

## II.    PLAINTIFFS WILL BE IRREPARABLY HARMED IF CONSTRUCTION OF THE BORDER BARRIER IS NOT HALTED.

For as long as the Defendants continue border fence construction without adequate review or tribal consultation, these construction activities inflict ongoing, irreparable harm on the Plaintiffs.  Under the Supreme Court's decision in *Winter*, a plaintiff must show "that irreparable injury is *likely* in the absence of an injunction."  555 U.S. at 22 (citations omitted).  Here, harm is not only likely—it is already occurring.

Construction of the new border fence segments involves substantial ground-disturbing activities, including trenching for placement of the fence, road construction for temporary and permanent access roads, and clearing land for ancillary facilities.[13]  Such activities, if undertaken on or near Kumeyaay cultural and religious sites in the border region, and if done without proper evaluation and mitigation of impacts, will unavoidably damage or even destroy those sites, and moreover, will do so even though some of that impact could have been avoided by the consultation that IIRIRA requires.  This damage includes destruction of the sites and cultural or religious artifacts found there, damage to the natural setting in which such sites are found, or physical damage to natural resources on which the sacred nature of such sites depends.  *See supra* at 5-11.

---

[13] *San Diego County Border Barrier Projects*, CBP, Mar. 16, 2020 (last modified Aug. 18, 2020), https://www.cbp.gov/document/environmental-assessments/san-diego-county-border-barrier-projects; *Imperial County Border Barrier Project*, CBP, Mar. 16, 2020 (last modified Aug. 18, 2020), https://www.cbp.gov/document/environmental-assessments/imperial-county-border-barrier-project.

Moreover, ground disturbing activities can involve the disinterment, destruction, or separation of Kumeyaay ancestors' remains. *See* Carrico Decl. ¶¶ 28-31. The disruption or desecration of burial sites or cemeteries is distressing and harmful to any group of people, as the law recognizes. *See, e.g.*, *Robinson v. Wadford*, 731 S.E.2d 539, 543 (N.C. Ct. App. 2012) (discussing state civil and criminal laws against grave desecration); *Alcor Life Extension Found. v. Richardson*, 785 N.W.2d 717, 731 (Iowa 2010) ("our legal tradition considers human remains very special and unique, regardless of their worldly value"); *Currier v. Woodlawn Cemetery*, 90 N.E.2d 18, 19 (N.Y. 1949) ("The quiet of the grave, the repose of the dead, are not lightly to be disturbed. Good and substantial reasons must be shown before disinterment is to be sanctioned."). This is even more so for the Kumeyaay, as in Kumeyaay religion such desecrations must be addressed by sacred ceremonies to put the souls of the dead back at rest. *See* Elliott Decl. ¶ 15; Santos Decl. ¶ 16. If Kumeyaay cannot undertake these ceremonies, the spiritual and emotional harms to them cannot be redressed with money damages.

Furthermore, Defendant CBP is daily undertaking its project activities without the consultation, evaluation of impacts, or tribal monitoring that is required by RFRA, IIRIRA, NAGPRA, the NHPA, ESA, and NEPA, as discussed above. Denying Plaintiffs the tribal consultation required by these federal laws is not a mere procedural technicality: It denies them the opportunity to identify, and then advise Defendants on the protection of, irreplaceable cultural and religious sites and objects. This is the very purpose of the evaluation and consultation required by federal law. *See, e.g.*, IIRIRA § 102(b)(1)(C)(i) (mandating consultation with "Indian tribes . . . to minimize the impact on the environment, culture, . . . and quality of life for the communities and residents located near the [construction] sites"); 36 C.F.R. § 800.2(c)(2)(ii)(A) (NHPA regulations requiring consultation that gives a Tribe "a reasonable opportunity to identify its

concerns about historic properties" and "advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance"). By denying Plaintiffs their rights under these statutes, the Defendants are harming Plaintiffs and their religious and cultural patrimony on a continual basis, and will continue to do so until construction stops and proper evaluations of impacts and means of mitigating those impacts are undertaken. These impacts are plainly both "imminent" and "beyond remediation." *League of Women Voters I*, 838 F.3d at 8. Once the environment is damaged, sacred sites are disturbed, or burial grounds dug up without proper care, these actions simply cannot be undone. *See, e.g.*, *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable."); *Nat'l Wildlife Fed. v. Burford*, 835 F.2d 305, 323 (D.C. Cir. 1987) ("destroying wildlife habitat, air and water quality, natural beauty, and other environmental and aesthetic values and interests" constitutes irreparable injury); *Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior*, 755 F. Supp. 2d 1104, 1120 (S.D. Cal. 2010) (damage to historic sites is irreparable harm); *Yankton Sioux Tribe v. U.S. Army Corps of Eng'rs*, 209 F. Supp. 2d 1008, 1022 (D.S.D. 2002) ("further exposure of human remains or loss of remains or funerary objects" protected by NAGPRA constitutes irreparable harm).

