**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MANZANITA BAND OF THE KUMEYAAY
NATION, *et al.*,

                          Plaintiffs,

    v.

CHAD WOLF, in his official capacity as Acting
Secretary of Homeland Security, *et al.*,

                          Defendants.

Civil Action No. 20-CV-02712 (TNM)

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 3

I.    Congress's Authorization of Border Barrier Construction and Limitations
on Judicial Review ................................................................................................3

II.    DoD's Support for DHS's Border Security Activities ....................................................4

III.    DoD's Support in Fiscal Year 2020 to DHS's Border Barrier
Construction Activities ................................................................................................5

LEGAL STANDARD................................................................................................................7

ARGUMENT ................................................................................................................ 8

I.    Plaintiffs are Not Likely to Succeed on the Merits ................................................8

    A.    Plaintiffs' IIRIRA Consultation Claims Fails.........................................................8

    B.    Plaintiffs' Claims Under NEPA, the NPHA, NAGPRA, and the ESA Fail
Because the Acting Secretary of Homeland Security Waived Application
of Those Statutes ................................................................................ 15

    C.    The Court Lacks Jurisdiction to Consider Plaintiffs' Non-Constitutional
Challenges to the Waivers ................................................................ 16

    D.    Even if the Court Conducts *Ultra Vires* Review, It Should Conclude that
the Acting Secretary Did Not Exceed His Statutory Authority by Issuing the
Waivers. ................................................................................ 20

        1.    Acting Secretary Wolf Is Properly Serving as the Acting Secretary
of Homeland Security. ................................................................21

            a.    Former Secretary Kirstjen Nielsen's April 9, 2019
Succession Order was Lawful................................................21

            b.    Acting Secretary Kevin McAleenan's November 8, 2019
Order of Succession was Lawful... ................................22

            c.    Acting Secretary Wolf's Ratification of His Prior Orders
Cures the Alleged Service-Related Defects in the Waivers........27

E.      Plainitiffs Have Failed to Establish a Likelihood of Success on their RFRA Claims ................................................................................................................... 31

F.      Defendants Have Not Violated Plaintiffs' First Amendment Rights.................... 37

II.   The Balance of Equities and Public Interest Weigh Against Plaintiffs' Request for an Emergency Injunction ...........................................................................................................39

A.      An Injunction Will Impose Substantial and Irreparable Harm on Defendants ..... 40

B.      Defendants' Interests Outweigh the Alleged Harm to Plaintiffs ......................... 41

CONCLUSION.............................................................................................................................. 45

# TABLE OF AUTHORITIES

## Cases

*Aamer v. Obama*,
   742 F.3d 1023 (D.C. Cir. 2014) ................................................................. 7

*Alexander v. Sandoval*,
   532 U.S. 275 (2001) ................................................................................... 8

*Barlow v. Collins*,
   397 U.S. 159 (1970) ................................................................................... 9

*Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*,
   502 U.S. 32 (1991) ..................................................................................... 9

*Bowen v. Roy*,
   476 U.S. 693 (1986) ................................................................................. 32

*Burwell v. Hobby Lobby Stores, Inc.*,
   573 U.S. 682 (2014) ................................................................................. 36

*Cal. Sportfishing Protection Alliance v. U.S. Bureau of Reclamation*,
   No. 15-912, 2015 WL 6167521 (E.D. Cal. Oct. 20, 2015) ...................... 9

*California v. Trump*,
   407 F. Supp. 3d 869 (N.D. Cal. 2019) .................................................... 39

*Casa de Maryland v. Trump, No. 8:20-cv-02118-PX*,
   2020 WL 5500165 (D. Md. Sept. 11, 2020) ........................................... 25

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) .................................................................. 7

*Corp. of Presiding Bishop v. Amos*,
   483 U.S. 327 (1987) ................................................................................. 38

*Ctr. for Biological Diversity v. McAleenan*,
   404 F. Supp. 3d 218 (D.D.C. 2019) ........................................... 17, 18, 19

*Ctr. for Biological Diversity v. Trump*,
   No. 19-CV-408 (TNM), 2020 WL 1643657 (D.D.C. Apr. 2, 2020) ....... 16

*DCH Reg'l Med. Ctr. v. Azar*,
   925 F.3d 503 (D.C. Cir. 2019) ...................................................... 9, 10, 20

*Defenders of Wildlife v. Chertoff*,
   527 F. Supp. 2d 119 (D.D.C. 2007) ........................................................ 17

*Edwards v. United States*,
   103 U.S. 471 (1880) ................................................................................ 22

*El Paso Cty., Texas v. Trump*,
   407 F. Supp. 3d 655 (W.D. Tex. 2019) .................................................... 39

*Employment Division v. Smith.*
   494 U.S. 872 (1990) ........................................................................... 31, 38

*Fowler v. Rhode Island*,
   345 U.S. 67 (1953) .................................................................................. 38

*Gonzaga Univ. v. Doe*,
   536 U.S. 273 (2002) ................................................................................. 9

*Greater New Orleans Fair Hous. Action Ctr. v. HUD*,
   639 F.3d 1078 (D.C. Cir. 2011) ............................................................... 7

*Guedes v. ATF*,
   920 F.3d 1 (D.C. Cir. 2019) ............................................................... 29, 30

*Harmon v. Dep't of Defense*,
   50 M.S.P.R. 218 (1991) .......................................................................... 22

*Hobbie v. Unemployment Appeals Comm'n of Fla.*,
   480 U. S. 136 (1987) ............................................................................... 38

*Immigrant Legal Resource Center v. Wolf*,
   No. 20-cv-05883-JSW, 2020 WL 5798269 (N.D. Cal. Sept. 29, 2020) ................ 25

*In re Border Infrastructure Environmental Litigation*,
   284 F. Supp. 3d 1092 (S.D. Cal. 2018) ................................................... 12

*In re Border Infrastructure Envtl. Litig.*,
   915 F.3d 1213 (9th Cir. 2019) ................................................................ 18

*Inland Empire Public Lands Council v. Glickman*,
   88 F. 3d 697 (9th Cir. 1996) ................................................................... 29

*Kaemmerling v. Lappin*,
   553 F.3d 669 (D.C. Cir. 2008) ................................................................ 32

*La Posta Band of the Diegueno Mission Indians of the La Posta Reservation v. Trump*,
   No. 20-cv-01552-AJB, Slip. Op. (S.D. Cal. Sept. 9, 2020) ........................... passim

*Larson v. Pamela*,
   456 U.S. 228 (1982) ............................................................................... 38

*Leedom v. Kyne*,
   358 U.S. 184 (1958) ................................................................................. 9

*Lyng v. Northwest Indian Cemetery Protective Association*,
485 U.S. 439 (1988) ................................................................................ 32, 34

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) ...................................................................................... 45

*McDaniel v. Paty*,
435 U.S. 618 (1978) ...................................................................................... 38

*Mockaitis v. Harcleroad*,
104 F.3d 1522 (9th Cir. 1997) ..................................................................... 36

*Munaf v. Geren*,
553 U.S. 674 (2008) ........................................................................................ 7

*Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*,
437 F.3d 1256 (D.C. Cir. 2006) .................................................................... 20

*Nat'l Treasury Employees Union v. Von Raab*,
489 U.S. 656 (1989) ...................................................................................... 40

*Navajo Nation v. U.S. Forest Serv.*,
535 F.3d 1058 (9th Cir. 2008) (en banc) ................................................ 33, 37

*North American Butterfly Ass'n v. Nielsen*,
368 F. Supp. 3d 1, 10 (D.D.C. 2019)................................................. 12, 16, 17

*Nken v. Holder*,
556 U.S. 418 (2009) .................................................................................. 39, 41

*Nyunt v. Broad. Bd. of Governors*,
589 F.3d 445 (D.C. Cir. 2009) .................................................................. 10, 20

*Priests for Life v. U.S. Dep't of Health & Human Servs.*,
772 F.3d 229 (D.C. Cir. 2014) ...................................................................... 36

*Ralpho v. Bell*,
569 F.2d 607 (D.C. Cir. 1977) ...................................................................... 17

*Save Our Heritage Org. v. Gonzales*,
533 F. Supp. 2d 58 (D.D.C. 2008) ................................................................ 17

*Sherbert v. Verner*,
374 U.S. 398 (1963) .................................................................................. 33, 35

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011) ........................................................................ 7

*Sierra Club v. Trump*,
379 F. Supp. 3d 883 (N.D. Cal. 2019) .......................................................... 16

*Singh v. Carter*,
168 F. Supp. 3d 216 (D.D.C. 2016) ........................................................................ 36

*Stand Up for California! v. DOI*,
298 F. Supp. 3d 136 (D.D.C. 2018) ................................................................. 26, 29

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
239 F. Supp. 3d 77–94 (D.D.C. 2017) .................................................... 33, 34, 35

*Story v. Green*,
978 F.2d 60 (2d Cir. 1993) ...................................................................................... 38

*SW Gen., Inc. v. NLRB*,
796 F.3d 67 (D.C. Cir. 2015) .................................................................................. 30

*Switchmen's Union v. Nat'l Mediation Bd.*,
320 U.S. 297 (1943) ................................................................................................... 9

*Texas Border Coal. v. Napolitano*,
614 F. Supp. 2d 54 (D.D.C. 2009) ............................................................................ 8

*Thomas v. Review Bd.*,
450 U.S. 707 (1981) ................................................................................................. 36

*Trump v. Sierra Club*,
140 S. Ct. 1 (2019) ................................................................................................... 39

*Trump v. Sierra Club*,
140 S. Ct. 2620 (2020) ............................................................................................. 39

*United States v. Guzman-Padilla*,
573 F.3d 865 (9th Cir. 2009) ............................................................................ 40, 41

*United States v. Harris Cnty.*,
No. 4:16-CV-2331, 2017 WL 7692396 (S.D. Tex. Apr. 26, 2017) ...................... 30

*United States v. Hoffman*,
436 F. Supp. 3d 1272 (D. Ariz. 2020) ................................................................... 36

*Univ. Research Ass'n v. Coutu*
450 U.S. 754 (1981) ................................................................................................... 9

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006) ................................................................................................. 36

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*,
714 F.3d 186 (4th Cir. 2013) .................................................................................. 24

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ................................................................................... 7, 41, 42, 45

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972) .......................................................................................... 33

**Constitutional Provisions**

1st Amend ..................................................................................... 2, 31, 32, 34, 37, 38

**Statutes**

5 U.S.C. § 551 ....................................................................................................... 7

5 U.S.C. § 3345 ............................................................................................... 20, 25

5 U.S.C. § 3346 ................................................................................................... 27

5 U.S.C. § 3348 ................................................................................................... 30

5 U.S.C. § 3349 ................................................................................................... 21

6 U.S.C. § 112 ..................................................................................................... 25

6 U.S.C. § 113 ........................................................................................ 20, 21, 23, 25–28

8 U.S.C. § 1103 ................................................................................................. 3, 29

10 U.S.C. §§ 271–84 ......................................................................................... 3, 29

10 U.S.C. § 284 ............................................................................................. 5, 6, 39

10 U.S.C. § 2808 ........................................................................................... 39, 40

16 U.S.C. § 1531 ................................................................................................... 6

19 U.S.C. § 1459 ..................................................................................... 42, 43, 44, 45

25 U.S.C. § 3001 ................................................................................................... 6

31 U.S.C. § 1344 ................................................................................................. 29

42 U.S.C. § 1996 ................................................................................................... 7

42 U.S.C. § 2000bb–1 ......................................................................................... 31

42 U.S.C. § 4321 ................................................................................................... 6

54 U.S.C. § 300101 ............................................................................................... 6

Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208,
Div. C., Title I § 102, 110 Stat. 3009-554 (Sept. 30, 1996) (IIRIRA § 102)........................ passim

Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002)............... 3

REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, Title I § 102,
119 Stat. 231 (May 11, 2005) ............................................................................... 3

Secure Fence Act of 2006, Pub. L. No. 109-367, 120 Stat. 2638 (Oct. 26, 2006) ........................ 3

Dep't of Homeland Security Appropriations Act, 2008, Pub. L. No. 110-161,
121 Stat. 2090 (Dec. 26, 2007) ................................................................................................ 3, 11

National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114- 328,
§ 1903 (Dec. 23, 2016) ................................................................................................................ 25

**Legislative Materials:**

H.R. Rep. No. 103-200 (1993)........................................................................................................ 4

H.R. Rep. No. 109-72 (2005)......................................................................................................... 4

**Regulations & Executive Orders:**

Exec. Order No. 13753, 81 Fed. Reg. 90667 (Dec. 9, 2016) ........................ 23, 24, 25, 26, 27, 28

Exec. Order No. 13767, 82 Fed. Reg. 8793 (Jan. 25, 2017) ........................................................ 5

Determinations Pursuant to Section 102 of IIRIRA, as Amended,
85 Fed. Reg. 14958–61 (March 20, 2020) .................................................................. 6, 8, 16, 27

Ratification of Department Actions, 85 Fed. Reg. 59651 (Sept. 23, 2020) ................................ 29

Presidential Memorandum, 2018 WL 1633761 (Apr. 4, 2018)...................................................... 5

**INTRODUCTION**

Enormous quantities of illegal drugs are flowing into our Nation through the southern border. In response to this crisis, and pursuant to longstanding statutory authority, the Department of Homeland Security (DHS) asked the Department of Defense (DoD) to support DHS's counter-narcotics operations by constructing fences and roads and installing lighting in San Diego and Imperial Counties in southern California. Plaintiffs in this case—a collection of entities, individuals, and federally-recognized tribes of the Kumeyaay Nation—seek to stop that construction. Their motion for a preliminary injunction should be denied because they cannot show a likelihood of success on the merits of their claims and the balance of equities tips sharply in favor of Defendants. Indeed, another district court recently rejected many of the same arguments Plaintiffs assert here in denying a motion for preliminary injunction filed by another Kumeyaay tribe to stop construction of the same projects. *See La Posta Band of the Diegueno Mission Indians of the La Posta Reservation v. Trump*, Case No. 20-CV-1552-AJB (S.D. Cal. Sept. 9, 2020) (Exhibit 1) (*La Posta* Mem. Op.), *appeal pending* No. 20-55941 (9th Cir.).

