**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

THE MANZANITA BAND OF THE KUMEYAAY
NATION, *et al.*,

                       Plaintiffs,

      v.

WOLF, *et al.*,

                     Defendants.

Civil Action No. 20-cv-02712 (TNM)

## <u>DECLARATION OF PAUL ENRIQUEZ</u>

I, Paul Enriquez, declare as follows:

1. I am the Acquisitions, Real Estate and Environmental Director for the Border Wall
   Program Management Office ("Wall PMO"), U.S. Border Patrol Program Management
   Office Directorate, U.S. Customs and Border Protection ("CBP"), an agency of the
   Department of Homeland Security ("DHS"). I have held this position since August 6,
   2018. From 2013 to August 2018, I was the Real Estate and Environmental Branch Chief
   for the Border Patrol and Air and Marine Program Management Office ("BPAM"),
   Facilities Management and Engineering, Office of Facilities and Asset Management
   ("OFAM"). From 2011 to 2013, I was employed as an Environmental Protection
   Specialist in the BPAM office. In that role, I performed environmental analyses for
   various border infrastructure projects. From 2008 to 2011, I was a contractor assigned to
   the BPAM office and provided environmental support on various border infrastructure
   projects.

1

2. CBP is the DHS component with primary responsibility for border security. CBP constructs, operates, and maintains border infrastructure necessary to deter and prevent illegal entry on the southern border.

3. Within CBP, the Wall PMO has expertise in managing and executing border infrastructure projects. The Wall PMO is directly tasked with managing the schedule, finances, real estate acquisition, environmental planning, and construction of the border infrastructure system along the U.S. border.

4. In my capacity as the Acquisitions, Real Estate and Environmental Director, I am responsible for overseeing all environmental planning and compliance activities as well as the real estate acquisition process for projects executed or overseen by the Wall PMO.

5. Based upon my current and past job duties, I am familiar with past and planned border infrastructure projects supporting border security. I am personally aware of the border barrier projects that have been approved for construction by the Secretary of Defense that are being executed with the assistance of the Department of Defense ("DoD") pursuant to 10 U.S.C. § 284(b)(7) in San Diego and Imperial Counties, California, that are at issue in this case.

6. This declaration is based on my personal knowledge and information made available to me in the course of my official duties.

# BACKGROUND

7. The Secretary of DHS has determined that the United States Border Patrol San Diego and El Centro Sectors are areas of high illegal entry. Consequently, Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended ("IIRIRA"), requires DHS to construct physical barriers and roads to deter and prevent illegal entry of people and drugs into the United States.

8. To support DHS's action under Section 102 of IIRIRA, on January 12, 2020, DHS, acting through CBP, sent DoD a request for assistance ("RFA"), requesting that the Secretary of Defense, pursuant to 10 U.S.C. § 284(b)(7), assist by constructing fences, roads, and lighting in certain locations within six United States Border Patrol Sectors, including the San Diego and El Centro Sectors. On February 13, 2020, the Secretary of Defense concluded that the support requested by DHS satisfies the statutory requirements of 10 U.S.C. § 284(b)(7) and that DoD will provide such support. The Secretary of Defense approved 31 border barrier projects for construction, including a project in the San Diego Sector within San Diego County known as "San Diego A" and a project in the El Centro Sector within Imperial County known as "El Centro A." San Diego A and El Centro A are collectively referred to herein as the "284 Projects."

9. Given its expertise in managing border infrastructure projects, the Wall PMO, on behalf of CBP, is working in close coordination with DoD on the 284 Projects.

10. For the 284 Projects, the Wall PMO, on behalf of CBP, among other things, reviews and approves technical specifications, reviews and approves barrier alignments and locations, and provides feedback and input on other aspects of project planning and execution. In

addition, the Wall PMO, on behalf of CBP, is responsible for all environmental planning, including stakeholder outreach and consultation, for the 284 Projects.

11. The 284 Projects are being executed on federally-owned land that is directly adjacent to the border. The project footprints, and thus the majority of the construction activities, occur within the federal Roosevelt Reservation, a 60-foot strip of land established in 1907 that parallels the international border that, consistent with the purpose for which it was established, functions primarily as a law enforcement zone. *See* 35 Stat. 2136. Each 284 Project is discussed in more detail below.

   **San Diego A**

12. San Diego A is being carried out under a waiver issued by the Secretary of DHS pursuant to Section 102(c) of IIRIRA that was published in the Federal Register on March 16, 2020, 85 Fed. Reg. 14958 (March 16, 2020) (the "San Diego Waiver").

13. The project area for San Diego A is in San Diego County, California, and is described in the San Diego Waiver (the "San Diego Project Area"). Attached as Exhibit A is a map depicting the areas within the San Diego Project Area where DHS and DoD will be constructing barrier as a part of San Diego A.

14. San Diego A involves the construction of border barrier along three segments of the international border. As a part of San Diego A, segment 1, DHS and DoD are replacing approximately 14 miles of existing primary pedestrian fencing with new steel bollard fencing. The 60-foot strip of federal land along the border that contains the project footprint for San Diego A, segment 1, is previously disturbed and functions as a law enforcement zone. The existing fencing that is being replaced was constructed between 2008 and 2010. There is also an existing border road that has been there for at least 30

years. As a part of San Diego A, segment 2, DHS and DoD will construct approximately two miles of new steel bollard fencing. As a part of San Diego A, segment 3, DHS and DoD will construct approximately two miles of new steel bollard fencing along two separate segments of the international border. The 60-foot strips of federal land along the border that contains the project footprints for San Diego A, segments 2 and 3, are previously disturbed, contain an existing border road that has been there for at least 30 years, and function as a law enforcement zone. The areas that surround the San Diego Project Area are largely rural, undeveloped desert and mountains. Attached as Exhibit B are photos of the San Diego Project Area and surrounding area. The new bollard fencing that is to be constructed as a part of San Diego A is 30-feet tall. It consists of steel bollards that are approximately six inches in diameter and spaced approximately four inches apart. San Diego A also includes the installation of a linear ground detection system, road construction or road improvements, and the installation of lighting, which will be supported by grid power and include embedded cameras. Substantial construction activities began on San Diego A on May 26, 2020.

**El Centro A**

15. El Centro A is being carried out under a waiver issued by the Secretary of DHS pursuant to Section 102(c) of IIRIRA that was published in the Federal Register on March 16, 2020, 85 Fed. Reg. 14960 (March 16, 2020) (the "El Centro Waiver").

16. The project area for El Centro A is in Imperial County, California, and is described in the El Centro Waiver (the "El Centro Project Area"). After the Secretary of Defense's February 13, 2020, approval of El Centro A, and as a result of additional project planning by DHS and DoD, El Centro A was modified. Approximately seven miles of proposed

barrier were removed from the project, thus reducing the scope of the project to an approximately three-mile segment of border barrier. Attached as Exhibit C is a map depicting the areas within the El Centro Project Area where DHS and DoD will be constructing new barrier.

17. As a part of El Centro A, DHS and DoD will construct approximately three miles of new steel bollard fencing. The project footprint for El Centro A is within the federal Roosevelt Reservation, a 60-foot strip of land along the international border that has been set aside for law enforcement purposes. There are portions of the Roosevelt Reservation within the El Centro Project Area that have previously disturbed by illegal crossing and off road activity. The area that surrounds the El Centro Project Area is a federally protected wilderness that is devoid of any development. Attached as Exhibit D are photos of the El Centro A Project Area and surrounding area. The new bollard fencing that is to be constructed as a part of El Centro A is 30-feet tall. It consists of steel bollards that are approximately six inches in diameter and spaced approximately four inches apart. The project also includes the installation of a linear ground detection system, road construction or road improvement, including the construction of north/south access roads, and the installation of lighting, which will be supported by grid power and include embedded cameras. Substantial construction activities began on El Centro A on June 30, 2020.

## ENVIRONMENTAL PLANNING AND CONSULTATION

18. CBP has long had a border security presence in the El Centro and San Diego Project Areas (collectively, the "284 Project Areas") and their surrounding areas. Through the planning and development of past projects and activities, CBP has developed an

understanding and awareness of the natural, biological, historic, and cultural resources in the 284 Project Areas and their surrounding areas.

19. In addition, CBP has engaged in new environmental planning and consultation for the 284 Projects.

20. Consistent with its past practice for prior border infrastructure projects, and to better understand the potential impacts of the 284 Projects, CBP reviewed prior cultural survey data for projects completed in the area of the 284 Project Areas. In addition, CBP has performed new cultural resource surveys of the 284 Project Areas. For the cultural resource surveys, CBP's environmental contractor performs records reviews and literature searches for records of cultural resources within the survey areas and conducts pedestrian surveys. During the pedestrian surveys archeologists walk in parallel transects no more than 15 meters apart and visually inspect the ground for evidence of cultural resources, including artifacts, soil stains, and features such as rock piles or rock alignments. Any cultural manifestation is assessed as to its significance. Any archeological sites or isolated artifacts found within the survey area is documented in a report and site records are entered into the California Historical Resources Information System. CBP also surveyed the 284 Project Areas for biological, historic and cultural resources, and jurisdictional "Waters of the United States," which identified, among other things, vegetation communities, endangered species habitat, and lists of species, primarily common birds and plants, observed within the 284 Project Areas.

21. Also in an effort to understand and address the potential impacts of the 284 Projects, CBP has done extensive outreach and consultation with stakeholders.

22. On March 16, 2020, CBP sent consultation letters regarding San Diego A and El Centro A to a range of stakeholders and potentially interested parties, including, among others, the Department of the Interior, the United States Fish and Wildlife Service, the Bureau of Land Management, the United States Environmental Protection Agency, State authorities and resource agencies, including the California State Historic Preservation Officer, the California Department of Fish and Wildlife, and the California Environmental Protection Agency, local officials, and numerous Native American Tribes and non-governmental organizations.

23. The San Diego A and El Centro A consultations letters were also posted to CBP's website, notifying the public of projects and soliciting the public's input regarding potential impacts. *See* https://www.cbp.gov/document/environmental-assessments/san-diego-county-border-barrier-projects; https://www.cbp.gov/document/environmental-assessments/imperial-county-border-barrier-project.

24. In addition to soliciting input through consultation letters, CBP has met with stakeholders and interested parties. For example, CBP has engaged in an on-going dialogue regarding the 284 Projects with federal land managers and resource agencies. On February 28, 2020, CBP conducted a webinar with federal land managers and resource agencies to discuss the 284 Projects, potential impacts, and issues of concern. CBP conducted another webinar with its federal partners on March 4, 2020.

25. CBP had planned for in-person site visits of the 284 Project Areas with resource agencies; however, due to the travel restrictions resulting from the novel coronavirus, CBP conducted virtual site visits where CBP and its federal partners had targeted

discussions concerning specific issues or areas of focus within the San Diego A and El Centro A Project Areas.

26. All of the information and input CBP obtains through stakeholder consultations, the biological and cultural resource surveys, and prior environmental planning has informed project planning and execution of the 284 Projects. For example, after surveys of the El Centro Project Area revealed two archeological sites within the project footprint, CBP, in coordination with DoD, took steps to ensure that the sites would not be impacted. In one instance, CBP shifted the alignment of an access road to avoid impacts to an archeological site. In another instance, CBP and DoD required that the construction contractor find a new location for a proposed well site in order to avoid impacts to an archeological site. In addition, CBP has developed construction Best Management Practices ("BMPs") and design modifications that were presented to DoD for incorporation into project planning and execution to minimize or avoid potential impacts to the greatest extent possible. CBP's suite of BMPs includes, among other things, a requirement that the contractor develop a storm water pollution prevention plan, an environmental awareness briefing for the construction contractor prior to any ground disturbing activities, environmental monitors who are on site during construction, pre-construction bird surveys, a stop work requirement if federally-listed species or archeological resources are discovered or are present within a work area, measures to limit the clearing of vegetation wherever possible, and measures to prevent the introduction of invasive species and minimize noise impacts. In addition, input from stakeholders and CBP's own analysis will be used to develop mitigation measures, which may be implemented after construction to offset or minimize unavoidable impacts.

**Tribal Consultation and Coordination**

27. CBP's environmental planning and consultation for the 284 Projects has included extensive outreach and coordination with Native American Tribes, including plaintiffs, the Manzanita Band of the Kumeyaay Nation (the "Manzanita Tribe"), the Campo Kumeyaay Nation (the "Campo Tribe"), the Ewiiaapaayp Band of Kumeyaay Indians (the "Ewiiaapaayp Tribe"), the Iipay Nation of Santa Ysabel (the "Iipay Tribe"), the Sycuan Band of the Kumeyaay Nation (the "Sycuan Tribe"), and the Kumeyaay Heritage Preservation Council (the "KHPC") (collectively "Plaintiffs").

