# DECLARATION OF SOUTH PACIFIC
# BORDER DISTRICT COMMANDER

I, Antoinette R. Gant, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. This declaration is based on my personal knowledge and information made available to me in the course of my official duties.

2. I am a Colonel in the United States Army, and I am currently the Commanding Officer for the South Pacific Border District ("Border District") for the U.S. Army Corps of Engineers ("Corps"), South Pacific Division. I am stationed in Phoenix, Arizona.

3. The Border District's primary mission is to plan, design, and construct Department of Defense-approved border barrier projects on the southern border of the United States.

4. In my capacity as the Commanding Officer of the Border District, I have overall responsibility for, and authority over, the Border District and its operations, consistent with relevant policy, regulations, and laws. In this respect, my responsibilities include providing oversight, direction, and management of all systems and personnel, including contracting officers involved in executing the Border District's mission. In particular, I currently oversee performance of work on border barrier construction projects either under contract or soon to be awarded, and that are funded under the authority of 10 U.S.C. § 284.

5. The areas of eastern San Diego and western Imperial County, California, as described by Plaintiffs, encompass Fiscal Year 2020 ("FY20") Section 284 projects San Diego A (Segments 1 and 3)[1] and El Centro A. An injunction prohibiting construction of border barrier and any associated infrastructure associated with the two aforementioned projects will result in irreparable harm to the Government, as discussed further below.

## I. Fiscal Year 2020 Section 284 Projects: San Diego A (Segments 1 and 3) and El Centro A.

6. In response to requests for assistance from the Department of Homeland Security (DHS), the Secretary of Defense has approved two FY20 Section 284 projects potentially impacted by this lawsuit, San Diego A (Segments 1 and 3) and El Centro A for construction of bollard-style barrier along the United States' southern border pursuant to 10 U.S.C. § 284. In FY20, $3.831 billion was transferred into the Drug Interdiction and Counter-Drug Activities, Defense, account for barrier construction. The funds were allocated to the Department of the Army, and further allocated to the Corps to undertake initial project scoping, contracting for construction, construction management, and necessary Corps' management and oversight expenses for projects in FY20.

---

[1] The authorized San Diego A project consists of Segments 1, 2, and 3. Segments 1 and 3 are both currently under contract and under construction. Segment 2 is an authorized FY20 Section 284 project for which FY20 funding is available; however, the Corps will not award and construct Segment 2 during FY20.

7. El Centro A and San Diego A (Segments 1 and 3) are being undertaken through a modification to the FY19 Section 284 Yuma 1/El Centro 1 contract. The modification was awarded on April 11, 2020 in the amount of $569,000,000.00. These two projects include the following:

a. *El Centro A*. The original project involved installing 3.17 miles of 30-foot primary pedestrian bollard-style barrier. Substantial construction activities commenced on June 30, 2020. On September 22, 2020, the Border District issued a contract modification to extend the El Centro A alignment through a drainage by 250 feet on the west-end and 120 feet on the east-end, which totals 0.07 miles, at a cost of $1,905,720.47. As a result of this modification, the total contracted length of the alignment increased to 3.24 miles from the previous 3.17 miles. To date, approximately 1.8 miles of barrier has been emplaced, which equates to approximately 56 percent of the total contracted 3.24 miles.

b. *San Diego A* (Segments 1 and 3). The original project involved installing 14 miles of 30-foot primary pedestrian bollard-style barrier. Substantial construction activities commenced on May 26, 2020. On September 28, 2020, the Border District issued a contract modification to fill the Western Gap (0.31 miles) and the Jacumba Gap (0.70 miles), at a cost of $10,142,987.97 and $11,004,533.37, respectively. As a result, the total contracted length of the San Diego A project increased to 15.01 miles, from the previous 14 miles. To date, approximately 12.25 total miles of barrier has been emplaced, which equates to approximately 82 percent of the total contracted 15.01 miles.

## II. Harms to the Government

8. The Government will suffer irreparable harm from an injunction. The Contractor and Government personnel are actively working on extensive construction and pre-construction activities in the project areas, but an injunction immediately stops those activities and prevents the Government from taking necessary steps to complete the barrier construction projects. Additionally, each day an injunction continues and contract performance on the Section 284 projects is suspended, the Government will be required to pay costs incurred by the contractor during the period of inactivity – costs that the Government would not have to pay but for an injunction. Further, the contractor has incurred significant costs for work already undertaken on the Section 284 projects, but an injunction would prevent the Government from paying those costs. The inability to pay the contractor for the work undertaken to date will result in additional costs to the Government in the form of penalty fees and harm the Government's ability to secure future contractors for important Federal contracts. These costs and fees will quickly become unsustainable for the Government, and if the work remains suspended for too long, the Government will be forced to reduce the scope or terminate the contracts. Moreover, even if an injunction were to be lifted at the conclusion of litigation, the Government would then face additional costs for re-procuring new contracts to complete the unfinished work left after termination. The Government will have to pay these additional, unnecessary costs from the finite funds available for Section 284 border barrier construction, thus diminishing the money available for actual border barrier construction and irreparably harming the Government's ability to complete the border barrier construction projects.

