UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MANZANITA BAND OF THE KUMEYAAY NATION,** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **CHAD WOLF,** *et al.*, <br><br> Defendants. | Case No. 1:20-cv-02712 (TNM) |

## MEMORANDUM OPINION

This case is about whether the Government can build the border wall on federal land notwithstanding concerns that Native American gravesites may be disturbed in the process. Plaintiffs are affiliated with the Kumeyaay Nation. They seek an expedited preliminary injunction to halt construction of two barrier projects along the U.S.-Mexico border in California. The Government argues that Kumeyaay religious or cultural materials have yet to be identified within the construction sites and that there are protocols in place to avoid or mitigate any potential harm in the future. A preliminary injunction is an extraordinary remedy that demands a clear showing of imminent harm that is both certain and great. Plaintiffs have not met this high standard. So the Court will deny their motion for expedited injunctive relief.

**I.**

Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") grants broad authority to Defendants Department of Homeland Security ("DHS") and U.S. Customs and Border Patrol ("CBP") to build "border barrier infrastructure along the southern border." Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. ("Defs.' Opp'n") at 12, ECF No.

1

16.[1]  The IIRIRA's statutory scheme reflects congressional intent to ensure that construction proceeds expeditiously, unimpeded by litigation that has historically beset such projects. *See Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 239 (D.D.C. 2019) (concluding it was "crystal clear that Congress intended to eliminate litigation that would delay the expeditious construction of border security infrastructure, to the fullest extent possible, *i.e.*, to the extent constitutionally allowed." (cleaned up)).  It authorizes the DHS Secretary to "waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary." IIRIRA § 102(c)(1).

There also is limited judicial review of these waivers.  A federal court can only consider a cause or claim arising from the waiver based on a constitutional violation. *Id.* § 102(c)(2)(A). And a claim must be brought within sixty days of the waiver. *Id.* § 102(c)(2)(B).  Even for these constitutional challenges, the IIRIRA only provides a limited right of appeal.  Any final or interlocutory decision on these waivers "may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States." *Id.* § 102(c)(2)(C).

Invoking the IIRIRA, DHS and other government agencies have set out to construct barrier projects at different locations along the U.S.-Mexico border. *See* Defs.' Opp'n at 14. This has prompted litigation all over the country as various entities and individuals seek to halt construction for different reasons, and with mixed results.  Last year, the Supreme Court stayed an injunction issued against border barrier construction. *See Trump v. Sierra Club*, 140 S. Ct. 1 (2019).  And it recently declined to lift that stay. *See Trump v. Sierra Club*, 140 S. Ct. 2620 (2020).  Since the Supreme Court's initial stay decision, other courts have denied or stayed injunctions halting construction of different border barrier projects. *See* Defs.' Opp'n at 48

---

[1]  All page citations refer to the page numbers that the CM/ECF system generates.

(citing cases). This includes a district court that last month considered and denied a similar preliminary injunction request brought by another Indian tribe of the Kumeyaay Nation involving the same barrier projects. *See id*. Ex. 1, ECF No. 48-1.

Construction of the barrier projects at issue here is taking place on a narrow strip of federal land that parallels the U.S.-Mexico border in San Diego and Imperial Counties, California (collectively, the "Projects"). Compl. for Decl. & Inj. Relief ("Compl.") ¶ 51, ECF No. 1; Decl. of Paul Enriquez ("Enriquez Decl.") ¶ 11, ECF No. 16-5. In these areas, "CBP has long had a border security presence." Enriquez Decl. ¶ 18. Most of the construction—fourteen of the twenty miles—will replace existing fencing. *Id*. ¶¶ 14, 17. And the Projects are located within an area that "functions primarily as a law enforcement zone." *Id*. ¶ 11. DHS identified the Projects as drug-smuggling corridors. Defs.' Opp'n at 15.

Exercising the authority under the IIRIRA, Defendant Chad Wolf purported to waive various federal laws that would otherwise apply to construction of the Projects.[2] *See* Compl. ¶¶ 52, 54; Enriquez Decl. ¶¶ 12, 15. In effect then, construction proceeded with the understanding that these federal laws do not apply to the Projects. Mot. for TRO & Prelim. Inj. ("Pls.' Mot.") at 15, ECF No. 7.