During the ongoing construction activities, Kumeyaay tribal members' access to areas where construction is or will be occurring has also been limited. *See* Haws Decl. ¶¶ 18 25e-h (limited tribal monitoring); Elliott Decl. ¶ 16 (stating Kumeyaay people needed to obtain permission to visit near the wall site). This denial inflicts harm on the Plaintiffs in multiple ways. First, the Plaintiffs' access to the site is necessary to advise Defendants of possible damage to sites or of the import of sites, artifacts, or remains that earthmoving uncovers, as discussed above. CBP

has allowed only severely limited and inadequate access; among other failings, CBP has agreed to fund only a small number of tribal monitors who can be present to oversee construction, for a limited time.  Haws Decl. ¶ 25f-g.  After initially retaining only a single tribal monitor, CBP's contractor has increased the number of tribal monitors to three, but that number remains woefully inadequate.  *Id.* ¶ 25f-h, k.  For the sake of comparison, other recent major earth-disturbing infrastructure projects in San Diego County in Kumeyaay aboriginal territory have employed ten to twenty tribal monitors.  July 31 Letter at 10.

As part of this denial of access, CBP is continuing to undertake construction activities without informing Plaintiffs about the scope and location of all ground-disturbing activity, and without giving Plaintiffs an opportunity to review soils at all work areas, which must be done ahead of, during, and after all ground disturbances to determine if cultural resources will be, are, or have been affected, and how any such effects can be minimized.  *See* Haws Decl. ¶ 25g-k.  Nor have Defendants developed basic protocols with the Plaintiffs for appropriate mitigation of impacts to Kumeyaay cultural and religious resources.[14]  Similarly, even as construction is ongoing, Defendants are failing to provide Plaintiffs with an adequate opportunity to remove, safeguard, and repatriate all cultural articles in accordance with Kumeyaay religious practices, and to engage in the sacred religious ceremonies required to put the souls of the dead at ease when disinterment of, harm to, or separation of human remains occurs.  This lack of consultation and access, as noted above, inflicts harm on Plaintiffs' cultural and religious resources each day that construction continues without proper evaluation and monitoring of impacts.  But not only that:

---

[14] CPB shared draft protocols entitled "Cultural Resources Protocol And Communication Plan For The Fy 2020 10 U.S.C. §284 Border Barrier Project-San Diego Sector" on August 31, 2020 and requested comment by September 14, 2020, but those protocols are inadequate, created without tribal input, and were circulated after construction had already begun.  *See* Haws Decl. ¶ 25*i*,

The Defendant's actions have denied the Plaintiffs' procedural rights, *see Lujan*, 504 U.S. at 572 n.7, which in this case is itself an irreparable harm as these impacts are irreversible, as additional procedures cannot retroactively mitigate or avoid them, *Quechan Tribe*, 755 F. Supp. 2d at 1120 (citing *Save Strawberry Canyon v. Dep't of Energy*, 613 F. Supp. 2d 1177, 1187 (N.D. Cal. 2009)).

Moreover, denying Plaintiffs and tribal members access to the construction sites also blocks their ability to engage in religious ceremonies, which directly infringes on their ability to worship in violation of the Free Exercise Clause and substantially burdens their religious exercise in violation of RFRA. The harm caused by violation of constitutionally protected religious freedom is *per se* irreparable, as "[i]t is well settled that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 129 (D.D.C. 2012) (second alteration in original) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[A] prospective violation of a constitutional right constitutes irreparable injury." (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998))). And "the same is true of rights afforded under the RFRA, which covers the same types of rights as those protected under the Free Exercise Clause of the First Amendment." *Tyndale House*, 904 F. Supp. 2d at 129 (citing *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 995 (10th Cir. 2004), *aff'd*, 546 U.S. 418 (2006). Under this clear precedent, the Defendants' denial of access to Plaintiffs during the illegal construction process irreparably harms the Plaintiffs by placing a substantial burden on free exercise of their religion under the Constitution and RFRA.