Plaintiffs have no likelihood of success on the merits of their claims, which seek to undermine Congress's decision to prevent litigation from delaying border infrastructure construction, as expressed in the plain language of § 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). That statute prohibits the Court from hearing Plaintiffs' challenges to Defendant's compliance with IIRIRA's consultation requirement and to the Secretary of Homeland Security's authority under IIRIRA to waive various laws in order to expedite construction of the projects. Even if the Court could reach the merits of these claims, they fail under a deferential *ultra vires* standard of review. Defendants have extensively consulted with Plaintiffs about the projects by sharing information, considering Plaintiffs' input, and adopting specific preventative measures suggested by Plaintiffs. These efforts satisfy Defendants'

1

consultation obligations, which say nothing about the timing, subjects, or depth of consultation.

Plaintiffs also challenge the waivers on the basis that Acting Secretary of Homeland Security Chad Wolf was not lawfully appointed to his position. That argument misinterprets both the relevant statutory provisions governing succession and DHS's own internal documents. Acting Secretary Wolf took office pursuant to a valid order of succession and was lawfully serving in that position when he issued the waivers. In any event, any doubt about Mr. Wolf's authority to issue the waivers has been removed because of recent DHS actions—not discussed in Plaintiffs' motion—that permit Mr. Wolf's lawful service as Acting Secretary even under Plaintiffs' theory of succession. Out of an abundance of caution, Acting Secretary Wolf has ratified his prior delegable actions, including the waivers, thus removing any question about their legality.

Plaintiffs' claims under the Religious Freedom Restoration Act (RFRA) and the First Amendment also fail. The Supreme Court and numerous other courts, including most recently *La Posta*, have rejected similar RFRA claims by Indian tribes to federal infrastructure projects on federal property, even in circumstances where construction harmed Indian religious practices. Plaintiffs also cannot show a likelihood of success on their First Amendment claim because the waivers do not discriminate against Plaintiffs on the basis of their religious beliefs.

The remaining preliminary injunction factors also favor Defendants, who have compelling interests in border security, drug interdiction, and preventing cross-border criminal activity. An injunction stopping ongoing construction would also impose millions of dollars in fees and costs that would otherwise be spent on the projects. These interests outweigh Plaintiffs' alleged harms, which are insufficient to establish an irreparable injury. The evidence shows that no ancient village sites or burial grounds lie in the path of the construction; that no significant artifacts or human remains have been found in the project areas; that the Government is working closely with tribal

cultural monitors to ensure that the work does not harm Plaintiffs' cultural and religious interests; and that if any culturally significant artifacts or items were to be found during construction, protocols will be followed that allow tribal cultural leaders to take appropriate care of those items.

The Supreme Court's stay of a permanent injunction against border barrier construction in July 2019 was a clear directive that construction for such projects should be permitted to proceed. Since then, no injunction issued in the related series of nationwide border barrier cases has remained in effect.  This Court should follow that same approach and deny Plaintiffs' motion.

## BACKGROUND

## I.    Congress's Authorization of Border Barrier Construction and Limitations on Judicial Review

In 1996, Congress passed section 102 of IIRIRA and amended it several times thereafter to provide DHS with broad authority to construct border barrier infrastructure along the southern border.  *See* Pub. L. No. 104-208, Div. C, Title I § 102, 110 Stat. 3009-554 (Sept. 30, 1996), *as amended by* Dep't of Homeland Security Appropriations Act, 2008, Pub. L. No. 110-161, Div. E, Title V § 564, 121 Stat. 2090 (Dec. 26, 2007); Secure Fence Act of 2006, Pub. L. No. 109-367, § 3; REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, Title I § 102, 119 Stat. 231, 302, 306 (May 11, 2005) (codified at 8 U.S.C. § 1103 note and attached as Exhibit 2).  Section 102(a) of IIRIRA currently directs the Secretary of Homeland Security to "take such actions as may be necessary to install additional physical barriers and roads . . . in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States."  In addition, Congress ordered DHS to "construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective."  IIRIRA § 102(b)(1)(A).

Congress also included several provisions in IIRIRA to ensure expeditious construction of border barriers.  First, Congress granted the DHS Secretary "authority to waive all legal

requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section." IIRIRA § 102(c)(1). Congress added this provision in 2005 after it grew frustrated by "[c]ontinued delays caused by litigation" preventing barrier construction. *See* H.R. Rep. No. 109-72, at 171 (May 3, 2005).

Second, Congress created a procedure for limited and streamlined judicial review of the Secretary's exercise of this waiver authority. *See* IIRIRA § 102(c). Federal district courts have "exclusive jurisdiction" to hear such claims, and the only "cause of action or claim" that may be brought is one "alleging a violation of the Constitution of the United States" filed within sixty days of the Secretary's action. *Id.* § 102(c)(2)(A)-(B). Further, "the court shall not have jurisdiction to hear any claim not specified in this subparagraph." *Id.* § 102(c)(2)(B). The conference report explained § 102(c) only provides "judicial review for claims alleging that the actions or decisions of the Secretary violate the United States Constitution." H.R. Rep. 109-72 at 172.

## II.     DoD's Support for DHS's Border Security Activities

Congress also has expressly authorized DoD to provide a wide range of support to DHS at the southern border. *See, e.g.*, 10 U.S.C. §§ 271–84. For decades, U.S. military forces have played an active role in barrier construction. Military personnel were critical to construction of the first modern border barrier near San Diego in the early 1990s, as well as other more recent border fence projects. *See, e.g.,* H.R. Rep. No. 103-200, at 330–31, 1993 WL 298896 (commending DoD for its role in construction of the San Diego primary fence); Armed Servs. Comm. Hr'g on S. Border Defense Support (Jan. 29, 2019) (Joint Statement of John Rood and Vice Admiral Michael Gilday) (Exhibit 3) (summarizing history of DOD suport for border security activities).

On January 25, 2017, the President issued an Executive Order directing federal agencies "to deploy all lawful means to secure the Nation's southern border." Border Security and

Immigration Enforcement Improvements, Exec. Order No. 13767, 82 Fed. Reg. 8793 (Jan. 25, 2017).  The Order required agencies to "take all appropriate steps to immediately plan, design and construct a physical wall along the southern border."  *Id.* at 8794.

On April 4, 2018, the President issued a memorandum titled, "Securing the Southern Border of the United States."  Presidential Memorandum, 2018 WL 1633761 (Apr. 4, 2018).  The President stated "[t]he security of the United States is imperiled by a drastic surge of illegal activity on the southern border."  *Id.* at *1.  The President directed DoD to support DHS in "securing the southern border and taking other necessary actions to stop the flow of deadly drugs and other contraband, gang members and other criminals, and illegal aliens into this country."  *Id.* at *2.

### III.   DoD's Support in Fiscal Year 2020 to DHS's Border Barrier Construction Activities

On January 14, 2020, in accordance with the requirements of 10 U.S.C. § 284, DHS requested DoD's assistance to construct 38 discrete border barrier project segments located in drug-smuggling corridors along the southern border.  *See* Administrative Record (AR) at 28–43 (Exhibit 4).[1]  On February 7, 2020, the Secretary of Defense approved construction and funding for 31 project segments.  *See id.* at 1–11.  Plaintiffs in this case challenge the construction of two projects, consisting of four discrete segments, in San Diego and Imperial Counties.  *See* Pls.' Mot. at 2.  "San Diego A" consists of three segments totaling approximately three miles of new primary pedestrian fencing and 14 miles of replacement pedestrian fencing in San Diego County.  *See* AR at 30–31.  "El Centro A" consists of approximately three miles of new pedestrian fencing in Imperial County.  *See id.* at 31–33; Declaration of Paul Enriquez ¶¶ 12–17 (Exhibit 5).  Both

---

[1] Section 284 authorizes DoD to "provide support for the counterdrug activities . . . of any other department or agency," if "such support is requested."  *Id.* § 284(a).  This support explicitly includes the "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States."  *Id.* § 284(b)(7).

projects are occurring within the federal Roosevelt Reservation, a 60-foot strip of federal land established in 1907 that parallels the international border and functions primarily as a law enforcement zone. *See* Enriquez Decl. ¶ 11; Proclamation No. 758, 35 Stat. 2136 (May 27, 1907). Part of the land in the El Centro section has been previously disturbed by illegal crossing and off road activity, while the land in the San Diego sections is already occupied by existing fencing and by an existing border road that has been there for at least 30 years. *Id.* ¶¶ 14, 17.

The Secretary of Defense concluded that DHS identified each project location as a drug-smuggling corridor in accordance with § 284(b)(7). *See* AR at 1–7, 9. The United States Border Patrol collectively had over 480 separate drug-related events in fiscal year 2019 between border crossings in the San Diego an El Centro border patrol sectors where the barriers will be built. *See id.* at 30–33. These encounters resulted in the seizure of approximately 3400 pounds of marijuana, 1300 pounds of cocaine, 400 pounds of heroin, 6500 pounds of methamphetamine, and 107 pounds of fentanyl. *See id.* DHS thus requires new and replacement barriers to impede and deny illegal narcotics smuggling. *See id.* at 28–33 (explaining that existing barriers are ineffective and drug cartels have adapted their tactics to evade them).

On March 16, 2020, the Acting Secretary of Homeland Security, Chad Wolf, exercised his authority under § 102(c)(1) of IIRIRA to waive the application of various federal and state laws, "in their entirety," to ensure expeditious construction of the San Diego and El Centro projects. *See* Determinations Pursuant to Section 102 of IIRIRA, as Amended, 85 Fed. Reg. 14958–61 (Mar. 16, 2020). As relevant to this case, the waived laws include the Native American Graves Protection and Repatriation Act (25 U.S.C. § 3001 *et seq.*) (NAGPRA), the National Environmental Policy Act (NEPA) (42 U.S.C. § 4321 *et. seq.*), the National Historic Preservation Act (NHPA) (54 U.S.C. § 300101 et seq.), the Endangered Species Act (ESA) (16 U.S.C. § 1531

*et seq.*), the American Indian Religious Freedom Act (AIRFA) (42 U.S.C. § 1996), and the Administrative Procedure Act (5 U.S.C. § 551 *et. seq.*).  *Id.*

## LEGAL STANDARD

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008).  A preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  A plaintiff seeking a preliminary injunction must show that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest.  *Id.* at 20.  The Court of Appeals has emphasized that the "first and most important factor" is whether the moving party has "established a likelihood of success on the merits."  *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).  "[W]hen a plaintiff has not shown a likelihood of success on the merits, we need not consider the other factors."  *Greater New Orleans Fair Hous. Action Ctr. v. HUD*, 639 F.3d 1078, 1088 (D.C. Cir. 2011).[2]

The Supreme Court has also instructed that a preliminary injunction cannot issue on the basis of speculative or possible injury.  Rather, the plaintiff must establish that irreparable harm is "*likely* in the absence of an injunction."  *Winter*, 555 U.S at 22.  The Court of Appeals has established "a high standard for irreparable injury" that requires an injury to "be both certain and great; it must be actual and not theoretical."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

---

[2] In *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011), the Court of Appeals noted that *Winter* called into question the "sliding-scale approach" to consideration of the preliminary injunction factors that had been the law of this Circuit.  This Court need not decide any questions related to the continued viability of the sliding-scale test, however, because Plaintiffs have not shown a likelihood of success on the merits.