28. CBP's March 16, 2020, consultation letters were sent to over 25 Native American Tribes, including Plaintiffs, requesting their input regarding the 284 Projects. The consultation letters were sent approximately two months before construction began on San Diego A and approximately three months before construction began on El Centro A. In addition to Plaintiffs, CBP sent consultation letters to numerous other Kumeyaay tribes, including the La Posta Band of Diegueño Mission Indians (the "La Posta Tribe"), the Barona Band of Mission Indians, the Cahuilla Band of Mission Indians, the Inaja-Cosmit Band of Mission Indians, the Jamul Indian Village, the Mesa Grande Band of Mission Indians, the San Pasqual Band of Diegueño Indians, and the Viejas Band of Kumeyaay Indians (collectively referred to herein as the "Kumeyaay Tribes").

29. On May 7, 2020, CBP held a tribal coordination briefing via WebEx with the Chairman of the Campo Tribe and the Director of the Campo Tribe's Environmental Protection Agency. CBP reached out to the Campo Tribe specifically due to the Campo Reservation's proximity to the San Diego Project Area. As a part of the briefing, CBP shared photos of the planned border barrier design and maps of the 284 Project Areas. In

addition, CBP shared its understanding of known biological and cultural resources within the 284 Project Areas based on the new surveys being conducted and information obtained from prior surveys. CBP also shared examples of the BMPs that would be implemented during construction. The parties also discussed the possibility of having tribal cultural monitors present during construction.

30. On June 16, 2020, CBP conducted a tribal coordination briefing with the Kumeyaay Tribes. The attendees included the Campo Tribe, the Manzanita Tribe, the La Posta Tribe, and the Jamul Indian Village. As a part of the briefing, CBP shared photos of the planned border barrier design, maps of the 284 Project Areas, CBP's understanding of known biological and cultural resources within the 284 Project Areas, and examples of the BMPs that would be implemented during construction, including having monitors on-site during construction. CBP further noted that it had reviewed survey information from previous projects within the 284 Project Areas and that new surveys were being conducted in areas that had not been previously surveyed. CBP informed the attendees that it was developing a protocol and communications plan and would continue to coordinate with tribes while the plan was being developed. The parties also discussed, among other things, the possibility of having tribal cultural monitors affiliated with the Kumeyaay Tribes on-site during construction, and CBP committed to sharing as much information as possible going forward.

31. On July 3, 2020, CBP reached out to the Chairpersons of the Kumeyaay Tribes requesting a conference call between CBP and the tribal leaders to further discuss San Diego A and the concerns that had been expressed by the Kumeyaay Tribes at the June 16th tribal coordination briefing regarding, among other things, insufficient survey data

and the need for tribal cultural monitors to be on-site during construction. CBP also planned to follow-up with the Kumeyaay Tribes regarding reports that human remains had been found in the San Diego Project Area on July 1, 2020.

32. The requested conference call took place on July 7, 2020. The attendees included the Manzanita Tribe, the La Posta Tribe, and the Jamul Indian Village. As detailed in Paragraph 86, the parties discussed a report that human remains had allegedly been found in the San Diego Project Area on July 1, 2020, and CBP's subsequent investigation of that report. The parties also discussed the Kumeyaay Tribes' concerns regarding insufficient survey data and the need for tribal cultural monitors to be on-site during construction. The Kumeyaay Tribes also requested that CBP perform additional soil sampling and that CBP have cadaver dogs on-site during construction. In addition, the Kumeyaay Tribes requested that CBP schedule a site visit to a portion of the San Diego Project Area that was scheduled to have a controlled detonation, which was of concern to the Kumeyaay Tribes. As detailed below, CBP followed-up on all of the issues or concerns expressed by the Kumeyaay Tribes.

33. Two days after the call, on July 9, 2020, CBP hosted a site visit to the portion of the San Diego Project Area where the controlled detonation was to take place. Attendees included the Manzanita Tribe, the La Posta Tribe, and the Jamul Indian Village. The attendees walked the site and the parties discussed the protocols for the detonation, including the presence of monitors during the detonation.

34. On July 10, 2020, in response to the Kumeyaay Tribes' request for further survey data, CBP's archeological contractor, Cogstone Resource Management ("Cogstone"), gave the Kumeyaay Tribes access to its online database containing information regarding the 284

Project Areas. The database includes, among other things, maps of the 284 Project Areas; KMZ files, which are interactive map files using Google Earth as a base; shapefiles, which are digital files that show or represent geographical data; site records; cultural reports; a listing of surveys of the 284 Project Areas; and survey data.

35. CBP also investigated the viability of having cadaver dogs on site during construction; however, CBP determined that it was cost prohibitive. In addition, CBP learned that average temperatures within the 284 Project Areas would hinder the dogs' ability to locate potential remains. CBP also followed-up with the Kumeyaay Tribes regarding their request for soil sampling. CBP has asked the Kumeyaay Tribes to provide additional information regarding protocols for the soil sampling; however, CBP has not received a response from the Kumeyaay Tribes regarding the desired protocols.

36. On July 10, 2020, in response to the Kumeyaay Tribes' concerns regarding insufficient monitoring in the San Diego Project Area, CBP, through Cogstone, secured the services of a tribal cultural monitor to observe certain construction activities associated with San Diego A.

37. Also on July 10, 2020, CBP and Cogstone hosted a webinar with the Manzanita Tribe, the La Posta Tribe, the Jamul Indian Village, and other Kumeyaay tribal representatives. The parties reviewed survey data from past and current cultural resource surveys of the San Diego Project Area and discussed specific areas of concern noted by the Kumeyaay Tribes. During the webinar, the Kumeyaay Tribes identified five areas within the San Diego Project Area that they believed had a high probability for cultural artifacts and other sensitive sites ("Survey Areas 1 – 5"). The Kumeyaay Tribes asked CBP to resurvey those areas. The Kumeyaay Tribes again noted their desire to have tribal

cultural monitors affiliated with the Kumeyaay Tribes on-site to monitor construction. The Kumeyaay Tribes also asserted that CBP should be responsible for the cost of the tribal cultural monitors.

38. Subsequent to the July 10th call, CBP made arrangements with Cogstone to have tribal cultural monitors affiliated with the Kumeyaay Tribes on-site during construction of San Diego A.

39. On July 13, 2020, based on a list provided to CBP by the Kumeyaay Tribes, Cogstone wrote the tribal leaders of the Kumeyaay Tribes, informing them that it would be hiring tribal cultural monitors to assist with construction monitoring. Cogstone's July 13th correspondence outlined the rate of pay for the tribal cultural monitors and the documentation that would be required for contract purposes, including work agreements, insurance certificates, W-9s, and a security screening conducted by the United States Border Patrol San Diego Sector. Cogstone made arrangements to retain tribal cultural monitors from the different Kumeyaay Tribes who expressed interest in providing monitors on-site on a rotating basis and submitted the appropriate paperwork.

40. Tribal cultural monitors from the interested tribes have been on-site to observe construction in the San Diego Project Area since July 10, 2020. At present, four tribal cultural monitors are on site each day. As set out in Paragraph 55, CBP has also made arrangements for two tribal cultural monitors to observe construction of El Centro A and expects such monitoring will begin the week of October 5th. For the San Diego Project Area, each morning the tribal cultural monitors are invited to a "tailgate meeting." At the tailgate meeting the tribal cultural monitors are told where construction activity will be occurring that day. CBP expects that similar processes will be implemented in El Centro.

The tribal cultural monitors are free to select, based on the location and type of planned construction activity, which construction activities they prefer to observe that day. Each tribal cultural monitor may choose his or her own site to observe. There is no requirement that all the tribal cultural monitors observe the same site. Similarly, there is no requirement that the tribal cultural monitors observe the same site as the Cogstone monitors.

41. On July 10, 2020, CBP received a letter from the Chairman of the Campo Tribe, Marcus Cuero, regarding San Diego A. Mr. Cuero's letter included questions concerning, among other things, the San Diego Project Area, the San Diego Waiver, CBP's consultation process, and whether any work would be occurring on the Campo Tribe's property. CBP responded to Chairman Cureo's letter on August 5, 2020. In its response CBP provided a map of the San Diego Project Area and a copy of the San Diego Waiver. CBP noted that it had not received any formal comments on San Diego A from the Campo Tribe in response to its March 2020 consultation letter. CBP also stated that it was not aware of any plans to for construction or construction-related activities on the Campo Tribe's property.

42. On July 19, 2020, the Manzanita Tribe sent an additional list of demands to CBP, including that CBP halt all ground-disturbing activities. The Manzanita Tribe's July 19th correspondence also notified CBP that it would not participate in the tribal monitoring program CBP had established, in part because the Manzanita Tribe objected to the security screening requirement for tribal cultural monitors. CBP responded to the Manzanita Tribe on July 27, 2020, noting that CBP would continue the monitoring program and it hoped the Manzanita Tribe would reconsider its position. In early-

September 2020, the Manzanita Tribe notified CBP that it would participate in the tribal monitoring program. Both CBP and Cogstone have since invited the Manzanita Tribe to participate; however, the Manzanita Tribe has not responded to the invitations.

43. On July 31, 2020, representatives from the Kumeyaay Tribes conducted a site visit to investigate reports that human remains had been found in the San Diego Project Area. As set out in more detail in Paragraph 87, the alleged remains were located in Mexico, south of the San Diego Project Area.

44. On August 3, 2020, CBP received a letter from Plaintiffs dated July 31, 2020, regarding San Diego A. Plaintiffs' July 31st letter included a detailed list of demands, including that CBP immediately stop all ground disturbing activities, engage in additional consultation with Plaintiffs, and take steps to avoid, minimize, or mitigate adverse impacts. (Santos Decl. Ex. 2.) CBP had a call with Plaintiffs on August 6, 2020, to discuss the demands in Plaintiffs' letter. Plaintiffs sent CBP a follow-up letter on August 10, 2020 (Santos Decl. Ex. 4). CBP sent an interim response on August 17, 2020. (Santos Decl. Ex. 5.) CBP formally responded to Plaintiffs' July 31st letter on August 20, 2020. (Santos Decl. Ex. 8.) In CBP's response, it explained that, given the importance of San Diego A to border security, it could not halt construction activity. CBP's response also detailed the ways in which CBP is already meeting Plaintiffs' demands, including ensuring tribal cultural monitors are present during ground-disturbing activities, sharing survey data, re-surveying areas that have been identified as areas of concern, continuing to coordinate with the tribes throughout the execution of San Diego A, memorializing processes to avoid, minimize, or mitigate impacts to cultural resources, and working closely with the tribes to ensure continued access for religious ceremonies.

45. On August 4, 2020, CBP received an inquiry from Lisa Haws, Tribal Historic Preservation Officer for the Manzanita Tribe, concerning previous site forms for areas within the San Diego Project Area that had already been surveyed and CBP's plans to survey additional areas. On August 7, 2020, Ms. Haws wrote to CBP with an inquiry regarding additional surveys in the San Diego Project Area.

46. CBP and Cogstone responded to Ms. Haws' inquiries on August 4, 2020, and August 7, 2020. The responses noted that Cogstone was preparing site forms for areas that had been surveyed. The responses also addressed the areas Ms. Haws had identified for re-survey. CBP noted that one of the areas that Ms. Haws requested that CBP re-survey was already included in Survey Area 3, the second area was added to Survey Area 5, and the third area was not added because it is outside the San Diego Project Area.

47. The week of August 10th, CBP re-surveyed Survey Areas 1 – 5, an area totaling approximately 76 acres of the San Diego Project Area, which the Kumeyaay Tribes had identified as having a high probability for cultural artifacts or other sensitive sites during the parties' July 10th meeting. CBP arranged to have tribal cultural monitors present during the re-survey of Survey Areas 1 – 5. The re-surveys indicated the presence of known and previously-unidentified individual resources or "isolates." Isolates are generally not considered significant under the National Historic Preservation Act. The re-surveys, like the earlier surveys, did not reveal the presence of cultural sites or artifacts that would be eligible for listing on the National Register of Historic Places. As detailed below, CBP shared the surveys with the Kumeyaay Tribes and discussed measures to avoid or minimize impacts to the resources found within Survey Areas 1 – 5.

48. On August 14 and 15, 2020, Ms. Haws requested additional data and information from CBP, including monitoring logs and records of past surveys. CBP, through Cogstone, responded to Ms. Haws' request and provided the additional data on August 19, 2020.