*A. Harms from Contract Suspension*

9.  As the Commander of the Border District, I have been made aware by construction personnel and the contracting officer that suspending work on the above-named projects will cause significant, immediate, and irreparable harm to the Government as described below.

10. Should the Court grant the Plaintiff's motion for an injunction, I will immediately direct the District to cease all actions involving construction of the border barrier at San Diego A (Segments 1 and 3) and El Centro A. The contracting officer for the projects would then direct the respective contractor to suspend all work on these projects and segments, pursuant to Federal Acquisition Regulation ("FAR") 52.242-14, Suspension of Work (Apr. 1984).

11. Pursuant to FAR 52.242-14(b), the contractor is entitled to an adjustment for any increase in the cost of performance of the contract (excluding profit) necessarily caused by an unreasonable period of time during which these projects and segments are suspended or delayed. The reasonableness of a suspension or delay is determined based upon the totality of the circumstances, including the duration of the delay. In this case, despite the suspension of work, the contractor will nevertheless continue to incur costs for every day that the contracts are suspended. The Corps estimates that these costs are likely to include significant costs for equipment the contractor must keep ready for use at multiple locations, costs for security to keep the equipment and materials from being stolen or vandalized, labor costs for the personnel managing the contract, labor costs for the personnel who have been trained and are dedicated to execute the tasks under the contract (workers whom the contractor would be reluctant to release due to the risk of not being able to rehire them), and potential costs associated with storing construction materials. Further, there will likely be increased market prices on labor, materials, and equipment (e.g., steel and concrete). The Corps will be obligated to reimburse these additional costs, which would not have been incurred but for a Court injunction. Moreover, the Corps will be obligated to reimburse these additional costs from funds that would otherwise be spent on actual barrier construction.

12. The contractor has already incurred substantial costs on the awarded projects and segments. These are costs to the contractor that the Government will owe, but could not pay because of an injunction, and they will result in additional costs to the Government. The prompt payment interest penalty is 1.125 percent per annum on invoices that are not paid within 30 days of certification and submission. *See* FAR 52.232-27 Prompt Payment for Construction Contracts (Jan. 2017) (citing 5 C.F.R. Parts 1315.10(a)(3); 1315.10(a)(10)).

13. Based on billing history, it is estimated that the contractor incurs costs of approximately $50,000,000.00 every 30 days for the San Diego A (Segments 1 and 3) and El Centro 2 projects. Per the terms and conditions of the contract, the contractor may invoice the Corps every two weeks.  Once the Corps has reviewed and approved an invoice, it must be paid within 14 calendar days of the approval.  Currently, the contractor owes an invoice for the period of 13 September through 01 October 2020, which has not yet been received by the Corps.  It is anticipated that this invoice will be for approximately $25,000,000.00.  Failure to timely pay the contractor's invoice for El Centro A and San Diego A (Segments 1 and 3) could cost the Government an estimated $562,500.00 per year in interest.

14. If the contractor's performance is suspended, it is estimated costs will accrue at the rate of $777,298.00 per day and $23,629,846.00 per month for the San Diego A (Segments 1 and 3) project, and $176,002.00 per day and $5,350,472.00 per month for the El Centro A project.

### B. Harms from Contract Termination

15. These suspension costs will quickly become unsustainable for the Government, and if work on the two projects remains suspended for too long, the Corps will be forced to de-scope or partially terminate the contracts. The affirmative responsibility to mitigate cost impacts to protect the best interests of the United States and the best interests of our contractor would require the Corps to consider de-scoping or partially terminating El Centro A and San Diego A (Segments 1 and 3) within a matter of weeks or months, rather than leaving the contracts in a suspended status.

16. Currently, the contracting officer estimates that if work on the projects remains suspended for more than six months, the Corps will likely need to consider termination. The Corps estimates that the termination and demobilization costs for El Centro A and San Diego A (Segments 1 and 3) would be approximately $22,406,501.00.

17. In the event the Government must terminate for convenience work being performed on the El Centro A and San Diego A (Segments 1 and 3) projects, applicable fiscal laws will likely prevent later re-use of funds made available to the Corps for FY20 Section 284 projects for any purpose other than a replacement contract for the same border barrier work. If these funds are unused or unusable, they would automatically return to the Treasury.