Plaintiffs are affiliated with the Kumeyaay Nation, which consists of thirteen federally recognized Indian tribes with reservations in southern California. Compl. ¶ 1. They include five tribes of the Kumeyaay Nation, a tribe member, and the Kumeyaay Heritage Preservation Council (collectively, the "Kumeyaay"). *Id*. ¶¶ 6–13. Generations of Kumeyaay members have

---

[2] Waived statutes included the Administrative Procedure Act, the Endangered Species Act, the National Environmental Policy Act, the National Historic Preservation Act, the Native American Graves Protection and Repatriation Act, and the American Indian Religious Freedom Act. *See* Compl. ¶¶ 52, 54.

practiced their religion and culture in the United States and Mexico. Pls.' Mot. at 17. This requires "access to, and the availability of, the sacred sites, mountains, trails, landscape, and cultural and natural resources in the region." *Id.* at 21.

The Kumeyaay consider the treatment of human remains sacred to their religious beliefs. *Id.* at 17. They believe that "a person's soul cannot rest in the afterlife if the remains are disturbed, or if parts of the body of the deceased are separated after death." *Id.* In the event of disinterment or separation from the body, the Kumeyaay "engage in religious ceremonies to restore peace to the souls of the dead." *Id.* According to the Kumeyaay, their religious and cultural practices are now at risk.

The Kumeyaay claim that the land for the Projects contains "numerous sites of longstanding, documented, and continuing cultural and religious importance to the Kumeyaay people." *Id.* They allege that while the construction "involves substantial ground-disturbing activities," the Government has not established sufficient consultation and mitigation procedures to protect their religion and culture. Compl. ¶¶ 91, 93. To the Kumeyaay, discovery of burial sites and human remains is "inevitable." Pls.' Mot. at 22. And they cannot conduct "the ceremonies necessary to rest the souls of the deceased in peace." *Id.*

The Kumeyaay filed a Complaint against DHS, the CBP, the U.S. Army Corps of Engineers, and several individuals within these agencies in their official capacities (collectively, the "Government"). Compl. ¶¶ 14–19. They raise claims under the Religious Freedom Restoration Act of 1993 ("RFRA"), the First Amendment, and the federal laws Wolf purported to waive. *See id*. ¶¶ 146–84. The Kumeyaay seek declaratory relief and an injunction barring more construction activity until the Government satisfies its consultation and statutory obligations. *Id.* at 65–67.

Two days after filing the Complaint, the Kumeyaay moved separately for a temporary restraining order and preliminary injunction repeating their request to halt construction of the Projects until adequate consultation and review procedures can be established.[3] *See* Pls.' Mot. The parties completed briefing on this motion, and the Court held a hearing. The motion is now ripe.

## II.

Preliminary injunctions are both "extraordinary and drastic." *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (cleaned up). They are "never awarded as of right." *Id.* at 690. And they "should not work to give a party essentially the full relief he seeks on the merits." *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 n.13 (D.C. Cir. 1969) (per curiam). Preliminary injunctions are reserved for situations when "it is manifest that the normal legal avenues are inadequate." *Id.* at 1174.

To secure a preliminary injunction, the moving party "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). And it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22.

Irreparable harm has "always" served as the "basis of injunctive relief in the federal courts." *Sampson v. Murray*, 415 U.S. 61, 88 (1974) (cleaned up). So the D.C. Circuit "has set a high standard." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The alleged injury "must be both certain and great; it must be actual and not theoretical."

---

[3] During an initial scheduling hearing, the Kumeyaay agreed that the Court should construe their motion as a request for an expedited preliminary injunction under Local Civil Rule 65.1(d). *See* Min. Entry (Sept. 25, 2020).

*Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). And it must be "of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (cleaned up) (emphasis in original).

Indeed, failure to establish irreparable harm dooms a preliminary injunction, even if the other three factors favor relief. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. If there is no irreparable harm, a court need not consider the remaining factors. *See CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995) (declining to consider the remaining factors because the plaintiff "has made no showing of irreparable injury here").

A court can grant a preliminary injunction "based on less formal procedures and on less extensive evidence than in a trial on the merits, but if there are genuine issues of material fact raised in opposition to a motion for a preliminary injunction, an evidentiary hearing is required." *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004) (cleaned up). Neither the Kumeyaay nor the Government asked the Court to resolve any factual disputes through an evidentiary hearing. And the Court finds no such hearing is needed because any factual dispute is not material to this motion.