## III.   THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH IN FAVOR OF AN INJUNCTION.

The balance of the equities and the public interest weigh heavily in favor of an injunction halting any further construction until Defendants comply with federal law. *See Nken v. Holder*,

556 U.S. 418, 434 (2009) (balance of equities and public interest inquiries "merge when the Government is the opposing party"). Defendants' actions are *ultra vires*, arbitrary and capricious, and not in accordance with federal law, including the First Amendment, RFRA, IIRIRA, NAGPRA, the NHPA, the ESA, and NEPA. As described above, this conduct is already causing— and will continue to cause—irreparable harm to Plaintiffs' cultural and religious patrimony. It is also an ongoing violation of Plaintiffs' constitutional rights. On the other side of the scale, no public interest can be advanced by the continuation of this conduct, as "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters I*, 838 F.3d at 12 (D.C. Cir. 2016) (citing *Pursuing Am.'s Greatness*, 831 F.3d at 511-12; *Gordon*, 721 F.3d at 653). "To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Here, this means the Defendants do not have a valid interest in promoting border security in a manner that goes beyond the authority delegated to them by Congress. And the public has an affirmative interest in ensuring that executive officials are not acting lawlessly to construct infrastructure without regard to the requirements Congress has imposed on that construction. The public interest therefore lies on the same side of the scale as the Plaintiffs' interests: both weigh in favor of halting the Defendants' illegal construction activities until proper procedures have been followed.

These considerations apply with even greater force with respect to the violation of Plaintiffs' First Amendment rights. "[E]nforcement of an unconstitutional law is always contrary to the public interest." *Gordon*, 721 F.3d at 653 (citations omitted). So *even if* the government had a valid interest in seeking to address border security—which it does not have here, given the illegal manner in which it is attempting to address that interest—the court may still give "greater

weight to the possibility that [Plaintiffs] could suffer an ongoing constitutional violation while this litigation proceeds." *See id.*

Finally, the balance of the equities weighs particularly strongly in favor of an injunction here, where the Plaintiff Kumeyaay Tribes repeatedly raised their concerns with the Defendants prior to bringing litigation and made multiple requests that the Defendants halt construction until proper analysis and consultation had been completed. The Plaintiff Kumeyaay Tribes sent a letter to Defendants Wolf, Commissioner Morgan, and Commanding General Semonite, dated July 31, 2020, in which the Tribes demanded that Defendants: (1) stop all ground disturbing activities in San Diego County until all impacts on Kumeyaay religious beliefs, practices, and cultural resources had been fully evaluated and provide adequate access to the Project sites by tribal monitors; (2) take concrete actions to avoid and mitigate impacts to cultural and religious resources; and (3) consult with the Tribes by providing information about the Project plans and schedule, the complete Environmental Stewardship Plan that Defendants are required by federal law to draft, and cultural resource studies completed since 2010, by receiving and accepting comments from Kumeyaay representatives on the requested documents, and by meeting with Kumeyaay representatives to discuss these matters. The Plaintiff Kumeyaay Tribes proposed a specific timeline for completing the consultation and limiting the delay of the projects. *See* July 31 Letter. Plaintiff Manzanita Band of Kumeyaay made multiple attempts to follow up on these initial requests, by phone and in multiple written letters. *See* Santos Decl., Ex. 4, Letter from Angela Elliot Santos, Chairwoman, Manzanita Band of Kumeyaay Nation, to Paul Enriquez, Border Wall Project Mgmt. Office, CBP (Aug. 10, 2020); Santos Decl., Ex. 6, Letter from Angela Elliot Santos, Chairwoman, Manzanita Band of Kumeyaay Nation, to Chad F. Wolf et al. (Aug.

44

17, 2020); Santos Decl., Ex. 7, Letter from Angela Elliot Santos, Chairwoman, Manzanita Band of Kumeyaay Nation, to Chad F. Wolf et al. (Aug. 21, 2020).

Yet the Plaintiffs received only vague responses to their concerns, coupled with the Defendants' refusal to halt construction during any consultation or evaluation processes.  In a written letter and a phone call with the Plaintiff Kumeyaay Tribes, CBP's responses made clear that an Environmental Stewardship Plan had not been (and would not be) completed, that there were insufficient tribal monitors available to oversee all construction activities, and that—notwithstanding this insufficiency—construction would not be stopped.  *See* Santos Decl., Ex. 8, Letter from Aaron M. Heitke, Chief Patrol Agent, CBP, San Diego Sector, to Angela Elliott Santos, Chairwoman, Manzanita Band of Kumeyaay Nation (Aug. 20, 2020).

Because Defendants have plainly demonstrated that they intend to continue violating the law unless ordered otherwise by this Court, the balance of the equities and public interest weigh heavily in favor of granting the relief requested by the Plaintiffs.

## CONCLUSION

For the foregoing reasons, preliminary injunctive relief is warranted, and the Plaintiffs respectfully request that the Court issue an order halting construction of the disputed segments of the border fence and barring Defendants from undertaking further construction activities pending a ruling on the merits of the Plaintiffs' claims.