## ARGUMENT

**I.      Plaintiffs Are Not Likely to Succeed on the Merits.**

**A.      Plaintiffs' IIRIRA Consultation Claim Fails.**

The Court should reject Plaintiffs' argument that Defendants have violated the APA by not complying with IIRIRA's consultation requirement. *See* Pls.' Mot. at 13–18. This requirement provides that, "[i]n carrying out" IIRIRA § 102, the DHS Secretary "shall consult with the Secretaries of Interior and Agriculture, along with "States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such construction is to be constructed." IIRIRA § 102(b)(1)(C)(1). As a threshold matter, DHS waived the APA with respect to the construction of the projects at issue and thus it is an unavailable vehicle for Plaintiffs' challenge. *See* 85 Fed. Reg. at 14960, 14961. Moreover, Congress generally foreclosed review of claims relating to the consultation requirement by expressly denying a private right of action. In the "savings provision," of the subparagraph creating the consultation requirement, Congress expressly provided that "[n]othing in this subparagraph may be construed to—(I) create or negate any right of action for a State, local government, or other person or entity affected by this subsection." IIRIRA § 102(b)(2)(C)(ii). The savings provision's explicit limitation on judicial review disposes of any attempt to infer a private cause of action. *See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) (statutory intent to create a private remedy "is determinative"). Indeed, Judge Walton of this court reached this same conclusion when confronted with a similar challenge to IIRIRA's consultation requirement, holding that "the plaintiff seeks to pursue a claim for which no private right of action or private remedy has been created." *See Texas Border Coal. v. Napolitano*, 614 F. Supp. 2d 54, 63 (D.D.C. 2009).

Congress's preclusion of a private cause of action also undermines any claim that Plaintiffs

would have an implied equitable *ultra vires* claim to challenge DHS's consultation efforts.  As the Court of Appeals recently emphasized, a necessary element of an implied *ultra vires* claim is that "the statutory preclusion of review is implied rather than express."  *See DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019).   Further, courts have emphasized that non-statutory *ultra vires* review is appropriate only as a last resort to protect individual statutory rights granted by Congress.  The Supreme Court explained that "[c]entral" to the decision in *Leedom v. Kyne*, 358 U.S. 184 (1958), which permitted *ultra vires* review in narrow circumstances, was the understanding that barring district court review would have "wholly deprive[d]" the plaintiff in that case of a "meaningful and adequate means of vindicating *its statutory rights*," *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991) (emphasis added); *see Leedom*, 358 U.S. at 190 ("Where, as here, Congress has given a [collective bargaining] 'right' to the professional employees it must be held that it intended that right to be enforced").  Plaintiffs, however, have not established that any "private rights," *Barlow v. Collins*, 397 U.S. 159, 166 (1970), or "rights which [Congress] create[d]" are at stake here.  *Switchmen's Union v. Nat'l Mediation Bd.*, 320 U.S. 297, 301 (1943).

Plaintiffs cannot invoke *ultra vires* review by simply pointing to a "statutory obligation" of an agency, but instead must identify a "statutory right" by which Plaintiffs are entitled to vindication.  *See Cal. Sportfishing Protection Alliance v. U.S. Bureau of Reclamation*, No. 15-912, 2015 WL 6167521, at *11 & n.8 (E.D. Cal. Oct. 20, 2015).  The consultation requirement of IIRIRA is "phrased as a directive to [a] federal agenc[y]," *Univ. Research Ass'n v. Coutu*, 450 U.S. 754, 772 (1981), and does not create any individual rights.  It is well established that for a statutory right to exist, the statute itself must direct its benefits to individuals, not merely to the aggregated public.  *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 287 (2002).  Because Plaintiffs have

not identified an individual statutory right in the text of IIRIRA's consultation provision, it would be an unwarranted extension of *ultra vires* review to apply it to the circumstances here.

Even assuming *arguendo* that APA or *ultra vires* review were available, Plaintiffs have not shown that DHS has failed to act in accordance with IIRIRA's consultation requirement or, in the case of *ultra vires* review, acted "contrary to a specific prohibition in the statute that is clear and mandatory." *DCH Regional Med. Ctr.*, 925 F.3d at 509; *see Nyunt v. Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (on *ultra vires* review plaintiff must show "extreme error," which is a "very stringent standard" under which a claim "rarely succeeds."). IIRIRA does not clearly establish (1) the specific *subject matter* for consultation, (2) *when* such consultation must occur, (3) with *whom* in particular it must necessarily occur, or (4) the *degree* of interaction required to satisfy the requirement. Plaintiffs focus on the timing and degree of consultation, but they cannot show that DHS contravened clear, mandatory statutory language.

First, contrary to Plaintiffs' contention, the consultation provision does not clearly state that consultation "must take place before construction of the border fence authorized by IIRIRA begins," Pls.' Mot. at 13, or before DHS issues a waiver under IIRIRA § 102(c)(1), *id.* at 14. Unlike many other statutory provisions, Congress did not require that consultation be completed "before" *any* specific action. [3] Further, nothing in either the consultation or waiver provisions of IIRIRA makes waiver expressly or implicitly dependent on completion of the consultation requirement. *See* Pls.' Mot. at 14-15. Rather, § 102(c)(1) permits the Secretary to waive legal provisions in his "sole discretion" upon determining that a waiver is necessary to expedite

---

[3] *See, e.g.*, 10 U.S.C. § 2667(g)(3) ("Before entering into any lease under this subsection, the Secretary shall consult with the [EPA] Administrator[.]"); 42 U.S.C. § 4332(C) ("Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of [certain] Federal agenc[ies].").

construction, and consultation with stakeholders would not likely inform the Secretary's decision whether waiver of a given legal requirement is necessary.  The consultation provision most naturally refers to initiating discussions centering on mitigation efforts *after* projects have been selected, and directs consultation on the subject of "minimiz[ing] the impact" of the construction. IIRIRA § 102(b)(1)(C)(ii).  The statute leaves to DHS to determine the appropriate timing in light of the myriad considerations implicated by a particular project.

That the timing of consultation is not tied to the commencement of construction or to a waiver determination is further evidenced by Congress's adoption of two different appropriations restrictions in the fiscal year 2008 appropriations Act that amended IIRIRA to include the consultation requirement—one specific to waiver authority, *see* Pub. L. No. 110-161, 121 Stat. at 2049 (prohibiting obligation of funds for waiver projects "until 15 days have elapsed" after the notice was published in the Federal Register); and one specific to the consultation requirement, *see id.* at 2091 (prohibiting DHS from obligating funds until it had "complied with" that requirement).  If Congress intended consultation to be a prerequisite to a waiver determination, this approach would be unnecessarily redundant.  And that Congress limited the use of fiscal year 2008 appropriations by requiring consultation before construction contracts were finalized demonstrates that the statute does not inherently include such a timing requirement.

Plaintiffs argue that the grammatical structure of IIRIRA's consultation provision indicates that consultation must be completed before construction.  *See* Pls.' Mot. at 15 (highlighting Congress's use of the infinitive tense in the phrase "to be constructed").  As noted above, the text does not compel that interpretation.  Moreover, in rejecting a motion for a preliminary injunction against the El Centro and San Diego projects, the court in *La Posta* rejected the same argument Plaintiffs raise here.  As *La Posta* held, § 102 "did not make th[e] requirement of consultation

11

before any construction 'clear and mandatory.'" *La Posta* Mem. Op. at 24.  The court further observed that, although it might be "better practice" to consult with relevant stakeholders before undertaking construction, IIRIRA "does not appear to specifically set forth any [un]equivocal requirement that demands consultation occur before a certain event."  *Id.* at 25.

Other courts have reached the same conclusion.  In *In re Border Infrastructure Environmental Litigation*, 284 F. Supp. 3d 1092, 1126 (S.D. Cal. 2018), *cert. denied sub nom. Animal Legal Def. Fund v. Dep't of Homeland Sec.*, 139 S. Ct. 594 (2018), *aff'd* 915 F.3d 1213 (9th Cir. 2019), the plaintiffs challenged DHS's issuance of a waiver under § 102(c) prior to completing the consultation process.  The court rejected the plaintiffs' claim because § 102 "does not provide any specific limitation or guidance concerning when or how consultation is to occur." *In re Border Infrastructure*, 284 F. Supp. 3d at 1126.  Indeed, immediately preceding the court's broad holding that IIRIRA "lack[s] a 'clear and mandatory' mandate regarding the timing of consultation," it noted that consultation on one project at issue was still on-going even though DHS had already begun construction.  *Id.*

Judge Leon of this court similarly held in *North American Butterfly Association v. Nielsen* that "IRIRA is silent as to whether the consultation required must occur *prior* to a waiver determination."  368 F. Supp. 3d 1, 10 (D.D.C. 2019) (emphasis in original).  As in *In re Border Infrastructure*, Judge Leon agreed that "[t]he statute neither requires the Secretary to consult with the stakeholders identified in § 102(b)(1)(C) *before* exercising her waiver authority, nor indicates that the Secretary's waiver power in any way depends on the views of those third parties."  *Id.*

Second, Congress did not specify the depth of consultation required under IIRIRA.  But whether reviewed as an APA or *ultra vires* claim, DHS has engaged in good faith efforts to provide tribal authorities, including Plaintiffs, the opportunity to comment on and suggest additional ways

to minimize relevant impacts of construction.  As detailed by the Customs and Border Protection (CBP) official overseeing environmental planning and compliance, CBP has engaged in extensive stakeholder consultation with respect to San Diego A and El Centro A beginning at the same time it issued the IIRIRA waivers (March 16, 2020), months in advance of construction.  Enriquez Decl. ¶ 28.  Since that time, it has maintained an ongoing dialogue with Plaintiffs (among numerous other tribes) to both share information about projects and to consider Plaintiffs' input on potential measures to minimize the impact of construction.  For example, on May 7, 2020, CBP hosted a tribal coordination briefing via WebEx for the Campo Tribe (a Plaintiff here), where CBP shared information about San Diego A and El Centro A.  *Id.* ¶ 29.  On June 16, 2020, CBP hosted another tribal coordination briefing, which Plaintiffs and other tribes attended.  *Id.* ¶ 30.  During the briefing, "CBP shared photos of the planned border barrier design; maps of the 284 Project Areas; CBP's understanding of known biological and cultural resources within the 284 Project Areas; [] examples of the [Best Management Practices (BMPs)] that would be implemented during construction"; CBP's plans to conduct new cultural resources surveys in areas not previously surveyed; and CBP's plan to develop a Cultural Resource Protocol and Communications Plan (Protocol Plan), about which it would coordinate with tribes.  *Id.*  "The parties also discussed, among other things, the possibility of having tribal cultural monitors affiliated with the Kumeyaay Tribes on-site during construction."  *Id.*

CBP and Plaintiffs have continued to engage in numerous communications and to share information about the 284 Projects for well over three months.  *See, e.g.*, *id.* ¶¶ 32 (July 7, 2020 call to discuss Plaintiffs' concerns about, *inter alia*, an alleged discovery of human remains and an upcoming controlled detonation); ¶ 34 (access to on-line databases containing information about the 284 Project Areas provided on July 10, 2020); ¶ 37 (July 10, 2020 webinar to discuss

results of past and current cultural resource surveys of the San Diego Project Area); ¶ 42 (July 19, 2020 correspondence from Plaintiffs concerning tribal monitoring, and CBP's response); ¶ 44 (July 31, 2020 letter from Plaintiffs concerning San Diego A, and CBP's response); ¶¶ 45–46 (August 4 & 7, 2020 inquiry from Plaintiffs' Tribal Historic Preservation Officer (THPO) regarding prior and planned surveys, and CBP's response); ¶ 48 (August 14 & 15, 2020 requests from Plaintiffs' THPO for monitoring logs and survey records, and CBP's response); ¶ 50 (results of five re-surveys conducted at Plaintiffs' request provided on August 28, 2020 and discussed with Plaintiffs); ¶ 52 (draft Protocol Plan distributed to Kumeyaay Tribes for comment on August 31, 2020); ¶ 57 (September 11, 2020 call to discuss results of three additional re-surveys conducted at Plaintiffs' request); ¶ 58 (September 15, 2020 call to discuss survey results for El Centro A).