49. On August 28, 2020, CBP shared the data from the re-surveys of Survey Areas 1 – 5 with the Kumeyaay Tribes. The survey data included maps showing the pinpoint location of any newly identified isolates and previously recorded resources.

50. Also on August 28, 2020, CBP conducted the first of what has become a recurring, bi-weekly call with the Kumeyaay Tribes, including Plaintiffs. During the August 28th call, CBP provided the Kumeyaay Tribes with an update on construction and the parties reviewed the data from the re-survey of Survey Areas 1 – 5. The parties agreed that the isolates should be flagged and a buffer zone created to ensure that they were not disturbed during construction activities. Subsequent to the call, CBP implemented those protection measures. CBP and the Kumeyaay Tribes also discussed potential treatment and curation strategies for artifacts that were located in the 284 Project Areas or discovered going forward. CBP also informed the attendees that it would be circulating the draft Cultural Resource Protocol and Communications Plan (the "Protocol Plan") and seeking comments and input.

51. During the week of August 31st, at the request of the Kumeyaay Tribes, CBP re-surveyed all the remaining areas in the San Diego Project Area for which CBP had relied on prior surveys ("Survey Areas 6 – 8"). That is, CBP surveyed all the remaining areas within the San Diego Project Area, an area totaling approximately 84 acres, that had not been surveyed in 2020 prior to construction or re-surveyed at the request of the Kumeyaay

Tribes.[1]  CBP arranged to have tribal cultural monitors present during the re-survey of Survey Areas 6 – 8.  The re-surveys indicated the presence of known and previously-unidentified isolates.  The re-surveys, like the earlier surveys, did not reveal the presence of cultural sites or artifacts that are eligible for listing on the National Register.

52. On August 31, 2020, CBP distributed the draft Protocol Plan to the Kumeyaay Tribes, including Plaintiffs, and requested their input on the draft.  The Protocol Plan is a living document.  It memorializes protocols that have been implemented by CBP since the 284 Projects were initiated and describes additional protocols that will be utilized going forward for avoidance, treatment, curation, and repatriation of cultural resources.  For example, the Protocol Plan calls for avoiding areas where resources are found and striving to leave the resources in place wherever possible.  If a resource cannot be avoided, the Protocol Plan requires an immediate halt to construction within 100 feet of the resource until it can be treated appropriately.  If the resource is one that would be eligible for treatment under the Native American Graves Protection and Repatriation Act, the Protocol Plan requires that no more than 48 hours after the notification of a discovery, the tribes and CBP will complete culturally appropriate repatriation efforts to address the discovery.  Additional time may be granted to secure appropriate repatriation.  The tribe on whose traditional land the item is found is given the opportunity to confer with their tribal cultural leaders to determine appropriate actions.  As the Protocol Plan has been developed and is being finalized, CBP has, as detailed herein, continued to share information with the Kumeyaay Tribes.  To this same end, for cultural resources that are

---

[1] CBP had planned, at the request of the Kumeyaay Tribes, to survey one additional area, known as "Survey Area 9," that is immediately north of the San Diego Project Area.  CBP was not able to re-survey Survey Area 9 because it is on private property and to date CBP has been unable to obtain access to the area.

found within the 284 Project Areas before the Protocol Plan is finalized, CBP will implement the protocols that are contained in the plan as outlined above.

53. CBP originally requested comments on the draft Protocol Plan by September 14, 2020. After it received no tribal input or feedback on the draft Protocol Plan, CBP extended the deadline for comment to September 21, 2020.

54. On September 4, 2020, CBP held another bi-weekly call with the Kumeyaay Tribes, including Plaintiffs. CBP provided an update on the construction schedule. The parties also discussed tribal monitoring schedules, including monitoring of night work, and CBP reminded the Kumeyaay Tribes that CBP needed their input on the draft Protocol Plan. During the call, representatives from the Kumeyaay Tribes expressed concerns about El Centro A. The Kumeyaay Tribes stated that the measures that they had requested for San Diego A, including tribal cultural monitors, cadaver dogs, and soil sampling, should also be implemented for El Centro A. Although the Kumeyaay Tribes were given access to Cogstone's database, which includes, among other things, maps, site records, a listing of surveys, and survey data for the 284 Project Areas, in early-July, they also expressed concerns that more detailed information about El Centro A had not been included in prior discussions between the parties. This was the first time the Kumeyaay Tribes had made specific demands concerning El Centro A. CBP committed to scheduling another call to discuss the survey data for El Centro A. CBP also informed the Kumeyaay Tribes that they could send one or more tribal cultural monitors who are observing construction of San Diego A to observe El Centro A. CBP also told the Kumeyaay Tribes that, alternatively, they could send their own tribal cultural monitors to observe construction of El Centro A at their own cost.

55. Subsequent to the September 4th call, CBP made arrangements with Cogstone to retain two additional tribal cultural monitors to observe construction of El Centro A. CBP is now funding four tribal cultural monitors for San Diego A and two tribal cultural monitors for El Centro A. CBP expects that the two tribal cultural monitors for El Centro A will be on-site beginning the week of October 5th.

56. On September 9, 2020, CBP shared the survey data from the re-survey of Survey Areas 6 – 8 with the Kumeyaay Tribes. As was the case with Survey Areas 1 – 5, the survey data included maps showing the pinpoint location of any newly identified isolates and previously recorded resources.

57. On September 11, 2020, CBP had a call with the Kumeyaay Tribes, including Plaintiffs, to discuss the results of the re-survey of Survey Areas 6 – 8. The parties discussed the isolates that were identified during the re-survey. In light of the avoidance measures that had been discussed and agreed to for Survey Areas 1 – 5, CBP confirmed that the isolated artifacts had been flagged and a buffer zone was created to ensure that they were not disturbed during construction activities. CBP and the Kumeyaay Tribes also discussed potential treatment and curation strategies for artifacts that were located in the 284 Project Areas or discovered going forward.

58. On September 15, 2020, CBP had a call with Kumeyaay Tribes, including Plaintiffs, to discuss the survey data for El Centro A. The parties also discussed avoidance, treatment, and curation of resources within the El Centro Project Area.

59. On September 18, 2020, CBP held another of its bi-weekly calls with the Kumeyaay Tribes, including Plaintiffs. No tribal representatives were able to attend the call. Therefore, in lieu of a call, CBP sent an update to the Kumeyaay Tribes via email. The

update included an overview of upcoming construction activities and tribal cultural monitoring schedules. The update also noted that CBP is planning a site visit to the El Centro Project Area, as requested by the Kumeyaay Tribes. The update also requested that the Kumeyaay Tribes submit their comments on the draft Protocol Plan by September 21, 2020.

60. CBP expects to finalize the Protocol Plan by October 9, 2020. Only the La Posta Tribe provided comments on the Protocol Plan. The majority of the La Posta Tribe's comments were provided by their attorney. CBP was unable to accept or implement a substantial number of her comments because they were not appropriate to intent or purpose of the Protocol Plan.

61. On October 5, 2020, CBP provided an update to the Kumeyaay Tribes that covered tribal monitoring schedules, construction updates, including planned construction activity for the week ahead. CBP provided the update in lieu of a bi-weekly call, as my schedule did not allow for a call on October 2, 2020.

**Plaintiffs' Allegations**

62. As evidenced by the discussion above, CBP takes the concerns of the Kumeyaay Tribes, including Plaintiffs, very seriously. As the 284 Projects have progressed, CBP has tried to respond to their concerns to the best of its abilities. Nevertheless, given my understanding of the 284 Projects, many of Plaintiffs' allegations of harm are inaccurate, exaggerated, or misplaced.

## A. Procedural Harms

63. Plaintiffs claim that CBP first announced its plan for the 284 Projects in 2018, but there was no consultation with the Kumeyaay Tribes until March 2020. (Pls. Br. at 16; Santos Decl. ¶ 5; Haws Decl. ¶¶ 6-7). This is incorrect.

64. The 2018 "announcement" that Plaintiffs refer to was unrelated to the 284 Projects. A copy of CBP's consultation letter dated February 23, 2018, is attached as Exhibit E is CBP's February 2018 consultation letter concerned a project to replace approximately 14 miles of primary pedestrian barrier that is a part of CBP's Border Infrastructure System ("BIS"). The segment of barrier at issue started near the eastern edge of Border Field State Park and extended to the base of Otay Mountain, a project area in southwestern San Diego County that is at least 20 miles west of the San Diego Project Area. As noted in Paragraph 8 above, for the 284 Projects, CBP sent a RFA to DoD on January 12, 2020, and the Secretary of Defense approved the 284 Projects on February 13, 2020.[2] CBP initiated consultation with the Kumeyaay Tribes and other stakeholders in March 2020.

65. Plaintiffs claim that construction on the 284 Projects started without a "full understanding of known cultural resource sites." (Haws Decl. ¶ 25c.) This is also inaccurate.

66. As stated, CBP reviewed prior cultural survey data, conducted records reviews, and performed new cultural resource surveys of the 284 Project Areas prior to commencing construction. It also has also re-surveyed areas the Kumeyaay Tribes identified as having a high probability for cultural resources, which largely confirmed the results of the earlier review. CBP has shared all that data with the Kumeyaay Tribes and has committed to

---

[2] Plaintiffs also allege that CBP never responded to their March 23, 2018, letter concerning the 2018 fence replacement project. (Santos Decl. ¶ 5, Exhibit 1.) This is also incorrect. A copy of CBP's March 28, 2018, response is attached as Exhibit F.

protocols concerning avoidance, treatment, curation, and repatriation of cultural resources within the 284 Project Areas and any unanticipated discoveries.

67. Plaintiffs assert that the tribal consultation that has occurred on the 284 Projects has been "minimal," "halting," or "inadequate," that CBP has tried to "downplay" tribal concerns, and that CBP has not "truly sought the Kumeyaay Tribe's views on mitigation or avoiding impacts." (Pl. Br. at 17; Haws Decl. ¶¶ 21, 25; Santos Decl. ¶¶ 14, 16, 19.) These claims are untrue.

68. As detailed above, CBP has made extensive efforts to not only share information with the Kumeyaay Tribes, but also take actions that are responsive to their concerns. Among other things, CBP has shared survey data, established a tribal cultural monitoring program, re-surveyed areas that were identified by the Kumeyaay Tribes has having a high probability for cultural resources, investigated the viability of having cadaver dogs on-site during construction, and sought input from the Kumeyaay Tribes regarding avoidance, treatment, curation, and repatriation of cultural resources.

69. Plaintiffs state that the number of tribal cultural monitors CBP is funding is insufficient and as a result there have been ground disturbing activities that have taken place without tribal cultural monitors on-site. (Santos Decl. ¶¶ 14, 17; Haws Decl. ¶ 25f.) This claim is overstated.

70. CBP is currently funding six tribal cultural monitors, four for San Diego A and two for El Centro A, in addition to monitors provided by Cogstone. CBP has stretched its available resources to fund tribal cultural monitors for the 284 Projects. Because CBP's available resources are limited, and in order to accommodate the Kumeyaay Tribe's demands for additional tribal cultural monitors, CBP has informed the Kumeyaay Tribes that it will

accommodate additional tribal cultural monitors if the Kumeyaay Tribes will provide them at their cost. The Kumeyaay Tribes, however, have never acted on that invitation. They have taken the position that CBP must bear the cost of any tribal cultural monitor who observes construction activities. In addition, CBP has placed no limits on where tribal cultural monitors can observe construction activity within the 284 Project Areas. As stated above in Paragraph 40, tribal cultural monitors are told where construction activity will be occurring and are free to select, based on the location and type of planned construction activity, which construction activities they prefer to observe. Each tribal cultural monitor may choose his or her own site to observe. There is no requirement that all the tribal cultural monitors observe the same site or that the tribal cultural monitors monitor the same site as the Cogstone monitors.

71. Plaintiffs allege CBP "refused to facilitate monitoring" for night shifts unless the tribal cultural monitors either work "without compensation" or the Kumeyaay Tribes transfer of one or more monitors from the day to the night shift. (Haws Decl. ¶ 25g.) This allegation is exaggerated.