18. In addition, if an injunction is vacated after the contractor has demobilized, the costs of remobilizing manpower and resources will be significant. For example, the contractor will face difficulties restoring manpower levels, and market prices for labor, supplies, materials, and equipment will likely increase. The Government will be obligated to reimburse these additional costs, which would not have been incurred but for a Court injunction. To compensate for these additional costs, the Government will suffer the irreparable harm of reducing barrier mileage, modifying barrier design to eliminate features (such as lighting, cameras, or sensors), or deferring Section 284 projects.

### C. Harms from Contract Reprocurement

19. In the event a final judicial ruling favors the Government but comes after partial termination of these contracts, the Government would also face onerous administrative costs for procuring new contracts to complete the unfinished work left after partial termination. The Corps estimates the reprocurement cost would be approximately $89,555.00 per contract, in addition to any market escalations in the cost for construction services. But for the injunction, the Corps would not need to expend duplicative administrative costs procuring the same requirement twice.

20. The Government expects the costs of any reprocured contracts to be significantly greater than the original contract costs, in part because the price of compensating a replacement contractor willing to take the proven risk of project suspension and non-payment will be high. Prices for reprocurement contracts will likely reflect increased market prices for labor, materials,

and equipment (e.g., steel and concrete). The Government's need to pay these higher costs would be a burden that the Government would not have been incurred but for a Court injunction. Moreover, the Government will be obligated to pay for these additional costs by reducing barrier mileage, or modifying barrier design to eliminate features (such as lighting, cameras, or sensors).

### D. *Harms from Demobilization and Caretaker Activities*

21. If enjoined, the Government must incur considerable overhead costs associated with demobilization. Once that process is complete, the Government must expend funds to maintain a minimal level of basic operations to prevent irreparable loss to the Government and ensure compliance with the Court's order. Specifically, the Government must continue to expend funds to perform a small number of functions that are essential to protect Government assets already on the ground, to minimize loss to the Government associated with existing assets and those assets anticipated for delivery, to ensure site safety and site security, and, consequently, to mitigate irreparable harm to the Government. The Corps expects to use personnel for the following caretaker activities as long as necessary while any injunction is in effect:

a. Eight Border District, Construction Division, personnel would monitor the El Centro A and San Diego A (Segments 1 and 3) worksites, and be available to accept materials that are in transit to the sites and cannot be returned; document and monitor site conditions to assure safety and ensure the contractor does not perform any work while suspended; facilitate security to prevent theft and vandalism; and perform associated reporting in connection with such activities. In the absence of such personnel, there would also be unquantifiable costs associated with the absence of construction site security to protect the Government from potential liabilities on the construction sites and to preserve Government construction assets already onsite;

b. Five Border District, 284 Program, personnel, comprised of one program manager and four project managers, would ensure the El Centro A and San Diego A (Segments 1 and 3) projects comply with suspension or termination requirements, and would be prepared to facilitate either the reactivation or termination of the projects;

c. One Border District contract specialist would monitor acquisition activities that have been interrupted to avoid or mitigate waste in the procurement process; ensure compliance with suspension or termination requirements; respond to requests for information from the contractor; and perform Resident Management System[2] reporting;

d. One Border District resource manager would resource essential positions; provide oversight of spending to ensure that no funds are expended improperly, including in violation of an injunction; process and reconcile Corps expenses incurred prior to the injunction (e.g., employee labor corrections, travel vouchers, and cardholder charges); and otherwise assure fiscal compliance with the injunction and other relevant laws and regulations;

---

[2] The Resident Management System is a comprehensive system for the expedient and effective management of construction contracts through tracking and documentation of all facets of a contract by Corps of Engineers' field offices and contractors.

5

e.  One Border District auditor would provide auditing oversight to facilitate stewardship of fiscal resources.  This includes personnel needed to comply with any ongoing Department of Defense Inspector General and Government Accountability Office audits; and

f.  One Border District attorney would respond to legal inquiries and otherwise provide legal oversight to ensure compliance with the law, including an injunction.

22.  The Corps would retain at least 17 individuals to perform the above caretaker functions. This is the minimal office and field staff necessary to undertake the above responsibilities. The Border District's temporary duty (TDY) and labor costs would be approximately $74,201.00 per week, or approximately $148,402.00 for each bi-weekly pay period in a calendar year.

23.  The only source of funds available for these demobilization and caretaker activities is the Drug Interdiction and Counter-Drug Activities, Defense account, from which funds are transferred to Operation and Maintenance, Army for execution pursuant to 10 U.S.C. § 284.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

                                                        Executed this 5th Day of October, 2020.

                                                        Antoinette R. Gant
                                                        Colonel, U.S. Army
                                                        Commanding