### III.

As the impetus for injunctive relief, the Court starts its analysis with the irreparable harm factor. And that is where it will end. The Court need not review the other three factors because the Kumeyaay fail to make out a certain, great, and imminent injury in the absence of a preliminary injunction. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016).

The Kumeyaay raise three theories of irreparable harm: destruction of Kumeyaay culture and religion, lack of access to the Projects, and injury to their procedural rights. None holds water.

6

**A.**

The Kumeyaay's principal claim of injury is this: So long as construction at the Projects continues without proper consultation and mitigation measures, it will "unavoidably damage" cultural and religious sites and artifacts, as well as the natural setting and resources "on which the sacred nature of such sites depends." Pls.' Mot. at 50. The Court does not doubt the significance of the region to the Kumeyaay's religion. But they have not made a clear showing to support their contention for any of these alleged harms.

**1.**

For starters, no Kumeyaay burial sites or remains have been identified within the narrow strip of federal land where construction is taking place, even after the Government surveyed and re-surveyed the land. *See* Enriquez Decl. ¶¶ 47, 51, 84; Tr. of Mot. for TRO ("Hr'g Tr.") 51:19–20, ECF No. 22 ("[N]o human remains were found during any of that work."). The Kumeyaay instead base a likelihood of irreparable harm on evidence found *near* the Projects. This includes the discovery of two human remains.[4] *See* Pls.' Mot. at 22. One object was found twenty miles west of the project in San Diego and another was found south of the project, possibly in Mexico.[5] Enriquez Decl. ¶¶ 43, 89.

---

[4] The CBP also received an initial report of a human bone later found to be PVC piping. Enriquez Decl. ¶ 86.

[5] The Government contends the bone was in Mexico, but the Kumeyaay claim the bone was within the United States but outside the project in San Diego. *Compare* Enriquez Decl. ¶ 43, *with* Decl. of Richard Carrico ("Carrico Decl.") ¶ 30, ECF No.7-5. The Court need not resolve this dispute because it is not material. Both parties agree the bone was located outside the Projects. *See* Hr'g Tr. 36:16–19 (confirming agreement that human remains were found south of the project in San Diego).

This evidence is insufficient on its own to establish actual, imminent injury. The Kumeyaay rely on these discoveries to show that it is "extremely likely" similar materials are located within the Projects' construction zones.[6] *See* Pls.' Reply in Supp. of Mot. for Prelim. Inj. ("Pls.' Reply") at 18, ECF No. 18. To support their conclusion, the Kumeyaay provide declarations from Richard Carrico, a "well-recognized authority on southern California Native Americans," and Angela Elliott Santos, the Chairwoman of Plaintiff Manzanita Band. *See* Carrico Decl. ¶ 6; Decl. of Angela Elliott Santos ("Santos Decl.") ¶ 2, ECF No. 7-2. The Court is unconvinced.

Carrico provides examples of village sites "in the border region of California that have produced burials," including "most of the village sites excavated in San Diego county." Carrico Decl. ¶ 28. He thus concludes that it "would be *reasonable* . . . that human remains would be associated with the large village complexes *near* Campo and Jacumba." Carrico Decl. ¶ 29 (emphasis added). Two holes sink this evidence. Carrico fails to link his conclusion to the Projects. He broadly refers to complexes *near* Campo and Jacumba, but the Court is left to speculate whether the Projects' construction zones fall within either area. Indeed, the Government submits evidence showing that the construction zones are outside both Campo and Jacumba. *See* Enriquez Decl. ¶ 100; *id.* Ex. A. And even if Carrico's conclusions do apply to the Projects, he speaks only to the *origin* of human remains, not the likelihood remains will be found within the construction zones.

---

[6] A declaration from Lisa Haws, the Tribal Historic Preservation Officer and Tribal Administrator for Plaintiff Manzanita Band, mentions that various objects were discovered during a July 2020 site visit. *See* Decl. of Lisa Haws ("Haws Decl.") ¶ 18, ECF No. 7-4. This statement, even if true, leaves several questions open for speculation. Was the "probable human bone" confirmed to be such? Do the objects belong to the Kumeyaay? Were these discoveries raised with the Government? If so, how did the Government respond? Without this information, the Kumeyaay cannot rely on this discovery as a basis for their irreparable harm claim.