Respectfully submitted,

DATED this 25th day of September, 2020.          */s/ Colin Cloud Hampson*

_____
Frank S. Holleman, Bar # 1011376
Sonosky, Chambers, Sachse, Endreson &
  Perry, LLP
1425 K Street, NW, Suite 600
Washington DC 20005
Phone no.: 202-682-0240

Fax no.: 202-682-0249
E-mail: fholleman@sonosky.com

Colin Cloud Hampson, Bar # 448481
Sonosky, Chambers, Sachse, Endreson &
  Perry, LLP
145 Willow Road, Suite 200
Bonita, CA 91902
Phone no.: 619-267-1306
Fax no.: 619-267-1388
E-mail: champson@sonoskysd.com

Whitney A. Leonard (application for
  admission *pro hac vice* forthcoming)
Sonosky, Chambers, Sachse, Miller &
  Monkman, LLP
725 East Fireweed Lane, Suite 420
Anchorage, AK 99503
Phone no.: 907-258-6377
Fax no.: 907-272-8332
E-mail: whitney@sonosky.net

*Counsel for Plaintiffs*

Mark Radoff (application for admission *pro
  hac vice* forthcoming)
Sycuan Tribal Government Legal
  Department
2 Kwaaypaay Ct.
El Cajon, CA 92019
Phone no.: 619-445-4564
Fax no.: 619-445-0238
E-mail: mradoff@sycuan-nsn.gov

*Counsel for Plaintiff Sycuan Band of the
  Kumeyaay Nation*

46

**CERTIFICATE OF SERVICE**

I hereby certify that on September 25, 2020, I electronically filed the above and foregoing document with the Clerk of Court via the ECF System for filing.

*/s/ Colin Cloud Hampson*

_____

Colin C. Hampson

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MANZANITA BAND OF THE KUMEYAAY NATION *et al.*, | Case No. 1:20-cv-02712-RC |
| Plaintiffs, | |
| v. | |
| CHAD WOLF, in his official capacity as Under Secretary of Homeland Security for Strategy, Policy, and Plans *et al.* | |
| Defendants. | |

## CERTIFICATION OF FRANK S. HOLLEMAN TO SHOW COMPLIANCE WITH LOCAL RULE 65.1(a)

I, Frank Holleman, declare pursuant to 28 U.S.C. § 1746:

1)       I am over the age of 21 years and am competent to testify about the matters stated herein.  I know the facts stated in this certification on my own personal knowledge, and they are true to the best of my knowledge, information, and belief.

2)       I am counsel for Plaintiffs in the above-captioned case.

3)       After review of motions and supporting papers seeking temporary restraining orders against the federal government in other cases, and discussion with a former Department of Justice ("DOJ") attorney, I determined that counsel for Plaintiffs would need to contact attorneys at the Federal Programs Branch of the DOJ in order to comply with Local Rule 65.1(a) and seek a temporary restraining order in this case.

4)       Around 9:45 AM on September 21, 2020, I telephoned the DOJ's Director of Federal Programs, Alex Haas, and informed him that I represented plaintiffs who intended to file a complaint in the United States District Court for the District of Columbia against federal

1

defendants that would challenge the construction of the border barrier and related infrastructure in southern California.  I informed him that Plaintiffs would likely seek a temporary restraining order shortly after filing the complaint.

5)      Director Haas agreed that I could provide him with copies of the complaint, the motion for temporary restraining order, and associated papers, in order to comply with Plaintiffs' obligations under Local Rule 65.1(a) to provide all pleadings and papers filed in the action to the adverse parties.  We agreed that providing him copies of these documents would not constitute service but would only be done to comply with Local Rule 65.1(a).

6)      Director Haas provided me with his email address and that of another attorney at the DOJ, Andrew Warden, who he said should also receive the courtesy copies of the papers.

7)      Plaintiffs filed the Complaint in the above-captioned case at about 2:00 AM on September 23.  At about 9:00 AM on September 23, I provided as-filed copies of those documents to Director Haas and Mr. Warden by email, and Mr. Warden confirmed receipt thereafter.

8)      Once the court issues summonses, I will serve copies of those documents on all defendants, the Attorney General, and the U.S. Attorney for the District of Columbia by certified mail, and at the same time email courtesy copies of the documents to the Office of the Chief Counsel of Defendant Customs and Border Protection, as directed by Disclosure of Information in Litigation, 85 Fed. Reg. 22,581, 22,583 (Apr. 23, 2020).

9)      Today, Mr. Warden appeared in the case for all Defendants and so will be served with all papers Plaintiffs file in this case.  Thus, Defendants were served with the motion for temporary restraining order and preliminary injunction and supporting papers when they were filed.

164594-1

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: September 24, 2020

_____

Frank S. Holleman

3

164594-1