CBP also conducted a site visit with Plaintiffs (among other tribes) on July 9, 2020, to discuss the protocols for an upcoming controlled detonation at the San Diego Project Area.  *Id.* ¶ 34.   Additionally, on July 31, 2020, CBP accommodated a site visit by Kumeyaay tribal representatives (including Plaintiffs) to investigate reports that human remains were discovered in the San Diego Project Area.  *See id.* ¶¶ 43, 87.  And beginning on August 28, 2020, CBP began holding a regular bi-weekly conference call with the Kumeyaay Tribes (including Plaintiffs) to discuss upcoming construction activities, any concerns of the tribes, and potential measures to minimize impacts from construction.  *See id.* ¶¶ 50, 54, 59, 61.  Finally, CBP has developed and is finalizing the Protocol Plan.  *Id.* ¶ 60.  The Protocol Plan "memorializes protocols that have been implemented by CBP since the 284 Projects were initiated and describes additional protocols that will be utilized going forward for avoidance, treatment, curation, and repatriation of cultural resources," such as "avoiding areas where resources are found and striving to leave the resources in place wherever possible" or, if a resource is unavoidable, "immediate[ly] halt[ing] . . .

construction within 100 feet of the resource until it can be treated appropriately." *Id.* ¶ 52.  As the Protocol Plan has been developed CBP has continued to share information with the Kumeyaay Tribes and committed to implementing the measures outlined in the Protocol Plan while it is being finalized. *Id.*

These consultations have informed the planning and execution of the projects.  *Id.* ¶ 26 (changes to the alignment of an access road and the location of a proposed well to avoid impacts to known archaeological sites).  CBP has also investigated and implemented mitigation measures requested by Kumeyaay tribal authorities, including Plaintiffs; secured cultural monitors to be on-site during construction, including six tribal cultural monitors affiliated with the Kumeyaay Tribes and Plaintiffs; and surveyed eight additional areas identified by the Tribes as potentially containing cultural items or ancestral remains.  *See, e.g.*, *id.* ¶¶ 35 (investigating, and ultimately finding infeasible, the Kumeyaay Tribes' request to have cadaver dogs on-site; following up with the Tribes on their request for soil sampling, to which the Tribes never responded); ¶¶ 38–40 (hiring four tribal cultural monitors from the Kumeyaay Tribe for San Diego A); ¶ 47 (conducting five re-surveys of the project areas at the Tribes' request); ¶ 51 (conducting an additional three re-surveys of the project areas at the Tribes' request); ¶ 55 (hiring two tribal monitors from the Kumeyaay Tribe for El Centro A).

DHS has thus reasonably complied with the consultation requirement; and even if Plaintiffs disagree, the factual disputes apparent from the record prevent Plaintiffs from meeting their burden of demonstrating that an injunction is warranted.  *La Posta* Mem. Op. at 25.

> **B.** **Plaintiffs' Claims Under NEPA, the NPHA, NAGPRA, and the ESA Fail Because the Acting Secretary of Homeland Security Waived Application of Those Statutes.**

Section 102(c) of IIRIRA authorizes DHS to waive a broad array of legal impediments to

border barrier construction: "Notwithstanding any other provision of law, the Secretary of

Homeland Security shall have the authority to waive all legal requirements such Secretary, in such

Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers

and roads under this section."  On March 16, 2019, the Acting Secretary issued waivers for the

two projects at issue in this case.  *See* Determinations Pursuant to Section 102 of IIRIRA, as

Amended, 85 Fed. Reg. 14958–61 (Mar. 16, 2020).  The waived laws include NEPA, the NHPA,

NAGPRA, and the ESA.  *See id.*  Accordingly, Plaintiffs' claims asserting violations of these

statutes are unlikely to succeed.  *See Ctr. for Biological Diversity v. Trump*, No. 19-CV-00408

(TNM), 2020 WL 1643657, at \*13–14 (D.D.C. Apr. 2, 2020) (rejecting NEPA claims against

§ 284 border barrier projects based on issuance of a similar waiver in 2019); *Sierra Club v. Trump*,

379 F. Supp. 3d 883, 922-23 (N.D. Cal. 2019) (same); *N. Am. Butterfly Ass'n v. Nielsen*, 368 F.

Supp. 3d at 8–9 (dismissing statutory claims under NEPA and the ESA based on 2018 waiver).

### C.    The Court Lacks Jurisdiction to Consider Plaintiffs' Non-Constitutional Challenges to the Waivers.

Plaintiffs do not dispute that the waivers at issue cover the statutes they seek to enforce.

*See* Pls.' Mot. at 27.  Instead, Plaintiffs contend that "Defendant Wolf could not exercise the

Secretary's waiver authority" because Mr. Wolf  "has never legally held the position of Secretary

of Homeland Security."  *Id.* at 27, 33.

This argument runs headlong into IIRIRA's jurisdictional and cause of action limitations.

Congress has expressly withdrawn district court jurisdiction to review non-constitutional

challenges to the exercise of waiver authority:

> The district courts of the United States shall have exclusive jurisdiction to
> hear all causes or claims arising from any action undertaken, or any decision
> made, by the Secretary of Homeland Security pursuant to paragraph (1).  A
> cause of action or claim may only be brought alleging a violation of the
> Constitution of the United States.  The court shall not have jurisdiction to

16

hear any claim not specified in this subparagraph.

IIRIRA § 102(c)(2)(A). This statutory language is emphatic and comprehensive. First, it expansively encompasses "*all* causes or claims arising from *any* action undertaken" and "*any* decision made" pursuant to § 102(c)(1)'s waiver authority. *Id.* Second, it carves out claims "alleging a violation of the Constitution." *Id.* Third, it removes district court jurisdiction over "any claim not specified in this subparagraph." *Id.* Indeed, four separate judges in this district have concluded that "Congress has expressly precluded judicial review of non-constitutional claims that arise from DHS's exercise of the IIRIRA's section 102(c) waiver authority." *Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 225 (D.D.C. 2019); *see N. Am. Butterfly Ass'n*, 368 F. Supp. 3d at 9; *Save Our Heritage Org. v. Gonzales*, 533 F. Supp. 2d 58, 60 (D.D.C. 2008); *Defenders of Wildlife v. Chertoff*, 527 F. Supp. 2d 119, 122 (D.D.C. 2007).

Plaintiffs' challenge to Mr. Wolf's status is based on alleged violations of federal statutes regarding succession to the role of Acting Secretary of Homeland Security that fall within the scope of § 102(c)'s restriction on judicial review of non-constitutional claims. *See* Pls.' Mot. at 34 (alleging that the waivers were issued "by an official who was serving as an Under Secretary, not the Secretary" in violation of the Federal Vacancy Reform Act and Homeland Security Act). Congress may leave district courts without jurisdiction to review non-constitutional claims against an agency. *See Ralpho v. Bell*, 569 F.2d 607, 622 & n.101 (D.C. Cir. 1977) (observing that nothing "prevent[s] [Congress] from shielding even the most patent deviation from the statutory scheme from judicial redress where the Constitution is in no wise implicated."). Here, Congress "in no uncertain terms" restricted "both the ability of a plaintiff to bring a cause of action or claim concerning the Secretary's exercise of th[e] waiver authority and the power of the federal district courts to review any such claims." *Ctr. for Biological Diversity*, 404 F. Supp. 3d at 238. These provisions "make crystal clear that Congress intended to eliminate litigation that would delay

expeditious construction of border barrier infrastructure, to the fullest extent possible, *i.e.*, to the extent constitutionally allowed." *Id.* at 239 (internal quotations omitted).

Plaintiffs attempt to evade IIRIRA's jurisdictional and cause of action limitations, but their arguments lack merit. *See* Pls.' Mot. at 36–38. Plaintiffs focus on the language that the district court may only address constitutional claims "arising from" the Secretary's exercise of the waiver authority. *Id.* at 27. Plaintiffs dispute that Mr. Wolf was lawfully serving as the Acting Secretary of Homeland Security when he issued the waivers, thus they contend that their claims "arise from action undertaken or made by" Mr. Wolf in his capacity as the Under Secretary for Strategy, Policy, and Plans, not by the Secretary of Homeland Security. *Id.* This argument boils down to whether the correct person issued the waivers, and that type of claim challenging issuance of the waivers "unquestionably" falls within the scope of § 102(c). *Ctr. for Biological Diversity*, 404 F. Supp. 3d at 238; *see In re Border Infrastructure Envtl. Litig.*, 915 F.3d 1213, 1221 (9th Cir. 2019) (holding that claims challenging "the waivers themselves" and whether they were lawfully issued "under section 102(c)(1)" are subject to the "jurisdictional bar"); *id.* at 1225 ("And of course, we lack jurisdiction to consider any argument challenging the waivers themselves.").

Statutory succession questions are not exempt from the waiver merely because § 102(c) applies to actions and decisions of the "Secretary of Homeland Security." The waiver states that claims "may only be brought alleging a violation of the Constitution of the United States." IIRIRA § 102(c)(2)(A). Congress did not explicitly carve out statutory succession claims from this bar. Had Congress wished to create such an exception, it certainly knew how to draft language that would have achieved this effect, as it did for constitutional claims, and there is no reason to believe it intended to create such an exception by drafting the statute in the manner that it did. Rather, Congress "intended to preclude *completely* judicial review of agency actions taken, or decisions

18

made, pursuant to section 102's waiver provision, including the condition that a particular waiver decision is not authorized by statute," so as not to "delay expeditious construction of border barrier infrastructure." *Ctr. for Biological Diversity*, 404 F. Supp. 3d at 238–39 (emphasis in original). Plaintiffs' interpretation would defeat that statutory purpose.

In *Ctr. for Biological Diversity*, Judge Brown Jackson rejected an argument similar to the one Plaintiffs make here. *See id.* at 239–40. In that case the plaintiffs sought to create a "loophole" to IIRIRA's jurisdictional limitations by arguing that Congress precluded judicial review of "legal claims concerning *lawful* exercises of the DHS's Secretary's waiver authority." *Id.* at 240. Judge Brown Jackson rejected that argument because whether or not the waiver was lawful is "precisely" the question that the Court would have to decide, if it has the power to so. *Id.* Plaintiffs in this case assert the same type of "circular" reasoning, contending that the jurisdictional limitation does not apply because Mr. Wolf lacked authority to issue the waivers because he was not validly installed as the Acting Secretary. But this argument "assumes the answer to the very question that has to be decided." *Id.* "[W]hether or not a federal court has the power to consider a plaintiff's claim does not, and cannot, depend upon the court's deciding, as a threshold matter, that the plaintiff's claim is a meritorious one," even when that claim goes to the authority of the decision-maker to issue the waiver. *Id.* at 241. Moreover, in barring all non-constitutional claims, Congress did not draw any distinctions between meritorious and non-meritorious claims, such that the Court would have to evaluate the merits of Plaintiffs' arguments regarding Mr. Wolf's status before deciding whether it has jurisdiction, or between claims relating to statutory appointments issues and all other non-constitutional claims challenging waivers. *See id.* To the contrary, Congress was clear that "federal courts do not have jurisdiction to consider the merits of *any* non-constitutional claims" concerning the exercise of § 102(c) waivers. *Id.* (emphasis added).

### D. Even if the Court Conducts *Ultra Vires* Review, It Should Conclude that the Acting Secretary Did Not Exceed His Statutory Authority by Issuing the Waivers.

Even if Court determines that—despite the plain meaning of § 102(c) and Congress' clear intent—it retains jurisdiction to decide whether a waiver determination is *ultra vires*, the Acting Secretary's decision must be upheld.  Under the extraordinarily deferential *ultra vires* review standard, the Secretary did not exceed his statutory authority.

As explained above, courts review *ultra vires* claims under a "very stringent standard" and such claims "rarely succeed."  *Nyunt*, 589 F.3d at 449.  *Ultra vires* review requires a plaintiff to show both that the challenged action is "contrary to a specific [statutory] prohibition which is clear and mandatory," and "that barring review by the district court would wholly deprive [the party] of a meaningful and adequate means of vindicating its statutory rights."  *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1263 (D.C. Cir. 2006).  Plaintiffs have not made that showing.