72. As stated in Paragraph 70, CBP has stretched its available resources to fund the tribal cultural monitors that are currently on-site. In order to ensure the Kumeyaay Tribes have the opportunity to have tribal cultural monitors observe night shifts, however, it offered the Kumeyaay Tribes the option of either re-assigning one or more of the tribal cultural monitors currently funded by CBP to the night shifts or the Kumeyaay Tribes providing tribal cultural monitors for night work at their cost. As stated in Paragraph 70, however, the Kumeyaay Tribes have taken the position that CBP must bear the cost of any tribal cultural monitor who observes construction activities. In addition, CBP received little to

no response from the Kumeyaay Tribes regarding its invitation to utilize the existing tribal cultural monitors to observe night shifts. Only the Campo Tribe, after additional consultation with CBP, agreed to provide a single tribal cultural monitor to observe night shift construction activities.

73. Plaintiffs allege that tribal cultural monitors are provided no opportunity to inspect soils that have been removed as a result of ground-disturbing activities. (Haws Decl. ¶ 25h; Santos Decl. ¶ 15.) This is untrue.

74. As evidenced by the weekly monitoring logs for the weeks of July 20th and July 27th that is attached as Exhibit G, tribal cultural monitors can and do inspect soils that have been removed as a result of ground-disturbing activities.

75. Plaintiffs allege that there has been insufficient participation from the Kumeyaay Tribes concerning surveys and monitoring of El Centro A. (Haws Decl. ¶ 25k; Santos Decl. ¶ 14.) This is claim is misleading.

76. CBP's outreach to the Kumeyaay Tribes began in March 2020, at which time CBP made clear that El Centro A would be one of the planned barrier projects executed by CBP and DoD. CBP has shared information about El Centro A and sought tribal input on the project. Detailed information about El Centro A is included in Cogstone's online database, which the tribes were given access to in July 2020. It was not until September 2020 that the Kumeyaay Tribes made specific demands regarding El Centro A, including that tribal cultural monitors observe construction activity. When the demands were made, CBP acted on them. It has discussed the El Centro A survey data with the Kumeyaay Tribes as well as avoidance, treatment, and curation of resources found within the El Centro Project Area. In addition, CBP has made arrangements with Cogstone to

fund two additional tribal cultural monitors to observe construction of El Centro A. CBP
is also planning a site visit to the El Centro Project Area for Kumeyaay representatives.

77. Plaintiffs allege that the Protocol Plan was "created without tribal input." (Haws Decl. ¶
25i.) This is inaccurate.

78. Despite circulating the draft Protocol Plan for comment, CBP received little to no input
from the Kumeyaay Tribes. Only the La Posta Tribe commented on the draft Protocol
and Plan. Plaintiffs provided no comments or input.

79. Although Plaintiffs did not avail themselves of the opportunity to comment on the draft
Protocol Plan, they assert that CBP is "required by federal law" to draft an Environmental
Stewardship Plan ("ESP") and complain that a draft ESP has not been made available for
review. (Pl. Br. at 44; Haws Decl. ¶ 25j.) Federal law imposes no such requirement.

80. CBP developed the ESP as a means of abiding by its commitment to responsible
environmental stewardship for projects covered by an IIRIRA waiver. ESPs typically
examine a range of potential impacts, including potential impacts to wildlife, vegetation,
surface and groundwater, and existing land use, and the steps CBP can and will take to
minimize impacts. ESPs are made publicly available when they are complete. CBP is
developing ESPs for the 284 Projects.

### B.    Alleged Impacts to Cultural Resources and Sacred Sites

81. Plaintiffs allege that historic village sites may be adversely affected by the 284 Projects
(Pls. Br. at 6; Carrico Decl. ¶¶ 13, 20, 23, 24; Elliott Decl. ¶ 10.) This is inaccurate.

82. None of CBP's surveys, including the re-surveys of areas specifically identified by the
Kumeyaay Tribes as having a high probability for cultural resources, or CBP's record
searches have indicated the presence of historical village sites within the 284 Project

Areas. Further, there have been no unanticipated discoveries during construction or evidence of a historic village site within the 284 Project Areas. No such sites have been identified by tribal cultural monitors either during construction or as a part of re-survey of Survey Areas 1 – 8.

83. Plaintiffs further assert that there is "no question that there are cremation sites and human remains" in the 284 Project Areas and "no doubt that construction activity" is impacting such sites. (Santos Decl. ¶ 16; Elliott Decl. ¶ 15; Carrico Decl. ¶ 29.) These allegations are untrue.

84. CBP's surveys and record searches do not indicate the presence of any known burial sites within the 284 Project Areas. No such sites have been revealed during construction or discovered by the tribal cultural monitors.

85. Plaintiffs attempt to bolster their allegation that cremation sites or human remains are being impacted by the 284 Projects by highlighting two alleged incidents where human remains were alleged to have been found within the San Diego Project Area. The first alleged incident occurred on July 1, 2020. (Elliott Decl. ¶ 16). The second alleged incident occurred on July 31, 2020. (Pl. Br. at 10; Carrico Decl. ¶ 30; Haws Decl. ¶ 18.) In neither instance where human remains found in the San Diego Project Area.

86. On July 1, 2020, CBP received reports that human remains had been found in the San Diego Project Area. After learning of these reports, CBP alerted Cogstone, and on July 2, 2020, Cogstone sent a monitor to the site of the alleged discovery. The July 2, 2020, Monitoring Report is attached as Exhibit H. As reflected in the attached Monitoring Report, when Cogstone examined the site where the human remains had allegedly been found, Cogstone found only PVC pipe. As detailed in Paragraph 32, CBP had a

conference call with the Kumeyaay Tribes on July 7th and among the topics discussed was the alleged discovery of human remains. On the July 7th conference call the Kumeyaay representative who allegedly made the discovery told CBP that he never stated that what he had found was in fact human bone. In a subsequent recounting of the incident, he stated that he reburied the alleged remain.

87. On July 31st, CBP and Cogstone were informed that a group of Kumeyaay representatives would be arriving on site to relocate a fragment of what may be human remains. The alleged fragment was located in Mexico, south of the San Diego Project Area. Upon arrival, the Kumeyaay representatives traversed into Mexico to examine the item. CBP personnel did not explicitly authorize Kumeyaay representatives traversing into Mexico, but also did not actively thwart them from doing so. Once in Mexico, the Kumeyaay representatives conducted a pedestrian survey. Once they located the alleged fragment, they relocated it to the base of a tree and then made their way back across the border into the United States. The Incident Report prepared by Cogstone that details the July 31st site visit by the Kumeyaay representatives is attached as Exhibit I.

88. Plaintiffs also attempt to bolster their allegation that cremation sites and human remains are within the 284 Project Areas and are being impacted by construction by pointing to such discoveries on other border barrier projects. (Pl. Br. at 10; Carrico Decl. ¶ 26.) Plaintiffs state that human remains were found at site SDI-4281, which is "just north of the Project site," during the construction of another border fence in west San Diego. (Id.) Plaintiffs further assert that the remains "were not and are not treated by Defendants as subject to the requirements of NAGPRA." (Pls. Br. at 10.) These allegations are untrue.

89. The site referred to by Plaintiffs, SDI-4281, is not "just north of the Project site." The site was discovered as a part of CBP's work on the BIS. As alluded to above, the BIS is an approximately fourteen-mile stretch of border barriers and roads in southwestern San Diego County. The BIS starts near the Pacific Ocean and extends 14 miles east. The BIS is located more than 20 miles west of the San Diego Project Area. Further, Plaintiffs characterization of CBP's treatment of SDI-4281 is incorrect. Relevant portions of a survey that documents SDI-4281, entitled "A Cultural Resources Survey of Fourteen Miles of Existing Primary Border Fence in the San Diego Border Infrastructure System, San Diego California" (the "BIS Survey"), is attached as Exhibit J. As noted in the BIS Survey, the site was "previously the subject of a 100% surface collection, archeological testing, and data recovery to mitigate the impacts from border infrastructure development." BIS Survey at 25. As is also noted in the BIS Survey, when the site was first discovered during initial construction in 2008, CBP worked very closely with the Kumeyaay Cultural Repatriation Committee ("KCRC") and Kumeyaay tribal archaeological monitors to preserve and protect human remains and other artifacts that were discovered during work on the BIS. (BIS Survey at 26.) In coordination with the San Diego County Medical Examiner's Office, the KCRC, and the monitors, CBP conducted a detailed assessment of the human remains that were found at the site. After that assessment, CBP executed a repatriation agreement with the Jamul Indian Village, through which the human remains are to be returned to the Jamul Indian Village. CBP is currently coordinating with the KCRC and the Barona Cultural Center and Museum on a curation agreement that will provide for the appropriate treatment and storage of artifacts found within the BIS project area.

90. Plaintiffs suggest that San Diego A may harm their ability to access, use, and practice their religion at sacred sites near the San Diego Project Area. These claims are inaccurate.

91. Plaintiffs express concerns about Tecate Peak, noting that it is an important ceremonial location and sacred site that Plaintiffs continue to visit to conduct ceremonies and religious practices. (Pls. Br. at 5; Carrico Decl. ¶ 18, 24, Elliott Decl. ¶ 8), Tecate Peak is located seven miles north and west of the San Diego Project Area. It will be unaffected by the construction of San Diego A and will continue to be accessible to Plaintiffs after the project is complete.

92. Similarly, Plaintiffs express concerns about Boundary Mountain, stating that it was a resting place for native runners and is valued for its panoramic views from the summit. (Pls. Br. at 6; Elliott Decl. ¶¶ 4, 6; Carrico Decl. ¶ 14.) Plaintiffs further state that the Kumeyaay people's use and occupancy of the area is confirmed by an archeological site, P-37-004466, southwest of Boundary Mountain. Boundary Mountain is north of the San Diego Project Area. Like Tecate Peak, Boundary Mountain will be unaffected by construction and will continue to be accessible to Plaintiffs after construction is complete. Further, CBP is aware of the adjacent archeological site P-37-004466, which is also located north of the San Diego Project Area and will be unaffected by construction.

93. Plaintiffs make similar assertions regarding Jacumba Hot Springs (Carrico Decl. ¶ 16), Jacumba Valley (Pls. Br. at 7, 9; Carrico Decl. ¶¶ 15-17; Elliott Decl. ¶¶ 4, 5, 10), and Table Mountain (Elliot Decl. ¶ 4). These sites are also outside the San Diego Project Area. Jacumba Hot Springs is approximately one-half mile north of the San Diego Project Area. Jacumba Valley is situated between San Diego A, segment 2, and San

Diego A, segment 3, in an area where no construction is occurring. Table Mountain is in the Jacumba Valley and is situated at least two miles north of the international border. (Elliot Decl. ¶ 4). Because they are not in the San Diego Project Area, Jacumba Hot Springs, Jacumba Valley, and Table Mountain will be unaffected by construction. They will also remain accessible to Plaintiffs after construction is complete.

94. Plaintiffs assert that San Diego A may impact the viewshed from Table Mountain, Tecate Peak, and Boundary Mountain. (Elliott Decl. ¶ 9.) However, 14 of the 18 miles of border barrier that will be constructed as a part of San Diego A simply replace existing border fencing. San Diego A is therefore unlikely to have significant impacts on the viewshed.

95. Plaintiffs also suggest that the 284 Projects will either damage historic trails that have traditionally been used by the Kumeyaay people or somehow preclude the Kumeyaay Tribes from continuing to use such trails. (Pls. Br. at 8 – 9; Carrico Decl. ¶ 18.) These allegations are inaccurate.

96. As stated above, the project footprints for the 284 Project and thus the majority of the construction activity, occur within the federal Roosevelt Reservation, a 60-foot strip of land established in 1907 that parallels the international border that functions primarily as a law enforcement zone. The 284 Projects will continue to function as a law enforcement zone, as they have prior to the construction of San Diego A and El Centro A. Plaintiffs may use the areas in and around the 284 Project Areas, including any historic trails, in the same manner as they did before construction. Not only will the 284 Projects not impact Plaintiffs' continued use of historic trails, the 284 Projects will not alter their orientation on the landscape; thus, the 284 Projects will not preclude future study or use of the trails.

97. Although none of the sites or resources discussed above will be impacted by the 284 Projects, Plaintiffs nevertheless assert that CBP's cultural surveys were flawed because they failed to properly account for such sites or resources and how they may be impacted by the 284 Projects. (Carrico Decl. ¶¶ 14, 21, 22, 25.) This assertion is misplaced.

98. In making this assertion, Plaintiffs suggest that CBP should have been required to survey any areas that might have been used or occupied by the Kumeyaay Tribes even if they are outside the 284 Project Area and unaffected by the 284 Projects. (Id.) In fact, Plaintiffs go so far as to suggest that CBP should have been required to survey areas up to ten square miles beyond the boundaries of the 284 Project Areas. (Carrico Decl. ¶ 22.)