Chairwoman Santos states that she "repeatedly cautioned CBP that there are cultural resources *near* the border" and "important facts were discovered 25 feet below ground *close* to the border." Santos Decl. ¶ 14 (emphasis added). This evidence only confirms what is already known: Potential Kumeyaay resources were identified outside the Projects' construction zones. But the fact remains that the Government has found no Kumeyaay remains within the Projects. *See* Enriquez Decl. ¶ 84.

Even if human remains or other artifacts are likely to be found within the Projects— which the Kumeyaay have not clearly established on this record—their irreparable harm theory is undermined by Government measures in place to avoid and mitigate any harm to their religion and culture. *Cf. Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 454 (1988) ("It is worth emphasizing . . . that the Government has taken numerous steps in this very case to minimize the impact that construction of the [] road will have on the Indians' religious activities."). The Government conducted surveys and re-surveys of the areas at the Kumeyaay's request, with Kumeyaay cultural monitors present. Hr'g Tr. 51:13–19 ("CBP has reviewed survey data, they did record searches, they conducted new surveys in advance of this construction in 2020. And at plaintiffs' request, through the consultation process, they re-surveyed specific areas requested by plaintiffs that were likely to have cultural items; and they did so with the tribal cultural monitors present."); Enriquez Decl. ¶¶ 20, 51.

As the Kumeyaay admit, "CBP hosted a number of conference calls with the Tribes about the border construction project . . . in July, August, and September 2020, and in which it provided information about their cultural surveying efforts and monitoring in San Diego." Santos Decl. ¶ 13; *see also* Enriquez Decl. ¶ 50 (describing "what has become a recurring,

biweekly call with the Kumeyaay Tribes, including Plaintiffs"). A coordination meeting between the Kumeyaay and Government took place just last month. *See* Haws Decl. ¶ 21.

The Government also has committed to a protocol establishing procedures for the "avoidance, treatment, curation, and repatriation of cultural resources." Enriquez Decl. ¶¶ 52, 60. Under the protocol, the Government will try to avoid "areas where resources are found" and will leave those resources in place "wherever possible." *Id.* ¶ 52. If the Government cannot avoid a resource, the protocol requires it to immediately halt construction within 100 feet of the resource "until it can be treated appropriately." *Id.* This may include "culturally appropriate repatriation efforts to address the discovery" within 48 hours. *Id.*

There is already concrete evidence of these efforts. When surveys identified two archeological sites at the project in Imperial County, the Government "took steps to ensure that the sites would not be impacted." *Id.* ¶ 26. It realigned an access road and required a construction contractor to find a new location for a proposed well site to avoid the archeological site. *Id.* In another instance, a re-survey identified "the presence of known and previously un-identified individual resources or 'isolates.'" *Id.* ¶ 47. These isolates were not eligible for listing on the National Register, but the CBP shared the survey results with the Kumeyaay and consulted with them before agreeing to "various protection measures."[7] *Id.* ¶¶ 47–51, 56–57. This led to flagging the isolates and creating a buffer zone "to ensure that they were not disturbed during construction activities." *Id.* ¶ 50.

---

[7] According to the Government, this re-survey, like the earlier surveys, "did not reveal the presence of cultural sites or artifacts that would be eligible for listing on the National Register of Historic Places." Enriquez Decl. ¶ 47.

To be sure, the Kumeyaay argue that the Government's measures are insufficient. *See* Pls.' Mot. at 53 n.14; Santos Decl. ¶ 13; Haws Decl. ¶ 25. But this is a question best left for the merits stage of the case.[8] For now, the mitigation efforts in place undermine the Kumeyaay's burden to establish both irreparable and imminent harm, especially given their own evidentiary shortcomings. *Accord Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 36 (D.D.C. 2016) (denying Indian tribe's request for preliminary injunction of oil pipeline construction near reservation in part because the construction was subject to restrictions "that make it unlikely that construction will damage or destroy sites of cultural significance to the Tribe"); *Macht v. Skinner*, 715 F. Supp. 1131, 1137 (D.D.C.), *aff'd*, 889 F.2d 291 (D.C. Cir. 1989) ("[I]n balancing the equities in this case, it is appropriate for the Court to consider the attempts at mitigation[.]").