Plaintiffs' challenge to Mr. Wolf's service as Acting Secretary suffers from the same flaw as their challenge to IIRIRA's consultation requirement:  the statutory violations that Plaintiffs assert under the Federal Vacancies Reform Act (FVRA) and Homeland Security Act (HSA) are not based on individually enforceable statutory rights.  *See supra* at 9–10.  These provisions merely establish rules for acting service of federal officers and in no way create statutory rights. *See* 5 U.S.C. § 3345(a); 6 U.S.C. § 113(g).

Even if the legality of Mr. Wolf's service were subject to *ultra vires* review, Plaintiffs have not shown that Mr. Wolf "plainly act[ed] in excess of [his] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory."  *DCH Reg'l Med. Ctr.*, 925 F.3d at 509.  Acting Secretary Wolf took office pursuant to a valid order of succession, and has been

serving lawfully ever since.  And, as discussed below, Plaintiffs' doubts about Mr. Wolf's earlier service and authority to issue the waivers are now gone because of recent DHS actions not discussed in Plaintiffs' motion.

       1.    **Acting Secretary Wolf Is Properly Serving as the Acting Secretary of Homeland Security.**

          a.    **Former Secretary Kirstjen Nielsen's April 9, 2019 Succession Order Was Lawful.**

Under the Homeland Security Act (HSA), the Secretary of Homeland Security has the power to "designate such other officers of the Department in further order of succession to serve as Acting Secretary." 6 U.S.C. § 113(g)(2).  On April 9, 2019, then-Secretary Kirstjen M. Nielsen exercised this power and designated an order of succession for the office of the Secretary.  *See* Declaration of Juliana Blackwell ¶ 2, Ex. 1, Designation of an Order of Succession for the Secretary (Apr. 9, 2019) ("April 2019 Order"); *see also* Declaration of Neal Swartz  ¶ 3.  That order applied to *all* vacancies in the office: "By the authority vested in me as Secretary of Homeland Security, including . . . 6 U.S.C. § 113(g)(2), I hereby designate the order of succession for the Secretary of Homeland Security as follows . . . ."  *See* April 2019 Order at 2; Swartz Decl. ¶ 3.  Her order then set out in "Annex A" a list of officers that comprised the order of succession. *See* April 2019 Order at 2.

Plaintiffs assert a "domino-theory" argument that Ms. Nielsen had no authority to issue the April 9 succession order because she resigned on April 7, meaning all later actions leading to the designation of Mr. Wolf as Acting Secretary were unlawful.  *See* Pls.' Mot. at 30–33.  This argument fails because Ms. Nielsen served as Secretary until April 10.  *See* Blackwell Decl. ¶ 7. Under the FVRA, agencies must notify Congress of certain vacancies and the date when the vacancy occurred.  5 U.S.C. § 3349(a).  On April 11, DHS notified Congress that a vacancy for

the office of Secretary began on April 10 and that an Acting Secretary had been designated.  *See* Swartz Decl. ¶ 7, Ex. 1, Letter from Neal J. Swartz, Associate General Counsel for General Law, DHS, to Hon. Michael R. Pence, President of the Senate (Apr. 11, 2019).

Although Plaintiffs rely on Ms. Nielsen's resignation letter, they point to nothing indicating when her resignation was accepted.  *See Edwards v. United States*, 103 U.S. 471, 473–74 (1880) (explaining the common law rule that a resignation is not effective until accepted).  In any event, as Plaintiffs themselves acknowledge, later on April 7, Ms. Nielsen herself indicated that she had been asked to stay on until April 10, which she clearly did.  *See* Pls.' Mot. at 30–31;[4] *cf. Harmon v. Dep't of Defense*, 50 M.S.P.R. 218, 220 (1991) (resignations are presumptively effective at the *end of the day* on which they are to take effect).  Thus, despite Ms. Nielsen's April 7 resignation letter, she remained the Secretary until April 10, *see* Blackwell Decl. ¶ 5, Ex. 4, Email from Kirstjen M. Nielsen, Secretary of Homeland Security (Apr. 10, 2019, 04:35 EST) (email from Ms. Nielsen announcing that April 10 was her "final day" at DHS), and her April 9 order was lawful, *see id.* ¶ 7.

### b.     Acting Secretary Kevin McAleenan's November 8, 2019 Order of Succession Was Lawful.

The April 9 order controlled the order of succession when Ms. Nielsen resigned on April 10.  *See* Swartz Decl. ¶ 6.  When she resigned, the first two offices in the succession order were vacant.  *See id.* ¶ 5.  Thus, as the next official in line, Kevin McAleenan, the Commissioner of U.S. Customs and Border Protection, began serving as Acting Secretary of Homeland Security. *See* Swartz Decl. ¶ 7, Ex. 1 (noting that McAleenan began service as Acting Secretary on April 11); April 2019 Order at 2 (CBP Commissioner listed as third position in the order of succession).

---

[4] *See also* @SecNielsen, Twitter (Apr. 7, 2019, 10:36 PM), https://twitter.com/SecNielsen/status/1115080823068332032.

As the lawfully serving Acting Secretary, Mr. McAleenan designated a new order of succession on November 8, 2019, pursuant to his authority under 6 U.S.C. § 113(g)(2).  *See* Blackwell Decl. ¶ 4, Ex. 3, Amendment to the Order of Succession for the Secretary (Nov. 8, 2019) ("November 2019 Order").  This order placed the Under Secretary for Strategy, Policy, and Plans fourth in the line of succession.  *Id.*  When Mr. McAleenan resigned, Mr. Wolf was the most senior successor on the order of succession and began serving as Acting Secretary.

Plaintiffs concede that the Secretary of Homeland Security has the power to designate a further order of succession.  *See* Pls.' Mot. at 30.  Plaintiffs instead argue that Executive Order ("EO") 13753—and not the order that Ms. Nielsen designated on April 9—controlled the order of succession applicable when a Secretary resigned.  *See id.* at 31–32.  And because Mr. McAleenan was not next in line under EO 13753, Plaintiffs claim that he had no authority to designate the order of succession under which Mr. Wolf currently serves.  *Id.* at 32.  That argument is incorrect— Ms. Nielsen designated the first-ever § 113(g)(2) order of succession on April 9, and it superseded EO 13753 as a matter of law.

Plaintiffs' argument relies on the wrong document: rather than relying on the order that Ms. Nielsen signed on April 9, Plaintiffs instead rely on Revision 8.5 to DHS Delegation 00106. *See* Pls.' Mot. at 31 (claiming Ms. Nielsen exercised her § 113(g)(2) authority on April 10 and citing Revision 8.5 as the document where Ms. Nielsen exercised that authority).  Plaintiffs wrongly claim that Ms. Nielsen signed Revision 8.5 to DHS Delegation Order 00106.  *See* Decl. of Frank S. Holleman ¶ 2, ECF No. 7-1.  She did not.  *See* Blackwell Decl. ¶ 3, Ex. 2, *DHS Orders of Succession and Delegations of Authorities for Named Positions*, DHS Delegation No. 00106, Revision No. 08.5 (Apr. 10, 2019) ("Revision 8.5").  DHS Delegation 00106 is an administrative document that is periodically updated and meant to consolidate and maintain in a single document

the orders of succession for many senior positions in DHS.  *See* Swartz Decl. ¶ 4.  It was last signed

on December 16, 2016, when then-Secretary Jeh Johnson issued Revision 8.  *See* Blackwell Decl.

¶ 6, Ex. 5, *DHS Orders of Succession and Delegations of Authorities for Named Positions*, DHS

Delegation No. 00106, Revision No. 08 (Dec. 15, 2016) (signed at page 3).  On April 10, 2019,

DHS Delegation 00106 was updated with Revision 8.5 to reflect Ms. Nielsen's April 9 order, *see*

Swartz Decl. ¶ 4, but Revision 8.5 did not accurately capture Ms. Nielsen's order.  Rather, in

Revision 8.5, § II.A was unchanged and said that EO 13753 would govern the order of succession

when the Secretary resigned.  But this is irrelevant because Ms. Nielsen's signed order is the

controlling document, and that signed order superseded EO 13753 as a matter of law.

An administrative document that incompletely collects orders from the Secretary cannot

override the Secretary's signed order.  *See* Swartz Decl. ¶ 4; *cf. Vill. of Bald Head Island v. U.S.

Army Corps of Eng'rs*, 714 F.3d 186, 195 (4th Cir. 2013) (explaining that agency's "formal

approval" of a project was the final agency action, not the agency's "subsequent activities in

carrying it out").  Thus, Ms. Nielsen's signed order, not Revision 8.5, controlled when she

resigned.  As the Secretary of Homeland Security, Ms. Nielsen was the only person within DHS

with the authority to designate an order of succession.  *See* 6 U.S.C. § 113(g)(2).  And her April 9

order expressly stated *five* times that she was designating a new "order of succession," employing

unqualified language.  *See generally* April 2019 Order.  The signed order was effective when Ms.

Nielsen signed the order on April 9, 2019, and would have controlled the order of succession even

if DHS Delegation 00106 were never updated to reflect the April 9 change.  *See* Swartz Decl. ¶ 6.

Thus, any conflict should be resolved in favor of the Secretary's signed order.

By designating the first-ever order of succession under § 113(g)(2), Ms. Nielsen's order

superseded EO 13753 as a matter of law.  Indeed, § II.A of DHS Delegation 00106 has never

established its own order of succession.  When then-Secretary Johnson signed Revision 8 in 2016, he did not have the power to designate an order of succession; it was only after Mr. Johnson signed Revision 8 that Congress gave the Secretary the power to designate an order of succession.  *See* National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114- 328, § 1903 (enacted on Dec. 23, 2016).  Thus, § II.A simply noted that the President's FVRA order of succession, which was set out in EO 13753, governed the order of succession.  *See* 5 U.S.C. § 3345(a)(2)-(3) (allowing the President to designate an acting official under the FVRA).  But when Ms. Nielsen designated the first-ever order of succession under § 113(g)(2), that order of succession superseded EO 13753 as a matter of law because the Secretary's § 113(g)(2) power applies "[n]otwithstanding" the FVRA.  *See* 6 U.S.C. § 113(g)(2).  Because § II.A was never an order from a Secretary, there was no need for Ms. Nielsen to expressly amend § II.A.  Rather, to designate an order of succession for the office of the Secretary, she only needed to exercise her authority under § 113(g)(2), which she did.

Plaintiffs may rely on *Casa de Maryland v. Trump*, No. 8:20-cv-02118-PX, 2020 WL 5500165, at *20-23 (D. Md. Sept. 11, 2020), and *Immigrant Legal Resource Center v. Wolf*, No. 20-cv-05883-JSW, 2020 WL 5798269, at *7-8 (N.D. Cal. Sept. 29, 2020), which both concluded that by amending Annex A, Ms. Nielsen's order only amended § II.B of DHS Delegation 00106, which sets an order for delegating authority during disasters or emergencies.  But those courts erroneously confused orders of succession and delegations of authority.  As the HSA recognizes, delegations of authority, which simply allow an official to exercise certain powers of the office of the Secretary, are different from orders of succession, which are lists of officials who may become Acting Secretary in the event of a vacancy.  *Compare* 6 U.S.C. § 112(b)(1) (allowing Secretary to delegate authority), *with id.* § 113(g)(2) (allowing Secretary to designate a further order of

succession); *see also Stand Up for California! v. DOI*, 298 F. Supp. 3d 136, 141 (D.D.C. 2018) (McFadden, J.).

Section II.B's plain text shows that it is a delegation of authority, not an order of succession. *See* Revision 8.5, § II.B ("I hereby delegate to the officials . . . listed [in Annex A], my authority to exercise the powers and perform the functions and duties of my office, to the extent not otherwise prohibited by law, in the event I am unavailable to act during a disaster or catastrophic emergency."). And DHS Delegation 00106's context reinforces this: as explained, when then-Secretary Johnson executed Revision 8 to DHS Delegation 00106, he had no authority to designate an order of succession. So by holding that Ms. Nielsen's order applied only to § II.B, those courts necessarily concluded that she set an order for delegation of authority, not an order of succession. But it would have made no sense for Ms. Nielsen to say that she was setting an "order of succession" under her § 113(g)(2) authority if she was actually just delegating her authority under § 112(b)(1).