99. Plaintiffs express concerns about impacts to plants from San Diego A. (Elliot Decl. ¶¶ 11 – 12.) For example, John Elliott states that throughout his life he has been gathering plants in the Jacumba Valley that are used for ceremonial purposes. (Id. ¶ 11.) He asserts that as a result of the 284 Projects, he "will likely not be able to gather plants as close to the border as [he] has in the past." (Id.) He also alleges that dozens of species of plants that are recognized as having ceremonial or healing purposes may not survive or retain their abundance. (Id.) These claims are inaccurate and overstated.

100. The Jacumba Valley is not within the San Diego Project Area. Thus, Mr. Elliott's ability to gather plants in the Jacumba Valley will be unaffected by San Diego A. Further, to the extent that Plaintiffs have gathered plants near the border in areas in or adjacent to the San Diego Project Area, they may continue to do so after construction is complete. San Diego A will not affect any of the existing land uses in or around the San Diego Project Area. As stated above, the project footprint for San Diego A, and thus the majority of the construction activity, occurs within the federal Roosevelt Reservation, a

60-foot strip of land along the border that functions primarily as a law enforcement zone. The San Diego Project Area will continue to function as a law enforcement zone, as it has prior to the construction of San Diego A, and Plaintiffs may use the areas in and around the San Diego Project Area in the same manner as they did before San Diego A's construction.

101. Additionally, while construction is on-going Plaintiffs are free to access areas immediately adjacent to or even within the 284 Project Areas to observe construction activities or, should they choose, engage in religious activities. CBP does not prevent or interfere with individuals who access these areas to observe construction, recreate, pray, or hold religious ceremonies so long as the activities do not pose an immediate threat to border security or public safety.

102. As to the allegation that valuable plant species may not survive or retain their abundance, the majority of construction activity for San Diego A is areas that are previously disturbed. Fourteen of the 18 miles of border barrier that will be constructed as a part of San Diego A will replace existing border fencing. The existing fencing was constructed between 2008 and 2010. The existing border road has been there for 30 years. Further, BMPs for San Diego A include measures to limit the clearing of vegetation wherever possible and measures to prevent the introduction of invasive species. Thus, it is unlikely that San Diego A will result in significant impacts to plant species that occur in or adjacent to the San Diego Project Area.

103. Plaintiffs also allege that El Centro A will irreparably harm Peninsular bighorn sheep, a species that has special cultural significance, because it will disrupt a critical migration

path for the species into Mexico. (Pls. Br. at 9; Elliot Decl. ¶ 17.) This claim is overstated.

104. A map of El Centro A is attached as Exhibit C. As depicted in the attached map, after El Centro A is complete, there will continue to be large unfenced areas to the east and west of the planned barrier. There will be an approximately six and one-half mile gap between the western terminus of El Centro A and the nearest existing or planned barrier segment to the west. On the eastern side, there will be an approximately one-half mile gap between the eastern terminus of El Centro A and western terminus of El Centro Project 1. Peninsular bighorn sheep will continue to be able to cross into Mexico after the completion of El Centro A.

105. Not only will Peninsular bighorn sheep continue to be able to cross into Mexico, the species will continue to be able to use known movement corridors it has relied on historically for such movement. According to the 2014 California Department of Fish and Wildlife Peninsular Bighorn Sheep Annual Report (the "Annual Report"), there are nine recovery regions for Peninsular bighorn sheep within the Peninsular Ranges. *California Department of Fish and Wildlife, Peninsular Bighorn Sheep 2014 Annual Report* at 2, available at https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=97891&inline. El Centro A occurs within the Carrizo Canyon recovery region. *Id.* As depicted on the map attached as Exhibit C, El Centro A will be constructed primarily in low-lying Davies and Skull Valleys, which are situated between the surrounding mountains. Therefore, El Centro A will not block the known movement corridors in the East Jacumba Mountains or in the mountains to the west of the Davies Valley that are depicted on Map 10 at page 12 of the

Annual Report. Accordingly, contrary to Plaintiffs' assertion, El Centro A will not significantly disrupt migration of Peninsular bighorn sheep into Mexico.

This declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct to the best of my current knowledge.

Executed on this 5th day of October, 2020.

Paul Enriquez
Acquisitions, Real Estate and Environmental Director
Border Wall Program Management Office
U.S. Border Patrol

# EXHIBIT A

# Exhibit A

## San Diego A

## LEGEND

Existing Vehicle Barrier

**Proposed Projects**

Primary Pedestrian Barrier

Primary Pedestrian Barrier Replacement

**If sheet measures less than 11x17" it is a reduced print. Reduce scale accordingly.*

1 in = 2.14 mi 1:135,500

**WARNING:** This document is **FOR OFFICIAL USE ONLY (FOUO)**. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

Map Request 600v10.1 April 16, 2020

# EXHIBIT B





# EXHIBIT C

# Exhibit C



El Centro A

**LEGEND**

Existing Pedestrian Barrier
Existing Vehicle Barrier

**Proposed Projects**
Primary Pedestrian Barrier

**Other Ongoing Projects**
Border Barrier (funded FY19)
Border Barrier (Funded FY18)

El Centro A

UNITED STATES
MEXICO

IMPERIAL COUNTY

El Centro Naval
Auxiliary
Air Station

*If sheet measures less than 11x17 it is a reduced print.
Reduce scale accordingly.*

1 in = 1.97 mi                    1:124,678

San Diego
Tijuana

☐ AREA ENLARGED

**WARNING:** This document is **FOR OFFICIAL USE ONLY (FOUO)**.
It contains information that may be exempt from public release under
the Freedom of Information Act (5 U.S.C. 552). It is to be controlled,
stored, handled, transmitted, distributed, and disposed of in accordance
with DHS policy relating to FOUO information and is not be released to
the public or other personnel who do not have a valid "need-to-know"
without prior approval of an authorized DHS official.



**EXHIBIT D**



09/08/2020 08:22 AM                    32.63365° N 115.93228° W



09/08/2020 07:37 AM      32.63258° N 115.93638° W

# EXHIBIT E



**U.S. Customs and
Border Protection**

FEB 2 3 2018

Angela Elliott Santos
Chairperson
Manzanita Band of Kumeyaay Nation
P.O. Box 1302
Boulevard, CA 91905

Subject:    Replacement of Primary Border Wall in San Diego County, California

Dear Chairperson Santos:

The Department of Homeland Security (DHS) and Customs and Border Protection (CBP) plan to
remove and replace approximately 14 miles of primary pedestrian border wall in San Diego
County, California (Project). The area in which the replacement project will take place (the
Project Area), which is described in more detail below, is situated within United States Border
Patrol (USBP) San Diego Sector (SDC). See Figure 1 for a map showing the location of the
Project Area. The existing primary wall is constructed from old military landing mats. It was
installed in the 1990s and has since deteriorated. This deterioration, along with the limited
visibility afforded by the landing mat, renders the current wall inadequate for the purpose of
fulfilling CBP's mission. The landing mat style wall will be replaced with a new bollard wall,
which will range in height from 18 feet to approximately 30 feet. As part of the Project, the
patrol road adjacent to the wall will be improved to a 20 foot wide, all-weather road.
The new bollard wall and improved patrol road are critical to prevent illegal entries into the
United States and to achieve operational control of the U.S.-Mexico international border.

The Project Area is located in southern San Diego County, California, ranging from near the
eastern edge of Border Field State Park to the base of Otay Mountain. The Project Area is
bordered to the south by the U.S.-Mexico international border and to the north by a variety of
public and private lands. The Project Area is located entirely on Federal land owned or managed
by CBP, the International Boundary and Water Commission, or the General Services
Administration and currently contains several border tactical infrastructure elements, including
primary wall, secondary wall, patrol roads, and lighting and surveillance systems. Much of the
Project Area has been disturbed during previous border activities and is frequently maintained.

The principal mission requirements of DHS include border security and the detection and
prevention of illegal entry into the United States. Congress has provided the Secretary of
Homeland Security (the Secretary) with a number of authorities necessary to carry out DHS's
border security mission. One of these authorities is found at section 102 of the Illegal
Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). In section 102(a) of
IIRIRA, Congress provided that the Secretary shall take such actions as may be necessary to
install additional physical barriers and roads (including the removal of obstacles to detection of
illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of
high illegal entry into the United States. In section 102(c) of IIRIRA, Congress granted to the
Secretary the authority to waive all legal requirements that the Secretary determines necessary to
ensure the expeditious construction of barriers and roads authorized by section 102 of IIRIRA.

In August of 2017, the Secretary issued a waiver covering the Project. Although the Secretary's waiver means that CBP no longer has any specific legal obligations under the laws that were included in the waiver, DHS and CBP, as was the case with past projects covered by a waiver, are committed to responsible environmental stewardship of our valuable natural and cultural resources. In order to uphold this commitment to responsible environmental stewardship, CBP has completed environmental resource surveys and prepared associated survey reports for the Project. CBP will also prepare an evaluation of potential environmental impacts associated with the Project in the form of an Environmental Stewardship Plan.

CBP is gathering data and input from local, state, and Federal agencies and Native American Tribes that may be affected by or otherwise have an interest in the Project. CBP respectfully requests any information you might have regarding the likely or anticipated effects to cultural resources from the implementation of the Project and recommended conservation or mitigation measures. Please send any comments and supporting information regarding the Project to commentsenv@cbp.dhs.gov before March 23, 2018 and include "SDC San Diego Primary Wall Replacement" in the title of your email. Should you have any questions, please contact Mr. John Petrilla at (949) 643-6385 or by email at john.petrilla@dhs.gov. Thank you.

Sincerely,

Paul Enriquez
Real Estate and Environmental Branch Chief
Border Patrol and Air and Marine
Program Management Office
U.S. Customs and Border Protection

Figure 1: Map Showing Location of the Project Area

# EXHIBIT F

RPT SDC San Diego Primary Wall Replacement Biological Survey FINAL.pdf
RPT SDC Primary Fence Replacement Cultural Resources Survey 2017 FINAL.pdf RPT
SDC San Diego Primary Wall Replacement Wetland Delineation Report FINAL.pdf

**From:** PETRILLA, JOHN <JOHN.P.PETRILLA@cbp.dhs.gov>
**Sent:** Wednesday, March 28, 2018 1:46 AM
**To:** Johnny EagleSpirit <johnny_es_7@yahoo.com>; COMMENTSENV <commentsenv@cbp.dhs.gov>
**Cc:** Angela Elliott Santos <aelliottsantos7@aol.com>; Johnny Elliot <johnny@eagle-spirit.us>;
Veronica Santos <nativespirit91@aol.com>; Toni Elliott <toni92elliott@yahoo.com>; ENRIQUEZ,
PAUL <paul.enriquez@cbp.dhs.gov>
**Subject:** RE: SDC San Diego Primary Wall Replacement

Hi Johnny,
We have received your email and letter.  Thank you for sharing this information regarding the
project.

I have attached for your information resource survey reports for the project area.  Let's plan for a
meeting in the next couple weeks after you've had a chance to read the reports.  If you propose a
couple dates and times that work for you, I'll run those by our staff here and set something up.

In the meantime, if you have any questions, please let me know.

Regards,
John

**John Petrilla**
Environmental Protection Specialist
Real Estate, Environmental, and Leasing Division
Border Patrol and Air and Marine Program Management Office
U.S. Customs and Border Protection
Office: (949) 643-6385
Mobile: (949) 278-0353
john.petrilla@dhs.gov

**From:** Johnny EagleSpirit [mailto:johnny_es_7@yahoo.com]

Good Afternoon,

I have attached the Manzanita Tribe's comments regarding the Border Wall Replacement in San Diego
County Califorina.

Please do not hesitate to contact me with any comments, if you need additional information, or to
schedule a meeting.

Thank you and have a great day.
Johnny EagleSpirit Elliott
Manzanita Band of the Kumeyaay Nation

# EXHIBIT G

## Campo Band of Mission Indians, Weekly Monitor Report

Monitor: John Mesa

Date: Tuesday July 21, 2020

Project/Location: Border Wall

Activities Observed:  trench at location 372 and excavator at 370

Resources Observed: soil from pugmill, natural soil dug with excavator

Concerns/Notes: no signs of native American artifacts


Monitor: John Mesa

Date: Wednesday, July 22, 2020

Project/Location: Border Wall

Activities Observed:  trencher at location 369, soil returning from pugmill and soil dug from second excavator

Resources Observed: soil from pugmill, natural soil dug by excavator

Concerns/Notes: no signs of native American artifacts


Monitor: John Mesa

Date: Thursday, July 23, 2020

Project/Location: Border Wall

Activities Observed:  trencher and excavator at location 368. Surveyed smith canyon because protestors claimed there was a village site. No village site was located.