Judge Boasberg recently considered a similar preliminary injunction request in *Eastern Band of Cherokee Indians v. U.S. Department of Interior*, Civil Action No. 20-757 (JEB), 2020 WL 2079443 (D.D.C. April 30, 2020). There, a tribe sought a preliminary injunction to halt the transfer of land for the construction of a casino. *Id.* They claimed that without an injunction they would lose their statutory consultation rights and any "cultural patrimony and/or human remains" found on site. *Id.* at *4 (cleaned up).

Judge Boasberg denied the request. He noted that the site was a "highly disturbed area that has been used for multiple purposes." *Id.* at *6 (cleaned up). There also was no evidence that "places the cultural relics on the proposed gaming site itself" or that "any of those items belonged to the Cherokee." *Id.* at *5. The government agency's searches of "historical and

---

[8] All of the Kumeyaay's statutory claims, except RFRA, challenge the adequacy of consultation and protective measures currently in place. *See* Compl. ¶¶ 146–53, 162–80.

11

archeological literature, as well as the National Register of Historic Properties," did not identify any "eligible or potentially eligible historic properties or paleontological resources." *Id.* at \*6 (cleaned up). Even if historical artifacts did exist on site, he found that the builders agreed to "use certain best practices and undertake enumerated mitigation measures so that the proposed complex would have a less than significant impact across several environmental measures." *Id.* (cleaned up). Judge Boasberg reasoned that since there was "no evidence of Cherokee artifacts and the land has already been substantially disturbed by state construction activities, the plan suffices to greatly reduce the imminence of injury." *Id.* at \*7.

So too here. The Projects are located "within a narrow construction corridor on federal land that parallels the international border, most of which is previously disturbed." Defs.' Opp'n at 50. Most of the construction—fourteen of the twenty miles—will replace fencing that already exists, and the areas function as a law enforcement zone. Enriquez Decl. ¶¶ 11–17. No Kumeyaay artifacts or remains have been discovered within the Projects' construction zones, despite the Government's surveys and re-surveys. *See id.* ¶ 84; Hr'g Tr. 51:13–20. So the Court cannot say with any confidence that the Kumeyaay certainly face injury at all. More, there are measures in place to mitigate any potential harm if materials are discovered, as the Government has already shown with its treatment of remains found near the Projects. *See* Enriquez Decl. ¶ 87 (stating the Government did not prevent the Kumeyaay from crossing the U.S.-Mexico border to retrieve the human remain discovered so that it could be appropriately relocated).

**2.**

The Court need only briefly address the Kumeyaay's argument that the Projects will inflict irreparable harm on "nearby sacred sites used by tribal members and the natural resources on which those sacred sites depend." Pls.' Reply at 26. This includes Tecate Peak, Boundary

12

Mountain, Jacumba Valley and Hot Springs, Table Mountain, the Yuha Basin, and the trail system the Kumeyaay use to link their villages to each other and the sacred sites.  *See* Pls.' Mot. at 17–21.  The area surrounding the Projects is no doubt significant to the Kumeyaay's practices.  *See* Decl. of John Elliott ("Elliott Decl.") ¶¶ 4–11, ECF No. 7-3; *see also* Carrico Decl. ¶¶ 14–19, 24–25.

These harms, however, run headlong into a critical feature of the construction:  it takes place only on federal land.  Enriquez Decl. ¶ 11.  In the context of the First Amendment, the Supreme Court has declined to enforce a permanent injunction barring government construction on federal land that would have "devastating effects on traditional Indian religious practices." *Lyng*, 485 U.S. at 451.  The Court reasoned that the "Constitution does not, and courts cannot, offer to reconcile the various competing demands on government, many of them rooted in sincere religious belief, that inevitably arise in so diverse a society as ours."  *Id.* at 452.  It found that "government simply could not operate if it were required to satisfy every citizen's religious needs and desires."  *Id.*  Thus, the Court held, "[w]hatever rights the Indians may have to the use of the area . . . those rights do not divest the Government of its right to use what is, after all, *its* land."  *Id.* at 453 (emphasis in original).