The difference between orders of succession and delegations of authority, as well as DHS Delegation 00106's context—namely, that § II.A has never itself designated an order of succession—confirm that Ms. Nielsen's order did two things: (1) it designated the first-ever § 113(g)(2) order of succession, which superseded the President's FVRA designation in EO 13753 as a matter of law, and (2) it amended the list in Annex A that would control who would exercise the Secretary's delegated authority during an emergency.

To be sure, when Mr. McAleenan amended the order of succession on November 8, he expressly said that Annex A governs when a Secretary resigns. *See* November 2019 Order. But while this clarified Annex A's role, Mr. McAleenan's order did more than that: it also changed the actual order of succession. Thus, it is not as though the sole purpose of Mr. McAleenan's order

was to address when Annex A governs.  Nor does this clarifying language change the legal effect of Ms. Nielsen's April 9 order—Ms. Nielsen's order superseded EO 13753 as a matter of law.

In sum, Ms. Nielsen's order controlled when she resigned, and Mr. McAleenan validly served as Acting Secretary.  He thus had the authority to designate the order of succession that Mr. Wolf lawfully serves under now, and has been since November 13, 2019.  In turn, Acting Secretary Wolf had the lawful authority under IIRIRA § 102(c)(1) to issue the two waivers at issue here.  *See* 85 Fed. Reg. at 14958–61.

### c.    Acting Secretary Wolf's Ratification of His Prior Orders Cures the Alleged Service-Related Defects in the Waivers.

As explained, Mr. Wolf was serving lawfully under the HSA and the relevant orders of succession when he issued the waivers.  But DHS recognizes that ongoing challenges to Acting Secretary Wolf's service risk an unnecessary "distraction to the mission of the Department of Homeland Security."  *See* Swartz Decl. ¶ 8, Ex. 2, Order Designating the Order of Succession for the Secretary of Homeland Security (Sept. 10, 2020).  Thus, even if the Court finds that Ms. Nielsen's order did not control the order of succession when she resigned and concludes that Mr. Wolf was not lawfully serving when he issued the two waivers (as Plaintiffs argue), DHS has taken steps necessary to cure any potential service-related defects in the two waivers.

Under Plaintiffs' theory, EO 13753 (not Ms. Nielsen's April 9 order) would control the current vacancy in the office of the Secretary.  *See* Pls.' Mot. at 32.  On September 10, the President submitted Mr. Wolf's nomination to serve as Secretary of Homeland Security to the Senate.[5]  Under Plaintiffs' theory, because there is no § 113(g)(2) order of succession, the FVRA would apply.  And under the FVRA, an acting official may serve while a nomination is pending, even if the FVRA's initial 210-day limit on acting service has expired.  *See* 5 U.S.C. § 3346(a)(2); S. Rep.

---

[5] www.congress.gov/nomination/116th-congress/2235.

No. 105-250, at 14 (1998). Thus, when the President submitted Mr. Wolf's nomination, the FVRA would have permitted acting service, and the President's FVRA designation set out in EO 13753 would control. Under EO 13753, the Senate-confirmed Administrator of the Federal Emergency Management Agency (FEMA), Peter T. Gaynor, would have been the officer next in line and thus would have begun serving as Acting Secretary under the FVRA after the President submitted Mr. Wolf's nomination.[6] Thus, after the President submitted Mr. Wolf's nomination, "out of an abundance of caution," on September 10 Mr. Gaynor exercised "any authority" he might possess as Acting Secretary and designated an order of succession for the office under § 113(g)(2), which applies "[n]otwithstanding" the FVRA. *Id.*

That is, although DHS disagrees with the legal theory advanced by Plaintiffs in this and other cases, if the Court agrees with Plaintiffs and finds that Ms. Nielsen's order did not control the order of succession when she resigned, the result would be that Mr. Gaynor (not Mr. Wolf) would have been the proper Acting Secretary under the EO's order of succession when the President submitted Mr. Wolf's nomination. Mr. Gaynor, in turn, would have been authorized under 6 U.S.C. § 113(g)(2) to alter the order of succession. And as a result of Mr. Gaynor's September 10 order—through which the FEMA Administrator and the Under Secretary for Strategy, Policy, and Plans would become sixth and fourth in line, respectively—Mr. Wolf began serving as the Acting Secretary, as the most senior official now serving in that line of succession.[7] *See* 6 U.S.C. § 113(g)(2).

---

[6] The first two positions listed in EO 13753, the Deputy Secretary of Homeland Security and the Under Secretary for Management, were at the time and still are vacant.

[7] The first three positions in Mr. Gaynor's order of succession, the Deputy Secretary of Homeland Security, the Under Secretary for Management, and the CBP Commissioner, were at the time and still are vacant.

On September 17, 2020, Acting Secretary Wolf ratified "each of [his] delegable prior actions as Acting Secretary" "out of an abundance of caution."  Ratification of Department Actions, 85 Fed. Reg. 59651 (Sept. 23, 2020).  In doing so, he confirmed that he had "full and complete knowledge of the contents and purpose of any and all actions taken by [him] since November 13, 2019."  *Id.*

The ratification covered all "delegable" actions, which includes the IIRIRA waivers at issue here.  The Secretary's authority to issue these waivers is delegable because no statute or regulation prevents the Secretary from delegating this authority. *See generally* IIRIRA § 102(c)(1); *see also Stand Up for California!*, 298 F. Supp. 3d at 142 ("As the D.C. Circuit has held, '[w]hen a statute delegates authority to a federal officer or agency, subdelegation to a subordinate federal officer or agency is presumptively permissible absent affirmative evidence of a contrary congressional intent.'" (alteration in original) (citation omitted)).  And Congress knows how to specify when certain authorities are to be exercised *only* by the Secretary of Homeland Security and are not to be further delegated.  *See, e.g.*, 31 U.S.C. § 1344(d)(3).

To be sure, IIRIRA says that the Secretary has the "sole discretion" to issue waivers.  IIRIRA § 102(c)(2).  But that means only that "no one can interfere with the Secretary's discretion."  *See Inland Empire Public Lands Council v. Glickman*, 88 F. 3d 697, 702-03 (9th Cir. 1996).  This does not prevent the Secretary from delegating this authority.  Because Acting Secretary Wolf ratified his earlier issuance of these waivers, Plaintiffs' claims based on alleged defects in Mr. Wolf's service fail on the merits.  *See Guedes v. ATF*, 920 F.3d 1, 12 (D.C. Cir. 2019) ("[R]atification is generally treated as a disposition on the legal merits of the appointments challenge.").

And because the Secretary can delegate this authority, the FVRA's limited bar on ratification does not apply here.  Section 3348 of the FVRA bars ratification of an action taken by an invalidly serving official when the official is "perform[ing] … a[] function or duty of a vacant office."  But, for the purposes of § 3348, the FVRA narrowly defines "function or duty" as "any function or duty" of the office that is "established" by statute or regulation and "required" by such provision "to be performed by the applicable officer (and only that officer)."  5 U.S.C. § 3348(a)(2).  That is, it bars ratification of a limited class of actions taken by an invalidly serving official that are, by statute or regulation, *exclusive* to the vacant office.  *SW Gen., Inc. v. NLRB*, 796 F.3d 67, 78 (D.C. Cir. 2015), *aff'd*, 137 S. Ct. 929 (2017).

Issuing the waivers was not an action "in the performance of any function or duty" of the office of the Secretary because there is no statute or regulation limiting authority for those actions to the Secretary only.  "[F]unction or duty" applies only to non-delegable functions made exclusive to a particular office by statute or regulation.  *See Guedes*, 920 F.3d at 12 (citing § 3348(d) as "only prohibiting the ratification of nondelegable duties"); *United States v. Harris Cnty.*, No. 4:16-CV-2331, 2017 WL 7692396, at *3 n.5 (S.D. Tex. Apr. 26, 2017) (authorization of complaint by Principal Deputy Assistant Attorney General was not "function or duty" under FVRA because "the relevant duties of the [office are delegable"); *see also* S. Rep. No. 105-250, at 18 (addressing a definition of "function or duty" materially identical to that now found in § 3348(a)(2) and explaining that "functions or duties of the office" are "defined as the *non-delegable* functions or duties of the officer" (emphasis added)).  That conclusion is compelled by the plain text.  If a function or duty is lawfully delegable, then necessarily, the statute or regulation creating that function or duty does not "require" it to be performed "only" by the vacant office.  Rather, the

statute or regulation permits *other individuals* to perform that function or duty by delegation.  As explained, the Secretary's authority to issue these waivers is delegable.

In sum, under Plaintiffs' own theory, Mr. Gaynor's September 10 order of succession provides an alternate basis for Acting Secretary Wolf's current authority.  Exercising his authority on that basis, Mr. Wolf then ratified the waivers at issue here, and that ratification cures any alleged service-related defect in the waivers.  Plaintiffs' claims fail under this alternative theory.

### E.   Plaintiffs Have Failed to Establish a Likelihood of Success on their RFRA Claim.

The Court should also find that Plaintiffs have no likelihood of success on their RFRA claim.  Plaintiffs' theory is that by "demand[ing] that the Plaintiff Kumeyaay Nations engage in 'communication' and 'coordination' while construction is ongoing," Defendants have "effectively requir[ed]" Plaintiffs "to accept severe ongoing restrictions on their ability to engage in Kumeyaay religion in exchange for the benefit of consultation," in contravention of RFRA.  Pls.' Mot. 18–23 (emphasis omitted).   But neither the construction nor the Government's consultation with Plaintiffs imposes a "substantial burden" on Plaintiffs' religious beliefs, as RFRA requires.  The district court in *La Posta* rejected a similar RFRA claim, *La Posta* Mem. Op. at 25–30, and this Court should do the same.

RFRA provides that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the government "demonstrates that application of the burden to the person–(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb–1(a), (b).  RFRA does not define "substantial burden," so courts look to First Amendment cases decided before *Employment Division v. Smith.* 494 U.S. 872 (1990), to construe the term.  42 U.S.C. § 2000bb(b)(1).  Under

31

those cases, "[a] substantial burden exists when government action puts 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'"   *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008) (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981)). Because Plaintiffs have failed to show a "substantial burden," their RFRA claim fails and there is no need for the Court to address whether Defendants' actions survive strict scrutiny.

The leading case on the application of the "substantial burden" test to construction on federal land is *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439 (1988).   In *Lyng*, the plaintiff Indian tribes alleged that the Government's decision to build roads and harvest timber on federal lands in northern California violated their First Amendment rights under the "substantial burden" test, which has since been incorporated into RFRA.   The parties did not dispute that "the logging and road-building projects at issue in this case could have devastating effects on traditional Indian religious practices."   485 U.S. at 451. Nonetheless, the Court ruled in the Government's favor.   It analogized the case to *Bowen v. Roy*, 476 U.S. 693 (1986), in which the Court rejected a claim by religious objectors that a law requiring the States to use Social Security numbers to operate certain benefits programs violated their religious beliefs.   485 U.S. at 448.   Finding that the tribes' claim "cannot be meaningfully distinguished from" *Roy*, the Court held that, "[i]n neither case . . . would the affected individuals be coerced by the Government's action into violating their religious beliefs; nor would either governmental action penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens."   *Id.* at 449.

*Lyng* binds this Court in its consideration of Plaintiffs' RFRA claim.   When Congress was debating RFRA, it acknowledged that the statute incorporated pre-*Smith* holdings that "strict scrutiny does not apply to government actions involving . . . the use of the Government's

32

own property or resources," including management of public lands, because such actions do not "substantially burden" religious exercise as articulated by either *Sherbert v. Verner,* 374 U.S. 398 (1963) or *Wisconsin v. Yoder,* 406 U.S. 205 (1972). *See* S. Rep. No. 111, 103d Cong., 1st Sess. 9 & n.19 (1993). Under those cases, "a 'substantial burden' is imposed only when individuals are [either (1)] forced to choose between following the tenets of their religion and receiving a governmental benefit," as in *Sherbert*, "or [(2)] coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions," as in *Yoder*. *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1069-70 (9th Cir. 2008) (en banc). *Lyng* and *Roy* were expressly cited as examples of cases embodying the proper approach to applying the substantial burden test to actions involving the government's own property. *See* S. Rep. No. 103-111 at 9 & n.19. Since then, numerous courts, including the D.C. Circuit, have "cited *Lyng* approvingly when resolving a RFRA or RLUIPA claim." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 239 F. Supp. 3d 77, 93–94 (D.D.C. 2017) (collecting cases).