Resources Observed: soil from pugmill, natural soil

Concerns/Notes:


Monitor:  John Mesa

Date: Friday, July 24, 2020

Project/Location: Border Wall

Activities Observed:  trencher and excavator at location 361. Watched screens at pugmill east of smith canyon.

Resources Observed: soil from pugmill, natural soil

Concerns/Notes: observed metate found by Jason Pinto. No concerns because it was very far from work area


Monitor:  John Mesa

Date: Saturday, July 25, 2020

Project/Location: Border Wall

Activities Observed:  trencher and excavator at location 358. Watched screen at pugmill east of smith canyon, visited other work areas that would be disturbed the next day

Resources Observed: soil from pugmill, natural soil

<u>Concerns/Notes</u>: nothing to report in undisturbed areas

# Campo Band of Mission Indians, Weekly Monitor Report

<u>Monitor</u>: John Mesa

<u>Date</u>: Monday July 27, 2020

<u>Project/Location</u>: Border Wall

<u>Activities Observed</u>:  trencher and excavator at location 347-00. Watched pub mill east of smith canyon. Observed area before and after blast location 344-00

<u>Resources Observed</u>: soil from pugmill, natural soil

<u>Concerns/Notes</u>: no concerns. Nothing to report in undisturbed blasting area. 14 hours.


<u>Monitor</u>: John Mesa

<u>Date</u>: Tuesday July 28, 2020

<u>Project/Location</u>: Border Wall

<u>Activities Observed</u>:  trencher and excavator at location 354. Observed blasting areas.

<u>Resources Observed</u>: soil from pugmill, natural soil and rock area

<u>Concerns/Notes</u>: no concerns. Nothing to report in rock areas to be blasted.


<u>Monitor</u>: John Mesa

<u>Date</u>: Wednesday, July 29, 2020

<u>Project/Location</u>: Border Wall

<u>Activities Observed</u>:  observed rock areas to be blasted

<u>Resources Observed</u>: rock areas, natural soil

<u>Concerns/Notes</u>: no concerns for blasting areas


<u>Monitor</u>:  John Mesa

<u>Date</u>: Thursday, July 30, 2020

<u>Project/Location</u>: Border Wall

<u>Activities Observed</u>:  trenchor and excavator dig at location 359.

<u>Resources Observed</u>: natural soil

<u>Concerns/Notes</u>: no concerns, nothing to report


<u>Monitor</u>:  John Mesa

<u>Date</u>: Friday, July 31, 2020

<u>Project/Location</u>: Border Wall

<u>Activities Observed</u>:  trencher and excavator at location 337. Surveyed new access roads west of clef yard. Johnathan Jones found slick and removed it from the work area. Arthur Ramcharan has new location of slick on his GPS. Observed blasting area east of smith canyon. Nothing was found. Area was blasted at 12:45. Observed areas after the blast, no concerns.

<u>Resources Observed</u>: natural soil

<u>Concerns/Notes</u>: now that the slick is not in the work area I have no concerns.


<u>Monitor</u>:  John Mesa

<u>Date</u>: Saturday, August 01, 2020

<u>Project/Location</u>: Border Wall

<u>Activities Observed</u>: excavator dig at location 334-00.

<u>Resources Observed</u>: natural soil, rock

<u>Concerns/Notes</u>: no concerns in the work area


<u>Monitor</u>:  John Mesa

<u>Date</u>: Monday, August 03, 2020

<u>Project/Location</u>: Border Wall

<u>Activities Observed</u>: breaking rock at location 448+18 west side of smith canyon

<u>Resources Observed</u>: rock

<u>Concerns/Notes</u>: no concerns

# EXHIBIT H

# Environmental Compliance Daily Monitoring Report

San Diego 4 & 11 and El Centro 5 & 9 Projects
United States/Mexico International Boundary
San Diego County, CA and Imperial County, CA

| | |
|---|---|
| Surveyor Name | Arthur Ramcharan |
| Monitoring Date | 07/02/2020 |
| Start Time | 6A |
| End Time | *6p* |
| Atmospheric Conditions | Raining<br>Thunderstorm<br>Partly Cloudy (>50%)<br>Scattered Clouds (<50%)<br>Drizzle<br>Overcast<br>Sunny*<br>Fog Am<br>Other |
| Wind Speed and Direction | NE 10 |
| Temperature High and Lowat Beginning and End of Day | 50-95 |
| Location of Construction Activities – A) Miles from project Eastern end or B) If on access road, miles from road entrance or | Maupin laydown(TDS) -W.Smith Canyon Laydown. Shockey TT access road, Patriot point. |
| Type of Construction Activities (Describe work being completed (trenching, grading, dynamite))) | Grub Grade clearing demolition of previous wall trenching, hauling material, bollard delivery,panel installation |
| Describe Work Area Before and After Construction | This section of the East slope of Smith Canyon was heavily wooded with Red shenk and shrub oak. An access road about 10 feet wide was cut to about 30 yrds before banking south an additional 100 yrds |
| Construction Equipment Used | Grader , excavator, front end loader, fork lift, semis, dozers, flatner, drill rigs,740 Haul trucks. |
| Description of Monitoring Activities | I observed chipping ,brushing and grubbing of an access road on the east slope of smith canyon . I received a call and was needed to identify a |

| | discovery. I was accompanied by Cpt Greenway as a mutual witness. At around 9 am, I was Contacted by Johna Hutira to meet Captain Greenway to look at possible human remains. Around 10 am I was at the spot where the remains were reported. Captain Greenway and I waited for "Darrell" to verify the exact location of the find. Around 11:30 I confirmed it was PVC pipe, took photos, collected the pipe fragments and notified Hutira of this finding. |
|---|---|
| Noncompliance Incident(s) Observed? | Yes<br>No*<br>If Yes, Describe: |
| **General-01:** BMPs were implemented as SOPs during all construction activities, including proper handling, storage, and disposal of hazardous or regulated materials. All fuels, waste oils, and solvents were collected and stored in tanks or drums within a secondary containment system that consists of an impervious floor and earthen dike capable of containing 125 percent of the volume of the containers stored therein. Machinery refueling followed accepted guidelines and provided drip plans for all vehicles while stored. Spills were immediately contained and an absorbent (e.g., granular, pillow, sock) was used to absorb and contain the spill. The Contracting Officer was immediately notified of any spill(s) of hazardous or regulated substances. | Yes*<br>No<br>N/A |
| **General-02:** Non-hazardous solid waste (trash and waste construction materials) was collected and deposited in on-site receptacles. Solid waste receptacles were maintained. All food related trash items such as wrappers, cans, bottles, and food scraps were collected in closable on-site receptacles and removed daily from the project site. | Yes*<br>No<br>N/A<br>If No, Describe: |

| | |
|---|---|
| **General-03:** If construction or work activities were authorized at night, all lights were shielded and directed only onto the work site and the area necessary to ensure the safety of the workers. The minimum wattage was used as needed. | Yes<br>No<br>N/A*<br>If No, Describe: |
| **General-04:** Vehicular traffic associated with the construction activities remained on established | Yes*<br>No |

| | |
|---|---|
| roads to the maximum extent practicable. Speed limits did not exceed 35 mph on major unpaved roads (graded with ditches on both sides) and 25 mph on all other unpaved roads. | N/A<br>If No, Describe: |
| **General-05:** The minimum number of roads needed for proposed actions were constructed and maintained to proper standards. Roads no longer needed were closed and restored to natural surface and topography using appropriate techniques. Photo document restoration efforts if they occur prior to completion of project. | Yes*<br>No<br>N/A<br>If No, Describe: |
| **General-06:** When available, areas already disturbed by past activities or those that will be used later in the construction period were used for staging, parking, and equipment storage. | Yes*<br>No<br>N/A<br>If No, Describe: |
| **General-07:** Existing roads were maintained during construction and existing roads returned to pre-construction conditions once construction was complete. | Yes*<br>No<br>N/A<br>If No, Describe: |
| **General-08:** If soil-binding agents were utilized, they were applied during the late summer/early fall months to avoid impacts on federally listed species. Soil-binding agents were not be used in or near surface (within 100 feet) of waters (e.g., wetlands, perennial streams, intermittent streams, washes). Soil-binding agents were only applied to areas that lack any vegetation. | Yes<br>No<br>N/A*<br>If No, Describe: |
| **General-09:** All disturbed soils not paved that will not be landscaped or otherwise permanently stabilized by construction were seeded using species native to the project vicinity. | Yes<br>No<br>N/A*<br>If No, Describe: |
| **General-10:** Prior to the start of ground disturbing activities, control of noxious and invasive species in the project area occurred. | Yes<br>No<br>N/A*<br>If No, Describe: |
| **General-11:** To prevent the introduction of invasive species seeds, all hauling and construction equipment, including work and personal vehicles, | Yes*<br>No<br>N/A |

| | |
|---|---|
| were washed at the identified facility. All vehicles and equipment were free of all attached soil, mud, vegetation, and other debris prior to entering the construction site. | If No, Describe: |
| **General-12:** To prevent invasive species from leaving the site, all construction equipment was inspected, and all attached plant/vegetation and soil/mud debris were removed prior to leaving the construction site. | Yes*<br>No<br>N/A<br>If No, Describe: |
| **General-13:** If vegetation must be removed, hand tools, mowing, trimming, or other removal methods were used that allowed root systems to remain intact to prevent disturbance that encourages establishment of invasive plant species. This BMP does not apply to any nonnative, invasive vegetation control that may occur. | Yes<br>No<br>N/A*<br>If No, Describe: |
| **General-14:** Use of herbicides did not occur in streams or other water bodies, areas of suitable habitat within the range or designated critical habitat of threatened or endangered plant species. | Yes*<br>No<br>N/A<br>If No, Describe: |
| **General-15:** Invasive plants that appeared on any restoration site were removed. Mechanical removal was performed in ways that eliminate the entire plant. All plant parts were removed and transported to a disposal area. Herbicides were used according to label directions. | Yes<br>No<br>N/A*<br>If No, Describe: |
| **General-16:** If local groundwater pumping was determined to have an adverse effect on aquatic-, marsh-, or riparian-dwelling threatened and/or endangered species, treated water from outside the immediate area was utilized. | Yes<br>No<br>N/A*<br>If No, Describe: |
| **General-17:** The Government was notified 5 days before entering areas where work will occur. | Yes*<br>No<br>N/A<br>If No, Describe: |
| **General-18:** To the extent possible, vehicles and equipment avoided traversing across flowing or standing watercourses. | Yes<br>No<br>N/A*<br>If No, Describe: |

| | |
|---|---|
| **Bio-01:** Designated travel corridors were marked with high visibility, removable, or biodegradable markers. Construction traffic through the corridor was minimized. No activities, ground disturbance, vegetation removal, or trimming occurred outside of the marked designated work area. | Yes*<br>No<br>N/A<br>If No, Describe: |
| **Bio-02:** Prior to ground disturbing activities or vegetation removal or trimming, a qualified biologist presented an environmental awareness program to all personnel who will be on site, including but not limited to USACE employees, Contractor, Contractor employees, supervisors, inspectors, and subcontractors. Following the education program, the photographs of sensitive species were posted in the office of the Contractor and resident engineer, where they remained through the duration of the project. The Contractor ensured that employees were aware of the listed species. | Yes*<br>No<br>N/A<br>If No, Describe: |
| **Bio-03:** If construction or clearing activities was scheduled during the nesting season (typically March 1-September 1) a pre-construction survey for migratory bird species was performed to identify active nests prior to the start of any construction or clearing activity. If construction activities resulted in the disturbance or harm of a migratory bird, coordination with the USFWS and AGFD occurred, and/or buffer zones around active nests were implemented until nestlings fledged and abandoned the nest. | Yes*<br><br>No<br>N/A<br>If No, Describe: |
| **Bio-04:** Areas hydro-seeded for temporary erosion-control measures only used native plant species appropriate to surrounding habitat types. | Yes<br>No<br>N/A*<br>If No, Describe: |
| **Bio-05:** Removal of trees and brush in federally listed species habitats was limited to the smallest amount needed to meet contract requirements. | Yes*<br>No<br>N/A<br>If No, Describe: |
| **Bio-06:** If an individual of a federally listed species was found within the project limits, work in the area of the species was stopped and the Contracting Officer was notified. Any species of concern was not | Yes<br>No<br>N/A* |