The Court reserves the merits of the Kumeyaay's First Amendment and RFRA claims for a later time.  But *Lyng* is instructive regarding the Kumeyaay's claimed harms to the surrounding sites.  As in *Lyng*, construction for the Projects is on a narrow strip of federal land that serves as a law enforcement zone and will largely replace fencing that has been in place for at least ten years.  Enriquez Decl. ¶¶ 11, 102.  Through the lens of *Lyng* then, damage to the surrounding areas—even those integral to the Kumeyaay religion and culture—that is incidental to the Government's use of its own land fails to meet the heightened standard for irreparable harm.

The record also does not support a clear showing that these sites will suffer actual damage. The Kumeyaay only cite Mr. Elliott's concerns and fears about the Projects' effect on the sacred sites, not any evidence that injuries are likely to occur. *See* Elliott Decl. ¶¶ 9, 12, 17, 19. While sincere, Mr. Elliott's sentiments do not meet the required showing for a preliminary injunction. *See Wis. Gas Co.*, 758 F.2d at 674 ("Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time." (cleaned up)). And they are unsupported by the rest of the evidence. Tecate Peak is located seven miles northwest of the project in San Diego, and the Government represents that construction will not affect it or Kumeyaay members' access to it. Enriquez Decl. ¶ 91. The Government makes similar representations for Boundary Mountain, Jacumba Valley and Hot Springs, and Table Mountain. *Id.* ¶¶ 92–93. The Kumeyaay also will retain their use of any historical trails, as the construction "will not alter their orientation on the landscape."[9] *Id.* ¶ 96.

In short, the Kumeyaay have not made a clear showing of imminent, irreparable harm to their culture and religion.

**B.**

Next, the Kumeyaay claim that their access to the Projects has been "limited." Pls.' Mot. at 52. This, they argue, inflicts harm in two ways. The Kumeyaay cannot advise the Government of "*possible* damage to sites or of the import of sites, artifacts, or remains that earthmoving uncovers." *Id.* (emphasis added). It also "blocks their ability to engage in religious ceremonies, which directly infringes on their ability to worship in violation of the Free Exercise Clause and substantially burdens their religious exercise in violation of RFRA." *Id.* at 54.

---

[9] The Government offers similar evidence for the migration of the bighorn sheep, which "will continue to be able to use known movement corridors it has relied on historically for such movement." Enriquez Decl. ¶ 105.

These harms, however, are only as strong as their foundation. And the foundation is quicksand. The Kumeyaay cite no instance in which the Government has barred their members from the Projects. They instead describe a single incident in which there was "much intense discussion and argument" as several members sought access to the Projects. *See* Elliot Decl. ¶ 16. But as the Kumeyaay concede, the members could enter. *Id.* So there is insufficient evidence that the Kumeyaay's "First Amendment interests are either threatened or in fact being impaired at the time relief is sought." *Nat'l Treasury Emps. Union v. United States*, 927 F.2d 1253, 1254 (D.C. Cir. 1991) (cleaned up). The Government contends that the "CBP does not prevent or interfere with individuals who access these areas to observe construction, recreate, pray, or hold religious ceremonies so long as the activities do not pose an immediate threat to border security or public safety." Enriquez Decl. ¶ 101. And the Kumeyaay have not shown otherwise.[10]

The record also does not show that the Government has prevented the Kumeyaay from advising on "possible damages" to sites or artifacts. As of now, the CBP funds at least three tribal cultural monitors.[11] *See* Pls.' Mot. at 53. And there are "no limits on where tribal cultural monitors can observe construction activity" within the Projects. Enriquez Decl. ¶ 70. The Kumeyaay argue that more monitors are needed. *See* Pls.' Mot. at 53; Haws Decl. ¶¶ 18, 25e–h.

---

[10] During the motion hearing, counsel for the Kumeyaay admitted that the Projects were not places where the Kumeyaay conduct religious ceremonies regularly. Hr'g Tr. 32:3–8. Their concern is that Kumeyaay ceremonies "would need to take place because the bodies are being harmed or dug or separated." *Id.* But as of now, no evidence of human remains has been found at the Projects. Enriquez Decl. ¶ 84; Hr'g Tr. 50:21–51:9.