For example, in *Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058 (9th Cir. 2008)*,* the *en banc* Ninth Circuit found *Lyng* to be "on point" when analyzing federal land use challenges under RFRA. *Navajo Nation*, 535 F.3d at 1071. "Like the Indians in *Lyng*, the Plaintiffs [challenged] a government-sanctioned project, conducted on the government's own land, on the basis that the project will diminish their spiritual fulfillment." *Id.* at 1072. The Ninth Circuit rejected the RFRA claims, concluding that, "despite their sincere belief that the use of recycled wastewater on the Peaks will spiritually desecrate a sacred mountain, [plaintiffs] cannot dictate the decisions that the government makes in managing 'what is, after all, its land.'" *Id.* at 1073 (quoting *Lyng*, 485 U.S. at 453) (emphasis omitted). Likewise, this Court "must follow *Lyng*" when applying RFRA in the context of construction on federal land.

*Standing Rock*, 239 F. Supp. 3d at 92–94 (discussing *Navajo Nation* and *Lyng* to deny RFRA claim challenging government infrastructure project on a federal waterway).

The concerns articulated by *Lyng* and *Navajo Nation* are particularly acute at the international border.  Management of the border is a part of the Government's internal operations, and should not, as a general rule, impose a "substantial burden" on religious beliefs. RFRA, like the First Amendment doctrines that preceded it, is not intended to give religious objectors a mechanism to second-guess the "broad range of *government* activities" that occur at the border because they deem those "activities deeply offensive, and perhaps incompatible with their own search for spiritual fulfillment and with the tenets of their religion." *Lyng*, 485 U.S. at 452 (emphasis added).  The politically accountable branches of government are better equipped to address such concerns, as Defendants are doing here. *Id.*

Under these decisions, Plaintiffs cannot satisfy the "substantial burden" test.  Even if the construction in this case will have "devastating effects" on Plaintiffs' religious practice (and that has not been established) the construction does not force anyone to "violat[e] their religious beliefs," nor does it "penalize religious activity" through the "denial of an equal share of the rights, benefits, or privileges enjoyed by other citizens."  *Lyng*, 485 U.S. at 449, 451. Rather, Plaintiffs' alleged harm arises from the Government's decisions about how best to use and manage the federal land near the border.  As *Roy*, *Lyng*, and *Navajo Nation* all hold, this sort of activity is not a "substantial burden" for purposes of RFRA.  *See Standing Rock*, 239 F. Supp. 3d at 100 ("*Lyng* likely prevents the Tribe from showing . . . a substantial burden on its members' free exercise of religion."); *La Posta* Mem. Op. at 25–31 (rejecting RFRA claim).

In an effort to avoid this straightforward application of Supreme Court precedent, Plaintiffs aver that a "substantial burden" exists here because they are being forced to choose

between engaging in consultation and "refus[ing] to engage in consultation, adhere to the tenets of their religion, but lose any opportunity to minimize the federal government's continuing harm to their religious practice."  Pls.' Mot. at 20.  This is not the sort of dilemma that gives rise to a RFRA claim.  First, regardless of whether Plaintiffs participate in the consultation process or not, it remains the case that the Government's actions *on federal land* are at issue and cannot give rise to a substantial burden.  Beyond that, any holding that consultation somehow conflicts with RFRA would also be inconsistent with *Lyng*, which *encouraged* the Executive Branch to make efforts to "accommodate[e] religious practices like those engaged in by the Indian respondents";  indeed, Plaintiffs' contention that having to make a choice on consultations itself violates RFRA would encourage the perverse result that efforts by the Government to offer accommodations could lead to a RFRA violation.  *Id.* at 453–54.

Plaintiffs also point to no evidence in the record that would support their RFRA claim. They argue that the Government's actions have made it "effectively impracticable" for them to practice their religion, and that the Government has pressured them "into accepting the elimination of part of their religious practice and giving it up forever, in exchange for consulting about how to save some other party of it."  Pls.' Mot. 20.  To the contrary, the Government has not coerced any of the Plaintiffs to participate in the consultation process by threatening to "eliminat[e]" their religious practice.  This case is no way similar to the coercion claim upheld by the Supreme Court in *Sherbert*, where a state law conditioned unemployment benefits on the availablity to work every day of the week except Sunday, thus forcing the plaintiff (a Sabbatarian who would not work on Saturdays) to "to choose between following the precepts of her religion and forfeiting benefits."  474 U.S. at 404.  Defendants are not forcing Plaintiffs to forego their religious beliefs as a condition of offering to consult with

them.  At most, the evidence cited by Plaintiffs indicates that construction has made access to certain areas of religious significance more difficult, or that consultation and cultural monitoring efforts have been inadequate in Plaintiffs' view.  Elliott Decl. ¶ 16 (conceding that declarant was "given access" to a border construction site near Tierra Del Sol after discussion with a CBP officer); *see* Haws Decl. ¶¶ 17–18, 25g–h, k; Santos Decl. ¶ 14.  But those allegations are insufficient to establish as substantial burden under *Lyng* and it progeny. Moreover, Defendants sharply contest the assertion that their efforts to accommodate Plaintiffs' concerns are inadequate or have denied Plaintiffs the access they require for religious ceremonies.  *See generally* Enriquez Decl.

Nor do Plaintiffs cite any legal authority supporting a different result.  Their motion does not even mention *Lyng*, much less provide a cogent reason why it does not apply here. Rather, they rely exclusively on RFRA and pre-*Smith* First Amendment cases involving the government's regulation or prosecution of private individuals and groups,[8] as opposed to internal government activities.  For example, Plaintiffs cite *Mockaitis v. Harcleroad*, 104 F.3d 1522 (9th Cir. 1997), where the Ninth Circuit found that a prosecutor's decision to record a criminal suspect while confessing his crime to a Catholic priest violated RFRA.  The *en banc* Ninth Circuit in *Navajo Nation* recognized that *Mockaitis* "did not define substantial burden, let alone analyze the substantial burden standard under the *Sherbert/Yoder* framework restored

---

[8] *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) (application of contraceptive coverage mandate to employer with religious objections); *Priests for Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229 (D.C. Cir. 2014) (same); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) (prohibition on use of hallucinogen in religious ceremonies); *Thomas v. Review Bd.*, 450 U.S. 707 (1981) (denial of unemployment benefits to individual who left job due to religious objections);  *United States v. Hoffman*, 436 F. Supp. 3d 1272, 1285 (D. Ariz. 2020) (prosecution of individuals motivated by religious beliefs to leave supplies for immigrants crossing border); *Singh v. Carter*, 168 F. Supp. 3d 216, 228 (D.D.C. 2016) (application of military uniform regulations to Sikh servicemember).

in RFRA," and concluded that it could not "serve as precedent" on the issue. *Navajo Nation*, 535 F.3d at 1073.  Defendants take Plaintiffs' concerns seriously, and have voluntarily taken significant steps to help accommodate their concerns.  Plaintiffs' criticism of this accommodation process simply does not support their RFRA claim.  For all the foregoing reasons, Plaintiffs have not shown they are likely to succeed on their RFRA claim.

### F.   Defendants Have Not Violated Plaintiffs' First Amendment Rights.

Plaintiffs also allege that the Government has violated the First Amendment "by only waiving laws that protect Indian religions,"—namely, NAGPRA and AIRFA—"and not any other laws having to do with religious exercise."  Pls.' Mot. at 34–35.

As a threshold matter, this claim is barred by the statute of limitations in IIRIRA § 102(c)(2)(B).  That section provides that any constitutional claim "shall be filed not later than 60 days after the date of the action or decision made by the Secretary of Homeland Security."  *Id.*  (providing that any such "claim shall be barred unless it is filed within the time specified.").  Plaintiffs challenge waivers issued by the Acting Secretary on March 16, 2020, but they filed their complaint on September 23, 2020, well outside of the required 60 day period.  *See* Complaint (ECF No. 1).  Plaintiffs try to avoid  this limitation  by arguing that they are challenging an action taken by Mr. Wolf in his capacity as a DHS Under Secretary, not Acting Secretary.  *See* Pls. Mot. at 37.  But as explained above, Plaintiffs cannot assume the success of their own merits argument about Mr. Wolf's status in order to evade a limitation on judicial review established by Congress.  *See supra* at 18–20.

Even assuming the Court could now review the merits of Plaintiffs' First Amendment claim, Plaintiffs have failed to establish a likelihood of success on the merits of that claim. Nothing in the IIRIRA waiver restricts Plaintiffs' free exercise of religion.  Of course, the First

Amendment does not permit the Government to "prefer[] some religious groups over [others]." *Fowler v. Rhode Island*, 345 U.S. 67, 69 (1953).  The Supreme Court "has long recognized that the government may (and sometimes must) accommodate religious practices," *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U. S. 136, 144–145 (1987), and subject to the constraints of the Establishment Clause, those exemptions may go beyond what the Free Exercise Clause requires, *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 335–36 (1987).  But Congress also has the authority to waive or repeal particular accommodations that are not required by the Free Exercise Clause.

This is what Congress did here.  IIRIRA gives DHS the authority to waive NAGPRA and AIRFA.  Plaintiffs do not argue that the First Amendment *requires* either statute.  Nor can Plaintiffs identify other religious accommodation statutes pertaining to a particular religious tradition that DHS could have waived through IIRIRA, but did not.  *See* Pls. Mot. at 18 n.4 (arguing that RFRA could not be waived because of the unique text of that statute).  Indeed, the waivers render any religious objections to construction at the border subject to claims under RFRA and the First Amendment.  This "uniformity of treatment" created by the IIRIRA waivers "provide[s] no sound basis for plaintiffs' claim that the" waivers discriminate against Indian tribes.  *Story v. Green*, 978 F.2d 60, 63–64 (2d Cir. 1993) (rejecting equal protection challenge to municipality's repeal of a disabled veterans' exemption to regulations of street peddling).  For these reasons, Plaintiffs have not met their burden of showing that the IIRIRA waivers violate the First Amendment.[9]

---

[9] Plaintiffs rely on the Supreme Court's statement in *Smith* that the federal government may not "impose special disabilities on the basis of religious views or religious status . . . ." *Smith*, 494 U.S. at 877.  But the religious discrimination cases the Supreme Court cited as examples of that proposition bear no resemblance this case.  *See Larson v. Pamela*, 456 U.S. 228 (1982) (state law imposing registration and reporting requirements on some religious organizations, but not others);

II.     **The Balance of Equities and Public Interest Weigh Against Plaintiffs' Request for Emergency Injunctive Relief.**

The Court also should deny Plaintiffs' request for an injunction because the balance of equities tips in favor of Defendants.  In staying an injunction issued by the Northern District of California against other § 284 projects, the Supreme Court already has determined that the harm to the Government from an injunction prohibiting § 284 border barrier construction outweighs allegedly irreparable environmental interests.  *See Trump v. Sierra Club*, 140 S. Ct. 1 (2019).  In granting that stay, the Court necessarily found that the balance of the harms and the public interest favors the Government in not halting construction.  *See Nken v. Holder*, 556 U.S. 418, 434–35 (2009).  The religious and cultural interests that Plaintiffs assert in this case are no more substantial than the *Sierra Club* plaintiffs' allegations of irreparable environmental harm from construction projects.  Nonetheless, the Supreme Court granted a stay over those objections, and recently denied a motion to lift the stay, *see Trump v. Sierra Club*, 140 S. Ct. 2620 (2020).  There is no basis for this Court to reach a different outcome.

Indeed, since the Supreme Court issued its stay in July 2019, courts have either denied or stayed injunctions prohibiting construction of border barrier projects.  *See El Paso County v. Trump*, No. 19-51144 (5th Cir. Jan. 8, 2020) (staying injunction against projects undertaken pursuant to 10 U.S.C. § 2808); *El Paso Cty., Texas v. Trump*, 407 F. Supp. 3d 655, 665 (W.D. Tex. 2019) (denying § 284 injunction); *California v. Trump*, 407 F. Supp. 3d 869, 907 (N.D. Cal. 2019) (staying § 2808 injunction); *Sierra Club v. Trump*, No. 19-17501 (9th Cir. Dec. 30, 2019) (denying

---

*McDaniel v. Paty*, 435 U.S. 618 (1978) (law barring ministers from serving as delegates to state constitutional convention imposed coercion similar to *Sherbert*, thus forcing ministers to choose between serving as a delegate or exercising their religion); *Fowler v. Rhode Island*, 345 U.S. 67 (1953) (city ordinance prevented Jehovah's Witnesses from performing religious services in public park, but allowed other religious groups to engage in that activity).

motion to lift stay of § 2808 injunction).  Most recently, the district court in *La Posta* concluded that another band of the Kumeyaay Nation did not carry its burden on the equitable factors to stop construction of the same projects at issue here.  *See La Posta* Mem. Op. at 35–37.  The equitable balance in this case is no different and similarly tips sharply in favor of Defendants.