| | |
|---|---|
| harmed, harassed, or disturbed to the extent possible by project activities. Work resumed only once the Government biologist safely removed the individual, or it moved away on its own. Individuals of federally listed species found in the project area and requiring relocation were relocated by the Government biologist. | If No, Describe: |
| **Bio-07:** All on-site workers checked under their parked vehicles and equipment prior to driving or moving to ensure there were no listed species or other wildlife underneath. | Yes*<br>No<br>N/A<br>If No, Describe: |
| **Bio-08:** Light poles and other pole-like structures were designed to discourage roosting by birds, particularly ravens or other raptors. | Yes<br>No<br>N/A*<br>If No, Describe: |
| **Bio-09:** To prevent entrapment of wildlife species during construction, all excavated, steep-walled holes or trenches more than 2 feet deep were covered at the close of each working day by plywood, or provided with one or more escape ramps constructed of earth fill or wooden planks. The ramps were located at no greater than 1,000-foot intervals and were sloped less than 45 degrees. Each morning before the start of construction and before such holes or trenches were filled, each hole or trench was thoroughly inspected for trapped animals. Any animals discovered were allowed to escape voluntarily (by escape ramps or temporary structures) without harassment, or removed from the trench or hole by the Government biologist before construction activities resumed | yes*<br>Yes<br>No<br>N/A<br>If No, Describe: |
| **Bio-10:** All hollow vertical bollards were covered to prevent wildlife entrapment. Covers were deployed from the time the bollards were erected until they were filled. | Yes*<br>No<br>N/A<br>If No, Describe: |
| **Bio-11:** To eliminate attraction to predators of protected animals, all food related trash items such as wrappers, cans, bottles, and food scraps were disposed of in closed containers and removed from the project site daily. Photo documentation and GPS | Yes*<br>No<br>N/A<br>If No, Describe: |

| | |
|---|---|
| coordinates were provided where correction was needed. | |
| **Bio-12:** The Government provided monitors for environmental and cultural resource monitoring, throughout the contract performance period. | Yes*<br>No<br>N/A<br>If No, Describe: |
| **AQ-01:** Mitigation measures were incorporated to ensure that PM10 emission levels did not rise above the de minimis threshold as required per 40 CFR 51.853(b)(1). Mitigation measures included dust suppression methods to minimize airborne particulate matter created during construction activities. Standard Construction BMPs were used, such as routine watering of the patrol, drag, and access roads to control fugitive dust during the construction phases of the project. All construction equipment and vehicles were kept in good operating condition to minimize exhaust emissions. | Yes*<br>No<br>N/A<br>If No, Describe: |
| **WR-01:** Standard construction procedures to minimize the potential for erosion and sedimentation during construction were implemented. All work was suspended during heavy rains and did not resume until conditions were suitable for the movement of equipment, as directed. Work within major drainages were conducted during months when the surface flows were expected to be the lowest. | Yes<br>No<br>N/A*<br>If No, Describe: |
| **WR-02:** All equipment maintenance, staging, laydown, and dispensing of fuel, oil, or any other such activities, occurred in designated upland areas. The designated upland areas were located in such a manner as to prevent any runoff from entering waters of the US, including wetlands. | Yes*<br>No<br>N/A<br>If No, Describe: |
| **WR-03:** Wastewater (water used for project purposes that is contaminated with construction materials, or was used for cleaning equipment, and thus carries oils or other toxic materials or other contaminants in accordance with state regulations) was stored in closed containers on site until removed for disposal. Concrete wash water was not dumped on the ground and was collected and moved offsite for disposal. | Yes*<br>No<br>N/A<br>If No, Describe: |

| | |
|---|---|
| **WR-04:** The potential for entrapment of surface flows within the roadbed due to grading was avoided or minimized. The depth of any pits created were minimized so animals did not become trapped. | Yes*<br>No<br>N/A<br>If No, Describe: |
| **WR-05:** Water tankers that convey untreated surface water did not discard unused water where it has the potential to enter surface waters or drainages. The environmental monitor advised as to appropriate sites. Pumps, hoses, tanks and other water storage devices were cleaned and disinfected with a 10% bleach solution at an appropriate facility (this water did not enter any surface water area) before use at another site, if untreated surface water was used. If a new water source is used that is not from a treated or groundwater source, the equipment required additional cleaning. This is important to kill any residual disease organisms or early life stages of invasive species that may affect local populations of Threatened and Endangered species. | Yes*<br>No<br>N/A<br>If No, Describe: |
| **WR-06:** Materials used for on-site erosion control in uninfested native habitats were free of nonnative plant seeds and other plant parts to limit potential for infestation. Since natural materials cannot be certified as completely weed-free, if such materials were used, follow up monitoring to document establishment of nonnative plants and appropriate control measures were implemented for a period of time to be determined in the site restoration plan. | Yes*<br>No<br>N/A<br>If No, Describe: |
| **CR-01:** Any known cultural resources were clearly flagged for avoidance during construction. | Yes<br>No<br>N/A*<br>If No, Describe: |
| **CR-02:** If any archaeological artifacts or human remains were found during construction, all ground disturbing activities in the vicinity of the discovery were stopped and the USACE was immediately notified. Work did not resume until authorized. | Yes<br>No<br>N/A*<br>If No, Describe: |

| Other Observations or Issues: | Monitor determined discovery to be PVC pipe fragments. It was collected after documentation. |
|---|---|
| | |

| Site Photo File Name | Site Photo Description | UTM or Station#or location |
|---|---|---|
| 2020_07_30ARSD15 01 | NorthWest facing view of access road clearing E.Smith Canyon | 11s 0554759 / 3606473 |
| 2020_07_02ARSD15 02 | Close up of 2020_07_02 ARSD15 A1 | 11 s 0560910 / 3607014 |
| 2020_07_02ARSD15 03 | west facing view of grub and clear | West of Sta 241 |
| 2020_07_02ARSD15 04 | East facing view of grub and clear | West of Sta 241 |
| 2020_07_02ARSD15 05 | North view of cleared peak | 11s 0547104 / 3605633 |
| 2020_07_02ARSD15 06 | NorthWest facing view of access road clearing E.Smith Canyon | 11s 0554759 / 3606473 |
| | | |
| | | |
| | | |
| | | |

`

# EXHIBIT I





**INCIDENT REPORT**

**July 31, 2020**

**FY2020 Border Wall 284 Project**
**San Diego Sector**

Cogstone Resource Management's (Cogstone) Environmental Monitor Arthur Ramcharan was contacted by local cultural resource management operators about a possible jobsite visit with intent of relocating possible human remains south of USA jurisdiction. Ramcharan told them that he could not physically or technically involve himself, but he would put them in touch with project personnel that could hear their requests.

On July 31, 2020, a group of Kumeyaay representatives arrived at roughly 1230 by the TDS entrance. After a brief security check, a train of a Jeeps, a Range Rover and two other vehicles that were recognized as being associated with sporadic protesting followed Ramcharan to the Redshank area. They parked and waited for USACE and CBP to arrive. Once there, the cultural resources team and associates (Ed and wife Gwen, Dr. Hinkes [coroner], Tom Hulm, Cynthia Prada, and Brooke Baines) met with Mr. Williams, Mr. Rubio, Capt. Greenway, Alan Deleon, and one other USACE person. USACE explained that Barnard will not remove any barriers. USACE said that they cannot allow them on or through and that if they did so, they were on their own. Also Mr. Williams added that there was an open hole to navigate. Ramcharan added to please be careful. Mr. Rubio said that when they are finished, he will oversee them coming back. Ramcharan began recording on his phone as the team approached the break in construction at the base of the hill. There a 100 ft span of border wall is secured with the vehicle barriers and 30 ft barriers east and west.

After some difficulty Tom managed to find a way in and helped Hinkes, Cynthia, and Ed beyond the vehicle barriers. These four made their way west along the wall a few hundred feet or so when they reached the area in question. They conducted a pedestrian survey approximately 50 feet south from the bollards but apparently well into Mexico when the team relocated the remain discovery (ankle or wrist fragment per Hinkes). Once found, Ed volunteered to repatriate the fragment to the base of a Manzanita tree. The team then regrouped at the wall and made their way east to the vehicle barriers and safely re-entered the project area, USA side. They then met with USACE and CBP to discuss the findings and to schedule procedures moving forward. After the meeting Ramcharan escorted the vehicles toward the Redshank exit and returned to monitor.

1518 West Taft Avenue
Orange, CA 92865
Office (714) 974-8300

Field Offices
San Diego • Riverside • Morro Bay • Northern California

cogstone.com
Toll free 888-333-3212

Federal Certifications SDB, EDWOSB
State Certifications DBE, WBE, SBE, UDBE

53

# EXHIBIT J

# A CULTURAL RESOURCES SURVEY OF FOURTEEN MILES OF EXISTING PRIMARY BORDER FENCE IN THE SAN DIEGO BORDER INFRASTRUCTURE SYSTEM, SAN DIEGO COUNTY, CALIFORNIA

**Prepared by:**

**Eric S. Cox**
**NRI Project No. 17-50**

**Prepared for:**

**U.S. Customs and Border Protection**

**Office of Border Patrol**
**FME CONTRACT GS10F0070W**
**TASK ORDER HSBP1017F00229**
**Work Order 01**

**Submitted by:**

**Eric S. Cox M.A., R.P.A.**
**Principal Investigator**

**Technical Report No. 17-62**
**Northland Research, Inc.**
**Tempe, Arizona**

**December 14, 2017**

# NATIONAL ARCHAEOLOGICAL DATA BASE INFORMATION

Authors: Eric S. Cox

Consulting Firm: Northland Research, Inc., 1865 E. 3rd St. Tempe, Arizona 85281
(480) 894-0020

Report Date: December 14, 2017

Report Title: *A Cultural Resources Survey of Fourteen Miles of Existing Primary Border Fence in the San Diego Border Infrastructure System, San Diego County, California*

Submitted To: U.S. Customs and Border Protection
24000 Avila Rd., Suite 5020
Laguna Niguel, CA 92677-3401

Contract Number: FME Contract GS10F0070W
Task Order HSBP1017F00229
Work Order 01

USGS Quadrangles: Imperial Beach OEW, Imperial Beach, and Otay Mesa 7.5' topographic quadrangles

Acreage: 14.2 linear miles of 60-foot transects totaling 101.8 acres

Keywords: Archaeological cultural resources survey; Roosevelt Reservation; San Diego County; U.S. Customs and Border Protection; border fence; P-37-004281 (CA-SDI-4281); P-37-008079 (CA-SDI-8079); P-37-008604 (CA-SDI-8604); P-37-008652 (CA-SDI-8652); P-37-008773 (CA-SDI-8773); P-37-010621 (CA-SDI-10,621); P-37-011947 (CA-SDI-11,947); P-37-012256 (CA-SDI-12,256); P-37-012257 (CA-SDI-12,257); P-37-012258 (CA-SDI-12,258); P-37-012259 (CA-SDI-12,259); P-37-012720 (CA-SDI-12,720); P-37-013486 (CA-SDI-13,486); P-37-016666 (CA-SDI-15,038); P-37-025680 (Union Pacific Railroad); Townships 18 and 19 South; Ranges 1 and 2 West; Range 1 East; Imperial Beach OEW, Imperial Beach, and Otay Mesa quadrangles.