[11] The parties appear to dispute the number of tribal cultural monitors present at the Projects. The Government contends there are six total monitors, four at the project in San Diego and two for the project in Imperial County. *See* Defs.' Opp'n at 53. The Court need not resolve this factual dispute because it is not material. *See Cobell*, 391 F.3d at 261. Regardless of the number, the presence of these monitors weighs against a finding of irreparable harm.

Perhaps. But the Government has invited the Kumeyaay to employ their own monitors for the Projects, which they have declined to do. Enriquez Decl. ¶ 70. To be sure, the Kumeyaay are under no legal obligation to provide monitors. Their decision not to do so, however, weakens their claim that they cannot oversee construction activities to mitigate potential damage.

The court reached a similar conclusion in *Standing Rock Sioux Tribe*. 205 F. Supp. 3d at 4. In that case, an Indian tribe moved for a preliminary injunction to prevent permitting of an oil pipeline near the tribe's reservation. The court denied the motion in part because the tribe had declined the Army Corps' invitation to "visit the sites or even conduct its own surveys." *Id.* at 36. As the court reasoned, the tribe could not then argue "that there would be a likely injury at these places by claiming that it was prevented from assessing these sites." *Id.*

The facts here warrant the same result. At least at this preliminary stage, the purported harms stemming from lack of access are theoretical, not actual. *See Wis. Gas Co.*, 758 F.2d at 674.

## C.

Finally, the Kumeyaay suggest that the Government has stripped them of their procedural rights, which they claim "is itself an irreparable harm." *See* Pls.' Mot. at 54. They appear to rely on their right to consultation under the IIRIRA and the federal statutes Wolf purported to waive. *See id.* at 51. The Court disagrees.

The Kumeyaay's alleged injury to their consultation rights—even if undisputed—cannot constitute irreparable harm on its own. *See, e.g.*, *E. Band of Cherokee Indians*, 2020 WL 2079443, at *4 ("A chorus of federal courts . . . has found that procedural injury, standing alone, cannot constitute irreparable harm." (collecting cases)).

The Kumeyaay still must identify a "concrete" and "great" injury that accompanies their alleged procedural injury. *See Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 327 (D.D.C. 2018). They fail to do so. The Kumeyaay claim that lack of consultation prevents them from preserving and protecting their culture and religion. *See* Pls.' Mot. at 53. These are the same injuries already raised, just dressed differently. As the Court explained above, the evidence is insufficient for the Kumeyaay to meet their heightened burden. So it likewise fails here.

More, the Kumeyaay concede that consultation *is* happening. Indeed, their RFRA claim depends on consultation with the Government. *See* Pls.' Mot. at 30–35. And the Government has documented its efforts to consult with the Kumeyaay before and after construction began for these Projects. *See* Defs.' Opp'n at 22–24. The Kumeyaay dispute whether this consultation is sufficient. The Court need not resolve the merits of their challenge now.[12] For now, evidence of consultation undermines the Kumeyaay's ability to establish a clear showing of their procedural injury.

## IV.

On this record, the Court finds no reason to deviate from the clear intent of the IIRIRA to ensure expeditious construction of the barrier projects. The Court acknowledges the Kumeyaay's efforts to preserve their culture and religious practices. But a preliminary injunction is an "extraordinary and drastic remedy." *Munaf*, 553 U.S. at 689.

The evidence shows that construction is proceeding on a narrow strip of federal land. And there are some consultation and protections in place to avoid damage if Kumeyaay cultural and religious resources are discovered within the construction zones, which has yet to occur.

---

[12] For its part, the Government argues that the consultation provision of the IIRIRA—the primary statute that the Kumeyaay rely on—is silent on the scope, extent, or timing of consultation for barrier projects. *See* Defs.' Opp'n at 19–22.

Against this evidence, the Kumeyaay have not made a clear showing that they will suffer imminent, irreparable injury in the absence of an injunction here.  The Court thus declines to consider the other three factors for a preliminary injunction.  It will address the merits in the normal course and the Kumeyaay will be able to pursue their injunctive relief through the claims they raise in their Complaint.  For these reasons, Plaintiffs' motion is denied.


Dated:  October 16, 2020                                  /s/
                                           TREVOR N. McFADDEN, U.S.D.J.