A.    **An Injunction Will Impose Substantial and Irreparable Harm on Defendants.**

The injunctive relief Plaintiffs seek would impose irreparable harm on the Defendants by undercutting efforts to combat drug trafficking and by imposing huge costs from halting construction.

DHS identified the barrier projects at issue in this case because of the high rates of drug smuggling between ports of entry in those areas of the border.  The record includes ample evidence of the severity of the problem; the limited effectiveness of the outdated barriers in those areas, which transnational criminal organizations have adjusted their tactics to evade; and the need for new barriers in areas where none currently exist.  *See* AR at 28–33.  The Supreme Court has recognized that the Government has "compelling interests in safety and in the integrity of our borders," *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 672 (1989), but an injunction would prohibit the Government from taking necessary steps to prevent illegal drugs from entering the country.  *See United States v. Guzman-Padilla*, 573 F.3d 865, 889 (9th Cir. 2009) (acknowledging the government's "strong interest[]" in "interdicting the flow of drugs").

In addition, an injunction that would stop ongoing construction would force DoD to incur potentially millions of dollars of unrecoverable fees and penalties to its contractors for each day that ongoing work is suspended—costs that DoD would not have to pay but for an injunction.  *See* Declaration of Antionette Gant ¶ 8 (Exhibit 8).  Construction of the projects has been ongoing for over three months and they are over halfway finished.  *See* Gant Decl. ¶ 7.  Stopping construction

midstream would impose suspension costs estimated at approximately $29 million per month.  *Id.* ¶ 14; *see also id.* ¶¶ 15–20 (explaining additional costs associated with potential termination and reprocuring contracts).  DoD would have to pay these additional, unnecessary costs from the funds available for § 284 border barrier construction, thus diminishing the money available for construction.  *See id.* ¶¶ 8, 18, 20.

### B.    Defendants' Interests Outweigh the Alleged Harm to Plaintiffs.

Defendants' harms "plainly outweigh[]" the alleged harm to Plaintiffs' attenuated religious and cultural interests in the San Diego A and El Centro A project areas.  *Winter*, 555 U.S. at 26, 33; *see Nken*, 556 U.S. at 435 (the interests of the federal government and the public merge with the federal government is a party).  Plaintiffs asserts three general types of harms:  harms to locations of cultural significance; harms associated with cultural items and human remains; and harms associated with a purported failure by the government to allow for cultural monitoring and access to the construction sites.  *See* Pls. Mot. at 4–10, 38–42.  On each point, Plaintiffs have failed to establish that irreparable harm is likely or that their alleged injuries outweigh Defendants' compelling interests.  *See Winter*, 555 U. S. at 22.

First, Plaintiffs make various assertions about injuries to sacred areas and locations, contending, for example, that the proposed construction is taking place on or near Kumeyaay cultural and religious sites near the border.  *See* Pls.' Opp. at 5–9, 38.  But the evidence shows that that none of the cultural sites identified by Plaintiffs will be affected by the projects.  As a general matter, the construction activity and footprints of the projects will occur within a narrow construction corridor on federal land that parallels the international border, most of which is previously disturbed, includes existing roads and 14 miles of existing barriers, and functions primarily as a law enforcement zone.  *See* Enriquez Decl. ¶¶ 12–17; *La Posta* Mem Op. at 35–36.

Moreover, the basic geography of the project areas refutes Plaintiffs' allegations.  Construction will not impact Plaintiffs' access to or use of sacred sites, including Tecate Peak (located seven miles north and west of the San Diego Project Area), Boundary Mountain (located north of the San Diego Project Area, a point Plaintiffs concede, *see* Carrico Decl. ¶ 14), Jacumba Hot Springs (located one-half mile north of the San Diego Project Area) and the Jacumba Valley (located *between* two segments of the San Diego project, and will not be affected).  *See* Enriquez Decl. ¶¶ 90–94.  These areas will be unaffected by construction, and will remain accessible to Plaintiffs after construction is complete.  *See id.*

There also is no factual support for Plaintiffs' assertion that construction will harm historic villages.  *See* Pls.' Mot. at 6–7.  None of CBP's surveys, including re-surveys of areas specifically identified by the Kumeyaay Tribes as having a high probability for cultural resources, or CBP's record searches have indicated the presence of any known historical village sites within the project areas.  Enriquez Decl ¶ 81–82; *see also id.* ¶¶ 38, 47–49, 52 (explaining efforts to re-survey specific areas at Plaintiffs' request).  Further, there have been no unanticipated discoveries during construction of historic village sites within the project areas by tribal cultural monitors.  *Id.* ¶ 82.

Similarly, there will be no irreparable injury to Plaintiffs' historic trail system.  *See* Pls.' Mot. at 1, 8.  In fact, 14 of the 18 barrier miles of San Diego A will merely replace pedestrian fencing that already impedes border crossings, Enriquez Decl. ¶ 14, and the projects themselves run along a narrow strip of land directly adjacent to the border.  *Id.* ¶¶ 95–96.  Plaintiffs may use any historic trails in and around the project areas, *see id.*, while federal law would otherwise prevent Plaintiffs from using the trails to cross back and forth into Mexico outside of a lawful port of entry.  *See* 19 U.S.C. § 1459.

Second, Plaintiffs have not shown a likelihood of irreparable harm to ancestral remains or

cultural items.  Plaintiffs contend that both are likely to be affected by the barrier construction projects, and that if they are, inadequate protocols are in place for addressing cultural and religious concerns.  Again, the evidence shows otherwise.

Plaintiffs argue that construction is disturbing human remains and assert that human remains have actually been discovered within the project areas.  *See* Pls.' Mot. at 10, 38–39.  But although the areas have been surveyed and re-surveyed at the tribes' request, with Kumeyaay cultural monitors present, no burial sites have been found either during these surveys or construction.  Enriquez Decl. ¶¶ 47, 51, 84.[10]  Further, the two alleged incidents where human remains were allegedly found in the San Diego A project area do not stand up to scrutiny.  *Id.* ¶¶ 85–89.  On July 1, 2020, CBP received reports that a human bone was discovered, but further investigation showed that the item was only a piece of PVC piping.  *Id.* ¶ 86.  Thereafter, the person who had reported the discovery, but who also claimed to have reburied the item, retracted his statement that the item was human in origin.  *Id.*  The other alleged discovery of human fragments on July 31, 2020 was located *outside* of the project area, south of the international border in Mexico.  *Id.* ¶ 87.  The Government did not prevent Tribal representatives from crossing the border to retrieve the item so that it could be appropriately relocated.  *Id.*  Plaintiffs also cannot establish irreparable harm by pointing to the discovery of human remains in different project areas.  *See* Pls.' Mot. at 10.  The other project area that Plaintiffs' identify (Site SDI-4281) as having human remains is located more than 20 miles west of the San Diego A project area.  Enriquez ¶¶ 88–89.

---

[10] The re-surveys indicated the presence of known and previously-unidentified isolates (*i.e.*, isolated archeology resources), but did not reveal the presence of items that are eligible for listing on the National Register under the National Historic Preservation Act.  *See* Enriquez Decl. ¶¶ 47, 51.  CBP shared the survey results with the Kumeyaay Tribes and, after consulting with the Tribes, agreed to various protection measures.  Enriquez Decl. ¶¶ 47–51, 56–57.

The record evidence also contradicts Plaintiffs' assertion that the Government has not taken appropriate steps to address the discovery of any items of cultural importance.  *See* Pls. Mot. at 41. No human remains been found in any area where DoD and CBP are working and CBP has developed the Protocol Plan, which memorializes procedures for notifying project personnel and tribal representatives if any historical or cultural artifacts are identified during construction work. Enriquez ¶¶ 52, 60.  For example, the Protocol Plan calls for avoiding areas where resources are found and striving to leave the resources in place wherever possible.  *Id.* ¶ 52.  If a resource cannot be avoided, the Protocol Plan requires an immediate halt to construction within 100 feet of the resource until it can be treated appropriately.  *Id.*  If the resource is one that would be eligible for treatment under the NAGPRA, the Protocol Plan requires that no more than 48 hours after the notification of a discovery, the tribes and CBP will complete culturally appropriate repatriation efforts to address the discovery.  *Id.*  The tribe on whose traditional land the item is found is also given the opportunity to confer with their tribal cultural leaders to determine appropriate actions and may be grated additional time to secure repatriation.  *Id.*  CBP has committed to implementing the procedures memorialized in the Protocol Plan.  *Id.*  Contrary to Plaintiffs' allegations, therefore, the evidence shows that CBP is making substantial efforts to allow the Kumeyaay tribes to direct matters pertaining to human remains if any such remains were ever to be encountered.

Third, Defendants' evidence likewise rebuts Plaintiffs' assertion that they are irreparably harmed by a lack of access to the sites by tribal cultural monitors.  *See* Pls.' Mot. at 40–42. CBP is currently funding six tribal cultural monitors, four for San Diego A and two for El Centro A, in addition to the monitors CBP itself is providing.  Enriquez Decl. ¶ 70.  Further, the Kumeyaay Tribes may provide additional tribal cultural monitors at their own cost, but they have chosen no to do so.  Enriquez Decl. ¶¶ 36, 38, 70, 72.  The monitors are notified each day of the locations

where construction will be occurring and are free to observe the construction activities of their choice. *Id.* ¶ 40, 70. Contrary to Plaintiffs' allegations, the monitors can and do inspect soils that have been removed as a result of ground-disturbing activities. *Id.* ¶¶ 73–74. [11]

There also is no merit to the Tribe's assertion that they are prevented from conducting religious ceremonies near the project site. *See* Pls. Mot. at 42. Plaintiffs point to only one incident on July 1, 2020 where Plaintiffs' requested access to a specific area was briefly delayed during discussions with CBP and Army Corps officials, but concede access was provided. *See* Elliott Decl. ¶ 16. Moreover, Plaintiffs are free to recreate, pray, or conduct religious ceremonies near the project area, subject to limited restrictions where such activities may pose an immediate threat to border security or public safety. Enriquez Decl. ¶ 101.

In sum, Plaintiffs have failed to establish that the extraordinary and drastic remedy of an injunction is appropriate here. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Winter*, 555 U.S. at 22. On the contrary, given the lopsided balance of equities in favor of the United States' important interest in protecting the integrity of the Nation's border and stopping the flow of illegal drugs from entering the country, Plaintiffs' claims do not warrant the extraordinary emergency relief they seek.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' requests for a temporary restraining order and preliminary injunction.

---

[11] There is also no merit to Plaintiffs' allegation that barrier construction will harm big horn sheep, which Plaintiffs assert have a cultural significance to the Kumeyaay people. *See* Pls.' Mot. at 9. These assertions do not account for the fact that the El Centro A projects has been reduced to three miles, leaving large gaps for cross-border sheep migration. *See* Enriquez Decl. ¶¶ 103–105; *see also id.* ¶ 102 (discussing mitigation measures to avoid harms to plant species and explaining why Plaintiffs' allegations are overstated).

DATE: October 5, 2020                    Respectfully submitted,

                                         JEFFREY BOSSERT CLARK
                                         Acting Assistant Attorney General

                                         JOHN V. COGHLAN
                                         Deputy Assistant Attorney General

                                         ALEXANDER K. HAAS
                                         Director, Federal Programs Branch

                                         ANTHONY J. COPPOLINO
                                         Deputy Director, Federal Programs Branch

                                         /s/ *Andrew I. Warden*
                                         ANDREW I. WARDEN (IN Bar No. 23840-49)
                                         KATHRYN C. DAVIS
                                         Senior Trial Counsel
                                         MICHAEL J. GERARDI
                                         Trial Attorney
                                         United States Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L Street, N.W.
                                         Washington, DC 20005
                                         Tel: (202) 616-5084
                                         Fax: (202) 616-8470
                                         Email: Andrew.Warden@usdoj.gov

                                         *Counsel for Defendants*