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1
PROJECT LOCATION ........................................................................................................8
ENVIRONMENTAL SETTING ..........................................................................................8
CULTURE HISTORY ..........................................................................................................8
   Archaic Period ...............................................................................................................8
   Late Period .....................................................................................................................9
   Historical Background ....................................................................................................9
      Spanish Period (1769–1821) ....................................................................................10
      Mexican Period (1821–1848) ...................................................................................10
      American Period (1848 to Present) ..........................................................................10
RECORDS REVIEW ..........................................................................................................11
   General Land Office Maps ............................................................................................11
FIELD METHODS..............................................................................................................19
SURVEY RESULTS ...........................................................................................................20
   Relocated Sites .............................................................................................................21
      P-37-016666 .............................................................................................................21
      P-37-025680 Union Pacific Railroad/San Diego and Arizona Eastern Railway ....24
   Sites Not Relocated ......................................................................................................25
      P-37-004281 .............................................................................................................25
      P-37-008079 .............................................................................................................27
      P-37-008604 .............................................................................................................29
      P-37-008652 .............................................................................................................30
      P-37-008773 .............................................................................................................32
      P-37-010621 .............................................................................................................33
      P-37-011947 .............................................................................................................34
      P-37-012256 .............................................................................................................35
      P-37-012257 .............................................................................................................36
      P-37-012258 .............................................................................................................37
      P-37-012259 .............................................................................................................39
      P-37-012720 .............................................................................................................41
      P-37-013486 .............................................................................................................42
VIEWSHED ANALYSIS.....................................................................................................43
SUMMARY AND RECOMMENDATIONS........................................................................47
APPENDIX A. RECORDS SEARCH INFORMATION......................................................49
REFERENCES CITED........................................................................................................79

# LIST OF FIGURES

Figure 1a. San Diego Fence Replacement project location, Map 1 ................................................ 2
Figure 1b. San Diego Fence Replacement project location, Map 2 ................................................ 3
Figure 1c. San Diego Fence Replacement project location, Map 3 ................................................ 4
Figure 1d. San Diego Fence Replacement project location, Map 4 ................................................ 5
Figure 1e. San Diego Fence Replacement project location, Map 5 ................................................ 6
Figure 2. Example of existing primary landing mat border fence. View west ............................... 7
Figure 3. Example of a bollard style fence. View south ................................................................ 7
Figure 4. 1870 GLO plat map for T19S, R2W .......................................................................... 12
Figure 5. Example of Border Monument location to APE. View south ....................................... 13
Figure 6. Channelized portion of the Tijuana River within the APE. View northeast ................ 13
Figure 7. 1883 GLO plat map for T19S, R1W .......................................................................... 15
Figure 8. 1891 GLO plat map for T19S, R1E ........................................................................... 16
Figure 9. 1879 GLO plat map for T18S, R1E ........................................................................... 17
Figure 10. 1880 GLO plat map for T18S, R1E ......................................................................... 18
Figure 11. Overview of San Diego Border Fence Replacement APE. View east ....................... 19
Figure 12. Example of trash dumping over the primary border fence. View east ....................... 20
Figure 13. Site map of P-37-016666 .......................................................................................... 22
Figure 14. Overview of P-37-016666. View northwest ............................................................. 22
Figure 15. Site map of P-37-025680 .......................................................................................... 24
Figure 16. Portion of P-37-025680 within the San Diego Border Fence Replacement APE. View
    east ......................................................................................................................................... 25
Figure 17. Site map of P-37-004281 .......................................................................................... 26
Figure 18. Overview of P-37-004281. View northwest ............................................................. 27
Figure 19. Site map of P-37-008079 .......................................................................................... 28
Figure 20. Site map of P-37-008604 .......................................................................................... 29
Figure 21. Overview of P-37-008604. View east ...................................................................... 30
Figure 22. Site map of P-37-008652 .......................................................................................... 31
Figure 23. Border Monument 252 visible over the primary border fence .................................. 31
Figure 24. Overview of P-37-008652. View west ..................................................................... 32
Figure 25. Site map of P-37-008773 .......................................................................................... 33
Figure 26. Site map of P-37-010621 .......................................................................................... 34
Figure 27. Site map of P-37-011947 .......................................................................................... 35
Figure 28. Site map of P-37-012256 .......................................................................................... 36
Figure 29. Site map of P-37-012257 .......................................................................................... 37
Figure 30. Site map of P-37-012258 .......................................................................................... 38
Figure 31. Overview of P-37-012258. View east ...................................................................... 39
Figure 32. Site map of P-37-012259 .......................................................................................... 40
Figure 33. Overview of P-37-012259. View east ...................................................................... 40
Figure 34. Site map of P-37-012720 .......................................................................................... 41
Figure 35. Site map of P-37-013486 .......................................................................................... 42
Figure 36. Viewshed analysis photographic locations for the NRHP listed Initial Point of
    Boundary Between U.S. and Mexico/Border Monument 258 ............................................... 43
Figure 37. Viewshed analysis photographic locations for the NRHP listed U.S. Inspection
    Station/U.S. Custom House ................................................................................................... 44

Figure 38. Photograph of Initial Point of Boundary Between U.S. and Mexico/Border Monument 258 circa 1974. View west. (Photograph courtesy of the NRHP database) ......................... 45
Figure 39. Current photograph of Initial Point of Boundary Between U.S. and Mexico/Border Monument 258. View south.............................................................................................. 45
Figure 40. Photograph looking toward Initial Point of Boundary Between U.S. and Mexico/Border Monument 258 showing built environment. View west-southwest ............ 46
Figure 41. Photograph of U.S. Inspection Station/U.S. Custom House at the San Ysidro POE in 1981. View north. (Photograph courtesy of Clayton B. Fraser/ FraserDesign.)................... 46
Figure 42. Current photograph of U.S. Inspection Station/U.S. Custom House at the San Ysidro POE showing built environment. View southwest ............................................................... 47
Figure A-1. Previously recorded cultural resources investigations within one-quarter mile of the San Diego Border Fence Replacement Project ..................................................................... 63
Figure A-2. Previously recorded cultural resources investigations within one-quarter mile of the San Diego Border Fence Replacement Project ..................................................................... 64
Figure A-3. Previously recorded cultural resources investigations within one-quarter mile of the San Diego Border Fence Replacement Project ..................................................................... 65
Figure A-4. Previously recorded cultural resources investigations within one-quarter mile of the San Diego Border Fence Replacement Project ..................................................................... 66
Figure A-5. Previously recorded cultural resources investigations within one-quarter mile of the San Diego Border Fence Replacement Project ..................................................................... 67
Figure A-6. Previous cultural and historical resources recorded within one-quarter mile of the San Diego Border Fence Replacement Project ............................................................................ 74
Figure A-7. Previous cultural and historical resources recorded within one-quarter mile of the San Diego Border Fence Replacement Project ............................................................................ 75
Figure A-8. Previous cultural and historical resources recorded within one-quarter mile of the San Diego Border Fence Replacement Project ............................................................................ 76
Figure A-9. Previous cultural and historical resources recorded within one-quarter mile of the San Diego Border Fence Replacement Project ............................................................................ 77
Figure A-10. Previous cultural and historical resources recorded within one-quarter mile of the San Diego Border Fence Replacement Project ............................................................................ 78

## LIST OF TABLES

Table 1. Cultural Sites within the San Diego Border Fence Replacement APE............................ 21
Table 2. Artifacts Observed at P-37-016666. ............................................................................ 23
Table 3. Recommended Mitigation Strategy for Cultural Sites Recorded in the San Diego Border Fence Replacement APE............................................................................................ 48
Table A-1. Previous Cultural Resources Studies within ¼ mile of the San Diego Border Fence Replacement Project .................................................................................................. 50
Table A-2. Previously Recorded Cultural Resources within ¼ mile of the San Diego Border Fence Replacement Project............................................................................................ 68

# MANAGEMENT SUMMARY/ABSTRACT

**Client:** U.S. Customs and Border Protection, U.S. Border Patrol

**Land Status:** Federal lands managed by the U.S. Customs and Border Protection

**Project Title:** A Cultural Resources Survey of Fourteen Miles of Existing Primary Border Fence in the San Diego Border Infrastructure System, San Diego County, California

**Project Description:** At the request of U.S. Customs and Border Protection (CBP), Northland Research, Inc. (Northland) conducted an archaeological survey of the 60-foot wide Roosevelt Reservation along 14 miles of the United States-Mexico International Border on lands administered by the CBP. Northland has completed the cultural resources survey and records review of the APE in advance of a proposed undertaking that will involve the removal and replacement of an estimated 14 miles of existing primary landing mat border fence with a taller bollard wall.

**Project Location:** The project area is in the southwestern corner of San Diego County, and follows the United States-Mexico International Border. Specifically, the APE is located in Township 18 South, Range 1 West, Sections 32 and 33; Township 19 South, Range 1 East, Section 6; Township 19 South, Range 1 West, Sections 1–6; Township 19 South, Range 2 West, Sections 1, 2, and 7–11 on the Imperial Beach OEW, Imperial Beach, and Otay Mesa USGS 7.5 minute quadrangles. The entire survey was conducted within the Roosevelt Reservation.

**Number of Acres:** 101.8

**Previously Recorded Sites:** 15

**Newly Recorded Sites:** None

**Comments:** Northland has completed an archaeological field survey and viewshed evaluation for the San Diego Border Fence Replacement APE in advance of an undertaking that will replace approximately 14 miles of existing primary border fence in the San Diego Border Infrastructure System with a new, taller bollard wall. The field work was completed at the request of the Department of Homeland Security and U.S. Customs and Border Protection as part of their commitment to continue to protect valuable natural and cultural resources through responsible environmental stewardship.

# INTRODUCTION

U.S. Customs and Border Protection (CBP) will replace approximately 14 miles of existing primary border fence in the San Diego Border Infrastructure System (BIS). The Area of Potential Effects (APE) for the proposed undertaking starts at the eastern end of Border Field State Park and moves eastward to the current extent of the existing primary border fence, in southern San Diego County, California (Figures 1a–1e). The undertaking will involve the removal and replacement of an estimated 14 miles of existing primary landing mat border fence within the 60-foot wide Roosevelt Reservation in the U.S. Border Patrol San Diego Sector (SDC), along the International Border adjacent to the City of Tijuana (Figure 2). The replacement will be comprised of a bollard wall and will range in height from 18 feet (typical) to approximately 21 feet or taller (Figure 3).

The principal mission requirements of the Department of Homeland Security (DHS) include border security and the detection and prevention of illegal entry into the United States. Congress has provided the Secretary of Homeland Security with a number of authorities necessary to carry out DHS's border security mission. One of these authorities is found at section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). In section 102(a) of IIRIRA, Congress provided that the Secretary of Homeland Security shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States. In section 102(b) of IIRIRA, Congress has called for the installation of additional fencing, barriers, roads, lighting, cameras, and sensors on the southwest border. Finally, in section 102(c) of IIRIRA, Congress granted to the Secretary of Homeland Security (the Secretary) the authority to waive all legal requirements that the Secretary determines necessary to ensure the expeditious construction of barriers and roads authorized by section 102 of IIRIRA.

In August of 2017, the Secretary issued a waiver covering, among other things, the replacement of approximately 14 miles of primary pedestrian barrier in the United States Border Patrol (USBP) San Diego Sector. Although the Secretary's waiver means that CBP no longer has any specific legal obligations under the laws that were included in the waiver, DHS and CBP, as was the case with past projects covered by a waiver, are committed to responsible environmental stewardship of our valuable natural and cultural resources. In order to uphold this commitment to responsible environmental stewardship, CBP has completed environmental resource surveys and prepared associated survey reports, including this one.

Initial fieldwork for the San Diego Border Fence Survey was conducted from the 9th through the 13th of October 2017 by Northland archaeologists Eric Cox and John Marshall. Cox and Marshall also completed a supplemental survey of an additional mile for the fence replacement project on December 5, 2017. Eric Cox meets the Professional Qualifications Standards as outlined in the Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation; he served as the Principal Investigator for the archaeological survey. This report follows the guidelines outlined by the California Office of Historic Preservation.



**Figure 16. Portion of P-37-025680 within the San Diego Border Fence Replacement APE. View east.**

### Sites Not Relocated

Twelve of the sites within the San Diego Border Fence Replacement APE were not relocated during the current project. Almost universally, the portions of the sites within the APE—and more appropriately between the primary and secondary border fences—have been previously mitigated, and the construction and maintenance of the United States-Mexico International Border infrastructure has covered any remaining potential elements of these sites. A brief description of these sites, their relationship to the APE, and the current status of the sites is listed below.

### P-37-004281

First recorded in 1978, P-37-004281 (also known as the Lichty Mesa Site) is the only site within the San Diego Border Fence Replacement APE that has been recommended as eligible for inclusion in the NRHP. It was recorded as a La Jolla habitation site containing an extensive marine shell and lithic artifact scatter. The site boundary was documented as extending to the border on the United States side, with the southern portion located in the current APE (Figure 17). This site was previously the subject of a 100% surface collection, archaeological testing, and data recovery to mitigate impacts from border infrastructure development (Schneeberger 2011).

During the current survey, a portion of the site that was within the APE was heavily overgrown, limiting visibility. However, some marine shell was observed on the surface, though not in significant quantities (Figure 18). This site has been the subject of an extensive and exhaustive data recovery and research effort that would not normally warrant any additional consideration for the proposed undertaking. However, human remains were found in this location during this effort and are currently being repatriated to the Kumeyaay Cultural Repatriation Committee (KCRC). Due to the previous presence of human remains on this site and in an order to be cautious, the CBP will have a cultural and Native American monitor on site during any ground disturbing activity at this location.



**Figure 17. Site map of P-37-004281.**